AUSTIN KNUDSEN
Montana Attorney General
KRISTIN HANSEN
  *Lieutenant General*
DAVID M.S. DEWHIRST
  *Solicitor General*
BRENT MEAD
  *Assistant Solicitor General*
ALWYN LANSING
  *Assistant Attorney General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
Phone:  406-444-2026
Fax:  406-444-3549
david.dewhirst@mt.gov
brent.mead2@mt.gov
alwyn.lansing@mt.gov

*Counsel for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| MONTANA MEDICAL ASSOCIATION, et al., Plaintiff, v. AUSTIN KNUDSEN, et al., Defendant. | CV 21-108-M-DWM **DEFENDANTS' REPLY IN SUPPORT OF SECOND MOTION TO DISMISS** |
|---|---|

Defendants Austin Knudsen and Laurie Esau (hereafter "the State") submit this reply in support of their second motion to dismiss.

## INTRODUCTION

"[T]here is no right to practice medicine which is not subordinate to the police power of the States." *Lambert v. Yellowley*, 272 U.S. 581, 596 (1926). Plaintiffs contend their subjective judgment trumps duly enacted state law. Doc. 23, 8 ("This lawsuit is about Plaintiffs' challenge to Defendants' ability to usurp the independent medical judgment of physicians …."). Not so. *See Mont. Cannabis Indus. Ass'n v. State*, 286 P.3d 1161, 1166 (Mont. 2012) ("the right to seek health is circumscribed by the State's police power to protect the public's health and welfare"); *Wiser v. State*, 129 P.3d 133, 137 (Mont. 2006); *Gonzales v. Carhart*, 550 U.S. 124, 163 (2007) ("The law need not give [] doctors unfettered choice in the course of their medical practice."); *Mazurek v. Armstrong*, 520 U.S. 968, 973 (1997) ("[T]he Constitution gives the States broad latitude" in designing regulations on healthcare providers, even when those providers raise contrary evidence.).

Montana enacted HB 702 to head off growing calls to discriminate based on vaccination status. Doc. 21, 8–10. Antidiscrimination regimes

are a basic exercise of the state's police powers. *See Hurley v. Irish-American Gay*, 515 U.S. 557, 572 (1995); *see also Bond v. United States*, 572 U.S. 844, 854 (2014) ("The States have broad authority to enact legislation for the public good—what we have often called a 'police power.'"). States may, through statutory schemes, grant protections to groups beyond those groups protected under the federal constitution. *See Romer v. Evans*, 517 U.S. 620, 628–29 (1996). Medical providers, including Plaintiffs, must abide by the State's proper authority to combat discrimination.

## ARGUMENT

Plaintiffs fail to meet the pleading standards of *Ashcroft v. Iqbal*, 556 U.S. 662, 679 (2009). Because they offer nothing more than naked assertions, legal conclusions, and policy arguments, the complaint should be dismissed.

Additionally, the Court may take judicial notice of matters of public record. *See Culinary Studios, Inc. v. Newsom*, 517 F. Supp. 3d 1042, 1057 (E.D. Cal. 2021) citing Fed. R. Evid. 201(b) (Judicial notice is appropriate when a fact "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned."). Public records may

include "government documents, court filings, press releases, and undisputed matters of public record." *Dehoog v. Anheuser-Busch InBev SA/NV*, 899 F.3d 758, 763 n.5 (9th Cir. 2018). The State asks the Court to take judicial notice of documents available on government websites, news articles, or statements by the Plaintiffs. Doc. 21, 11. These records merely point out that Plaintiffs failed to plead sufficient factual allegations—scientific or otherwise—to support their claims. Even if the Court excluded these records, the Plaintiffs carry the burden of adequately pleading their claims. Rather than support their allegations with sufficient facts, Plaintiffs rely on unsubstantiated claims to create imagined harms arising from HB 702.

## I. Plaintiffs fail to plead sufficient facts establishing standing

Article III requires plaintiffs establish they personally have (1) suffered an actual or threatened injury; (2) fairly traceable to the defendant; (3) and redressable by a favorable decision. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560–61 (1992); Doc. 21, 12–13.

Plaintiffs tacitly acknowledge they lack standing. Doc. 23, 18 ("Even if this Court should find some Plaintiffs lack standing to assert some of the claims, Plaintiffs as a group have standing to sue.").

Plaintiffs misapply *Leonard v. Clark*, 12 F.3d 885, 889 (9th Cir. 1993) to support this claim. But *Leonard* only stands for allowing an organization to continue a suit when *some* of its individual members lacked standing. *Id.* at 888–89. *Leonard* doesn't allow a plaintiff to continue in an action when that plaintiff lacks standing.

Fatally, Plaintiffs cannot rebut the State's argument that they currently provide the level of care they complain HB 702 will impair. So they cannot demonstrate injury. Doc. 23, 15. The State repeatedly stressed that—presumably—the Plaintiffs currently comply with HB 702, and have complied with the law for six months, while providing effective and ethical medical care. Doc. 21, 15–19. One way they do so is by using various safety protocols. Doc. 21, 18 n.9. These protocols will remain necessary, first, because vaccination doesn't obviate the need for them. Doc. 21, 27–28. Vaccination alone doesn't prevent an individual from contracting or transmitting a disease. Doc. 21, 17 n.8. Second, Plaintiffs will continue to treat nonvaccinated individuals. So even if Plaintiffs could force all their employees to vaccinate, unvaccinated individuals will continue to visit their facilities, and the safety protocols will remain in place. Plaintiffs currently provide adequate care and their

safety protocols will remain unchanged regardless of HB 702; their claimed injury, therefore, doesn't exist.

Plaintiffs instead attempt to subtly shift their injury argument: HB 702 harms them by preventing them from determining an individual's *immunity* status.[1]  Doc. 23, 11.  But in their complaint, Plaintiffs' only theory of injury is their inability to terminate those employees they cannot force to vaccinate.  *See e.g.* Doc. 14, ¶ 18.  If Plaintiffs are okay with unvaccinated, but immune, workers treating patients then they fail to plead those facts.  More importantly, Plaintiffs acknowledge vaccination status doesn't necessarily cause injury, which renders their complained injury conjectural and hypothetical.[2]

Plaintiffs also assert new harms by hypothesizing local vaccine-preventable disease outbreaks that occurred prior to HB 702 are traceable to HB 702.  Doc. 23, 13.  HB 702 cannot cause events prior to its existence.

Unsubstantiated "exposure to legal liability" doesn't constitute cognizable injury.  Doc. 23, 15.  Absent some nonspeculative basis that the

---

[1] But Plaintiffs don't stick with this new argument.  They later claim that the only reasonable accommodation available to an immunocompromised patient is treatment from a vaccinated worker.  Doc. 23 at 20–21.

[2] Importantly, it is commonly accepted that positive titers may substitute for vaccination, even when vaccines are required.  *See* Mont. Admin. R. § 37.114.703(3)(d).

Plaintiffs actually face a threat of liability, these bare assertions are insufficient. *See Montanans for Cmty. Dev. v. Mangan*, 735 Fed. App'x. 280, 282 (9th Cir. 2018). Plaintiffs must plead real harms, not imagined ones. Doc. 21, 25.

The Appleby individuals merely repeat the unsupported allegations in the complaint. Doc. 23, 17. And those allegations suffer from the same deficiencies: the Appleby individuals' alleged injuries would persist even without HB 702 because they cannot risk exposure to *anyone* who may carry an infectious disease. Doc. 14, ¶ 24; Doc. 21, 20. Even if the backroom bookkeeper at the doctor's office was vaccinated, the Appleby individuals would have to reckon with unvaccinated fellow patients, grocery store patrons, and thousands of others who have decided against vaccination. And, importantly, both vaccinated and unvaccinated individuals may spread disease. Doc. 21, 17 n.8. The seriousness of their conditions will cause them to take precautions regardless of HB 702. Doc. 21, 20–21.

In sum, no Plaintiff sufficiently alleges cognizable injuries. Doc. 21, 11–22. The Court should dismiss the complaint for lack of subject matter jurisdiction.

## II. Plaintiffs fail to state any viable legal claim.

Plaintiffs' response fails to strengthen the Amended Complaint's conclusory and unfounded allegations.   This Court should accordingly dismiss the complaint under Fed. R. Civ. P. 12(b)(6).   *See Ashcroft*, 556 U.S. at 678.

### A. Neither the ADA nor OSHA preempt HB 702

When it comes to preemption, the million-dollar question is whether Congress clearly and unambiguously preempted the state law. Doc. 21, 24.   Plaintiffs must either demonstrate an impossibility of compliance with both federal and state law, or meet the high threshold required by obstacle preemption.   *Id.; see also Monarch Content Mgmt. LLC v. Ariz. Dep't of Gaming*, 971 F.3d 1021, 1028 (9th Cir. 2020) (Obstacle preemption starts from the premise that Congress intended to leave intact state police powers.).

#### 1. *ADA*

Without any factual basis, Plaintiffs assert HB 702 "requires providers to ignore their mandate" under the Americans with Disabilities Act ("ADA").   Doc. 23, 23.   If true, this would be a stunning admission of current non-compliance with federal law—because, of course, HB 702 has been the law for many months.   But Plaintiffs never allege they are out

of compliance with the ADA.  Doc. 23, 15 ("The Providers will continue to provide appropriate medical care within established standards of care."); *see also* Doc. 21, 16 n.5.  If Plaintiffs cannot argue they are currently violating the ADA, they cannot argue that HB 702 irreconcilably conflicts with it.

Plaintiffs assert the ADA requires patients with immunocompromised systems be treated only by vaccinated medical workers.  Doc. 23, 20–21 ("patients with compromised immune systems, comorbidities, or extraordinary sensitivity to vaccine-preventable diseases require individualized treatment from vaccinated individuals").  But Plaintiffs don't cite the text of the ADA, or any regulation, to support this conclusion.

Plaintiffs claim hospitals cannot avail themselves of HB 702's reasonable accommodation provisions if an employee doesn't volunteer their vaccination status.  Doc. 23, 23.  Plaintiffs need to read the statute.  MCA § 49-2-312(3)(b) ("A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility …").  HB 702 allows hospitals to treat non-answers as if the employee is unvaccinated and implement reasonable accommodations accordingly.

Plaintiffs further misread the healthcare facility exception to limit the scope of permissible reasonable accommodations to apply only to unvaccinated employees.  Doc. 23, 23.  But the text of the statute provides vaccination status may be used to determine whether "the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases."  MCA § 49-2-312(3)(b)(i). By its plain language, HB 702 allows for reasonable accommodations to protect the "safety and health" of "patients," in line with the ADA.

Plaintiffs cite inapposite out-of-circuit decisions to argue antidiscrimination laws like HB 702 run afoul of the ADA.  Doc. 23, 23–24 citing *Mary Jo C. v. N.Y. State and Local Ret. Sys.*, 707 F.3d 144, 164 (2nd Cir. 2013) (preempting a state law filing deadline when plaintiff missed deadline on account of a disability); Memo. Op., *E.T., et al. v. Morath, et al.*, No. 1:21-CV-717- LY, Doc. 82, 14 (W.D. Tex. Nov. 10, 2021) (Holding the ADA preempts a state ban on school mask mandates.);[3] *Crowder v. Kitagawa*, 81 F.3d 1480, 1484 (9th Cir. 1996) (holding a state quarantine of

---

[3] Texas's Executive Order GA-39 banning COVID-19 vaccine mandates remains in effect.  *In re Texas*, No. 21-0873 (Tex. Oct. 14, 2021).

dogs to protect against rabies violated visually impaired plaintiffs' rights under the ADA).  Here, Plaintiffs argue the ADA preempts HB 702—even though they're currently providing reasonable accommodations required by the ADA—because those accommodations might be easier if HB 702 didn't exist.  Doc. 21, 25–26.  Plaintiffs fail to cite any authority suggesting the ADA requires violation of an employee's medical autonomy to reasonably accommodate someone else.

### 2. OSHA

Plaintiffs' response simply rehashes their Amended Complaint's conclusory and unsupported arguments that the Occupational Safety and Health Act (OSHA) requires healthcare employers to discriminate based on vaccination status.  Doc. 23, 25–26.  Nothing in OSHA or the OSHA regulations mandates vaccination.  Doc. 21, 27–31.

Plaintiffs again claim, without any supporting authority, that various diseases including COVID-19 constitute "recognized hazards" redressable only via mandatory vaccination.  Doc. 23, 25; Doc. 14, ¶ 47. OSHA does regulate certain diseases as hazards, but no regulation cited by Plaintiffs requires vaccination.  *See* 29 C.F.R. § 1910.502 (COVID-19 protocols).  Other similar OSHA regulations also implement an optional

vaccination scheme.  *See* 29 C.F.R. § 1910.1030(f)(2)(iii) ("If the employee initially declines hepatitis B vaccination but at a later date while still covered under the standard decides to accept the vaccination, the employer shall make available hepatitis B vaccination at that time.").  HB 702 operates in concert—not conflict—with OSHA, by allowing employers to offer and recommend vaccinations.  Doc. 21, 29.

The State previously argued 29 C.F.R. § 1910.502 only recommends, but doesn't require, COVID-19 vaccination.   Doc. 21, 28–29.  Plaintiffs restate their incorrect interpretation of the rule and compound their mistake by claiming the rule must preempt HB 702 because HB 702 denies them the ability to "avail itself of the exemptions" in the rule.  Doc. 23, 26.  Denial of an exemption doesn't render compliance impossible.  And if OSHA's existing regulations required COVID-19 vaccinations then OSHA wouldn't have needed to issue an Emergency Temporary Standard which was immediately enjoined by the Fifth Circuit.  *See BST Holdings, L.L.C. v. OSHA*, 2021 U.S. App. LEXIS 33698 (5th Cir. 2021).

Finally, Plaintiffs state that HB 702 "frustrates OSHA's clear and unambiguous objective of preventing transmission of communicable disease."  Doc. 23, 26.  The only support offered cites a case about mask

mandates, not vaccines, and dealing with ARPA, not OSHA. *Id.* By con-
trast, the Fifth Circuit recently stayed enforcement of OSHA's vaccine
mandate. *See BST Holdings*, 2021 U.S. App. LEXIS 33698 *23 n.20
("Here, it is simply unlikely that Congress assigned authority over such
a monumental policy decision to OSHA—hard hats and safety goggles,
this is not.").

### B. HB 702 does not violate Montana's environmental provisions

The State previously argued the provisions of article II, section 3,
and article IX, section 1 of the Montana Constitution don't support Plain-
tiffs' novel legal theory. Doc. 21, 31–35. Plaintiffs' response only bolsters
the State's argument that no court recognizes their theory.

Plaintiffs admit "that the Montana Supreme Court has not yet ap-
plied this provision in the context of vaccines." Doc. 23, 29. Plaintiffs
offer only an unsupported conclusion: "it was a foregone conclusion that
vaccines contribute to the clean and healthful environment." *Id.* Naked
assertions such as these fail to shore up Plaintiffs' deficient pleadings.
*See Ashcroft*, 556 U.S. at 679.

Plaintiffs' analogy to airborne pollutants such as asbestos proves
the State's point. Doc. 23, 28. For more than a hundred years, Montana

has regulated workplace particulates such as asbestos through its police powers exercised by the Legislature.  *See Orr v. State*, 106 P.3d 100, 105–07 (Mont. 2004) (tracing the history of Montana's Occupational Health Act ("OHA") in a case involving asbestos exposure).  Plaintiffs argue that their claim lacks any authority in the constitutional text, convention transcripts, or caselaw because workplace hazards, obviously, must be encapsulated in the environmental rights.  Doc. 23, 28–29.  But as *Orr* details, Montana's OHA went through major revisions in 1971, a year before the 1972 Constitutional Convention.  106 P.3d at 106.  The environmental rights provisions omit any reference to workplace hazards because it was well understood the environmental rights apply only to the natural environment.  Doc. 21, 31–32.  By contrast, it was well understood that workplace hazards, including asbestos, are dealt with through the OHA.  *See Park Cty. Envtl. Council v. Mont. Dep't of Envtl. Quality*, 477 P.3d 288, 305–06 (Mont. 2020) (In considering the environmental provisions, recent legislative enactments "could not have been far from the minds of delegates" because the delegates chose to constitutionalize various statutory references.); *see also* Doc. 21, 31–34.

Plaintiffs incorrectly claim the right to a clean and healthful environment also encompasses the right to seek health.  Doc. 23, 29 (("The Montana Supreme Court has embraced these constitutional provisions in the context of an individual's fundamental right to 'seek health.'") citing *Mont. Cannabis Indus. Ass'n*, 286 P.3d 1161).  But article II, § 3 treats these rights separately; "[a]ll persons are born free and have certain inalienable rights.  They include the right to a clean and healthful environment …  and seeking their safety, health and happiness in all lawful ways."  The Montana Supreme Court made clear the right at issue in *Montana Cannabis Industry Association* was only the right to seek health and "the Constitution is clear that the right to seek health is circumscribed by the State's police power."  286 P.3d at 1166.

Plaintiffs acknowledge HB 702 constitutes an exercise of the state's police power and that Montana struck a balance in favor of medical autonomy.  Doc. 23, 30 ("MCA § 49-2-312 is not an instance of the state exercising its police powers to protect public health in degradation to individual liberty – it is the opposite.").  They offer no authority or justification why Montana, in times of emergency, cannot err on the side of protecting individual rights.  Plaintiffs' argument assumes that police

powers operate as a one-way street, that their exercise must always serve to degrade individual liberty as California chose to do. *See S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613–14 (2020). Plaintiffs' one-way ratchet allows only for infringement of rights, but *Newsom* plainly allows states "broad latitude" in exercising police powers. *Id.* This must include protecting citizens from discrimination.

### C. HB 702 complies with the equal protection clauses

Plaintiffs improperly merge their state law and federal law equal protection claims together. Doc. 23, 31. Plaintiffs then argue strict scrutiny applies because *state* constitutional rights are allegedly implicated. Doc. 23, 35. They don't plead any violation of any federal right that would trigger strict scrutiny. Doc. 21, 39. This Court should decline to join these separate legal issues.

Plaintiffs also raise allegations for the first time in response. Doc. 23, 34 (Claiming payment source similarly situates the classes and raising a new legal issue of the CMS vaccine mandate). The Court shouldn't consider any allegations raised in Plaintiffs' response brief that weren't raised in their complaint.

Plaintiffs assert that "[p]rivate physician offices represent a class similarly situated to hospitals and other licensed facilities," but fail to address that Montana has long regulated hospitals separately from private physician offices.  Doc. 23, 33.  The difference between physician offices and licensed facilities should be self-evident—Montana imposes different licensing requirements on physician offices and other facilities.  Doc. 21, 37; *see also* Mont. Admin. R. § 37.106.603 (setting minimum staffing levels for nursing homes, but not physician offices, consistent with an acceptable level of care).  Montana regulates different healthcare settings differently because they are different.  While all may treat patients in a general sense, the type of care, class of patients, and required safety standards vary based on setting.  Doc. 21, 37.

But the Plaintiffs must demonstrate that the comparator class(es) "are equivalent in all relevant respects other than the factor constituting the alleged discrimination." *Vision Net, Inc. v. State*, 447 P.3d 1034, 1038 (Mont. 2019).  Plaintiffs can't here, because Montana law routinely regulate physicians' offices differently than other healthcare settings.

Hospitals and the exempted facilities under MCA § 50-2-311 are regulated    separately    because    the    core    services    provided    are

fundamentally different.[4]  *See e.g.* MCA § 50-5-225 (assisted living facilities may not hire certain persons, must provide personal services, and assistance with daily living in recognition the population they care for triggers unique concerns).  HB 702 simply recognizes Montana historically imposes differing, and often more stringent regulations, on the exempt facilities.

The State possesses compelling interests in preventing discrimination.  Doc. 21, 35–36.  Under both federal and state law, Montana may impose differing regulations on various healthcare settings.  Doc. 21 at 36, 39.  Plaintiffs offer no factual or legal support for their contention that the State must regulate different healthcare settings and facilities identically.  Doc. 23, 31–36.

---

[4] Plaintiffs note healthcare facilities includes hospitals and long-term care facilities. Doc. 23, 34.  Plaintiffs must know while both are healthcare facilities, they are distinct.  *See* MCA  § 50-5-101(30), (37).

## CONCLUSION

For the reasons set forth above, this Court should grant the State's motion to dismiss.

DATED this 24th day of November, 2021.

AUSTIN KNUDSEN
Montana Attorney General

KRISTIN HANSEN
  *Lieutenant General*

DAVID M.S. DEWHIRST
  *Solicitor General*

*/s/ Brent Mead*
BRENT MEAD
  *Assistant Solicitor General*
215 North Sanders
P.O. Box 201401
Helena, MT 59620-1401
p. 406.444.2026
brent.mead2@mt.gov

*Attorney for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 3,246 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/ *Brent Mead*
BRENT MEAD

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: November 24, 2021      /s/ *Brent Mead*
BRENT MEAD