IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

MONTANA MEDICAL
ASSOCIATION, et al.,

                    Plaintiffs,

and

MONTANA NURSES
ASSOCIATION,

           Plaintiff-Intervenor,

vs.

AUSTIN KNUDSEN, et al.,

                    Defendants.

CV 21–108–M–DWM

OPINION
and ORDER

This case challenges parts of Mont. Code Ann. §§ 49–2–312 and 49–2–313.

In short, the former statute prohibits persons and entities—with limited

exceptions—from withholding goods, services, or employment "based on the

person's vaccination status or whether the person has an immunity passport."[1]  The

---

[1] The timing of the law's enactment suggests it is meant to address COVID-19 vaccination mandates or concerns.  However, "vaccine" has a broader meaning: "a preparation that is used to stimulate the body's immune response against diseases. Vaccines are usually administered through needle injections, but some can be administered by mouth or sprayed into the nose."  CTR. FOR DISEASE CONTROL, Definition of Terms, http://www.cdc.gov/healthyschools/bam/diseases/vaccine-basics.htm (last visited Mar. 17, 2022); *see also* Mont. Code Ann. § 20–5–402

latter statute then exempts certain facilities from § 49–2–312, such as licensed nursing homes, long-term care facilities, or assisted living facilities (collectively, "Exempted Facilities").  In light of this statutory scheme, multiple parties sued Austin Knudsen, in his official capacity as the Montana Attorney General, and Laurie Esau, in her official capacity as the Montana Commissioner of Labor and Industry (collectively "Defendants").  The plaintiffs include multiple private physician offices, the Montana Medical Association, and multiple individuals.  The Montana Nurses Association ("the Nurses") appeared in this case as a plaintiff-intervenor, (the plaintiffs and the Nurses are collectively referred to as "Plaintiffs").  Plaintiffs now seek to preliminarily enjoin enforcement of §§ 49–2–312 and 49–2–313.  A motion hearing and argument occurred on March 3, 2022.  For the reasons stated below, the motion for a preliminary injunction is granted in part and denied in part.

**BACKGROUND**

## I.   Montana's Statutory Scheme

In early 2021, the Montana Legislature passed Montana House Bill 702. (Doc. 14 at ¶ 3.)  House Bill 702 is codified at §§ 49–2–312 and 49–2–313. Section 49–2–312 is entitled "Discrimination based on vaccination status or

---

("'Immunization' means induction of a state of resistance to a disease through administration of an immunizing agent.").

2

possession of immunity passport prohibited – definitions." In sum, it makes it "an unlawful discriminatory practice" for any person, governmental entities, or public accommodation to deny benefits or services or condition such benefits or services "based on a person's vaccination status or whether the person has an immunity passport." § 49–2–312(1). An "immunity passport" is "a document, digital record, or software application indicating that a person is immune to a disease, either through vaccination or infection and recovery" while "'vaccination status' means an indication of whether a person has received one or more doses of a vaccine." § 49–2–312(5). The statute specifically exempts schools from its requirements, and it permits "health care facility[ies], as defined in 50–5–101" to ask an employee or volunteer for their vaccination status, but the employee or volunteer need not answer such inquiry. § 49–2–312(2), (3). For the purposes of § 49–2– 312, a "health care facility" is a term that "*does not include* offices of private physicians, dentists, or other physical or mental health care workers regulated under Title 37, including licensed addiction counselors." § 50–5–101(26) (emphasis added). A non-answer to a vaccine inquiry may be treated as an indication that an employee or volunteer is not vaccinated, and that indication may inform an employer's decision to implement reasonable accommodations. § 49–2– 312(3). The statute also prohibits private employers and others from imposing the

requirement of any vaccine that is authorized under an "emergency use" designation.  § 49–2–312(4).

The Exempted Facilities are included in § 49–2–313.  Exempted Facilities are "exempt from compliance with 49–2–312 during any period of time that compliance with 49–2–312 would result in a violation of regulations or guidance issued by the centers for medicare and medicaid services or the centers for disease control and prevention."  § 49–2–313.

## II.    Federal Regulation

The Centers for Medicare and Medicaid Services ("CMS") is the agency responsible for establishing health and safety standards with which healthcare facilities must comply in order to receive federal Medicare and Medicaid funding.[2]  86 Fed. Reg. 61,555, 61,556 (Nov. 5, 2021).  "CMS contracts . . . with State Survey Agencies to conduct surveys (inspections) for these oversight and compliance determinations."  (Doc. 51-1 at ¶ 4.) These surveys are unannounced, and they include investigations of the facility—including a review of books and records—and interviews of staff and patients.  (*Id.* ¶ 8.)  The findings from state surveys are certified to CMS, and when a facility is found to be out of substantial compliance with

_____

[2] At least one Plaintiff, Providence Health and Services, "receives a majority of its reimbursement through CMS."  (Doc. 45 at ¶ 7.)

one or more of the applicable federal regulations, a "Statement of
Deficiencies" issues detailing the findings of non-compliance.  (*Id.* ¶ 10.)
The noncompliant facility then has ten days to respond with a "Plan of
Correction" for each deficiency, and if the facility fails to come into
compliance with the relevant CMS regulation, CMS determines the
appropriate penalty.  (*Id.*)

In November 2021, the CMS issued an interim final rule entitled
"Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff
Vaccination" ("Interim Final Rule").  The Interim Final Rule "requires most
Medicare- and Medicaid-certified providers and suppliers to ensure that their
staff are fully vaccinated for COVID-19."  86 Fed. Reg. at 61,568.[3]  The
Interim Final Rule notes that employers must comply with federal anti-
discrimination and civil rights protections, and they must "provide
appropriate accommodations, to the extent required by Federal law, for
employees who request and receive exemption from vaccination because of
a disability, medical condition, or sincerely held religious belief, practice, or

---

[3] The Interim Final Rule "directly applies only to the Medicare- and Medicaid-
certified providers and suppliers [identified in the Rule].  It does not directly apply
to other health care entities, such as physician offices, that are not regulated by
CMS."  86 Fed. Reg. at 61,556.

observance." *Id.* at 61,568–69.  Two groups of states[4] challenged the

Interim Final Rule, and district courts in Louisiana and Missouri enjoined it.

*Biden v. Missouri*, 142 S. Ct. 647, 651 (2022) (per curiam).  The Fifth and

Eighth Circuits denied the government's request for a stay of the preliminary

injunction, and the government successfully appealed the denial of the stay

to the Supreme Court.  *Id.*

The Supreme Court determined that the Secretary of Health and Human

Services did not exceed his authority in promulgating the Interim Final Rule and

determined that the Secretary issued the Interim Final Rule based on his

"determin[ation] that a COVID-19 vaccine mandate will substantially reduce the

likelihood that healthcare workers will contract the virus and transmit it to their

patients." *Id.* at 652.  The Court also cited "conditions of participation" that are

routinely imposed on healthcare workers.  *See id.* at 653.  The Court noted that

"[v]accination requirements are a common feature of the provision of healthcare in

America: Healthcare workers are ordinarily required to be vaccinated for diseases

such as hepatitis B, influenza, and measles, mumps, or rubella." *Id.*

Subsequently, on January 14, 2022, CMS issued a memorandum titled

"Guidance for the Interim Final Rule" ("the Guidance").  (Doc. 44-1.)  The initial

---

[4] The Montana Attorney General joined the litigation brought by Louisiana,
arguing Montana had the same or a similar interest.  (*See* Doc. 27 (citing *Louisiana
& Montana, et. al. v. Becerra*, No. 3:21-CV-0370).)

page of the memorandum explicitly states that the "guidance in th[e] memorandum specifically applies" to a number of states, including Montana. (*Id.* at 1.) The Guidance establishes benchmarks for compliance on 30-day, 60-day, and 90-day intervals. (*Id.* at 3–4.) It also states the penalties for non-compliance. Given that the Guidance was issued on January 14, 2022, the 30-day deadline for compliance was February 13, 2022. To be in compliance with the 30-day benchmark, facilities must demonstrate two things: (1) policies and procedures are in place "for ensuring all facility staff, regardless of clinical responsibility or patient or resident contact are vaccinated for COVID-19" and (2) "100% of staff have received at least one dose of COVID-19 vaccine, or have a pending request for, or have been granted qualifying exemption, or identified as having a temporary delay as recommended by the CDC." (*Id.* at 3.) If either the first or second requirement is not met, the facility is not in compliance with the Interim Final Rule. (*Id.*) If a facility fails to meet the 30-day benchmark—or the 60- or 90-day benchmarks—the facility is subject to "enforcement actions" that include "plans of correction, civil monetary penalties, denial of payment, [or] termination" depending on the extent of the violation and the type of facility. (*Id.*)

In the week after the Guidance issued, surveys were conducted on seven facilities in Montana: six long-term care facilities and one home health agency. (Doc. 51-1 at ¶ 11.) Five of these facilities were found to be compliant with the

7

Interim Final Rule, while two of the facilities were noncompliant with respect to vaccination deficiencies. (*Id.* ¶ 13.)

## III. Procedural Posture

Previously, Defendants filed a motion to dismiss Plaintiffs' claims, and that motion was mostly denied. (*See* Doc. 35.) Subsequently, Plaintiffs filed amended complaints that are materially the same as the previous complaints, but they omit the claims that were dismissed and add an additional claim ("Count VIII"). (Docs. 37, 38.) Count VIII alleges that § 49–2–312 is preempted by 42 C.F.R. Part 482, of which the Interim Final Rule is part, so that § 49–2–312 is invalid and unenforceable as a consequence of the Supremacy Clause of the United States Constitution. (*See* Doc. 37 at 23–25; *see also* Doc. 38 at 23–26.)

Plaintiffs now seek relief by joint motion for a preliminary injunction. (Doc. 42.) They argue that a preliminary injunction of §§ 49–2–312 and 49–2–313 is warranted because the Interim Final Rule preempts § 49–2–312. Plaintiffs also argue that an injunction is appropriate because both statutes violate the Equal Protection Clause. However, Plaintiffs minimize their equal protection argument in their briefing. In response, Defendants insist that the Interim Final Rule is invalid, and, like ships passing in the night, they devote the majority of their briefing to the equal protection argument; they are correct that it has not been adequately briefed by Plaintiffs.

Before the March 3, 2022 hearing, the Court provided notice that it was considering consolidating the preliminary injunction hearing with a trial on the merits on Claim VIII, consistent with Federal Rule of Civil Procedure 65(a)(2). (Doc. 49.)  Defendants objected and stated they opposed any such consolidation, (Doc. 50), reiterating that position at the March 3 hearing.

## ANALYSIS

There are multiple issues encompassed in Plaintiffs' request for an injunction.  First, it is unclear whether Plaintiffs seek to enjoin both §§ 49–2–312 and 49–2–313, or just the former.  Second is the problem of whether the applicable legal standard is the preliminary injunction standard or whether the higher standard for permanent injunctions applies.  Third is the question of whether Plaintiffs have carried their burden under the applicable injunction standard.  And finally, assuming Plaintiffs can satisfy the relevant burden, what the proper scope of any injunction should be.  For the reasons explained below, Plaintiffs' motion is, for the most part, granted.  The injunction is limited only to the provisions of § 49–2–312, and the preliminary injunction standard is determinative.  Under that standard, Plaintiffs have carried their burden as it relates only to Claim VIII.  Accordingly, injunctive relief that is limited to Montana health care facilities and individual practitioners and clinics subject to the Interim Final Rule is granted, and that relief is temporally limited by the duration of the Interim Final Rule.

## I.      Section 49–2–313

It is unclear whether Plaintiffs want to enjoin § 49–2–313 in addition to

§ 49–2–312.  (*Compare* Doc. 42 at 2 (moving "for a preliminary injunction

prohibiting enforcement of House Bill 702, codified as Montana Code Annotated

§ 49–2–312 and § 49–2–313 . . .") *with* (Doc. 43 at 25 ("Plaintiffs respectfully ask

the Court to . . . enjoin defendants from enforcing MCA § 49–2–312 . . .").)  In any

event, § 49–2–313 is not enjoined because it is not preempted by the Interim Final

Rule.  The plain text of the Montana statute exempts compliance with § 49–2–312

when such compliance would contradict "regulations or guidance issued by the

centers for medicare and medicaid services or the centers for disease control and

prevention."  § 49–2–313.

Nor can § 49–2–313 be enjoined at this point on the basis that Plaintiffs are

likely to succeed on the merits of their equal protection claim.  Plaintiffs did not

make any arguments concerning their equal protection claims as those claims relate

to the preliminary injunction factors of irreparable harm and the public interest,

and they made only passing reference to the equal protection claims as they relate

to the balance of the equities.  As a result, to the extent Plaintiffs seek an injunction

of § 49–2–313, that request is denied.

## II.     Section 49–2–312

### A.      Applicable Standard

In addressing § 49–2–312, the threshold question is whether the preliminary injunction standard applies to Plaintiffs' request, or whether the more onerous permanent injunction standard applies. The former standard governs here.

To succeed on a motion for a preliminary injunction, a plaintiff "must establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor, and that an injunction is in the public interest." *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008). Similarly, "[t]o be entitled to a permanent injunction, a plaintiff must demonstrate: (1) actual success on the merits; (2) that it has suffered an irreparable injury; (3) that remedies at law are inadequate; (4) that the balance of hardships justify a remedy in equity; and (5) that the public interest would not be disserved by a permanent injunction." *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019) (quotation marks omitted). The standard stated in *Edmo* is applicable when the court "advance[s] the trial on the merits and consolidate[s] it with the hearing" on a motion for preliminary injunction. Fed. R. Civ. P. 65(a)(2). Where such consolidation is considered, "the court should provide the parties with clear and unambiguous notice of the intended consolidation either before the hearing commences or at a time which will afford the parties a full opportunity to present their respective cases." *Air Line Pilots Ass'n, Int'l v. Alaska Airlines, Inc.*, 898 F.2d 1393, 1397 (9th Cir. 1990) (quotation

11

marks and alteration omitted). The plain text of Rule 65(a)(2) makes clear that any consolidation may occur "[b]efore or after beginning the hearing on a motion for a preliminary injunction."

After the Court issued notice that it was considering consolidation, Plaintiffs argued at the March 3 hearing that consolidating the preliminary injunction hearing with a trial on the merits of Claim VIII was appropriate. Defendants, on the other hand, restated their objection to proceeding on the merits. Defendants' objection is based in large part on timing. (*See* Doc. 50 at 3.) While the fact that the Court indicated it was *considering* consolidation the day before the preliminary injunction hearing was entirely permissible under the plain language of Rule 65(a)(2), following argument and after reviewing the limited record, consolidation on the merits is not warranted. Accordingly, the preliminary injunction standard based on the familiar *Winter* factors applies.

**B.    Preliminary Injunction**

Under the *Winter* evaluation, each factor tips in Plaintiffs' favor. Because of the doctrine of federal preemption, Plaintiffs are likely to succeed on the merits of Claim VIII. They also demonstrate they are likely to suffer irreparable harm in the absence of preliminary relief. Finally, the balance of the equities and the public interest both inure to Plaintiffs. As for the scope of the injunction, Defendants are

12

correct that it should be narrow in duration and substance, so § 49–2–312 is enjoined only so long as the Interim Final Rule remains in effect.

### 1.    Likelihood of Success on the Merits

The doctrine of preemption flows from the Supremacy Clause of the United States Constitution, which identifies the Constitution and "the Laws of the United States" as "the supreme Law of the Land; and the Judges in every State shall be bound thereby, any Thing in the Constitution or Laws of any State to the Contrary notwithstanding."  U.S. Const. art. VI cl. 2.  There are three recognized ways in which a federal statute[5] might preempt state law: "First, Congress can adopt express language defining the existence and scope of pre-emption.  Second, state law is pre-empted where Congress creates a scheme of federal regulation so pervasive as to leave no room for supplementary state regulation.  And third, state law is pre-empted to the extent that it actually conflicts with federal law."  *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 109 (1992) (Kennedy, J., concurring in part) (quotation marks omitted).

Under the third approach, often referred to as "conflict preemption," state law must give way to federal law "where it is impossible for a private party to comply with both state and federal requirements, or where state law stands as an

---

[5] Federal regulations may preempt state law as well.  *Hillsborough Cnty. v. Auto. Med. Labs., Inc.*, 471 U.S. 707, 713 (1985).

obstacle to the accomplishment and execution of the full purposes and objectives

of Congress." *English v. Gen. Elec. Co.*, 496 U.S. 72, 79 (1990) (quotation marks

and citations omitted).  "[T]he purpose of Congress is the ultimate touchstone in

every pre-emption case." *Altria Group, Inc. v. Good*, 555 U.S. 70, 76 (2008)

(quotation marks omitted).  Thus, the preemption analysis begins "with the

assumption that the historic police powers of the States are not to be superseded by

the Federal Act unless that was the clear and manifest purpose of Congress." *Id.* at

77 (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)) (alteration

omitted).

To begin with, Plaintiffs argue that they are likely to succeed on the merits

of Claim VIII based on federal preemption, and express the view that their claims

rooted in equal protection are also impervious.  (*See* Doc. 43 at 15.)  But, as noted

above, they barely addressed any equal protection argument in the briefing.  Given

that the focus of Plaintiffs' motion is preemption, in conjunction with the canon of

constitutional avoidance, *see, e.g.*, *Kim Ho Ma v. Ashcroft*, 257 F.3d 1092, 1106

(9th Cir. 2001), Plaintiffs' equal protection claim is not considered in resolving the

present motion.

Plaintiffs allege multiple preemption claims, but the only one relevant here

is Claim VIII: that § 49–2–312 is preempted by the Interim Final Rule.  The

language of the Interim Final Rule makes it likely that Plaintiffs will succeed in

14

showing that it is "impossible for a private party to comply with both [the Montana] and federal requirements." *See English*, 496 U.S. at 79. For example, the Guidance requires that, to comply with the Interim Final Rule, facilities must demonstrate that all staff have received a vaccine for COVID-19 or have applied for or received a qualifying exemption. On the other hand, § 49–2–312(3) prohibits health care facilities from meaningfully inquiring into the vaccination status of their employees. While the statute permits health care facilities to "ask[] an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures," it does not require that the employee respond. *See* § 49–2–312(3)(b)(i). Basically, no meaningful answer is required. Consequently, even though the statute permits health care facilities to consider an employee's refusal to answer about his or her vaccination status as an indication that the employee is unvaccinated, that "consideration" is not a suitable substitute for the data required for a health care facility to prove compliance with the Interim Final Rule. Without such quantifiable data it will be nearly impossible for facilities to demonstrate compliance during the unannounced surveys that investigate the facilities' records and interview staff. (*See* Doc. 51-1 at ¶ 8.)

Moreover, the Supreme Court in the recent *Biden* case noted that the Interim Final Rule was implemented because it was "necessary to promote and protect

patient health and safety in the face of the ongoing pandemic."  142 S. Ct. at 652.

The "clear and manifest purpose" of the Interim Final Rule is public health.  By

contrast, Defendants previously emphasized at the motion to dismiss stage an

argument that Montana's statutory scheme was enacted to promote an individual's

right to privacy, placing the individual's interest on a pedestal of importance

exceeding public health and safety in a pandemic.  While these two purposes are

not inherently irreconcilable, the current codification of the state's attempt to

elevate individual privacy rights above all other rights is likely to be superseded by

the clear purpose evinced in the Interim Final Rule.  *Cf. Altria Group, Inc.*, 555

U.S. at 76 (emphasizing the importance of Congress's intent).

Ultimately, given the clear preemption language in the Guidance, Plaintiffs

have demonstrated they are likely to succeed on the merits of Claim VIII as it

relates to § 49–2–312.

## 2.    Irreparable Harm

Plaintiffs must establish that the prospect of irreparable harm is not merely

possible but that it is "likely."  *Winter*, 555 U.S. at 22.  Monetary injury alone is

not usually considered "irreparable" in the context of an injunction.  *See L.A. Mem.*

*Coliseum Comm'n v. Nat'l Football League*, 634 F.2d 1197, 1202 (9th Cir. 1980).

A significant concern is whether the moving party has an adequate remedy at law.

*Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992).  "When

enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law." *Id.* A constitutional violation alone can suffice to show irreparable harm, as can the loss of business goodwill and reputation. *See Am. Trucking Ass'ns, Inc. v. City of L.A.*, 559 F.3d 1046, 1057 (9th Cir. 2009).

*American Trucking* is instructive. In that case, the plaintiffs challenged mandatory "Concession Agreements" implemented by California on the basis that the Concession Agreements improperly attempted to regulate "the price, route, or service of any motor carrier" in violation of the Federal Aviation Administration Authorization Act. *Id.* at 1048. The plaintiff sought to preliminarily enjoin the Concession Agreements, a request the district court denied largely based on its finding that the plaintiffs failed to establish irreparable harm. *Id.* The Ninth Circuit reversed the district court on the basis that "a very real penalty attaches to the motor carriers regardless of how they proceed. That is an imminent harm." *Id.* at 1058. The court emphasized that the plaintiff could refuse to sign "the likely unconstitutional Concession agreements" and likely face a loss of business goodwill, or it could sign the agreements, in which case "its plight is not much better" for two reasons. First, the plaintiff "will have been forced to sign an agreement to conditions which are likely unconstitutional because they are

preempted." *Id.* Second, the plaintiff "will be forced to incur such large costs which, if it manages to survive those, will disrupt and change the whole nature of its business in ways that most likely cannot be compensated with damages alone." *Id.* Essentially, the Ninth Circuit determined that "motor carriers should not be required to adhere to the various unconstitutional provisions in the [Concession] agreements, and are likely to suffer irrevocably if forced to do that or give up their business." *Id.* at 1059.

Here, Plaintiffs argue that the "impossible choice" of complying with either the Interim Final Rule or § 49–2–312, but not both, creates irreparable harm. (*See* Doc. 43 at 16.) Plaintiffs argue they will sustain additional harm absent a preliminary injunction, including potential termination from the Medicaid and Medicare programs and the resulting loss of healthcare capabilities to people in Montana. Defendants respond that Plaintiffs' alleged harm is both too speculative and not "irreparable." Specifically, Defendants emphasize that, if the Interim Final Rule preempts § 49–2–312, "the [] Rule acts as an affirmative defense to any action taken by the State pursuant to [the statute]—a defense that may be raised throughout the administrative process before subjecting Plaintiffs to liability." (Doc. 51 at 25 (citing *Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 530 n.1 (2021).) Defendants also argue that there is no evidence to show that compliance with the Interim Final Rule will result in irreparable harm. (*Id.* at 28–29.) That

argument seems to be that if charged with wrongdoing, the Plaintiffs would not be liable because their preemption argument is probably well-taken.

Plaintiffs demonstrate that irreparable harm is likely to occur absent injunctive relief. Under the Guidance's 30-, 60-, and 90-day benchmarks for compliance with the Interim Final Rule, health care facilities that fail to demonstrate compliance may be subject to "enforcement action," such as civil monetary penalties. While Defendants correctly note monetary penalties do not satisfy the irreparable harm showing on their own, *see L.A. Mem. Coliseum Comm'n*, 634 F.2d at 1202, like the plaintiff in *American Trucking*, Plaintiffs here face more than mere monetary penalties. The failure to comply with the Interim Final Rule could result in a range of penalties, including termination of participation in Medicaid and Medicare. (*See* Doc. 43 at 17.) In addition, the Guidance specifically targets Montana as a state to which the Interim Final Rule and the Guidance benchmarks apply. (Doc. 44-1 at 1.) That callout increases the likelihood that penalties will be enforced.

Moreover, Defendants submitted a letter from the Montana Health Network that describes the "difficult position" in which Montana health care facilities find themselves given the contradiction between § 49–2–312 and the Interim Final Rule. (Doc. 51-2 at 5.) This letter emphasizes the Hobson's choice Montana's health care facilities find themselves facing, similar to the choice in *American*

*Trucking*. On one hand, facilities can comply with § 49–2–312 and violate the Interim Final Rule, which requires them to "risk being decertified by the [CMS] program." (Doc. 51-2 at 4.) But, if facilities ignore the Interim Final Rule "and continue billing Medicare and Medicaid, they are committing fraud against the program, which could result in steep fines and jail time for some of its employees." (*Id.*) On the other hand, if health care facilities comply with the Interim Final Rule, the Montana Health Network avers such compliance would naturally result in the loss of goodwill for health care facilities in Montana because compliance with the Interim Final Rule will effectively shutter rural health care facilities and "[b]ecause of this, many will forego care because of the inconvenience or impossibility of travel and added costs associated with it." (*Id.* at 5.)

Defendants' suggested affirmative defense argument likewise fails. First, *Whole Woman's Health* is inapposite to the argument that the Interim Final Rule could defeat an action before the Montana Human Rights Commission. In noting that "applicable federal constitutional defenses always stand fully available when properly asserted," the Supreme Court presumed that the body reviewing the claim would have the power to adjudicate constitutional questions. *See Whole Woman's Health*, 142 S. Ct. at 530 n.1. The Montana Constitution states that constitutional questions must only be decided by a judicial body, not an administrative body, and so the federal preemption defense would necessarily fail if raised before the

Montana Human Rights Commission.  *See* Mont. Const. Art. III, § 1.

Additionally, while Defendants are correct that the mere cost of litigation is not an

irreparable harm, (Doc. 51 at 27 (citing *FTC v. Standard Oil Co.*, 449 U.S. 232,

244 (1980)), as explained above, the irreparable harm here stretches beyond the

"mere cost of litigation."  Unlike the plaintiffs in *Standard Oil*, Plaintiffs face the

harms described above: they will be penalized for complying with either the

Interim Final Rule or § 49–2–312.  Plaintiffs cannot be forced to choose between

"two roads diverging in a wood" when they face dire consequences that could

make "all the difference."

The record shows that "a very real penalty attaches to the [health care

facilities] regardless of how they proceed.  That is an imminent harm."  *Am.*

*Trucking*, 559 F.3d at 1058.  The imminence of this harm is further demonstrated

by the fact that CMS compliance surveys are presently occurring and

noncompliance is being documented.  (Doc. 51-1 at ¶ 1; *see also* Doc. 51-2 at 5

("[W]e cannot defy the mandate by continuing to employ [unvaccinated] workers

without punitive action being taken by the CMS."))  The harm of non-compliance

is also likely to be irreparable.  If facilities comply with § 49–2–312, they risk

termination from the CMS program.  (Doc. 45 at ¶¶ 3, 7; Doc. 51-1 at ¶ 10; Doc.

51-2 at 4.)  And given that Plaintiffs have shown they are likely to succeed on the

merits of their preemption claim, ignoring the Interim Final Rule means complying

with a statute that is "likely unconstitutional because [it is] preempted." *Am.*

*Trucking*, 559 F.3d at 1058.  This kind of constitutional injury shows a likelihood

of irreparable harm.  Plaintiffs have therefore shown irreparable harm will result

absent injunctive relief.

### 3.    Balance of the Equities and the Public Interest

Where the government is the opposing party, the third and fourth factors of

the preliminary injunction inquiry merge, so that the balance of the equities and the

public interest are considered together.  *See Nken v. Holder*, 556 U.S. 418, 435

(2009) (so stating in the context of a stay).  In balancing the equities,

considerations include whether "the impact of an injunction reaches beyond the

parties, carrying with it a potential for public consequences." *Boardman v. Pac.*

*Seafood Grp.*, 822 F.3d 1011, 1023–24 (9th Cir. 2016) (quotation marks omitted).

While "[t]he public interest may be declared in the form of a statute," *Golden Gate*

*Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008), "it would

not be equitable or in the public's interest to allow the state to violate the

requirements of federal law, especially when there are no adequate remedies

available," *Ariz. Dream Coal. v. Brewer*, 757 F.3d 1053, 1069 (9th Cir. 2014)

(quotation marks and alteration omitted).

In addition, Montana has an interest in administering its police power to

"protect the public health and the public safety." *Jacobson v. Massachusetts*, 197

U.S. 11, 25 (1905).  But the State's police power is circumscribed by principles of federalism, and "[t]he mode or manner in which those results are to be accomplished is within the discretion of the state, subject . . . to the condition that no rule prescribed by a state, nor any regulation adopted by a local governmental agency acting under the sanction of state legislation, shall contravene the Constitution of the United States."  *Id.*  There is also a public interest in a functioning society.  "Real liberty for all could not exist under the operation of a principle which recognizes the right of each individual to use his own, whether in respect of his person or his property, regardless of the injury that may be done to others."  *Id.* at 26.

Here, as Defendants argue, the codification of House Bill 702 in §§ 49–2–312 and 49–2–313 in some way expresses the public's interest because the legislature passed the law.  *See Golden Gate*, 512 F.3d at 1126.  But, as Plaintiffs point out, it is inherently against the public interest to allow a state statute to violate federal law, *see Ariz. Dream Coal.*, 757 F.3d at 1069, and here Plaintiffs have shown that § 49–2–312 is likely a violation of federal law based on the preemption question discussed above.

Each party also emphasizes the purported consequences to public health should the adverse party's requested relief be granted.  According to Plaintiffs, the public is best served by enjoining the law because health care facilities would then

be able to ensure that all staff are vaccinated (against COVID-19) or have approved accommodation requests.  According to Defendants, the public would be best served by allowing the statute to actively remain on the books, to protect Montana workers from the fear of losing their jobs, and to protect individual choice, even in a pandemic.  Given that the police power of the State should operate to "protect the public health and the public safety" and also submit to federal law in the event of conflict, *Jacobson*, 197 U.S. at 25, the scales tip in favor of Plaintiffs' more persuasive argument concerning public health.  As the Supreme Court in *Jacobson* recognized, certain restraints on an individual are occasionally reasonable to promote the common good and actualize the public interest in a civil society.  Therefore, while there is undeniably tension between the Interim Final Rule and § 49–2–312, principles of federalism, including the Supremacy Clause, elevate the interests expressed in the Interim Final Rule to favor the Plaintiffs' argument.

## III.   Scope of the Injunction

"Crafting a preliminary injunction is an exercise of discretion and judgment, often dependent as much on the equities of a given case as the substance of the legal issues it presents." *Trump v. Int'l Refugee Assistance Project*, 137 S. Ct. 2080, 2087 (2017).  A preliminary injunction should be crafted to "meet the exigencies of the particular case." *Id.* (quotation marks omitted).  With these

24

considerations in mind, the preliminary injunction here is limited in application to the law set forth in § 49–2–312, and it will only be in place so long as the Interim Final Rule remains in effect.  Because all Montana facilities receiving CMS funds must comply with the Interim Final Rule, the enforcement of § 49–2–312 is enjoined against all such facilities.

## CONCLUSION

For the reasons stated above, a limited preliminary injunction of § 49–2–312 is warranted.  Accordingly,

IT IS ORDERED that the joint motion seeking a preliminary injunction, (Doc. 42), is GRANTED IN PART and DENIED IN PART.  It is GRANTED in that enforcement of § 49–2–312 as it relates to the COVID-19 vaccine is enjoined from enforcement against all Montana health care facilities and individual practitioners and clinics subject to the Interim Final Rule for so long as the Interim Final Rule remains in effect.  It is DENIED in all other respects.

IT IS FURTHER ORDERED that the parties shall notify the Court within ten days of any changes to or the expiration of the Interim Final Rule.

DATED this 18th day of March, 2022.

10:30 A.M

_____
Donald W. Molloy, District Judge
United States District Court