# HRB CONFIDENTIAL

## *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU



| | |
|---|---|
| ███████ <br><br> Charging Party, <br><br> vs. <br><br> ███████[1], <br><br> Respondent. | Final Investigative Report <br><br><br> HRB Case No. 0210598 |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

### I.   ISSUE PRESENTED

Did the ███████ discriminate against ███████ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) by subjecting him to quarantine and denying him employment and other opportunities?

### II.   SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.   Charging Party's Position Statement:

███████ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ███████ ( ███████  He asserts he is employed by ███████ **and that** he was informed on August 16, 2021, that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnesses vaccinated inmates being permitted to enjoy their employment status.

---

[1] Nine complaints were filed by ███████ ( ███████ inmates using a template containing substantially similar language. On the template, inmates checked whether they were felt they were denied visitation or medical care, some inmates wrote in additional information regarding denials including hobby, haircuts and religious services. The complaints all involve a quarantine by ███████ in August 2021 at ███████  The template names ███████ ███████ Defendants." The Bureau sent Charging Parties' complaints to ███████ which responded on behalf of all named respondents.

Page 1 of 14

**EXHIBIT  77**
**30(b)(6) Designee**
**Mon, Aug 22, 2022**
**Reported by:**
**Mary Sullivan, RMR, CRR**

DEFS 001371

**Exhibit 35 - 1**

## HRB CONFIDENTIAL

He then states that, "I and all other vaccinated inmates" were allowed to commingle after work for purposes of recreation, laundry pass, food service and other non-restrictive social activities. He asserts that as a result of the quarantine he has been denied services and privileges such as visitation.

**B.    Respondent's Position Statement:**

■ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in MSP's C-Unit. In the wake of this potential exposure, inmates were quarantined based on vaccination status.

On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ■ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19.  The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

■ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue that must be addressed before any further proceeding, ■ argues the Human Rights Bureau (the Bureau) should dismiss these complaints.  The Bureau is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ■ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ■ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims."

Additionally, ■ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19.  It is ■ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19.  Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period.  Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ■ "absolute immunity" from civil actions.

In response to the Bureau's requests for information, ■ further argued that COVID-19 presented unique challenges because the prison population was at or near capacity for bed space. ■ needed to provide certain services such as food and laundry while simultaneously managing the health crisis. ■ contends it relied on the "expertise of clinical services division staff which was receiving regular guidance specific to correctional facilities from the U.S. Centers for Disease Control (CDC), the Montana Department of Health and Human Services, county/local health officials, as well as direction from the Department Director in the event of a conflict between Montana law and guidance provided by the aforementioned resources."

DEFS 001372

**Exhibit 35 - 2**

## HRB CONFIDENTIAL

████ argues the inmates complains amount to a 'brief disruption of non-employment "employment" activity,' temporary disruption of haircut services and hobby, and brief disruptions to in-person visitation.

### C.   Additional Information

The parties were asked to address the application of the health care facility provisions of § 49-2-312, MCA. ████ responded and stated that ████████ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

Inmates argued ████ is not a health care facility given the quality of care and further, if it were, then only the ████ building containing the infirmary should be considered as a health care facility. The infirmary is a separate building from the housing units.

### D.   Witnesses

████ **Inmate.** ████ asserts he was denied employment and visitation based on his vaccination status.[2] ████ states that all of the housing units have been shut down at various times beginning in 2020, probably for three to four months in the beginning. He believes the C-Unit was shut down for approximately three weeks in July and August 2021. When an inmate tested positive, that inmate was sent to administrative segregation and the rest of his unit was locked down. Now, when an inmate tests positive, he is still sent to administrative segregation, but only the cube is locked down for 14 days.

████ began taking Motor Vocational Maintenance Classes in October 2020. He graduated in October 2021 and did not miss work during this time but missed classes that slightly prolonged his graduation, maybe a day or a week. He says he missed class time when he was quarantined in July and August 2021. ████ says it's interesting that inmates that are unvaccinated are not allowed to go to work with vaccinated, but they all eat together. ████ says he was supposed to have a visit with his wife, but this visit was cancelled. He says he knows of vaccinated inmates that received visits. He was asked to identify these inmates and said he would send in a list. In this later submission, ████ doesn't identify inmates that were allowed visitation rather he lists six inmates "that had seen or heard" that vaccinated inmates were allowed to continue services. ████ says Correctional Officers have told him that vaccinated inmates get visits, but ████ could not recall the names of the ████ staff that told him this.

████ believes the infirmary staff doctors/nurses need more training to provide quality care like a healthcare facility should. Since the quality of care is lacking, he does not believe ████ is a healthcare facility.

---

[2] ████ submitted additional statements and said that on August 16, 2021, he was told that due to his non-vaccinated status he would have to quarantine and no longer enjoy employment, haircuts, religious activities, library, and visitation. He only asserted employment and visitation in his complaint.

DEFS 001373

**Exhibit 35 - 3**

## HRB CONFIDENTIAL

In written submissions, _____ relayed that more recent quarantining had been done differently. Both vaccinated and unvaccinated inmates were allowed to go to work "except those that were in direct contact."

**_____ Inmate.** _____ asserts that he was denied employment and visitation. He says when the pandemic began, he was housed up in the Shelby facility. As a result of the outbreak up there, _____ says he has natural immunity, and he is not vaccinated. At _____ he works on buildings doing HVAC (heating ventilation and air conditioning). He moves all around the campus.

He recalls that someone tested positive in August 2021 and after that the inmates were confined for a week and then _____ gave you an option of going back to work if you were vaccinated. The vaccination was not mandatory, but it is his opinion that _____ was trying to force inmates to get the vaccine. He believes he recalls the MCE Administrator _____ coming to the unit, but later he says maybe it was that he was given the option of doing a waiver. _____ says he wishes he would have taken better notes. His recollection is that the quarantine was lifted and then put in place and then lifted again. He says _____ asks the inmates to wear masks, he refers to the inmates that wear masks as "sheeple."

_____ asserts he was not even allowed to use a phone during this quarantine. Asked if he could identify anyone that was allowed to go to visitation, he says he's not sure. As for any contention that _____ is a healthcare facility, _____ doesn't believe that _____ should qualify because they 'don't provide healthcare at all.'

**_____ Inmate.** _____ is an inmate at _____ He is not vaccinated, and states vaccination is not mandatory at the prison. He asserted he was denied employment, visitation, and the ability to get a haircut. _____ was employed by _____ as a boilerman in the maintenance department. In this position, he would leave the C-Unit and go to the 'industries compound.' (The industries compound is a separate facility at _____

_____ asserts that on or around August 16, 2021, the Administrator for Montana _____ and another person from the Clinical Services Division announced that inmates needed to sign a "waiver" regarding their medical information to disclose their vaccination status to work in the "industries compound." _____ states he never got to read this waiver. He says if you did not sign the waiver you were assumed to be unvaccinated. It is _____ recollection that _____ said, "if you're not vaccinated and cannot prove your vaccination status, you will be required to stay in the Unit."

_____ says _____ posted a notice listing the inmates that could go to work in the "industries compound." _____ says only persons that were vaccinated were on the list. Since he could not go to the industries compound, _____ asserts his hours were reduced significantly. It is his recollection that shortly after the complaints were filed, he was allowed to return to work. _____ states he then lost this position on October 4, 2021.

In August 2021, _____ locked down the C-Unit. _____ does not take issue with _____ quarantining individuals that test positive in accordance with the Centers for Disease Control (CDC). He tested positive in 2020, at that time the whole facility was locked down.

DEFS 001374

**Exhibit 35 - 4**

## HRB CONFIDENTIAL

As for ▮▮▮ assertion that he was denied visitation, he says it was "common knowledge" that you could not have visitation if you were not vaccinated. Asked how this was known, he asserted there was a memo posted by ▮▮▮ at the Command Post. ▮▮▮ has been to the infirmary 12 to 15 times in the past year but disagrees that ▮▮▮ as a whole should be a considered a health care facility.

**Inmate.** ▮▮▮ is an inmate at ▮▮▮ and he is not vaccinated. He states vaccines are not mandatory at ▮▮▮ He asserted he was denied employment, visitation and hobby. ▮▮▮ says if there is an outbreak on the unit, the unvaccinated are quarantined, whereas the vaccinated are allowed to go to work ▮▮▮ states this has occurred "a couple times" with the last occurring in around August 2021.

▮▮▮ has been working for Montana ▮▮▮ since March 2021. ▮▮▮ states inmates work in close proximity to one another and are there from 7 a.m. to around 4:15 p.m. He says he was denied visitation once in September 2021, because he wasn't vaccinated. ▮▮▮ says he 'told his family to not bother coming.' ▮▮▮ said the only inmates allowed visitation at that time were the ones who were vaccinated. He doesn't know if other unvaccinated inmates are still being denied visitation.

▮▮▮ says he was also denied hobby once (and a there was a second time when he wasn't scheduled for hobby). He believes this occurred in around August or September 2021. He said for the past month and a half, they have been on a regular weekly schedule where inmates can go to hobby, regardless of whether they are vaccinated.

▮▮▮ indicated that he has been to the infirmary several times. He does not feel that ▮▮ is a healthcare facility because they do not provide adequate healthcare. ▮▮▮ said he does not want to get the vaccine because, as a Native American he does not believe in vaccines. He has not submitted any sort of religious accommodation relative to vaccines.

**Inmate.** ▮▮▮ complaint only asserts he was denied employment based on his vaccination status. In his interview, he said he was not allowed to work to earn money to make earrings or buy commissary items. ▮▮▮ says he was prevented from going to work for two weeks and the unvaccinated restrictions lasted about three weeks. After a month and a half, ▮▮ completely changed policies and the quarantines were cube specific. (The entire cube, which is a subsection of the unit, would quarantine regardless of vaccination status.)

▮▮▮ wants it noted that he does not go to religious services, but he would not have been able to go if he did. Although it is not in his complaint, he also asserted that once he wanted to get a haircut but was stopped in the hall by a Correctional Officer. ▮▮▮ does not recall which officer, but the officer knew ▮▮▮ was not vaccinated. When ▮▮▮ asked how the officer knew his vaccination status, the officer then asked, "Well, are you?" ▮▮▮ said he wouldn't release this information and he was denied his haircut.

▮▮▮ says an inmate in a different cube tested positive for COVID-19 and inmates in his cube were allowed to go to work if they were vaccinated. He asserts that it doesn't make sense that vaccinated and unvaccinated inmates were allowed to eat, use telephones, go in

DEFS 001375

**Exhibit 35 - 5**

## HRB CONFIDENTIAL

the yard and intermingle with each other but they were not allowed to enjoy other opportunities.

▇▇▇▇▇ **Inmate.** ▇▇▇▇▇ complaint was substantially similar to the other complaints, but it was handwritten. He asserted he was denied employment, medical care, and religious services.

Initially, ▇▇▇ was asked to explain the assertion in his complaint that he was denied medical care, but he did not remember making this allegation. Later in the interview, he stated that he believes he should have received treatment for a non-emergency back injury. He said another inmate was allowed to get medical services during this time and he was not. (▇▇▇ believes that inmate had a knee injury, but he is unsure of the inmate's exact medical situation or his vaccination status.)

▇▇▇ complaint asserts that he was denied employment but he explained that he was in the MCE "education program" for welding. It is his recollection that ▇▇ had multiple COVID-19 cases in the facility and initially they tried to do something with testing; if you were negative you could go to work. He believes C-Unit was locked down for a month or a month and a half. He says he wasn't allowed to go back to school for almost two months. ▇▇▇ offered a witness he believes is vaccinated that was allowed to go to work.

▇▇▇ says he typically attends three religious meetings every week; Fresh Lives, Baptist Bible Studies and Bread of Life, but he has not been able to attend for two to three months. Pressed, ▇▇▇ wasn't sure if anyone was attending religious meetings at this time. ▇▇▇ wanted more time to put together more information on his denial of religious services and stated he would send more information in, but the Bureau has not received anything.

▇▇▇ **Administrator for Montana** ▇▇▇▇▇ ▇▇ is unfamiliar with the complaints under investigation by the Bureau, but she is familiar with the vaccination law. She explained that the industries compound is a different area of the prison and that houses MCE programs (training and educational). It also houses some ▇▇ programs such as maintenance. ▇▇ says that many of the inmates working in the industries compound around this time were making Personal Protected Equipment (PPE).

It is her best recollection that C-Unit went into quarantine and all movement was restricted for both vaccinated and unvaccinated inmates. After this, ▇▇ and an ▇▇ employee Clinical Services when to C-Unit on August 17, 2021. ▇▇ explained that the C-Unit houses inmates that worked over in the industries compound. ▇▇ explained to the inmates that they could sign a waiver that would allow an inmate's MCE supervisor to know the inmate's vaccination status. If an inmate was vaccinated, he could continue working pursuant to CDC guidelines. She does not recall any inmate asking her what would happen if he was not vaccinated. She believes Clinical Services then took this information back to check against existing records and then a list was created of inmates that were vaccinated. This list was disseminated to the appropriate supervisor (not the entire list of names but the names relevant to a particular supervisor). ▇▇ denies that any sort of list was posted regarding the inmate's vaccination status.

DEFS 001376

**Exhibit 35 - 6**

## HRB CONFIDENTIAL

After this, it is ▮▮▮▮ recollection that there were concerns about the discrimination law and that the Warden sent out an email urging compliance with both the state vaccination law and the CDC guidelines. ▮▮▮▮ contends this happened as soon as practicable. She does not recall when everyone went back to work, but it wasn't long after this.

▮▮▮▮▮▮▮▮▮▮ **Medical Bureau Chief.** ▮▮▮▮▮▮ has been with ▮▮▮ for 20 years. She states that she has previously experienced outbreaks of influenza but nothing like COVID-19. She states that ▮▮▮ routinely provides medical services outside of MSP's infirmary. She says medical staff respond to emergencies providing care at the scene. There are different types of medication and medication administration in the various housing units. If there is a "health care request" or kite by an inmate for medical services, that request needs to be assessed within a certain time frame so the inmate may be visited by medical staff in the housing units. Add to this, ▮▮▮ has several 'satellite offices' for health care services outside of the infirmary (e.g., locked housing unit, high side, low side, work and re-entry unit.) There's medical staff in the intake unit (the ▮▮▮ Diagnostic and Intake Unit) every day.

In terms of addressing the spread of COVID-19 in the institution, ▮▮▮▮▮ says there are unique challenges. For example, social distancing can be hard to achieve. ▮▮▮▮ says there is not an across-the-board-masking requirements at ▮▮▮▮ rather ▮▮ works to educate staff and inmates on the available infection control protocols. If the compound is on "outbreak status" masks are recommended. ▮▮▮ has utilized testing protocols, there are both rapid and PCR (nose swab sent to a lab) types of testing. Rapid testing results will be back in 15 minutes, but PCR can take several days to get results. ▮▮▮▮▮▮ says at times ▮▮▮ has run low on rapid tests and had to use more PCR tests.

▮▮▮▮▮▮ does not have a clear recollection of the quarantine in August 2021 (she stated she did not review her notes for the interview). ▮▮▮▮▮▮ says the ▮▮▮ has worked DPHHS and relied on CDC guidance for direction. She notes the guidance has changed throughout the pandemic. In C-Unit housing unit, inmates are in cubes and share the same bathroom and have a small common area. A person that tests positive will be removed from the areas. ▮▮▮▮▮▮ acknowledges ▮▮▮ has had to change its approach depending on the circumstances, ▮▮▮ is currently using a "cohorted quarantine" protocol.

### E. Documents

- Emails between ▮▮▮ Clinical Services Divisions staff and DPHHS staff on matters relating to masking, testing and vaccination status. (Included are ▮▮▮▮ who is identified as Communicable Disease Nurse Consultant for the Communicable Disease and Prevention Bureau.)

- ▮▮▮ 4.5.11 – Infection Control Program. Revised 12/23/16. General Requirements: "Each health care unit will monitor infectious and communicable diseases in an effort to minimize their occurrence in accordance with state and federal guidelines." Prevention: "An integral component of the infection control program is the prevention of the occurrence and spread of infectious and communicable diseases."

DEFS 001377

**Exhibit 35 - 7**

## HRB CONFIDENTIAL

- Excerpts from CDC Guidance on Management of Coronavirus Disease 2019 (COVID-10) in Correctional and Detention Facilities.

- ▉ 'contact' visitation logs for August 2021. Contact visits stop on August 15, 2021 and start again on August 19, 2021.

- C-Unit Hobby Night Call Out sheets for July 13, 2021, July 28, 2021, August 4, 2021, August 11, 2021, (there is no August 18, 2021), August 25, 2021, September 1, 2021, and September 8, 2021. At least one of the inmates that filed is on the call out sheet for September 1, 2021 and two are on September 8, 2021.

- Undated "Sunday" Workers Only C-Unit Haircut list, ▉ is marked as a "No Show"

### F.   Timeline:

As displayed in the witness interviews **neither** party's witnesses could offer much clarity on dates relevant to the particular quarantine at issue. Albeit based on imperfect evidence, this investigator has put together the following timeline of relevant events:

| | |
|---|---|
| August 16, 2021 | Four positive staff at ▉ with extensive contacts, ▉ starts restricting movement by for inmates. |
| August 17, 2021 | Warden ▉ stopped all movement in various units as the day progresses (including C-Unit). No inmates were allowed any function outside of the unit. |
| August 17, 2021 | ▉ solicits releases or waivers from inmates to disclose their vaccination status 'for the purpose of returning them to work.' |
| August 18, 2021 | A list of inmates who agreed to have their vaccination status released is circulated to those inmate's supervisors. These inmates 'are available for school, work, and other functions.' |
| August 19, 2021 | Director ▉ sends email to leadership team and ▉ clinical director stating ▉ would 'follow state law' and CDC guidelines "unless they conflict with or violate state law….[h]aving this in mind, we need to allow visitation and programs regardless of vaccination status…" |

### III.   ANALYSIS

▉ is alleging ▉ unlawfully discriminated against him in the area of governmental services because of his vaccination status. He has filed a timely complaint and the Montana Human Rights Bureau has jurisdiction.

DEFS 001378

**Exhibit 35 - 8**

**HRB CONFIDENTIAL**

In ▮▮▮▮▮'s complaint, he asserts ▮▮▮▮ quarantined him based on his vaccination status on or about August 16, 2021[3], and that because he was quarantined, he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.  It is Ellsworth's recollection this occurred in July and August.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis of these complaints. All we have is the language of the applicable statute:

> **49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:
>
> (a)   a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;
>
> (b)   an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or
>
> (c)   a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.
>
> …

In its response to these complaints, ▮▮▮▮ argued the Bureau should dismiss under the authority of another new statute found in Title 2, Chapter 9, "Limitations on Liability Relating to COVID-19." Under this statute, a governmental entity that takes 'reasonable measures' consistent with public health guidance will have an affirmative defense to any civil damages "for injuries or death from or relating to exposure to or potential exposure to COVID-19." *Mont. Code Ann. § 2-9-902.*  In § 2-9-905, MCA, it states that if a governmental entity proves an affirmative defense, it operates as a "complete bar" to any action "relating to COVID-19." *Mont. Code Ann. § 2-9-905(4).*[4]  As part of this investigation, ▮▮▮▮ **provided**

---

[3] The inmate's complaints all have a paragraph that states "On or about _____, 2021, I was informed that, due to my non-vaccinated status that I would have to quarantine in C-Unit and could no longer enjoy my employment at the industries compound."  Inmates ▮▮▮▮ and Rodriguez failed to put a date in the blank, ▮▮▮▮ and ▮▮▮▮ put August 16, 2021, and ▮▮▮▮ and ▮▮▮▮ put August 17, 2021.

[4] **2-9-905.**   *(Temporary)* **Affirmative defense -- reasonable measures consistent with regulations, orders, and public health guidance.** (1) In addition to all other defenses, a government entity may assert as an affirmative defense that the government entity took reasonable measures consistent with a federal or state statute, regulation, order, or public health guidance related to covid-19 that was applicable to the government entity or activity at issue at the time of the alleged injury, death, or property damage.

(2)   If two or more sources of public health guidance are applicable, a government entity does not breach a duty of care if the person took reasonable measures consistent with one applicable set of public health guidance.

**(3)   If a government entity proves the affirmative defense contained in this section, the affirmative defense is a complete bar to any action relating to covid-19.**

DEFS 001379

**Exhibit 35 - 9**

## HRB CONFIDENTIAL

communication between ▇ Clinical Services and the Department of Public Health and Human Services discussing Centers for Disease Control guidance on how to best handle an outbreak in a correctional setting. ▇ asserts that because it was operating in accordance with this guidance, it has an affirmative defense that stands as an 'absolute bar' to an inmate complaint.

▇ arguments are compelling, but this statute doesn't quite seem to fit. Here, the inmates are not asserting ▇ is liable for their exposure or potential exposure to COVID-19. The inmates are asserting ▇ is liable for violating a provision of the Montana Human Rights Act that protects the inmates based on vaccination status. *Mont. Code Ann. § 49-2-312.* Ultimately, a fact finder may agree that this statute stands as a bar to inmate complaints under discrimination laws, but for now the Bureau will continue its analysis.

As we begin, it bears noting that putting together a clean timeline was <u>extremely</u> challenging. ▇ counsel was asked and created one, the Bureau then talked to two different ▇ staff as well as six different inmates in C-Unit. Most every witness stated they had some difficulty remembering the details. ▇ argued any restrictions on unvaccinated inmates were short term, lasting for maybe one day. Meanwhile, the inmates put restrictions on unvaccinated inmates anywhere from a week to several months. Given the testimony and documentation, it seems likely that any restrictions lasted a few days.

Everyone involved acknowledged there have been various quarantines throughout the pandemic and these various quarantines have looked different. At the beginning of the pandemic, it sounds like ▇ quarantined every inmate due to the scope of the outbreak, later quarantines were by housing unit, and more recently quarantines are done by "cohort" depending on an inmate's exposure (e.g., direct contact). Inmates that are vaccinated are in the same housing units as inmates that are unvaccinated. The charging parties are housed in C-Unit and according to ▇ C-Unit houses the inmates that work over in the industries compound. An inmate's vaccination status is not necessarily static. An inmate's status may be unvaccinated one day and vaccinated the next. Through interviews, it is apparent that some ▇ inmates choose to discuss their vaccination status freely, while others do not.

All of the inmates stated that they were allowed to "comingle" for the purposes of recreation, laundry pass, food services and other non-restrictive social activities but denied other services, such as visitation, hobby services, religious activities. In interviewing the inmates, clearly this is what created the most confusion. But, as ▇ has pointed out in this investigation, the pandemic did not relieve ▇ of its obligation to provide basic services and keep the facility as operational as possible.

---

(4)   This section may not be construed to impose liability on a government entity for failing to comply with a federal or state statute, regulation, order, or public health guidance related to covid-19. *(Terminates December 31. 2031—sec. 12, Ch. 516, L. 2021.)*

**History:   En. Sec. 5, Ch. 516, L. 2021.**

(emphasis added)

DEFS 001380

**Exhibit 35 - 10**

## HRB CONFIDENTIAL

Four of the inmates asserted that their visitation was restricted because they were unvaccinated, including ▮▮▮▮▮▮ It is difficult to put your arms around these allegations. ▮▮▮ provided visitation logs for August 2021 and only one of the unvaccinated inmates shows up; ▮▮▮ on August 12, 2021. ▮▮▮ asserts visitation with his wife was later cancelled. It also appears visitation was cancelled for everyone between August 15, 2021, and August 18, 2021. If an inmate's visit was supposed to occur in this timeframe, that would not be an issue. (Visitation was cancelled for all inmates.) But no one has a clear recollection of what happened when. If several inmates had tested positive inside the C-Unit, ▮▮▮▮▮▮▮ stated medical services would have recommended limiting exposure. Several inmates confirmed that both vaccinated and unvaccinated inmates were using a form of "tele-visitation." I find the inmates have not established they were denied visitation based on vaccination status.

▮▮▮ does not assert that he was denied hobbies in his complaint, but others did. ▮▮▮ argues that given the short time frame of the quarantine, the inmates cannot show they were denied hobby services. ▮▮▮ says C-Unit is called out for hobby on Wednesday nights. Because of the quarantine, there was no C-Unit hobby on August 18, 2021. ▮▮▮ provided the Inmate Call Out Sheets for hobby from July 13, 2021 through September 8, 2021. (A listing of the inmates called out to the activity.) There was no call out sheet for August 18, 2021. There are inmates that filed vaccination complaints on both the September 1, 2021, and September 8, 2021, call out sheets.

Only one inmate alleged a denial of religious services in his complaint, ▮▮▮ He was unsure of the timeframes or whether the services were being offered to anyone. ▮▮▮ was asked to send in additional information, but nothing was provided (nor did he submit a rebuttal). As for ▮▮▮ assertion that he was not allowed to get a haircut, ▮▮▮ argued did not show up for his haircut and it produced documentation he was a "no show."

In ▮▮'s timeline of the restrictions for this particular quarantine, ▮▮▮ asserted that on August 16, 2021, there were four COVID-19 positives. Initially, MSP's Warden restricted movement in the A-Unit. But this changed as the day progressed, and by the end of the day, no movement was allowed in either the A-Unit or the C-Unit. There is a lot of testing happening. ▮▮▮ says it sent out 225 PCR tests. ▮▮▮ emails reflect that it is looking to CDC guidance for protocols, including testing strategies. If there is a clear bad act to grab on to, it happens somewhere in here. ▮▮▮ allows persons that are vaccinated to return to work on August 18, 2021, whereas persons that were unvaccinated were not allowed to return to work. Later, the quarantine was lifted for unvaccinated inmates as well.

If the claim at issue involved only employment, ▮▮▮ argued the Bureau does not have jurisdiction over inmates' complaints. *See Quigg v. South, 243 Mont. 218 (1990).* In *Quigg,* the male inmates had filed a discrimination complaint asserting that they were being paid less than female inmates. Our Supreme Court found that there was statutory language, specifically §§ 53-30-151-153, MCA, that precluded this type of discrimination complaint, specifically wage based discrimination complaints. Generally speaking, the Bureau disagrees with ▮▮▮ assertion that *Quigg* is "black letter law." It remains unclear how the ruling in *Quigg* will apply to this new statute.

DEFS 001381

**Exhibit 35 - 11**

## HRB CONFIDENTIAL

All this aside, these complaints have raised a whole different question. As noted, the Bureau is working with a new statute and this new statute contains special provisions for health care facilities. *Mont. Code Ann. § 49-2-312(3)(b)*. The new statute treats health care facilities differently from other environments and the language suggests that such a facility may have to take measures to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases.

> (b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:

> (i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

> (ii)   implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

The new statute defines health care facility using § 50-5-101, MCA:

> (26)   (a)   "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

Inmates argue that because ▮▮▮▮ was not providing "quality" care, it could not be considered a health care facility, but this argument is not compelling. Quality of care may impact licensure but not designation as a health care facility. ▮▮▮▮ has been issued a health care facility license by DPPHS and ▮▮▮ is accredited by the National Commission on Correctional Healthcare.

The inmates also argued the definition of health care facility should be restricted to MSP's infirmary. The inmates have a point. It would be reasonable for the Bureau to restrict its interpretation of the term "health care facility" to those portions of ▮▮▮ that are labeled as providing health care services, specifically the infirmary. But the definition says a health care facility means "all or portion of an institution" *used* or designed to provide health services, medical treatment, or nursing, rehabilitative or preventative care to any individual. Meaning if ▮▮▮ is providing health services, medical treatment, or nursing, rehabilitative or preventative care outside of the infirmary, then seemingly this expands the scope of that "facility." In interviews, ▮▮▮ provided a laundry list of examples displaying that medical treatment is provided outside of the infirmary. This included emergency treatment, "sick calls," medication distribution, and mental health services. Add to this there are "satellite offices" for medical services throughout the ▮▮▮ campus. Then if you look at the definition of a "health care facility," it seems very broad. It includes hospitals and infirmaries, but it also picks up residential care facilities, home health agencies, medical assistance facilities. The

DEFS 001382

**Exhibit 35 - 12**

## HRB CONFIDENTIAL

use of such a broad definition suggests the legislature intended for the term health care facility to be interpreted broadly.

Bottom line, ▉ is constitutionally obligated to provide health care services for the inmates while the inmate is in MSP's custody and the provision of health care is happening across campus. *See* ▉ *4.5.2 Responsible Health Authority.* I find ▉ has presented adequate documentation to show that ▉ operates as a health care facility. Any argument that only the ▉ infirmary should be considered a health care facility doesn't hold up given the unique circumstances of this institutional setting.

The statute then says a health care facility does not discriminate if it (1) asks about vaccination status; and then (2) implements reasonable accommodation measures. Here, testimony establishes that ▉ asked inmates working in the industries compounds about vaccination status on August 16, 2021. Next, the Bureau looks at whether ▉ implemented reasonable accommodation measures. From information provided by ▉ it looks like from August 18, 2021, through August 19, 2021 - or as late as August 23, 2021 - inmates that were not vaccinated were restricted in ways inmates that were vaccinated were not, most likely from going to work in the industries compound. So, the relevant question is: Was this a reasonable accommodation measure?

As a quick aside, the Bureau notes Montana's Human Rights Act has a definition for "reasonable accommodation." *Mont. Code Ann. § 49-2-101(19).* A reasonable accommodation is some form of assistance provided to a person with a disability[5] that allows that person to perform in a position or perhaps enjoy a governmental service. In this new statute, the term "reasonable accommodation measures" appears unrelated to this definition. The term reasonable accommodation measures are not intended to attach to a person with a disability. The "measures" are to be taken to "protect the safety and health of employees, patients, visitors and other persons from communicable diseases."

In this investigation, ▉ has argued it is immune from suit under § 2-9-902, MCA, precisely because the steps it took were reasonable measures consistent with public health guidance, specifically that it restricted the movement of inmates based on vaccination status in accordance with DPHHS and CDC guidance for correctional facilities. A restriction that was lifted shortly after it was imposed.

Could ▉ have handled this differently? Arguably, it could have required working inmates to wear a full set of personal protective equipment (PPE), or it could have quarantined every inmate regardless of vaccination status similarly. But the law does not ask the Bureau to determine the best way to have handled the situation, it asks the Bureau to determine if the health care facility (1) asked about vaccination status; and (2) then implemented reasonable accommodation measures. Here, I find ▉ asked about vaccination status and then followed guidance from the CDC for correctional facilities.

If this matter goes forward, ▉ will ultimately have a variety of defenses available. ▉ may enjoy the protection of the absolute bar to complaints put forth in § 2-9-902, MCA, and since the inmates have not been able to point to any opportunity that was denied outside of

---

[5] A person with a disability has a condition or impairment that substantially limits one or more major life activities.

DEFS 001383

**Exhibit 35 - 13**

## HRB CONFIDENTIAL

employment *Quigg* may be controlling.  Following these investigations, it appears that ▇▇ would also be able to show that restrictions on unvaccinated inmates were reasonable accommodation measures.

For these reasons, I find that ▇▇▇▇ is unable to prove by a preponderance of the evidence that ▇▇ discriminated against him on the basis of vaccination status.

### CONCLUSION

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Marieke Beck*                                                              *February 25, 2022*

_____                          _____
Marieke Beck                                                                      Date
Montana Human Rights Bureau

DEFS 001384

**Exhibit 35 - 14**

# HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

| | |
|---|---|
| ▆▆▆▆▆▆▆ <br><br> Charging Party, <br><br> vs. <br><br> ▆▆▆▆▆▆▆▆▆▆▆▆[1], <br><br> Respondent. | Final Investigative Report <br><br> HRB Case No. 0210610 |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.   ISSUE PRESENTED

Did the ▆▆▆▆▆▆▆▆▆ discriminate against ▆▆▆▆▆▆ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) by subjecting him to quarantine and denying him employment and other opportunities?

## II.   SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.   Charging Party's Position Statement:

▆▆▆▆▆▆▆ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ▆▆▆▆▆▆▆▆ (▆▆▆ He asserts he is employed by Montana ▆▆▆▆▆▆▆▆▆▆ and that he was informed on August 17, 2021, that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnesses vaccinated inmates being permitted to enjoy their employment status.

---

[1] Nine complaints were filed by ▆▆▆▆▆▆▆ (▆▆▆ inmates using a template containing substantially similar language. On the template, inmates checked whether they were felt they were denied visitation or medical care, some inmates wrote in additional information regarding denials including hobby, haircuts and religious services.  The complaints all involve a quarantine by ▆▆ in August 2021 at ▆▆ The template names "▆▆▆▆▆ ▆▆▆▆▆ ▆▆▆▆▆ ▆▆▆▆▆ ▆▆▆▆▆ ▆▆▆▆▆Defendants."  The Bureau sent Charging Parties' complaints to ▆▆ which responded on behalf of all named respondents.

DEFS 001385

**Exhibit 35 - 15**

## HRB CONFIDENTIAL

He then states that, "I and all other vaccinated inmates" were allowed to commingle after work for purposes of recreation, laundry pass, food service and other non-restrictive social activities. ▮▮▮ asserted that he was denied visitation and access to hobby services.

**B.     Respondent's Position Statement:**

▮▮ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in MSP's C-Unit. In the wake of this potential exposure, inmates were quarantined based on vaccination status.

On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ▮▮ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19. The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

▮▮ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue that must be addressed before any further proceeding, ▮▮ argues the Human Rights Bureau (the Bureau) should dismiss these complaints. The Bureau is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ▮▮ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ▮▮ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims."

Additionally, ▮▮ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19. It is ▮▮ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19. Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period. Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ▮▮ "absolute immunity" from civil actions.

In response to the Bureau's requests for information, ▮▮ further argued that COVID-19 presented unique challenges because the prison population was at or near capacity for bed space. ▮▮ needed to provide certain services such as food and laundry while simultaneously managing the health crisis. ▮▮ contends it relied on the "expertise of clinical services division staff which was receiving regular guidance specific to correctional facilities from the U.S. Centers for Disease Control (CDC), the Montana Department of Health and Human Services, county/local health officials, as well as direction from the Department Director in the event of a conflict between Montana law and guidance provided by the aforementioned resources."

DEFS 001386

**Exhibit 35 - 16**

## HRB CONFIDENTIAL

███ argues the inmates complains amount to a 'brief disruption of non-employment "employment" activity,' temporary disruption of haircut services and hobby, and brief disruptions to in-person visitation.

### C.  Additional Information

The parties were asked to address the application of the health care facility provisions of § 49-2-312, MCA. ███ responded and stated that ███████████ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

Inmates argued ███ is not a health care facility given the quality of care and further, if it were, then only the ████ building containing the infirmary should be considered as a health care facility. The infirmary is a separate building from the housing units.

### D.  Witnesses

████████ **Inmate.** ████ is an inmate at ████ and he is not vaccinated. He states vaccines are not mandatory at ████ He asserted he was denied employment, visitation and hobby. ████ says if there is an outbreak on the unit, the unvaccinated are quarantined, whereas the vaccinated are allowed to go to work. ████ states this has occurred "a couple times" with the last occurring in around August 2021.

████ has been working for Montana ████████ (MCE) since March 2021. ████ states inmates work in close proximity to one another and are there from 7 a.m. to around 4:15 p.m. He says he was denied visitation once in September 2021, because he wasn't vaccinated. ████ says he 'told his family to not bother coming.' ████ said the only inmates allowed visitation at that time were the ones who were vaccinated. He doesn't know if other unvaccinated inmates are still being denied visitation.

████ says he was also denied hobby once (and a there was a second time when he wasn't scheduled for hobby). He believes this occurred in around August or September 2021. He said for the past month and a half, they have been on a regular weekly schedule where inmates can go to hobby, regardless of whether they are vaccinated.

████ indicated that he has been to the infirmary several times. He does not feel that ███ is a healthcare facility because they do not provide adequate healthcare. ████ said he does not want to get the vaccine because, as a Native American he does not believe in vaccines. He has not submitted any sort of religious accommodation relative to vaccines.

████████ **Inmate.** ████ complaint was substantially similar to the other complaints, but it was handwritten and was submitted later. ████ asserted he was denied employment, medical care, and religious services.

Initially, ████ was asked to explain the assertion in his complaint that he was denied medical care, but he did not remember making this allegation. Later in the interview, he stated that he believes he should have received treatment for a non-emergency back injury. He said another inmate was allowed to get medical services during this time and he was not.

DEFS 001387

**Exhibit 35 - 17**

## HRB CONFIDENTIAL

███ believes that inmate had a knee injury, but he is unsure of the inmate's exact medical situation or his vaccination status.)

███ complaint asserts that he was denied employment but he explained that he was in the MCE "education program" for welding. It is his recollection that ███ had multiple COVID-19 cases in the facility and initially they tried to do something with testing; if you were negative you could go to work. He believes C-Unit was locked down for a month or a month and a half. He says he wasn't allowed to go back to school for almost two months. ███ offered a witness he believes is vaccinated that was allowed to go to work.

███ says he typically attends three religious meetings every week; Fresh Lives, Baptist Bible Studies and Bread of Life, but he has not been able to attend for two to three months. Pressed, ███ wasn't sure if anyone was attending religious meetings at this time. ███ wanted more time to put together more information on his denial of religious services and stated he would send more information in, but the Bureau has not received anything.

███ **Inmate.** ███ complaint only asserts he was denied employment based on his vaccination status. In his interview, he said he was not allowed to work to earn money to make earrings or buy commissary items. ███ says he was prevented from going to work for two weeks and the unvaccinated restrictions lasted about three weeks. After a month and a half, ███ completely changed policies and the quarantines were cube specific. (The entire cube, which is a subsection of the unit, would quarantine regardless of vaccination status.)

███ wants it noted that he does not go to religious services, but he would not have been able to go if he did. Although it is not in his complaint, he also asserted that once he wanted to get a haircut but was stopped in the hall by a Correctional Officer. ███ does not recall which officer, but the officer knew ███ was not vaccinated. When ███ asked how the officer knew his vaccination status, the officer then asked, "Well, are you?" ███ said he wouldn't release this information and he was denied his haircut.

███ says an inmate in a different cube tested positive for COVID-19 and inmates in his cube were allowed to go to work if they were vaccinated. He asserts that it doesn't make sense that vaccinated and unvaccinated inmates were allowed to eat, use telephones, go in the yard and intermingle with each other but they were not allowed to enjoy other opportunities.

███ **Inmate.** ███ asserts he was denied employment and visitation based on his vaccination status.[2] ███ states that all of the housing units have been shut down at various times beginning in 2020, probably for three to four months in the beginning. He believes the C-Unit was shut down for approximately three weeks in July and August 2021. When an inmate tested positive, that inmate was sent to administrative segregation and the rest of his unit was locked down. Now, when an inmate tests positive, he is still sent to administrative segregation, but only the cube is locked down for 14 days.

---

[2] ███ submitted additional statements and said that on August 16, 2021, he was told that due to his non-vaccinated status he would have to quarantine and no longer enjoy employment, haircuts, religious activities, library, and visitation. He only asserted employment and visitation in his complaint.

DEFS 001388

**Exhibit 35 - 18**

## HRB CONFIDENTIAL

███████ began taking Motor Vocational Maintenance Classes in October 2020. He graduated in October 2021 and did not miss work during this time but missed classes that slightly prolonged his graduation, maybe a day or a week. He says he missed class time when he was quarantined in July and August 2021. ███████ says it's interesting that inmates that are unvaccinated are not allowed to go to work with vaccinated, but they all eat together. ███████ says he was supposed to have a visit with his wife, but this visit was cancelled. He says he knows of vaccinated inmates that received visits. He was asked to identify these inmates and said he would send in a list. In this later submission, ███████ doesn't identify inmates that were allowed visitation rather he lists six inmates "that had seen or heard" that vaccinated inmates were allowed to continue services. ███████ says Correctional Officers have told him that vaccinated inmates get visits, but ███████ could not recall the names of the ███ staff that told him this.

███████ believes the infirmary staff doctors/nurses need more training to provide quality care like a healthcare facility should. Since the quality of care is lacking, he does not believe ███ is a healthcare facility.

In written submissions, ███████ relayed that more recent quarantining had been done differently. Both vaccinated and unvaccinated inmates were allowed to go to work "except those that were in direct contact."

███████ **Inmate.** ███████ asserts that he was denied employment and visitation. He says when the pandemic began, he was housed up in the Shelby facility. As a result of the outbreak up there, ███████ says he has natural immunity, and he is not vaccinated. At ███ he works on buildings doing HVAC (heating ventilation and air conditioning). He moves all around the campus.

He recalls that someone tested positive in August 2021 and after that the inmates were confined for a week and then ███ gave you an option of going back to work if you were vaccinated. The vaccination was not mandatory, but it is his opinion that ███ was trying to force inmates to get the vaccine. He believes he recalls the ███ Administrator ███████ coming to the unit, but later he says maybe it was that he was given the option of doing a waiver. ███████ says he wishes he would have taken better notes. His recollection is that the quarantine was lifted and then put in place and then lifted again. He says ███ asks the inmates to wear masks, he refers to the inmates that wear masks as "sheeple."

███████ asserts he was not even allowed to use a phone during this quarantine. Asked if he could identify anyone that was allowed to go to visitation, he says he's not sure. As for any contention that ███ is a healthcare facility, ███████ doesn't believe that ███ should qualify because they 'don't provide healthcare at all.'

███████ **Inmate.** ███ is an inmate at ███ He is not vaccinated, and states vaccination is not mandatory at the prison. He asserted he was denied employment, visitation, and the ability to get a haircut. ███ was employed by ███ as a boilerman in the maintenance department. In this position, he would leave the C-Unit and go to the 'industries compound.' (The industries compound is a separate facility at ███

DEFS 001389

**Exhibit 35 - 19**

## HRB CONFIDENTIAL

█████ asserts that on or around August 16, 2021, the Administrator for Montana ████ ████ ████ ████ and another person from the Clinical Services Division announced that inmates needed to sign a "waiver" regarding their medical information to disclose their vaccination status to work in the "industries compound." ███ states he never got to read this waiver. He says if you did not sign the waiver you were assumed to be unvaccinated. It is ██████ recollection that ███ said, "if you're not vaccinated and cannot prove your vaccination status, you will be required to stay in the Unit."

██████ says ████ posted a notice listing the inmates that could go to work in the "industries compound." ████ says only persons that were vaccinated were on the list. Since he could not go to the industries compound, ████ asserts his hours were reduced significantly. It is his recollection that shortly after the complaints were filed, he was allowed to return to work. ████ states he then lost this position on October 4, 2021.

In August 2021, ████ locked down the C-Unit. ████ does not take issue with ████ quarantining individuals that test positive in accordance with the Centers for Disease Control (CDC). He tested positive in 2020, at that time the whole facility was locked down.

As for ████ assertion that he was denied visitation, he says it was "common knowledge" that you could not have visitation if you were not vaccinated. Asked how this was known, he asserted there was a memo posted by ████████ at the Command Post. ████ has been to the infirmary 12 to 15 times in the past year but disagrees that ███ as a whole should be a considered a health care facility.

████████ **Administrator for Montana** ████████████████ ████ is unfamiliar with the complaints under investigation by the Bureau, but she is familiar with the vaccination law. She explained that the industries compound is a different area of the prison and that houses MCE programs (training and educational). It also houses some ████ programs such as maintenance. ████ says that many of the inmates working in the industries compound around this time were making Personal Protected Equipment (PPE).

It is her best recollection that C-Unit went into quarantine and all movement was restricted for both vaccinated and unvaccinated inmates. After this, ████ and an ████ employee Clinical Services when to C-Unit on August 17, 2021. ████ explained that the C-Unit houses inmates that worked over in the industries compound. ████ explained to the inmates that they could sign a waiver that would allow an inmate's ████ supervisor to know the inmate's vaccination status. If an inmate was vaccinated, he could continue working pursuant to CDC guidelines. She does not recall any inmate asking her what would happen if he was not vaccinated. She believes Clinical Services then took this information back to check against existing records and then a list was created of inmates that were vaccinated. This list was disseminated to the appropriate supervisor (not the entire list of names but the names relevant to a particular supervisor). ████ denies that any sort of list was posted regarding the inmate's vaccination status.

After this, it is ████ recollection that there were concerns about the discrimination law and that the Warden sent out an email urging compliance with both the state vaccination law and the CDC guidelines. ████ contends this happened as soon as practicable. She does not recall when everyone went back to work, but it wasn't long after this.

DEFS 001390

**Exhibit 35 - 20**

# HRB CONFIDENTIAL

_____ **Medical Bureau Chief.** _____ has been with___ for 20 years. She states that she has previously experienced outbreaks of influenza but nothing like COVID-19. She states that___ routinely provides medical services outside of MSP's infirmary. She says medical staff respond to emergencies providing care at the scene. There are different types of medication and medication administration in the various housing units. If there is a "health care request" or kite by an inmate for medical services, that request needs to be assessed within a certain time frame so the inmate may be visited by medical staff in the housing units. Add to this,___ has several 'satellite offices' for health care services outside of the infirmary (e.g., locked housing unit, high side, low side, work and re-entry unit.) There's medical staff in the intake unit (the ___ Diagnostic and Intake Unit) every day.

In terms of addressing the spread of COVID-19 in the institution, _____ says there are unique challenges. For example, social distancing can be hard to achieve. _____ says there is not an across-the-board-masking requirements at ____ rather ___ works to educate staff and inmates on the available infection control protocols. If the compound is on "outbreak status" masks are recommended. ___ has utilized testing protocols, there are both rapid and PCR (nose swab sent to a lab) types of testing. Rapid testing results will be back in 15 minutes, but PCR can take several days to get results. _____ says at times ___ has run low on rapid tests and had to use more PCR tests.

_____ does not have a clear recollection of the quarantine in August 2021 (she stated she did not review her notes for the interview). _____ says the __ has worked DPHHS and relied on CDC guidance for direction. She notes the guidance has changed throughout the pandemic. In C-Unit housing unit, inmates are in cubes and share the same bathroom and have a small common area. A person that tests positive will be removed from the areas. _____ acknowledges ___ has had to change its approach depending on the circumstances, ___ is currently using a "cohorted quarantine" protocol.

### E. Documents

- Emails between___ Clinical Services Divisions staff and DPHHS staff on matters relating to masking, testing and vaccination status. (Included are _____ who is identified as Communicable Disease Nurse Consultant for the Communicable Disease and Prevention Bureau.)

- ___ 4.5.11 – Infection Control Program. Revised 12/23/16. General Requirements: "Each health care unit will monitor infectious and communicable diseases in an effort to minimize their occurrence in accordance with state and federal guidelines." Prevention: "An integral component of the infection control program is the prevention of the occurrence and spread of infectious and communicable diseases."

- Excerpts from CDC Guidance on Management of Coronavirus Disease 2019 (COVID-10) in Correctional and Detention Facilities.

DEFS 001391

**Exhibit 35 - 21**

## HRB CONFIDENTIAL

- ████ 'contact' visitation logs for August 2021.  Contact visits stop on August 15, 2021 and start again on August 19, 2021.

- C-Unit Hobby Night Call Out sheets for July 13, 2021, July 28, 2021, August 4, 2021, August 11, 2021, (there is no August 18, 2021), August 25, 2021, September 1, 2021, and September 8, 2021.  At least one of the inmates that filed is on the call out sheet for September 1, 2021 and two are on September 8, 2021.

- Undated "Sunday" Workers Only C-Unit Haircut list, ████████ is marked as a "No Show"

### F.    Timeline:

As displayed in the witness interviews **neither** party's witnesses could offer much clarity on dates relevant to the particular quarantine at issue. Albeit based on imperfect evidence, this investigator has put together the following timeline of relevant events:

| | |
|---|---|
| August 16, 2021 | Four positive staff at ████ with extensive contacts, ████ starts restricting movement by for inmates. |
| August 17, 2021 | Warden ████████ stopped all movement in various units as the day progresses (including C-Unit). No inmates were allowed any function outside of the unit. |
| August 17, 2021 | ████ solicits releases or waivers from inmates to disclose their vaccination status 'for the purpose of returning them to work.' |
| August 18, 2021 | A list of inmates who agreed to have their vaccination status released is circulated to those inmate's supervisors. These inmates 'are available for school, work, and other functions.' |
| August 19, 2021 | Director ████████ sends email to leadership team and ████ clinical director stating ████ would 'follow state law' and CDC guidelines "unless they conflict with or violate state law….[h]aving this in mind, we need to allow visitation and programs regardless of vaccination status…" |

### III.    ANALYSIS

████████ is alleging ████ unlawfully discriminated against him in the area of governmental services because of his vaccination status. He has filed a timely complaint and the Montana Human Rights Bureau has jurisdiction.

DEFS 001392

**Exhibit 35 - 22**

## HRB CONFIDENTIAL

In ▮▮▮▮▮ complaint, he asserts ▮▮▮ quarantined him based on his vaccination status on or about August 17, 2021[3], and that because he was quarantined, he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis of these complaints. All we have is the language of the applicable statute:

> **49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:
>
> (a)   a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;
>
> (b)   an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or
>
> (c)   a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.
>
> ...

In its response to these complaints, ▮▮▮ argued the Bureau should dismiss under the authority of another new statute found in Title 2, Chapter 9, "Limitations on Liability Relating to COVID-19." Under this statute, a governmental entity that takes 'reasonable measures' consistent with public health guidance will have an affirmative defense to any civil damages "for injuries or death from or relating to exposure to or potential exposure to COVID-19." *Mont. Code Ann. § 2-9-902.* In § 2-9-905, MCA, it states that if a governmental entity proves an affirmative defense, it operates as a "complete bar" to any action "relating to COVID-19." *Mont. Code Ann. § 2-9-905(4).*[4] As part of this investigation, ▮▮▮ provided

---

[3] The inmate's complaints all have a paragraph that states "On or about _____, 2021, I was informed that, due to my non-vaccinated status that I would have to quarantine in C-Unit and could no longer enjoy my employment at the industries compound." Inmates ▮▮▮ and ▮▮▮ failed to put a date in the blank, ▮▮▮ and ▮▮▮ put August 16, 2021, and ▮▮▮ and ▮▮▮ put August 17, 2021.

[4] **2-9-905.**   *(Temporary)* **Affirmative defense -- reasonable measures consistent with regulations, orders, and public health guidance.** (1) In addition to all other defenses, a government entity may assert as an affirmative defense that the government entity took reasonable measures consistent with a federal or state statute, regulation, order, or public health guidance related to covid-19 that was applicable to the government entity or activity at issue at the time of the alleged injury, death, or property damage.

(2)   If two or more sources of public health guidance are applicable, a government entity does not breach a duty of care if the person took reasonable measures consistent with one applicable set of public health guidance.

**(3)   If a government entity proves the affirmative defense contained in this section, the affirmative defense is a complete bar to any action relating to covid-19.**

DEFS 001393

**Exhibit 35 - 23**

## HRB CONFIDENTIAL

communication between ▮▮ Clinical Services and the Department of Public Health and Human Services discussing Centers for Disease Control guidance on how to best handle an outbreak in a correctional setting. ▮▮ asserts that because it was operating in accordance with this guidance, it has an affirmative defense that stands as an 'absolute bar' to an inmate complaint.

▮▮ arguments are compelling, but this statute doesn't quite seem to fit. Here, the inmates are not asserting ▮▮ is liable for their exposure or potential exposure to COVID-19. The inmates are asserting ▮▮ is liable for violating a provision of the Montana Human Rights Act that protects the inmates based on vaccination status. *Mont. Code Ann. § 49-2-312.* Ultimately, a fact finder may agree that this statute stands as a bar to inmate complaints under discrimination laws, but for now the Bureau will continue its analysis.

As we begin, it bears noting that putting together a clean timeline was <u>extremely</u> challenging. ▮▮ counsel was asked and created one, the Bureau then talked to two different ▮▮ staff as well as six different inmates in C-Unit. Most every witness stated they had some difficulty remembering the details. ▮▮ argued any restrictions on unvaccinated inmates were short term, lasting for maybe one day. Meanwhile, the inmates put restrictions on unvaccinated inmates anywhere from a week to several months. Given the testimony and documentation, it seems likely that any restrictions lasted a few days.

Everyone involved acknowledged there have been various quarantines throughout the pandemic and these various quarantines have looked different. At the beginning of the pandemic, it sounds like ▮▮ quarantined every inmate due to the scope of the outbreak, later quarantines were by housing unit, and more recently quarantines are done by "cohort" depending on an inmate's exposure (e.g., direct contact). Inmates that are vaccinated are in the same housing units as inmates that are unvaccinated. The charging parties are housed in C-Unit and according to ▮▮ C-Unit houses the inmates that work over in the industries compound. An inmate's vaccination status is not necessarily static. An inmate's status may be unvaccinated one day and vaccinated the next. Through interviews, it is apparent that some ▮▮ inmates choose to discuss their vaccination status freely, while others do not.

All of the inmates stated that they were allowed to "comingle" for the purposes of recreation, laundry pass, food services and other non-restrictive social activities but denied other services, such as visitation, hobby services, religious activities. In interviewing the inmates, clearly this is what created the most confusion. But, as ▮▮ has pointed out in this investigation, the pandemic did not relieve ▮▮ of its obligation to provide basic services and keep the facility as operational as possible.

---

(4)   This section may not be construed to impose liability on a government entity for failing to comply with a federal or state statute, regulation, order, or public health guidance related to covid-19. *(Terminates December 31, 2031--sec. 12, Ch. 516, L. 2021.)*

**History:   En. Sec. 5, Ch. 516, L. 2021.**

(emphasis added)

DEFS 001394

**Exhibit 35 - 24**

# HRB CONFIDENTIAL

███████ and other inmates asserted visitation was restricted because they were unvaccinated. It is difficult to put your arms around these allegations. ███████ provided visitation logs for August 2021 and only one of the unvaccinated inmates shows up; ███████ on August 12, 2021.  It also appears visitation was cancelled for everyone between August 15, 2021, and August 18, 2021.  If an inmate's visit was supposed to occur in this timeframe, that would not be an issue. (Visitation was cancelled for all inmates.) But no one has a clear recollection of what happened when. If several inmates had tested positive inside the C-Unit, ████████████ stated medical services would have recommended limiting exposure. Several inmates confirmed that both vaccinated and unvaccinated inmates were using a form of "tele-visitation."  I find the inmates have not established they were denied visitation based on vaccination status.

███████ also asserted he was denied hobby. ███████ argues that given the short time frame of the quarantine, the inmates cannot show they were denied hobby services. ███████ says C-Unit is called out for hobby on Wednesday nights. Because of the quarantine, there was no C-Unit hobby on August 18, 2021. ███████ provided the Inmate Call Out Sheets for hobby from July 13, 2021 through September 8, 2021.  (A listing of the inmates called out to the activity.) There was no call out sheet for August 18, 2021.  There are inmates that filed vaccination complaints on both the September 1, 2021, and September 8, 2021, call out sheets.

In ███████ timeline of the restrictions for this particular quarantine, ███████ asserted that on August 16, 2021, there were four COVID-19 positives. Initially, ███████'s Warden restricted movement in the A-Unit.  But this changed as the day progressed, and by the end of the day, no movement was allowed in either the A-Unit or the C-Unit.  There is a lot of testing happening. ███████ says it sent out 225 PCR tests. ███████ emails reflect that it is looking to CDC guidance for protocols, including testing strategies. If there is a clear bad act to grab on to, it happens somewhere in here. ███████ allows persons that are vaccinated to return to work on August 18, 2021, whereas persons that were unvaccinated were not allowed to return to work. Later, the quarantine was lifted for unvaccinated inmates as well.

If the claim at issue involved only employment, ███████ argued the Bureau does not have jurisdiction over inmates' complaints. *See Quigg v. South, 243 Mont. 218 (1990)*.  In *Quigg*, the male inmates had filed a discrimination complaint asserting that they were being paid less than female inmates. Our Supreme Court found that there was statutory language, specifically §§ 53-30-151-153, MCA, that precluded this type of discrimination complaint, specifically wage based discrimination complaints. Generally speaking, the Bureau disagrees with ███████ assertion that *Quigg* is "black letter law." It remains unclear how the ruling in *Quigg* will apply to this new statute.

All this aside, these complaints have raised a whole different question. As noted, the Bureau is working with a new statute and this new statute contains special provisions for health care facilities.  *Mont. Code Ann. § 49-2-312(3)(b)*.  The new statute treats health care facilities differently from other environments and the language suggests that such a facility may have to take measures to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases.

> (b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:

DEFS 001395

**Exhibit 35 - 25**

HRB CONFIDENTIAL

(i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

(ii)   implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

The new statute defines health care facility using § 50-5-101, MCA:

(26)   (a)   "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

Inmates argue that because ▇▇▇ was not providing "quality" care, it could not be considered a health care facility, but this argument is not compelling. Quality of care may impact licensure but not designation as a health care facility. ▇▇▇ has been issued a health care facility license by DPPHS and ▇▇▇ is accredited by the National Commission on Correctional Healthcare.

The inmates also argued the definition of health care facility should be restricted to MSP's infirmary.  The inmates have a point.  It would be reasonable for the Bureau to restrict its interpretation of the term "health care facility" to those portions of ▇▇▇ that are labeled as providing health care services, specifically the infirmary.  But the definition says a health care facility means "all or portion of an institution" *used* or designed to provide health services, medical treatment, or nursing, rehabilitative or preventative care to any individual. Meaning if ▇▇▇ is providing health services, medical treatment, or nursing, rehabilitative or preventative care outside of the infirmary, then seemingly this expands the scope of that "facility."  In interviews, ▇▇▇ provided a laundry list of examples displaying that medical treatment is provided outside of the infirmary. This included emergency treatment, "sick calls," medication distribution, and mental health services. Add to this there are "satellite offices" for medical services throughout the ▇▇▇ campus. Then if you look at the definition of a "health care facility," it seems very broad.  It includes hospitals and infirmaries, but it also picks up residential care facilities, home health agencies, medical assistance facilities. The use of such a broad definition suggests the legislature intended for the term health care facility to be interpreted broadly.

Bottom line, ▇▇▇ is constitutionally obligated to provide health care services for the inmates while the inmate is in MSP's custody and the provision of health care is happening across campus.  *See* ▇▇▇ *4.5.2 Responsible Health Authority.*  I find ▇▇▇ has presented adequate documentation to show that ▇▇▇ operates as a health care facility. Any argument that only the ▇▇▇ infirmary should be considered a health care facility doesn't hold up given the unique circumstances of this institutional setting.

DEFS 001396

**Exhibit 35 - 26**

## HRB CONFIDENTIAL

The statute then says a health care facility does not discriminate if it (1) asks about vaccination status; and then (2) implements reasonable accommodation measures. Here, testimony establishes that ▇ asked inmates working in the industries compounds about vaccination status on August 16, 2021. Next, the Bureau looks at whether ▇ implemented reasonable accommodation measures. From information provided by ▇ it looks like from August 18, 2021, through August 19, 2021 - or as late as August 23, 2021 - inmates that were not vaccinated were restricted in ways inmates that were vaccinated were not, most likely from going to work in the industries compound. So, the relevant question is: Was this a reasonable accommodation measure?

As a quick aside, the Bureau notes Montana's Human Rights Act has a definition for "reasonable accommodation." *Mont. Code Ann. § 49-2-101(19).* A reasonable accommodation is some form of assistance provided to a person with a disability[5] that allows that person to perform in a position or perhaps enjoy a governmental service. In this new statute, the term "reasonable accommodation measures" appears unrelated to this definition. The term reasonable accommodation measures are not intended to attach to a person with a disability.  The "measures" are to be taken to "protect the safety and health of employees, patients, visitors and other persons from communicable diseases."

In this investigation, ▇ has argued it is immune from suit under § 2-9-902, MCA, precisely because the steps it took were reasonable measures consistent with public health guidance, specifically that it restricted the movement of inmates based on vaccination status in accordance with DPHHS and CDC guidance for correctional facilities. A restriction that was lifted shortly after it was imposed.

Could ▇ have handled this differently?  Arguably, it could have required working inmates to wear a full set of personal protective equipment (PPE), or it could have quarantined every inmate regardless of vaccination status similarly. But the law does not ask the Bureau to determine the best way to have handled the situation, it asks the Bureau to determine if the health care facility (1) asked about vaccination status; and (2) then implemented reasonable accommodation measures. Here, I find ▇ asked about vaccination status and then followed guidance from the CDC for correctional facilities.

If this matter goes forward, ▇ will ultimately have a variety of defenses available. ▇ may enjoy the protection of the absolute bar to complaints put forth in § 2-9-902, MCA, and since the inmates have not been able to point to any opportunity that was denied outside of employment *Quigg* may be controlling.  Following these investigations, it appears that ▇ would also be able to show that restrictions on unvaccinated inmates were reasonable accommodation measures.

For these reasons, I find that ▇ is unable to prove by a preponderance of the evidence that ▇ discriminated against him on the basis of vaccination status.

### CONCLUSION

---

[5] A person with a disability has a condition or impairment that substantially limits one or more major life activities.

DEFS 001397

**Exhibit 35 - 27**

## HRB CONFIDENTIAL

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Marieke Beck*

*February 25, 2022*

---

Marieke Beck

Montana Human Rights Bureau

Date

DEFS 001398

**Exhibit 35 - 28**

# HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

| | |
|---|---|
| ████████ | |
| Charging Party, | Final Investigative Report |
| vs. | |
| ████████████████████[1], | HRB Case No. 0210597 |
| Respondent. | |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.    ISSUE PRESENTED

Did the ████████████████ discriminate against ████████ ████ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) when he was quarantined and denied employment and other opportunities?

## II.    SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.    Charging Party's Position Statement:

████ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ████████████████ ████ He asserts he is employed by Montana ████████ ████ and that on or about August 17, 2021, he was informed that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnessed vaccinated inmates being permitted to enjoy their employment status.

### B.    Respondent's Position Statement:

---

[1] Nine complaints were filed by ████████ ████ inmates on a template form containing substantially similar allegations. All these complaints involve a quarantine by ████ in August 2021 at ████ The template names '████ Clinical Services Division, Montana ████████ ████████

████████ Defendants." The Bureau sent Charging Parties' complaints to ████ and ████ responded.

DEFS 001399

**Exhibit 35 - 29**

## HRB CONFIDENTIAL

████ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in MSP's Unit C. In the wake of this potential exposure, inmates were quarantined based on vaccination status. On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided████ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19. The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

In its response, ████ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue, ████ argues HRB should dismiss these complaints. HRB is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ████ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ████ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims.

Additionally, ████ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19. It is ████ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19. Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period. Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords████ "absolute immunity" from civil actions

### C.    Additional Information

On October 20, 2021, ████ was asked to address the application of the health care facility provisions of § 49-2-312, MCA. ████ responded and stated that ████████████ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

### D.    Omissions

The Bureau currently has nine substantially similar complaints filed by inmates regarding a quarantine event on or about August 17, 2021. After████ provided its response, it was sent to the named Charging Parties on October 20, 2021. The inmates were given until November 9, 2021, to provide a rebuttal. ████ did not submit a rebuttal.

A second letter was sent on November 30, 2021, stating that if████ did not respond or contact the Bureau on or before December 20, 2021, the Bureau would write the report based on the information contained in the file. A final letter was sent to████ attention on January 11, 2021. The Bureau has not heard from████ The Bureau was able to interview and proceed with five substantially similar complaints.

DEFS 001400

**Exhibit 35 - 30**

## HRB CONFIDENTIAL

████ has not participated. The Bureau limited its investigation to the information in the file.

### III.   ANALYSIS

████ alleges ████ **unlawfully** discriminated against him in the area of governmental services because **of his vaccination status.** ████ establishes he filed a timely complaint. The Montana Human Rights Bureau has jurisdiction over the complaint.

████ asserts ████ quarantined him based on his vaccination status on or about August 17, 2021, and that because he was quarantined he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis. All we have is the language of the applicable statutes:

**49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:

(a)   a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;

(b)   an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or

(c)   a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

(2)   This section does not apply to vaccination requirements set forth for schools pursuant to Title 20, chapter 5, part 4, or day-care facilities pursuant to Title 52, chapter 2, part 7.

(3)   (a) A person, governmental entity, or an employer does not unlawfully discriminate under this section if they recommend that an employee receive a vaccine.

(b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:

(i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

(ii)   implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

DEFS 001401

**Exhibit 35 - 31**

## HRB CONFIDENTIAL

(4)    An individual may not be required to receive any vaccine whose use is allowed under an emergency use authorization or any vaccine undergoing safety trials.

(5)    As used in this section, the following definitions apply:

(a)    "Immunity passport" means a document, digital record, or software application indicating that a person is immune to a disease, either through vaccination or infection and recovery.

(b)    "Vaccination status" means an indication of whether a person has received one or more doses of a vaccine.

**History:    En. Sec. 1, Ch. 418, L. 2021.**

**49-2-313.    Exemption.** A licensed nursing home, long-term care facility, or assisted living facility is exempt from compliance with **49-2-312** during any period of time that compliance with **49-2-312** would result in a violation of regulations or guidance issued by the centers for medicare and medicaid services or the centers for disease control and prevention.

**History:    En. Sec. 2, Ch. 418, L. 2021.**

Here, ▇▇▇ submitted a boilerplate complaint that is substantially similar to complaints filed by other inmates. ▇▇▇ has chosen not to participate in this investigation. The Bureau notes when a party refuses to provide information or evidence reasonably necessary for an investigation, the Bureau can draw an "adverse inference" as to the information sought. *Admin. R. Mont. 24.8.216.*

Without ▇▇▇ participation, the Bureau cannot fully understand the adverse act(s). Further, ▇▇▇ has failed to counter ▇▇▇ various defenses. The Bureau will focus its attention on the remaining Charging Parties with substantially similar allegations.

## CONCLUSION

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Bre Koffman*                                                   February 11, 2022
_____                  _____
Bre Koffman                                                     Date
Montana Human Rights Bureau

DEFS 001402

**Exhibit 35 - 32**

## HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

|  |  |
|---|---|
| ▇▇▇▇▇▇ <br><br> Charging Party, <br><br> vs. <br><br> ▇▇▇▇▇▇▇▇▇[1], <br><br> Respondent. | Final Investigative Report <br><br><br> HRB Case No. 0220118 |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

### I.    ISSUE PRESENTED

Did the ▇▇▇▇▇▇▇▇▇▇▇▇ discriminate against ▇▇▇▇▇▇ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) by subjecting him to quarantine and denying him employment and other opportunities?

### II.    SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.    Charging Party's Position Statement:

▇▇▇▇▇▇ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ▇▇▇▇▇▇▇▇▇ ( ▇ He asserts he is employed by Montana ▇▇▇▇▇▇ and that he was informed on August 16, 2021, that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnesses vaccinated inmates being permitted to enjoy their employment status.

---

[1] Nine complaints were filed by ▇▇▇▇▇▇▇▇ inmates using a template containing substantially similar language. On the template, inmates checked whether they were felt they were denied visitation or medical care, some inmates wrote in additional information regarding denials including hobby, haircuts and religious services. The complaints all involve a quarantine by ▇▇ in August 2021 at ▇▇ The template names ▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇▇ Defendants." The Bureau sent Charging Parties' complaints to ▇▇ which responded on behalf of all named respondents.

Page 1 of 14

**Exhibit 35 - 33**

## HRB CONFIDENTIAL

He then states that, "I and all other vaccinated inmates" were allowed to commingle after work for purposes of recreation, laundry pass, food service and other non-restrictive social activities.

███ also asserted that he was denied medical care and religious services due to not being vaccinated.

**B.    Respondent's Position Statement:**

███ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in███ C-Unit. In the wake of this potential exposure, inmates were quarantined based on vaccination status.

On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided███ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19. The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

███ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue that must be addressed before any further proceeding, ███ argues the Human Rights Bureau (the Bureau) should dismiss these complaints. The Bureau is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ███ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach.███ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims."

Additionally, ███ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19. It is███ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19. Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period. Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords███ "absolute immunity" from civil actions.

In response to the Bureau's requests for information,███ further argued that COVID-19 presented unique challenges because the prison population was at or near capacity for bed space.███ needed to provide certain services such as food and laundry while simultaneously managing the health crisis.███ contends it relied on the "expertise of clinical services division staff which was receiving regular guidance specific to correctional facilities from the U.S. Centers for Disease Control (CDC), the Montana Department of Health and Human Services, county/local health officials, as well as direction from the

DEFS 001404

**Exhibit 35 - 34**

## HRB CONFIDENTIAL

Department Director in the event of a conflict between Montana law and guidance provided by the aforementioned resources."

███ argues the inmates complains amount to a 'brief disruption of non-employment "employment" activity,' temporary disruption of haircut services and hobby, and brief disruptions to in-person visitation.

### C.    Additional Information

The parties were asked to address the application of the health care facility provisions of § 49-2-312, MCA. ███ responded and stated that ███ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

Inmates argued ███ is not a health care facility given the quality of care and further, if it were, then only the ███ building containing the infirmary should be considered as a health care facility. The infirmary is a separate building from the housing units.

### D.    Witnesses

███ **Inmate.** ███ complaint was substantially similar to the other complaints, but it was handwritten and was submitted later. ███ asserted he was denied employment, medical care, and religious services.

Initially, ███ was asked to explain the assertion in his complaint that he was denied medical care, but he did not remember making this allegation. Later in the interview, he stated that he believes he should have received treatment for a non-emergency back injury. He said another inmate was allowed to get medical services during this time and he was not. (███ believes that inmate had a knee injury, but he is unsure of the inmate's exact medical situation or his vaccination status.)

███ complaint asserts that he was denied employment but he explained that he was in the ███ "education program" for welding. It is his recollection that ███ had multiple COVID-19 cases in the facility and initially they tried to do something with testing; if you were negative you could go to work. He believes C-Unit was locked down for a month or a month and a half. He says he wasn't allowed to go back to school for almost two months. ███ offered a witness he believes is vaccinated that was allowed to go to work.

███ says he typically attends three religious meetings every week; Fresh Lives, Baptist Bible Studies and Bread of Life, but he has not been able to attend for two to three months. Pressed, ███ wasn't sure if anyone was attending religious meetings at this time. ███ wanted more time to put together more information on his denial of religious services and stated he would send more information in, but the Bureau has not received anything.

███ **Inmate.** ███ complaint only asserts he was denied employment based on his vaccination status. In his interview, he said he was not allowed to work to earn money to make earrings or buy commissary items. ███ says he was prevented from going to work for two weeks and the unvaccinated restrictions lasted about three

DEFS 001405

**Exhibit 35 - 35**

## HRB CONFIDENTIAL

weeks. After a month and a half, ▮▮▮ completely changed policies and the quarantines were cube specific. (The entire cube, which is a subsection of the unit, would quarantine regardless of vaccination status.)

▮▮▮▮▮▮ wants it noted that he does not go to religious services, but he would not have been able to go if he did. Although it is not in his complaint, he also asserted that once he wanted to get a haircut but was stopped in the hall by a Correctional Officer. ▮▮▮▮ does not recall which officer, but the officer knew ▮▮▮▮▮▮ was not vaccinated. When ▮▮▮▮▮▮ asked how the officer knew his vaccination status, the officer then asked, "Well, are you?" ▮▮▮▮▮▮ said he wouldn't release this information and he was denied his haircut.

▮▮▮▮▮▮ says an inmate in a different cube tested positive for COVID-19 and inmates in his cube were allowed to go to work if they were vaccinated. He asserts that it doesn't make sense that vaccinated and unvaccinated inmates were allowed to eat, use telephones, go in the yard and intermingle with each other but they were not allowed to enjoy other opportunities.

▮▮▮▮▮▮▮▮ **Inmate.** ▮▮▮▮▮ asserts he was denied employment and visitation based on his vaccination status.[2] ▮▮▮▮▮ states that all of the housing units have been shut down at various times beginning in 2020, probably for three to four months in the beginning. He believes the C-Unit was shut down for approximately three weeks in July and August 2021. When an inmate tested positive, that inmate was sent to administrative segregation and the rest of his unit was locked down. Now, when an inmate tests positive, he is still sent to administrative segregation, but only the cube is locked down for 14 days.

▮▮▮▮▮▮ began taking Motor Vocational Maintenance Classes in October 2020. He graduated in October 2021 and did not miss work during this time but missed classes that slightly prolonged his graduation, maybe a day or a week. He says he missed class time when he was quarantined in July and August 2021. ▮▮▮▮▮▮ says it's interesting that inmates that are unvaccinated are not allowed to go to work with vaccinated, but they all eat together. ▮▮▮▮▮▮ says he was supposed to have a visit with his wife, but this visit was cancelled. He says he knows of vaccinated inmates that received visits. He was asked to identify these inmates and said he would send in a list. In this later submission, ▮▮▮▮▮▮ doesn't identify inmates that were allowed visitation rather he lists six inmates "that had seen or heard" that vaccinated inmates were allowed to continue services. ▮▮▮▮▮▮ says Correctional Officers have told him that vaccinated inmates get visits, but ▮▮▮▮ could not recall the names of the ▮▮▮ staff that told him this.

▮▮▮▮▮▮ believes the infirmary staff doctors/nurses need more training to provide quality care like a healthcare facility should. Since the quality of care is lacking, he does not believe ▮▮▮ is a healthcare facility.

---

[2] ▮▮▮▮▮ submitted additional statements and said that on August 16, 2021, he was told that due to his non-vaccinated status he would have to quarantine and no longer enjoy employment, haircuts, religious activities, library, and visitation. He only asserted employment and visitation in his complaint.

Exhibit 35 - 36

## HRB CONFIDENTIAL

In written submissions, _____ relayed that more recent quarantining had been done differently. Both vaccinated and unvaccinated inmates were allowed to go to work "except those that were in direct contact."

**_____ _____ Inmate.** _____ asserts that he was denied employment and visitation. He says when the pandemic began, he was housed up in the Shelby facility. As a result of the outbreak up there, _____ says he has natural immunity, and he is not vaccinated. At _____ he works on buildings doing HVAC (heating ventilation and air conditioning). He moves all around the campus.

He recalls that someone tested positive in August 2021 and after that the inmates were confined for a week and then _____ gave you an option of going back to work if you were vaccinated. The vaccination was not mandatory, but it is his opinion that _____ was trying to force inmates to get the vaccine. He believes he recalls the _____ Administrator _____ coming to the unit, but later he says maybe it was that he was given the option of doing a waiver. _____ says he wishes he would have taken better notes. His recollection is that the quarantine was lifted and then put in place and then lifted again. He says _____ asks the inmates to wear masks, he refers to the inmates that wear masks as "sheeple."

_____ asserts he was not even allowed to use a phone during this quarantine. Asked if he could identify anyone that was allowed to go to visitation, he says he's not sure. As for any contention that _____ is a healthcare facility, _____ doesn't believe that _____ should qualify because they 'don't provide healthcare at all.'

**_____ Inmate.** _____ is an inmate at _____ He is not vaccinated, and states vaccination is not mandatory at the prison. He asserted he was denied employment, visitation, and the ability to get a haircut. _____ was employed by _____ as a boilerman in the maintenance department. In this position, he would leave the C-Unit and go to the 'industries compound.' (The industries compound is a separate facility at _____

_____ asserts that on or around August 16, 2021, the Administrator for Montana _____ _____ and another person from the Clinical Services Division announced that inmates needed to sign a "waiver" regarding their medical information to disclose their vaccination status to work in the "industries compound." _____ states he never got to read this waiver. He says if you did not sign the waiver you were assumed to be unvaccinated. It is _____ recollection that _____ said, "if you're not vaccinated and cannot prove your vaccination status, you will be required to stay in the Unit."

_____ says _____ posted a notice listing the inmates that could go to work in the "industries compound." _____ says only persons that were vaccinated were on the list. Since he could not go to the industries compound, _____ asserts his hours were reduced significantly. It is his recollection that shortly after the complaints were filed, he was allowed to return to work. _____ states he then lost this position on October 4, 2021.

In August 2021, _____ locked down the C-Unit. _____ does not take issue with _____ quarantining individuals that test positive in accordance with the Centers for Disease Control (CDC). He tested positive in 2020, at that time the whole facility was locked down.

DEFS 001407

**Exhibit 35 - 37**

## HRB CONFIDENTIAL

As for      assertion that he was denied visitation, he says it was "common knowledge" that you could not have visitation if you were not vaccinated. Asked how this was known, he asserted there was a memo posted by      at the Command Post.      has been to the infirmary 12 to 15 times in the past year but disagrees that      as a whole should be a considered a health care facility.

     **Inmate.**      is an inmate at      and he is not vaccinated. He states vaccines are not mandatory at      He asserted he was denied employment, visitation and hobby. Johnston says if there is an outbreak on the unit, the unvaccinated are quarantined, whereas the vaccinated are allowed to go to work. Johnston states this has occurred "a couple times" with the last occurring in around August 2021.

     has been working for Montana      since March 2021.      states inmates work in close proximity to one another and are there from 7 a.m. to around 4:15 p.m. He says he was denied visitation once in September 2021, because he wasn't vaccinated.      says he 'told his family to not bother coming.'      said the only inmates allowed visitation at that time were the ones who were vaccinated. He doesn't know if other unvaccinated inmates are still being denied visitation.

     says he was also denied hobby once (and a there was a second time when he wasn't scheduled for hobby). He believes this occurred in around August or September 2021. He said for the past month and a half, they have been on a regular weekly schedule where inmates can go to hobby, regardless of whether they are vaccinated.

     indicated that he has been to the infirmary several times. He does not feel that      is a healthcare facility because they do not provide adequate healthcare.      said he does not want to get the vaccine because, as a Native American he does not believe in vaccines. He has not submitted any sort of religious accommodation relative to vaccines.

     **Administrator for Montana**      is unfamiliar with the complaints under investigation by the Bureau, but she is familiar with the vaccination law. She explained that the industries compound is a different area of the prison and that houses      programs (training and educational). It also houses some      programs such as maintenance.      says that many of the inmates working in the industries compound around this time were making Personal Protected Equipment (PPE).

It is her best recollection that C-Unit went into quarantine and all movement was restricted for both vaccinated and unvaccinated inmates. After this,      and an      employee Clinical Services when to C-Unit on August 17, 2021.      explained that the C-Unit houses inmates that worked over in the industries compound.      explained to the inmates that they could sign a waiver that would allow an inmate's      supervisor to know the inmate's vaccination status. If an inmate was vaccinated, he could continue working pursuant to CDC guidelines. She does not recall any inmate asking her what would happen if he was not vaccinated. She believes Clinical Services then took this information back to check against existing records and then a list was created of inmates that were vaccinated. This list was disseminated to the appropriate supervisor (not the entire list of names but the names relevant to a particular supervisor).      denies that any sort of list was posted regarding the inmate's vaccination status.

DEFS 001408

**Exhibit 35 - 38**

## HRB CONFIDENTIAL

After this, it is ▆▆▆▆ recollection that there were concerns about the discrimination law and that the Warden sent out an email urging compliance with both the state vaccination law and the CDC guidelines. ▆▆▆▆ contends this happened as soon as practicable. She does not recall when everyone went back to work, but it wasn't long after this.

▆▆▆▆▆▆ **Medical Bureau Chief.** ▆▆▆▆▆▆▆▆ has been with ▆▆ for 20 years. She states that she has previously experienced outbreaks of influenza but nothing like COVID-19. She states that ▆▆ routinely provides medical services outside of ▆▆ infirmary. She says medical staff respond to emergencies providing care at the scene. There are different types of medication and medication administration in the various housing units. If there is a "health care request" or kite by an inmate for medical services, that request needs to be assessed within a certain time frame so the inmate may be visited by medical staff in the housing units. Add to this, ▆▆ has several 'satellite offices' for health care services outside of the infirmary (e.g., locked housing unit, high side, low side, work and re-entry unit.) There's medical staff in the intake unit (the Martz Diagnostic and Intake Unit) every day.

In terms of addressing the spread of COVID-19 in the institution, ▆▆▆▆▆▆ says there are unique challenges. For example, social distancing can be hard to achieve. ▆▆▆▆ says there is not an across-the-board-masking requirements at ▆▆ rather ▆▆ works to educate staff and inmates on the available infection control protocols. If the compound is on "outbreak status" masks are recommended. ▆▆ has utilized testing protocols, there are both rapid and PCR (nose swab sent to a lab) types of testing. Rapid testing results will be back in 15 minutes, but PCR can take several days to get results. ▆▆▆▆▆▆ says at times ▆▆ has run low on rapid tests and had to use more PCR tests.

▆▆▆▆▆▆ does not have a clear recollection of the quarantine in August 2021 (she stated she did not review her notes for the interview). ▆▆▆▆▆▆ says the ▆▆ has worked DPHHS and relied on CDC guidance for direction. She notes the guidance has changed throughout the pandemic. In C-Unit housing unit, inmates are in cubes and share the same bathroom and have a small common area. A person that tests positive will be removed from the areas. ▆▆▆▆▆▆ acknowledges ▆▆ has had to change its approach depending on the circumstances, ▆▆ is currently using a "cohorted quarantine" protocol.

### E.   Documents

- Emails between ▆▆ Clinical Services Divisions staff and DPHHS staff on matters relating to masking, testing and vaccination status. (Included are ▆▆▆▆ who is identified as Communicable Disease Nurse Consultant for the Communicable Disease and Prevention Bureau.)

- ▆▆ 4.5.11 – Infection Control Program.  Revised 12/23/16. General Requirements: "Each health care unit will monitor infectious and communicable diseases in an effort to minimize their occurrence in accordance with state and federal guidelines."  Prevention: "An integral component of the infection control

**Exhibit 35 - 39**

program is the prevention of the occurrence and spread of infectious and communicable diseases."

- Excerpts from CDC Guidance on Management of Coronavirus Disease 2019 (COVID-10) in Correctional and Detention Facilities.
- [redacted] 'contact' visitation logs for August 2021. Contact visits stop on August 15, 2021 and start again on August 19, 2021.
- C-Unit Hobby Night Call Out sheets for July 13, 2021, July 28, 2021, August 4, 2021, August 11, 2021, (there is no August 18, 2021), August 25, 2021, September 1, 2021, and September 8, 2021. At least one of the inmates that filed is on the call out sheet for September 1, 2021 and two are on September 8, 2021.
- Undated "Sunday" Workers Only C-Unit Haircut list, [redacted] is marked as a "No Show"

**F. Timeline:**

As displayed in the witness interviews **neither** party's witnesses could offer much clarity on dates relevant to the particular quarantine at issue. Albeit based on imperfect evidence, this investigator has put together the following timeline of relevant events:

| | |
|---|---|
| August 16, 2021 | Four positive staff at [redacted] with extensive contacts, [redacted] starts restricting movement by for inmates. |
| August 17, 2021 | Warden [redacted] stopped all movement in various units as the day progresses (including C-Unit). No inmates were allowed any function outside of the unit. |
| August 17, 2021 | [redacted] solicits releases or waivers from inmates to disclose their vaccination status 'for the purpose of returning them to work.' |
| August 18, 2021 | A list of inmates who agreed to have their vaccination status released is circulated to those inmate's supervisors. These inmates 'are available for school, work, and other functions.' |
| August 19, 2021 | Director [redacted] sends email to leadership team and [redacted] clinical director stating [redacted] would 'follow state law' and CDC guidelines "unless they conflict with or violate state law....[h]aving this in mind, we need to allow visitation and programs regardless of vaccination status..." |

//

## HRB CONFIDENTIAL

### III.    ANALYSIS

████████ is alleging ████ unlawfully discriminated against him in the area of governmental services because of his vaccination status. He has filed a timely complaint and the Montana Human Rights Bureau has jurisdiction.

In ████ complaint, he asserts ████ quarantined him based on his vaccination status on or about August 16, 2021[3], and that because he was quarantined, he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy. ████ believes the restrictions lasted for several months (on religious services).

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis of these complaints. All we have is the language of the applicable statute:

49-2-312.  Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions. (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:

(a)  a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;

(b)  an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or

(c)  a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

…

In its response to these complaints, ████ argued the Bureau should dismiss under the authority of another new statute found in Title 2, Chapter 9, "Limitations on Liability Relating to COVID-19." Under this statute, a governmental entity that takes 'reasonable measures' consistent with public health guidance will have an affirmative defense to any civil damages "for injuries or death from or relating to exposure to or potential exposure to COVID-19." *Mont. Code Ann. § 2-9-902.* In § 2-9-905, MCA, it states that if a governmental entity proves an affirmative defense, it operates as a "complete bar" to any action "relating to COVID-19." *Mont. Code Ann. § 2-9-905(4).*[4] As part of this investigation, ████ provided

---

[3] The inmate's complaints all have a paragraph that states "On or about _____, 2021, I was informed that, due to my non-vaccinated status that I would have to quarantine in C-Unit and could no longer enjoy my employment at the industries compound." Inmates ████ and ████ failed to put a date in the blank, ████ and ████ put August 16, 2021, and ████ and ████ put August 17, 2021.

[4] 2-9-905.  *(Temporary)* Affirmative defense -- reasonable measures consistent with regulations, orders, and public health guidance. (1) In addition to all other defenses, a government entity may assert as an affirmative defense that the government entity took reasonable measures consistent with a federal or state statute,

DEFS 001411

**Exhibit 35 - 41**

## HRB CONFIDENTIAL

communication between ▮▮▮ Clinical Services and the Department of Public Health and Human Services discussing Centers for Disease Control guidance on how to best handle an outbreak in a correctional setting. ▮▮▮ asserts that because it was operating in accordance with this guidance, it has an affirmative defense that stands as an 'absolute bar' to an inmate complaint.

▮▮▮ arguments are compelling, but this statute doesn't quite seem to fit. Here, the inmates are not asserting ▮▮▮ is liable for their exposure or potential exposure to COVID-19. The inmates are asserting ▮▮▮ is liable for violating a provision of the Montana Human Rights Act that protects the inmates based on vaccination status. *Mont. Code Ann. § 49-2-312.* Ultimately, a fact finder may agree that this statute stands as a bar to inmate complaints under discrimination laws, but for now the Bureau will continue its analysis.

As we begin, it bears noting that putting together a clean timeline was <u>extremely</u> challenging. ▮▮▮ counsel was asked and created one, the Bureau then talked to two different ▮▮▮ staff as well as six different inmates in C-Unit. Most every witness stated they had some difficulty remembering the details. ▮▮▮ argued any restrictions on unvaccinated inmates were short term, lasting for maybe one day. Meanwhile, the inmates put restrictions on unvaccinated inmates anywhere from a week to several months. Given the testimony and documentation, it seems likely that any restrictions lasted a few days.

Everyone involved acknowledged there have been various quarantines throughout the pandemic and these various quarantines have looked different. At the beginning of the pandemic, it sounds like ▮▮▮ quarantined every inmate due to the scope of the outbreak, later quarantines were by housing unit, and more recently quarantines are done by "cohort" depending on an inmate's exposure (e.g., direct contact). Inmates that are vaccinated are in the same housing units as inmates that are unvaccinated. The charging parties are housed in C-Unit and according to ▮▮▮ C-Unit houses the inmates that work over in the industries compound. An inmate's vaccination status is not necessarily static. An inmate's status may be unvaccinated one day and vaccinated the next. Through interviews, it is apparent that some ▮▮▮ inmates choose to discuss their vaccination status freely, while others do not.

---

regulation, order, or public health guidance related to covid-19 that was applicable to the government entity or activity at issue at the time of the alleged injury, death, or property damage.

(2)   If two or more sources of public health guidance are applicable, a government entity does not breach a duty of care if the person took reasonable measures consistent with one applicable set of public health guidance.

**(3)   If a government entity proves the affirmative defense contained in this section, the affirmative defense is a complete bar to any action relating to covid-19.**

(4)   This section may not be construed to impose liability on a government entity for failing to comply with a federal or state statute, regulation, order, or public health guidance related to covid-19. *(Terminates December 31, 2031--sec. 12, Ch. 516, L. 2021.)*

**History:   En. Sec. 5, Ch. 516, L. 2021.**

(emphasis added)

DEFS 001412

**Exhibit 35 - 42**

## HRB CONFIDENTIAL

All of the inmates stated that they were allowed to "comingle" for the purposes of recreation, laundry pass, food services and other non-restrictive social activities but denied other services, such as visitation, hobby services, religious activities. In interviewing the inmates, clearly this is what created the most confusion. But, as ▮▮▮▮ has pointed out in this investigation, the pandemic did not relieve ▮▮▮ of its obligation to provide basic services and keep the facility as operational as possible.

▮▮▮▮ did not assert that his visitation was restricted because they were unvaccinated, but other inmates did. It is difficult to put your arms around these allegations. ▮▮▮▮ provided visitation logs for August 2021 and only one of the unvaccinated inmates shows up; ▮▮▮▮ on August 12, 2021. It also appears visitation was cancelled for everyone between August 15, 2021, and August 18, 2021. If an inmate's visit was supposed to occur in this timeframe, that would not be an issue. (Visitation was cancelled for all inmates.) But no one has a clear recollection of what happened when. If several inmates had tested positive inside the C-Unit, ▮▮▮▮▮▮▮ stated medical services would have recommended limiting exposure. Several inmates confirmed that both vaccinated and unvaccinated inmates were using a form of "tele-visitation." I find the inmates have not established they were denied visitation based on vaccination status.

▮▮▮▮ also did not complain that he was denied hobby, but other inmates did. ▮▮▮▮ argues that given the short time frame of the quarantine, the inmates cannot show they were denied hobby services. ▮▮▮ says C-Unit is called out for hobby on Wednesday nights. Because of the quarantine, there was no C-Unit hobby on August 18, 2021. ▮▮▮▮ provided the Inmate Call Out Sheets for hobby from July 13, 2021 through September 8, 2021. (A listing of the inmates called out to the activity.) There was no call out sheet for August 18, 2021. There are inmates that filed vaccination complaints on both the September 1, 2021, and September 8, 2021, call out sheets.

▮▮▮▮ asserted a denial of medical services. He initially did not remember this was one of his allegations. Later, ▮▮▮▮ remembered that maybe he was not allowed to seek treatment for a back injury. Given the lack of details, there's nothing to grab on to here and other witnesses indicated that they continued to receive care. As for religious services, ▮▮▮▮ explained that he attended three different services in a week. In discussing this, he was unsure of the timeframes or whether the services were being offered to anyone. ▮▮▮▮ was asked to send in additional information, but nothing was provided (nor did he submit a rebuttal).

In ▮▮ timeline of the restrictions for this particular quarantine, ▮▮▮▮ asserted that on August 16, 2021, there were four COVID-19 positives. Initially, ▮▮▮ Warden restricted movement in the A-Unit. But this changed as the day progressed, and by the end of the day, no movement was allowed in either the A-Unit or the C-Unit. There is a lot of testing happening. ▮▮▮ says it sent out 225 PCR tests. ▮▮▮ emails reflect that it is looking to CDC guidance for protocols, including testing strategies. If there is a clear bad act to grab on to, it happens somewhere in here. ▮▮▮ allows persons that are vaccinated to return to work on August 18, 2021, whereas persons that were unvaccinated were not allowed to return to work. Later, the quarantine was lifted for unvaccinated inmates as well.

DEFS 001413

**Exhibit 35 - 43**

# HRB CONFIDENTIAL

If the claim at issue involved only employment, ████ argued the Bureau does not have jurisdiction over inmates' complaints. *See Quigg v. South, 243 Mont. 218 (1990).* In *Quigg,* the male inmates had filed a discrimination complaint asserting that they were being paid less than female inmates. Our Supreme Court found that there was statutory language, specifically §§ 53-30-151-153, MCA, that precluded this type of discrimination complaint, specifically wage based discrimination complaints. Generally speaking, the Bureau disagrees with ████ assertion that *Quigg* is "black letter law." It remains unclear how the ruling in *Quigg* will apply to this new statute.

All this aside, these complaints have raised a whole different question. As noted, the Bureau is working with a new statute and this new statute contains special provisions for health care facilities. *Mont. Code Ann. § 49-2-312(3)(b).* The new statute treats health care facilities differently from other environments and the language suggests that such a facility may have to take measures to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases.

> (b)  A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:
>
> (i)  asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.
>
> (ii) implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

The new statute defines health care facility using § 50-5-101, MCA:

> (26)  (a)  "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

Inmates argue that because ████ was not providing "quality" care, it could not be considered a health care facility, but this argument is not compelling. Quality of care may impact licensure but not designation as a health care facility. ████ has been issued a health care facility license by DPPHS and ████ is accredited by the National Commission on Correctional Healthcare.

The inmates also argued the definition of health care facility should be restricted to ████ infirmary.  The inmates have a point.  It would be reasonable for the Bureau to restrict its interpretation of the term "health care facility" to those portions of ████ that are labeled as providing health care services, specifically the infirmary.  But the definition says a health care facility means "all or portion of an institution" *used* or designed to provide health services, medical treatment, or nursing, rehabilitative or preventative care to any individual. Meaning

DEFS 001414

**Exhibit 35 - 44**

## HRB CONFIDENTIAL

if ▮ is providing health services, medical treatment, or nursing, rehabilitative or preventative care outside of the infirmary, then seemingly this expands the scope of that "facility." In interviews, ▮ provided a laundry list of examples displaying that medical treatment is provided outside of the infirmary. This included emergency treatment, "sick calls," medication distribution, and mental health services. Add to this there are "satellite offices" for medical services throughout the ▮ campus. Then if you look at the definition of a "health care facility," it seems very broad. It includes hospitals and infirmaries, but it also picks up residential care facilities, home health agencies, medical assistance facilities. The use of such a broad definition suggests the legislature intended for the term health care facility to be interpreted broadly.

Bottom line, ▮ is constitutionally obligated to provide health care services for the inmates while the inmate is in ▮ custody and the provision of health care is happening across campus. *See* ▮ *4.5.2 Responsible Health Authority.* I find ▮ has presented adequate documentation to show that ▮ operates as a health care facility. Any argument that only the ▮ infirmary should be considered a health care facility doesn't hold up given the unique circumstances of this institutional setting.

The statute then says a health care facility does not discriminate if it (1) asks about vaccination status; and then (2) implements reasonable accommodation measures. Here, testimony establishes that ▮ asked inmates working in the industries compounds about vaccination status on August 16, 2021. Next, the Bureau looks at whether ▮ implemented reasonable accommodation measures. From information provided by ▮ it looks like from August 18, 2021, through August 19, 2021 - or as late as August 23, 2021 - inmates that were not vaccinated were restricted in ways inmates that were vaccinated were not, most likely from going to work in the industries compound. So, the relevant question is: Was this a reasonable accommodation measure?

As a quick aside, the Bureau notes Montana's Human Rights Act has a definition for "reasonable accommodation." *Mont. Code Ann. § 49-2-101(19).* A reasonable accommodation is some form of assistance provided to a person with a disability[5] that allows that person to perform in a position or perhaps enjoy a governmental service. In this new statute, the term "reasonable accommodation measures" appears unrelated to this definition. The term reasonable accommodation measures are not intended to attach to a person with a disability. The "measures" are to be taken to "protect the safety and health of employees, patients, visitors and other persons from communicable diseases."

In this investigation, ▮ has argued it is immune from suit under § 2-9-902, MCA, precisely because the steps it took were reasonable measures consistent with public health guidance, specifically that it restricted the movement of inmates based on vaccination status in accordance with DPHHS and CDC guidance for correctional facilities. A restriction that was lifted shortly after it was imposed.

Could ▮ have handled this differently? Arguably, it could have required working inmates to wear a full set of personal protective equipment (PPE), or it could have quarantined every inmate regardless of vaccination status similarly. But the law does not ask the Bureau to

---

[5] A person with a disability has a condition or impairment that substantially limits one or more major life activities.

DEFS 001415

**Exhibit 35 - 45**

## HRB CONFIDENTIAL

determine the best way to have handled the situation, it asks the Bureau to determine if the health care facility (1) asked about vaccination status; and (2) then implemented reasonable accommodation measures. Here, I find ▇ asked about vaccination status and then followed guidance from the CDC for correctional facilities.

If this matter goes forward, ▇ will ultimately have a variety of defenses available. ▇ may enjoy the protection of the absolute bar to complaints put forth in § 2-9-902, MCA, and since the inmates have not been able to point to any opportunity that was denied outside of employment *Quigg* may be controlling. Following these investigations, it appears that ▇ would also be able to show that restrictions on unvaccinated inmates were reasonable accommodation measures.

For these reasons, I find that ▇ is unable to prove by a preponderance of the evidence that ▇ discriminated against him on the basis of vaccination status.

**CONCLUSION**

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Marieke Beck*                                        *February 25, 2022*
_____                  _____
Marieke Beck                                                Date
Montana Human Rights Bureau

DEFS 001416

**Exhibit 35 - 46**

# HRB CONFIDENTIAL

## *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

| | |
|---|---|
| | |
| Charging Party, | Final Investigative Report |
| vs. | |
| ▮. | HRB Case No. 0210579 |
| Respondent. | |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.   ISSUE PRESENTED

Did the Department of Corrections discriminate against Juan ▮ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) by subjecting him to quarantine and denying him employment and other opportunities?

## II.   SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.   Charging Party's Position Statement:

Juan ▮ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the Montana State Prison ▮ He asserts he is employed by ▮ and that he was informed that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnesses vaccinated inmates being permitted to enjoy their employment status.

---

[1] Nine complaints were filed by Montana State Prison ▮ inmates using a template containing substantially similar language. On the template, inmates checked whether they were felt they were denied visitation or medical care, some inmates wrote in additional information regarding denials including hobby, haircuts and religious services. The complaints all involve a quarantine by ▮ in August 2021 at ▮ The template names "▮

▮ Defendants." The Bureau sent Charging Parties' complaints to ▮ which responded on behalf of all named respondents.

DEFS 001417

**Exhibit 35 - 47**

## HRB CONFIDENTIAL

He then states that, "I and all other vaccinated inmates" were allowed to commingle after work for purposes of recreation, laundry pass, food service and other non-restrictive social activities.

**B.      Respondent's Position Statement:**

████ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in ████ C-Unit. In the wake of this potential exposure, inmates were quarantined based on vaccination status.

On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ████ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19. The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

████ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue that must be addressed before any further proceeding, ████ argues the Human Rights Bureau (the Bureau) should dismiss these complaints. The Bureau is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ████ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ████ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims."

Additionally, ████ argues that the newly passed § 2-9-902, MCA, states that a governmental **entity is not liable for civil** damages for injuries or death from or relating to exposure or potential exposure to COVID-19. It is ████ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19. Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period. Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ████ "absolute immunity" from civil actions.

In response to the Bureau's requests for information, ████ further argued that COVID-19 presented unique challenges because the prison population was at or near capacity for bed space. ████ needed to provide certain services such as food and laundry while simultaneously managing the health crisis. ████ contends it relied on the "expertise of clinical services division staff which was receiving regular guidance specific to correctional facilities from the U.S. Centers for Disease Control (CDC), the Montana Department of Health and Human Services, county/local health officials, as well as direction from the Department Director in the event of a conflict between Montana law and guidance provided by the aforementioned resources."

DEFS 001418

**Exhibit 35 - 48**

[redacted] argues the inmates complains amount to a 'brief disruption of non-employment "employment" activity,' temporary disruption of haircut services and hobby, and brief disruptions to in-person visitation.

### C. Additional Information

The parties were asked to address the application of the health care facility provisions of § 49-2-312, MCA. [redacted] responded and stated that Montana State Prison is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

Inmates argued [redacted] is not a health care facility given the quality of care and further, if it were, then only the [redacted] building containing the infirmary should be considered as a health care facility. The infirmary is a separate building from the housing units.

### D. Witnesses

[redacted] **Inmate.** [redacted] complaint only asserts he was denied employment based on his vaccination status. In his interview, he said he was not allowed to work to earn money to make earrings or buy commissary items. [redacted] says he was prevented from going to work for two weeks and the unvaccinated restrictions lasted about three weeks. After a month and a half, [redacted] completely changed policies and the quarantines were cube specific. (The entire cube, which is a subsection of the unit, would quarantine regardless of vaccination status.)

[redacted] wants it noted that he does not go to religious services, but he would not have been able to go if he did. Although it is not in his complaint, he also asserted that once he wanted to get a haircut but was stopped in the hall by a Correctional Officer. [redacted] does not recall which officer, but the officer knew [redacted] was not vaccinated. When [redacted] asked how the officer knew his vaccination status, the officer then asked, "Well, are you?" [redacted] said he wouldn't release this information and he was denied his haircut.

[redacted] says an inmate in a different cube tested positive for COVID-19 and inmates in his cube were allowed to go to work if they were vaccinated. He asserts that it doesn't make sense that vaccinated and unvaccinated inmates were allowed to eat, use telephones, go in the yard and intermingle with each other but they were not allowed to enjoy other opportunities.

[redacted] **Inmate.** [redacted] asserts he was denied employment and visitation based on his vaccination status.[2] [redacted] states that all of the housing units have been shut down at various times beginning in 2020, probably for three to four months in the beginning. He believes the C-Unit was shut down for approximately three weeks in July and August 2021. When an inmate tested positive, that inmate was sent to administrative

---

[2] [redacted] submitted additional statements and said that on August 16, 2021, he was told that due to his non-vaccinated status he would have to quarantine and no longer enjoy employment, haircuts, religious activities, library, and visitation. He only asserted employment and visitation in his complaint.

## HRB CONFIDENTIAL

segregation and the rest of his unit was locked down. Now, when an inmate tests positive, he is still sent to administrative segregation, but only the cube is locked down for 14 days.

⬛ began taking Motor Vocational Maintenance Classes in October 2020. He graduated in October 2021 and did not miss work during this time but missed classes that slightly prolonged his graduation, maybe a day or a week. He says he missed class time when he was quarantined in July and August 2021. ⬛ says it's interesting that inmates that are unvaccinated are not allowed to go to work with vaccinated, but they all eat together.
⬛ says he was supposed to have a visit with his wife, but this visit was cancelled. He says he knows of vaccinated inmates that received visits. He was asked to identify these inmates and said he would send in a list. In this later submission, ⬛ doesn't identify inmates that were allowed visitation rather he lists six inmates "that had seen or heard" that vaccinated inmates were allowed to continue services. ⬛ says Correctional Officers have told him that vaccinated inmates get visits, but ⬛ could not recall the names of the ⬛ staff that told him this.

⬛ believes the infirmary staff doctors/nurses need more training to provide quality care like a healthcare facility should. Since the quality of care is lacking, he does not believe ⬛ is a healthcare facility.

In written submissions, ⬛ relayed that more recent quarantining had been done differently. Both vaccinated and unvaccinated inmates were allowed to go to work "except those that were in direct contact."

⬛ **Inmate.** ⬛ asserts that he was denied employment and visitation. He says when the pandemic began, he was housed up in the Shelby facility. As a result of the outbreak up there, ⬛ says he has natural immunity, and he is not vaccinated. At ⬛ he works on buildings doing HVAC (heating ventilation and air conditioning). He moves all around the campus.

He recalls that someone tested positive in August 2021 and after that the inmates were confined for a week and then ⬛ gave you an option of going back to work if you were vaccinated. The vaccination was not mandatory, but it is his opinion that ⬛ was trying to force inmates to get the vaccine. He believes he recalls the ⬛ Administrator ⬛ coming to the unit, but later he says maybe it was that he was given the option of doing a waiver. ⬛ says he wishes he would have taken better notes. His recollection is that the quarantine was lifted and then put in place and then lifted again. He says ⬛ asks the inmates to wear masks, he refers to the inmates that wear masks as "sheeple."

⬛ asserts he was not even allowed to use a phone during this quarantine. Asked if he could identify anyone that was allowed to go to visitation, he says he's not sure. As for any contention that ⬛ is a healthcare facility, ⬛ doesn't believe that ⬛ should qualify because they 'don't provide healthcare at all.'

⬛ **Inmate.** ⬛ is an inmate at ⬛ He is not vaccinated, and states vaccination is not mandatory at the prison. He asserted he was denied employment, visitation, and the ability to get a haircut. ⬛ was employed by ⬛ as a boilerman in the

DEFS 001420

**Exhibit 35 - 50**

## HRB CONFIDENTIAL

maintenance department. In this position, he would leave the C-Unit and go to the 'industries compound.' (The industries compound is a separate facility at

██████ asserts that on or around August 16, 2021, the Administrator for Montana Correctional Enterprises (MEC), ████████ and another person from the Clinical Services Division announced that inmates needed to sign a "waiver" regarding their medical information to disclose their vaccination status to work in the "industries compound." ██ states he never got to read this waiver. He says if you did not sign the waiver you were assumed to be unvaccinated. It is ████ recollection that ████ said, "if you're not vaccinated and cannot prove your vaccination status, you will be required to stay in the Unit."

██████ says ██ posted a notice listing the inmates that could go to work in the "industries compound." ████ says only persons that were vaccinated were on the list. Since he could not go to the industries compound, ████ asserts his hours were reduced significantly. It is his recollection that shortly after the complaints were filed, he was allowed to return to work. ██████ states he then lost this position on October 4, 2021.

In August 2021, ██████ locked down the C-Unit. ████ does not take issue with ██████ quarantining individuals that test positive in accordance with the Centers for Disease Control (CDC). He tested positive in 2020, at that time the whole facility was locked down.

As for ████ assertion that he was denied visitation, he says it was "common knowledge" that you could not have visitation if you were not vaccinated. Asked how this was known, he asserted there was a memo posted by ██████ at the Command Post. ████ has been to the infirmary 12 to 15 times in the past year but disagrees that ██ as a whole should be a considered a health care facility.

**Inmate.** ██████ is an inmate at ████ and he is not vaccinated. He states vaccines are not mandatory at ████ He asserted he was denied employment, visitation and hobby. ██████ says if there is an outbreak on the unit, the unvaccinated are quarantined, whereas the vaccinated are allowed to go to work. ██████ states this has occurred "a couple times" with the last occurring in around August 2021.

██████ has been working for Montana Correctional Enterprises ████ since March 2021. ████ states inmates work in close proximity to one another and are there from 7 a.m. to around 4:15 p.m. He says he was denied visitation once in September 2021, because he wasn't vaccinated. ██████ says he 'told his family to not bother coming.' ████ said the only inmates allowed visitation at that time were the ones who were vaccinated. He doesn't know if other unvaccinated inmates are still being denied visitation.

██████ says he was also denied hobby once (and a there was a second time when he wasn't scheduled for hobby). He believes this occurred in around August or September 2021. He said for the past month and a half, they have been on a regular weekly schedule where inmates can go to hobby, regardless of whether they are vaccinated.

██████ indicated that he has been to the infirmary several times. He does not feel that ██ is a healthcare facility because they do not provide adequate healthcare. ██████ said he does not want to get the vaccine because, as a Native American he does not believe in vaccines. He has not submitted any sort of religious accommodation relative to vaccines.

DEFS 001421

**Exhibit 35 - 51**

## HRB CONFIDENTIAL

████████ **Inmate.** ████████ complaint was substantially similar to the other complaints, but it was handwritten.  He asserted he was denied employment, medical care, and religious services.

Initially, ████ was asked to explain the assertion in his complaint that he was denied medical care, but he did not remember making this allegation. Later in the interview, he stated that he believes he should have received treatment for a non-emergency back injury. He said another inmate was allowed to get medical services during this time and he was not. ████████ believes that inmate had a knee injury, but he is unsure of the inmate's exact medical situation or his vaccination status.)

████████ complaint asserts that he was denied employment but he explained that he was in the ████ "education program" for welding. It is his recollection that ████ had multiple COVID-19 cases in the facility and initially they tried to do something with testing; if you were negative you could go to work.  He believes C-Unit was locked down for a month or a month and a half.  He says he wasn't allowed to go back to school for almost two months. ████████ offered a witness he believes is vaccinated that was allowed to go to work.

████████ says he typically attends three religious meetings every week; Fresh Lives, Baptist Bible Studies and Bread of Life, but he has not been able to attend for two to three months. Pressed, ████ wasn't sure if anyone was attending religious meetings at this time. ████ wanted more time to put together more information on his denial of religious services and stated he would send more information in, but the Bureau has not received anything.

████████ **Administrator for Montana Correctional Enterprises.** ████ is unfamiliar with the complaints under investigation by the Bureau, but she is familiar with the vaccination law.  She explained that the industries compound is a different area of the prison and that houses ████ programs (training and educational).  It also houses some ████ programs such as maintenance. ████ says that many of the inmates working in the industries compound around this time were making Personal Protected Equipment (PPE).

It is her best recollection that C-Unit went into quarantine and all movement was restricted for both vaccinated and unvaccinated inmates. After this, ████ and an ████ employee Clinical Services when to C-Unit on August 17, 2021. ████ explained that the C-Unit houses inmates that worked over in the industries compound. ████ explained to the inmates that they could sign a waiver that would allow an inmate's ████ supervisor to know the inmate's vaccination status. If an inmate was vaccinated, he could continue working pursuant to CDC guidelines. She does not recall any inmate asking her what would happen if he was not vaccinated.  She believes Clinical Services then took this information back to check against existing records and then a list was created of inmates that were vaccinated. This list was disseminated to the appropriate supervisor (not the entire list of names but the names relevant to a particular supervisor). ████ denies that any sort of list was posted regarding the inmate's vaccination status.

After this, it is ████ recollection that there were concerns about the discrimination law and that the Warden sent out an email urging compliance with both the state vaccination law

DEFS 001422

**Exhibit 35 - 52**

## HRB CONFIDENTIAL

and the CDC guidelines.█████ contends this happened as soon as practicable. She does not recall when everyone went back to work, but it wasn't long after this.

███████ Medical Bureau Chief. ██████████ has been with█████ for 20 years. She states that she has previously experienced outbreaks of influenza but nothing like COVID-19. She states that █████ routinely provides medical services outside of█████ infirmary. She says medical staff respond to emergencies providing care at the scene. There are different types of medication and medication administration in the various housing units. If there is a "health care request" or kite by an inmate for medical services, that request needs to be assessed within a certain time frame so the inmate may be visited by medical staff in the housing units. Add to this, █████ has several 'satellite offices' for health care services outside of the infirmary (e.g., locked housing unit, high side, low side, work and re-entry unit.) There's medical staff in the intake unit (the ████ Diagnostic and Intake Unit) every day.

In terms of addressing the spread of COVID-19 in the institution, ████████ says there are unique challenges. For example, social distancing can be hard to achieve. ████████ says there is not an across-the-board-masking requirements at █████ rather ███ works to educate staff and inmates on the available infection control protocols. If the compound is on "outbreak status" masks are recommended. █████ has utilized testing protocols, there are both rapid and PCR (nose swab sent to a lab) types of testing. Rapid testing results will be back in 15 minutes, but PCR can take several days to get results. ██████████ says at times █████ has run low on rapid tests and had to use more PCR tests.

████████ does not have a clear recollection of the quarantine in August 2021 (she stated she did not review her notes for the interview). ██████████ says the █████ has worked DPHHS and relied on CDC guidance for direction. She notes the guidance has changed throughout the pandemic. In C-Unit housing unit, inmates are in cubes and share the same bathroom and have a small common area. A person that tests positive will be removed from the areas. ████████ acknowledges ███ has had to change its approach depending on the circumstances, █████ is currently using a "cohorted quarantine" protocol.

### E.   Documents

- Emails between█████ Clinical Services Divisions staff and DPHHS staff on matters relating to masking, testing and vaccination status. (Included are ██████████ who is identified as Communicable Disease Nurse Consultant for the Communicable Disease and Prevention Bureau.)

- █████ 4.5.11 – Infection Control Program. Revised 12/23/16. General Requirements: "Each health care unit will monitor infectious and communicable diseases in an effort to minimize their occurrence in accordance with state and federal guidelines." Prevention: "An integral component of the infection control program is the prevention of the occurrence and spread of infectious and communicable diseases."

**Exhibit 35 - 53**

## HRB CONFIDENTIAL

- Excerpts from CDC Guidance on Management of Coronavirus Disease 2019 (COVID-10) in Correctional and Detention Facilities.

- ▮ 'contact' visitation logs for August 2021. Contact visits stop on August 15, 2021 and start again on August 19, 2021.

- C-Unit Hobby Night Call Out sheets for July 13, 2021, July 28, 2021, August 4, 2021, August 11, 2021, (there is no August 18, 2021), August 25, 2021, September 1, 2021, and September 8, 2021. At least one of the inmates that filed is on the call out sheet for September 1, 2021 and two are on September 8, 2021.

- Undated "Sunday" Workers Only C-Unit Haircut list, ▮        ▮ is marked as a "No Show"

### F.    Timeline:

As displayed in the witness interviews **neither** party's witnesses could offer much clarity on dates relevant to the particular quarantine at issue. Albeit based on imperfect evidence, this investigator has put together the following timeline of relevant events:

| | |
|---|---|
| August 16, 2021 | Four positive staff at ▮ with extensive contacts, ▮ starts restricting movement by for inmates. |
| August 17, 2021 | Warden ▮ stopped all movement in various units as the day progresses (including C-Unit). No inmates were allowed any function outside of the unit. |
| August 17, 2021 | ▮ solicits releases or waivers from inmates to disclose their vaccination status 'for the purpose of returning them to work.' |
| August 18, 2021 | A list of inmates who agreed to have their vaccination status released is circulated to those inmate's supervisors. These inmates 'are available for school, work, and other functions.' |
| August 19, 2021 | Director ▮ sends email to leadership team and ▮ clinical director stating ▮ would 'follow state law' and CDC guidelines "unless they conflict with or violate state law….[h]aving this in mind, we need to allow visitation and programs regardless of vaccination status…" |

### III.    ANALYSIS

▮        ▮ is alleging ▮ unlawfully discriminated against him in the area of governmental services because of his vaccination status. He has filed a timely complaint and the Montana Human Rights Bureau has jurisdiction.

DEFS 001424

**Exhibit 35 - 54**

## HRB CONFIDENTIAL

In _____ complaint, he asserts _____ quarantined him based on his vaccination status[3] and that because he was quarantined, he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy. It is _____ recollection this occurred in July and August.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis of these complaints. All we have is the language of the applicable statute:

> **49-2-312. Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:
>
> (a)  a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;
>
> (b)  an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or
>
> (c)  a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

...

In its response to these complaints, _____ argued the Bureau should dismiss under the authority of another new statute found in Title 2, Chapter 9, "Limitations on Liability Relating to COVID-19." Under this statute, a governmental entity that takes 'reasonable measures' consistent with public health guidance will have an affirmative defense to any civil damages "for injuries or death from or relating to exposure to or potential exposure to COVID-19." *Mont. Code Ann. § 2-9-902.* In § 2-9-905, MCA, it states that if a governmental entity proves an affirmative defense, it operates as a "complete bar" to any action "relating to COVID-19." *Mont. Code Ann. § 2-9-905(4).[4]* As part of this investigation, _____ provided

---

[3] The inmate's complaints all have a paragraph that states "On or about _____, 2021, I was informed that, due to my non-vaccinated status that I would have to quarantine in C-Unit and could no longer enjoy my employment at the industries compound." Inmates _____ and _____ failed to put a date in the blank, _____ and _____ put August 16, 2021, and _____ and _____ put August 17, 2021.

[4] **2-9-905.** *(Temporary)* **Affirmative defense -- reasonable measures consistent with regulations, orders, and public health guidance.** (1) In addition to all other defenses, a government entity may assert as an affirmative defense that the government entity took reasonable measures consistent with a federal or state statute, regulation, order, or public health guidance related to covid-19 that was applicable to the government entity or activity at issue at the time of the alleged injury, death, or property damage.

(2)  If two or more sources of public health guidance are applicable, a government entity does not breach a duty of care if the person took reasonable measures consistent with one applicable set of public health guidance.

**(3)  If a government entity proves the affirmative defense contained in this section, the affirmative defense is a complete bar to any action relating to covid-19.**

DEFS 001425

**Exhibit 35 - 55**

## HRB CONFIDENTIAL

communication between ▮▮ Clinical Services and the Department of Public Health and Human Services discussing Centers for Disease Control guidance on how to best handle an outbreak in a correctional setting. ▮▮ asserts that because it was operating in accordance with this guidance, it has an affirmative defense that stands as an 'absolute bar' to an inmate complaint.

▮▮ arguments are compelling, but this statute doesn't quite seem to fit. Here, the inmates are not asserting ▮▮ is liable for their exposure or potential exposure to COVID-19. The inmates are asserting ▮▮ is liable for violating a provision of the Montana Human Rights Act that protects the inmates based on vaccination status. *Mont. Code Ann.* § *49-2-312.* Ultimately, a fact finder may agree that this statute stands as a bar to inmate complaints under discrimination laws, but for now the Bureau will continue its analysis.

As we begin, it bears noting that putting together a clean timeline was <u>extremely</u> challenging. ▮▮ counsel was asked and created one, the Bureau then talked to two different ▮▮ staff as well as six different inmates in C-Unit. Most every witness stated they had some difficulty remembering the details. ▮▮ argued any restrictions on unvaccinated inmates were short term, lasting for maybe one day. Meanwhile, the inmates put restrictions on unvaccinated inmates anywhere from a week to several months. Given the testimony and documentation, it seems likely that any restrictions lasted a few days.

Everyone involved acknowledged there have been various quarantines throughout the pandemic and these various quarantines have looked different. At the beginning of the pandemic, it sounds like ▮▮ quarantined every inmate due to the scope of the outbreak, later quarantines were by housing unit, and more recently quarantines are done by "cohort" depending on an inmate's exposure (e.g., direct contact). Inmates that are vaccinated are in the same housing units as inmates that are unvaccinated. The charging parties are housed in C-Unit and according to ▮▮ C-Unit houses the inmates that work over in the industries compound. An inmate's vaccination status is not necessarily static. An inmate's status may be unvaccinated one day and vaccinated the next. Through interviews, it is apparent that some ▮▮ inmates choose to discuss their vaccination status freely, while others do not.

All of the inmates stated that they were allowed to "comingle" for the purposes of recreation, laundry pass, food services and other non-restrictive social activities but denied other services, such as visitation, hobby services, religious activities. In interviewing the inmates, clearly this is what created the most confusion. But, as ▮▮ has pointed out in this investigation, the pandemic did not relieve ▮▮ of its obligation to provide basic services and keep the facility as operational as possible.

---

(4)   This section may not be construed to impose liability on a government entity for failing to comply with a federal or state statute, regulation, order, or public health guidance related to covid-19. *(Terminates December 31, 2031–sec. 12, Ch. 516, L. 2021.)*

**History:**   En. Sec. 5, Ch. 516, L. 2021.

(emphasis added)

DEFS 001426

**Exhibit 35 - 56**

## HRB CONFIDENTIAL

████ did not assert that his visitation was restricted because they were unvaccinated, but other inmates did. It is difficult to put your arms around these allegations. ████ provided visitation logs for August 2021 and only one of the unvaccinated inmates shows up; ████ on August 12, 2021. It also appears visitation was cancelled for everyone between August 15, 2021, and August 18, 2021. If an inmate's visit was supposed to occur in this timeframe, that would not be an issue. (Visitation was cancelled for all inmates.) But no one has a clear recollection of what happened when. If several inmates had tested positive inside the C-Unit, ████ stated medical services would have recommended limiting exposure. Several inmates confirmed that both vaccinated and unvaccinated inmates were using a form of "tele-visitation." I find the inmates have not established they were denied visitation based on vaccination status.

In his interview, ████ talked about his access to hobbies, but he did not put this in his complaint. ████ argues that given the short time frame of the quarantine, the inmates cannot show they were denied hobby services. ████ says C-Unit is called out for hobby on Wednesday nights. Because of the quarantine, there was no C-Unit hobby on August 18, 2021. ████ provided the Inmate Call Out Sheets for hobby from July 13, 2021 through September 8, 2021. (A listing of the inmates called out to the activity.) There was no call out sheet for August 18, 2021. There are inmates that filed vaccination complaints on both the September 1, 2021, and September 8, 2021, call out sheets.

Only one inmate alleged a denial of religious services in his complaint, ████ He was unsure of the timeframes or whether the services were being offered to anyone. ████ was asked to send in additional information, but nothing was provided (nor did he submit a rebuttal). As for ████ assertion that he was not allowed to get a haircut, ████ argued ████ did not show up for his haircut and it produced documentation he was a "no show."

In ████ timeline of the restrictions for this particular quarantine, ████ asserted that on August 16, 2021, there were four COVID-19 positives. Initially, ████ Warden restricted movement in the A-Unit. But this changed as the day progressed, and by the end of the day, no movement was allowed in either the A-Unit or the C-Unit. There is a lot of testing happening. ████ says it sent out 225 PCR tests. ████ emails reflect that it is looking to CDC guidance for protocols, including testing strategies. If there is a clear bad act to grab on to, it happens somewhere in here. ████ allows persons that are vaccinated to return to work on August 18, 2021, whereas persons that were unvaccinated were not allowed to return to work. Later, the quarantine was lifted for unvaccinated inmates as well.

If the claim at issue involved only employment, ████ argued the Bureau does not have jurisdiction over inmates' complaints. *See Quigg v. South, 243 Mont. 218 (1990).* In *Quigg*, the male inmates had filed a discrimination complaint asserting that they were being paid less than female inmates. Our Supreme Court found that there was statutory language, specifically §§ 53-30-151-153, MCA, that precluded this type of discrimination complaint, specifically wage based discrimination complaints. Generally speaking, the Bureau disagrees with ████ assertion that *Quigg* is "black letter law." It remains unclear how the ruling in *Quigg* will apply to this new statute.

All this aside, these complaints have raised a whole different question. As noted, the Bureau is working with a new statute and this new statute contains special provisions for health care

DEFS 001427

**Exhibit 35 - 57**

HRB CONFIDENTIAL

facilities. *Mont. Code Ann. § 49-2-312(3)(b).* The new statute treats health care facilities differently from other environments and the language suggests that such a facility may have to take measures to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases.

> (b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:
>
> (i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.
>
> (ii)   implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

The new statute defines health care facility using § 50-5-101, MCA:

> (26)   (a)   "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

Inmates argue that because ▮▮▮ was not providing "quality" care, it could not be considered a health care facility, but this argument is not compelling. Quality of care may impact licensure but not designation as a health care facility. ▮▮▮ has been issued a health care facility license by DPPHS and ▮▮ is accredited by the National Commission on Correctional Healthcare.

The inmates also argued the definition of health care facility should be restricted to ▮▮▮ infirmary. The inmates have a point. It would be reasonable for the Bureau to restrict its interpretation of the term "health care facility" to those portions of ▮▮ that are labeled as providing health care services, specifically the infirmary.  But the definition says a health care facility means "all or portion of an institution" *used* or designed to provide health services, medical treatment, or nursing, rehabilitative or preventative care to any individual. Meaning if ▮▮ is providing health services, medical treatment, or nursing, rehabilitative or preventative care outside of the infirmary, then seemingly this expands the scope of that "facility."  In interviews, ▮▮ provided a laundry list of examples displaying that medical treatment is provided outside of the infirmary. This included emergency treatment, "sick calls," medication distribution, and mental health services. Add to this there are "satellite offices" for medical services throughout the ▮▮ campus. Then if you look at the definition of a "health care facility," it seems very broad.  It includes hospitals and infirmaries, but it also picks up residential care facilities, home health agencies, medical assistance facilities. The use of such a broad definition suggests the legislature intended for the term health care facility to be interpreted broadly.

DEFS 001428

**Exhibit 35 - 58**

## HRB CONFIDENTIAL

Bottom line, ▮ is constitutionally obligated to provide health care services for the inmates while the inmate is in ▮ custody and the provision of health care is happening across campus. *See* ▮ *4.5.2 Responsible Health Authority.* I find ▮ has presented adequate documentation to show that ▮ operates as a health care facility. Any argument that only the ▮ infirmary should be considered a health care facility doesn't hold up given the unique circumstances of this institutional setting.

The statute then says a health care facility does not discriminate if it (1) asks about vaccination status; and then (2) implements reasonable accommodation measures. Here, testimony establishes that ▮ asked inmates working in the industries compounds about vaccination status on August 16, 2021. Next, the Bureau looks at whether ▮ implemented reasonable accommodation measures. From information provided by ▮ it looks like from August 18, 2021, through August 19, 2021 - or as late as August 23, 2021 - inmates that were not vaccinated were restricted in ways inmates that were vaccinated were not, most likely from going to work in the industries compound. So, the relevant question is: Was this a reasonable accommodation measure?

As a quick aside, the Bureau notes Montana's Human Rights Act has a definition for "reasonable accommodation." *Mont. Code Ann. § 49-2-101(19).* A reasonable accommodation is some form of assistance provided to a person with a disability[5] that allows that person to perform in a position or perhaps enjoy a governmental service. In this new statute, the term "reasonable accommodation measures" appears unrelated to this definition. The term reasonable accommodation measures are not intended to attach to a person with a disability. The "measures" are to be taken to "protect the safety and health of employees, patients, visitors and other persons from communicable diseases."

In this investigation, ▮ has argued it is immune from suit under § 2-9-902, MCA, precisely because the steps it took were reasonable measures consistent with public health guidance, specifically that it restricted the movement of inmates based on vaccination status in accordance with DPHHS and CDC guidance for correctional facilities. A restriction that was lifted shortly after it was imposed.

Could ▮ have handled this differently? Arguably, it could have required working inmates to wear a full set of personal protective equipment (PPE), or it could have quarantined every inmate regardless of vaccination status similarly. But the law does not ask the Bureau to determine the best way to have handled the situation, it asks the Bureau to determine if the health care facility (1) asked about vaccination status; and (2) then implemented reasonable accommodation measures. Here, I find ▮ asked about vaccination status and then followed guidance from the CDC for correctional facilities.

If this matter goes forward, ▮ will ultimately have a variety of defenses available. ▮ may enjoy the protection of the absolute bar to complaints put forth in § 2-9-902, MCA, and since the inmates have not been able to point to any opportunity that was denied outside of employment *Quigg* may be controlling. Following these investigations, it appears that ▮

---

[5] A person with a disability has a condition or impairment that substantially limits one or more major life activities.

DEFS 001429

**Exhibit 35 - 59**

## HRB CONFIDENTIAL

would also be able to show that restrictions on unvaccinated inmates were reasonable accommodation measures.

For these reasons, I find that ▮▮▮▮▮ is unable to prove by a preponderance of the evidence that ▮▮ discriminated against him on the basis of vaccination status.

**CONCLUSION**

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Marieke Beck*                                                                 *February 25, 2022*

_____                    _____

Marieke Beck                                                                    Date
Montana Human Rights Bureau

DEFS 001430

**Exhibit 35 - 60**

# HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

| | |
|---|---|
| ▆▆▆▆▆▆ <br><br> Charging Party, <br><br> vs. <br><br> ▆▆▆▆▆▆▆▆▆▆▆[1], <br><br> Respondent. | Final Investigative Report <br><br> HRB Case No. 0210599 |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.    ISSUE PRESENTED

Did the ▆▆▆▆▆▆▆▆▆ discriminate against ▆▆▆▆▆ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) by subjecting him to quarantine and denying him employment and other opportunities?

## II.    SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.    Charging Party's Position Statement:

▆▆▆▆▆ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ▆▆▆▆▆▆▆▆▆▆ ( **He asserts he is employed by** ▆▆ **and** that he was informed that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnesses vaccinated inmates being permitted to enjoy their employment status.

He then states that, "I and all other vaccinated inmates" were allowed to commingle after work for purposes of recreation, laundry pass, food service and other non-restrictive social

---

[1] Nine complaints were filed by ▆▆▆▆▆▆ ▆▆ inmates using a template containing substantially similar language. On the template, inmates checked whether they were felt they were denied visitation or **medical care, some inmates wrote in additional information regarding denials including hobby, haircuts and** religious services. The complaints all involve a **quarantine by** ▆▆ **in August 2021 at** ▆▆ **The template** names ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Defendants." The Bureau sent Charging Parties' complaints to ▆▆ which responded on behalf of all named respondents.

DEFS 001431

**Exhibit 35 - 61**

## HRB CONFIDENTIAL

activities. He asserts that as a result of the quarantine he has been denied services and privileges such as visitation and the "ability to get a haircut."

**B.    Respondent's Position Statement:**

████ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in ████ C-Unit. In the wake of this potential exposure, inmates were quarantined based on vaccination status.

On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ████ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19.  The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

████ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue that must be addressed before any further proceeding, ████ argues the Human Rights Bureau (the Bureau) should dismiss these complaints.  The Bureau is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ████ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ████ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims."

Additionally, ████ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19.  It is ████ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19.  Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period.  Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ████ "absolute immunity" from civil actions.

In response to the Bureau's requests for information, ████ further argued that COVID-19 presented unique challenges because the prison population was at or near capacity for bed space. ████ needed to provide certain services such as food and laundry while simultaneously managing the health crisis. ████ contends it relied on the "expertise of clinical services division staff which was receiving regular guidance specific to correctional facilities from the U.S. Centers for Disease Control (CDC), the Montana Department of Health and Human Services, county/local health officials, as well as direction from the Department Director in the event of a conflict between Montana law and guidance provided by the aforementioned resources."

DEFS 001432

**Exhibit 35 - 62**

## HRB CONFIDENTIAL

▉▉▉ argues the inmates complains amount to a 'brief disruption of non-employment "employment" activity,' temporary disruption of haircut services and hobby, and brief disruptions to in-person visitation.

#### C.    Additional Information

The parties were asked to address the application of the health care facility provisions of § 49-2-312, MCA. ▉▉▉ responded and stated that ▉▉▉▉▉▉ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

Inmates argued ▉▉▉ is not a health care facility given the quality of care and further, if it were, then only the ▉▉▉ building containing the infirmary should be considered as a health care facility. The infirmary is a separate building from the housing units.

#### D.    Witnesses

▉▉▉▉▉▉▉ **Inmate.** ▉▉▉ is an inmate at ▉▉▉ He is not vaccinated, and states vaccination is not mandatory at the prison. He asserted he was denied employment, visitation, and the ability to get a haircut. ▉▉▉ was employed by ▉▉▉ as a boilerman in the maintenance department. In this position, he would leave the C-Unit and go to the 'industries compound.' (The industries compound is a separate facility at ▉▉▉

▉▉▉ asserts that on or around August 16, 2021, the Administrator for Montana ▉▉▉▉▉ ▉▉▉▉ ▉▉▉▉▉▉ and another person from the Clinical Services Division announced that inmates needed to sign a "waiver" regarding their medical information to disclose their vaccination status to work in the "industries compound." ▉▉▉ states he never got to read this waiver. He says if you did not sign the waiver you were assumed to be unvaccinated. It is ▉▉▉ recollection that ▉▉▉ said, "if you're not vaccinated and cannot prove your vaccination status, you will be required to stay in the Unit."

▉▉▉ says ▉▉▉ posted a notice listing the inmates that could go to work in the "industries compound." ▉▉▉ says only persons that were vaccinated were on the list. Since he could not go to the industries compound, ▉▉▉ asserts his hours were reduced significantly. It is his recollection that shortly after the complaints were filed, he was allowed to return to work. ▉▉▉ states he then lost this position on October 4, 2021.[2]

In August 2021, ▉▉▉ locked down the C-Unit. ▉▉▉ does not take issue with ▉▉▉ quarantining individuals that test positive in accordance with the Centers for Disease Control (CDC). He tested positive in 2020, at that time the whole facility was locked down.

As for ▉▉▉ assertion that he was denied visitation, he says it was "common knowledge" that you could not have visitation if you were not vaccinated. Asked how this was known, he asserted there was a memo posted by ▉▉▉ at the Command Post. ▉▉▉ has been to the infirmary 12 to 15 times in the past year but disagrees that ▉▉▉ as a whole should be a considered a health care facility.

---

[2] ▉▉▉ indicated he was retaliated against for filing this complaint. The Bureau informed ▉▉▉ he could pursue a claim of retaliation, but he would need to file a new complaint to initiate an investigation of that claim.

DEFS 001433

**Exhibit 35 - 63**

## HRB CONFIDENTIAL

██████████ **Inmate.** ████████ is an inmate at ███ and he is not vaccinated. He states vaccines are not mandatory at ████ He asserted he was denied employment, visitation and hobby. ████████ says if there is an outbreak on the unit, the unvaccinated are quarantined, whereas the vaccinated are allowed to go to work. ████████ states this has occurred "a couple times" with the last occurring in around August 2021.

██████ has been working for Montana ████████████ ████████ since March 2021. ████████ states inmates work in close proximity to one another and are there from 7 a.m. to around 4:15 p.m. He says he was denied visitation once in September 2021, because he wasn't vaccinated. ████████ says he 'told his family to not bother coming.' ████████ said the only inmates allowed visitation at that time were the ones who were vaccinated. He doesn't know if other unvaccinated inmates are still being denied visitation.

██████ says he was also denied hobby once (and a there was a second time when he wasn't scheduled for hobby). He believes this occurred in around August or September 2021. He said for the past month and a half, they have been on a regular weekly schedule where inmates can go to hobby, regardless of whether they are vaccinated.

██████ indicated that he has been to the infirmary several times. He does not feel that ████ is a healthcare facility because they do not provide adequate healthcare. ████████ said he does not want to get the vaccine because, as a Native American he does not believe in vaccines. He has not submitted any sort of religious accommodation relative to vaccines.

██████ **Inmate.** ████████ complaint only asserts he was denied employment based on his vaccination status. In his interview, he said he was not allowed to work to earn money to make earrings or buy commissary items. ████████ says he was prevented from going to work for two weeks and the unvaccinated restrictions lasted about three weeks. After a month and a half, ████ completely changed policies and the quarantines were cube specific. (The entire cube, which is a subsection of the unit, would quarantine regardless of vaccination status.)

██████ wants it noted that he does not go to religious services, but he would not have been able to go if he did. Although it is not in his complaint, he also asserted that once he wanted to get a haircut but was stopped in the hall by a Correctional Officer. ████████ does not recall which officer, but the officer knew ████████ was not vaccinated. When ████████ asked how the officer knew his vaccination status, the officer then asked, "Well, are you?" ████████ said he wouldn't release this information and he was denied his haircut.

██████ says an inmate in a different cube tested positive for COVID-19 and inmates in his cube were allowed to go to work if they were vaccinated. He asserts that it doesn't make sense that vaccinated and unvaccinated inmates were allowed to eat, use telephones, go in the yard and intermingle with each other but they were not allowed to enjoy other opportunities.

DEFS 001434

**Exhibit 35 - 64**

## HRB CONFIDENTIAL

**Inmate.** ⬛⬛⬛ asserts he was denied employment and visitation based on his vaccination status.[3] ⬛⬛⬛ states that all of the housing units have been shut down at various times beginning in 2020, probably for three to four months in the beginning. He believes the C-Unit was shut down for approximately three weeks in July and August 2021. When an inmate tested positive, that inmate was sent to administrative segregation and the rest of his unit was locked down. Now, when an inmate tests positive, he is still sent to administrative segregation, but only the cube is locked down for 14 days.

⬛⬛⬛ began taking Motor Vocational Maintenance Classes in October 2020. He graduated in October 2021 and did not miss work during this time but missed classes that slightly prolonged his graduation, maybe a day or a week. He says he missed class time when he was quarantined in July and August 2021. ⬛⬛⬛ says it's interesting that inmates that are unvaccinated are not allowed to go to work with vaccinated, but they all eat together. ⬛⬛⬛ says he was supposed to have a visit with his wife, but this visit was cancelled. He says he knows of vaccinated inmates that received visits. He was asked to identify these inmates and said he would send in a list. In this later submission, ⬛⬛⬛ doesn't identify inmates that were allowed visitation rather he lists six inmates "that had seen or heard" that vaccinated inmates were allowed to continue services. ⬛⬛⬛ says Correctional Officers have told him that vaccinated inmates get visits, but ⬛⬛⬛ could not recall the names of the ⬛⬛ staff that told him this.

⬛⬛⬛ believes the infirmary staff doctors/nurses need more training to provide quality care like a healthcare facility should. Since the quality of care is lacking, he does not believe ⬛⬛ is a healthcare facility.

In written submissions, ⬛⬛⬛ relayed that more recent quarantining had been done differently. Both vaccinated and unvaccinated inmates were allowed to go to work "except those that were in direct contact."

**Inmate.** ⬛⬛⬛ asserts that he was denied employment and visitation. He says when the pandemic began, he was housed up in the Shelby facility. As a result of the outbreak up there, ⬛⬛⬛ says he has natural immunity, and he is not vaccinated. At ⬛⬛ he works on buildings doing HVAC (heating ventilation and air conditioning). He moves all around the campus.

He recalls that someone tested positive in August 2021 and after that the inmates were confined for a week and then ⬛⬛ gave you an option of going back to work if you were vaccinated. The vaccination was not mandatory, but it is his opinion that ⬛⬛ was trying to force inmates to get the vaccine. He believes he recalls the ⬛⬛ Administrator ⬛⬛⬛ coming to the unit, but later he says maybe it was that he was given the option of doing a waiver. ⬛⬛⬛ says he wishes he would have taken better notes. His recollection is that the quarantine was lifted and then put in place and then lifted again. He says ⬛⬛ asks the inmates to wear masks, he refers to the inmates that wear masks as "sheeple."

---

[3] ⬛⬛⬛ submitted additional statements and said that on August 16, 2021, he was told that due to his non-vaccinated status he would have to quarantine and no longer enjoy employment, haircuts, religious activities, library, and visitation. He only asserted employment and visitation in his complaint.

Exhibit 35 - 65

## HRB CONFIDENTIAL

██████ asserts he was not even allowed to use a phone during this quarantine. Asked if he could identify anyone that was allowed to go to visitation, he says he's not sure. As for any contention that ████ is a healthcare facility, ██████ doesn't believe that ████ should qualify because they 'don't provide healthcare at all.'

██████████ **Inmate.** ██████ complaint was substantially similar to the other complaints, but it was handwritten. He asserted he was denied employment, medical care, and religious services.

Initially, ██████ was asked to explain the assertion in his complaint that he was denied medical care, but he did not remember making this allegation. Later in the interview, he stated that he believes he should have received treatment for a non-emergency back injury. He said another inmate was allowed to get medical services during this time and he was not. (██████ believes that inmate had a knee injury, but he is unsure of the inmate's exact medical situation or his vaccination status.)

██████ complaint asserts that he was denied employment but he explained that he was in the MCE "education program" for welding. It is his recollection that ████ had multiple COVID-19 cases in the facility and initially they tried to do something with testing; if you were negative you could go to work. He believes C-Unit was locked down for a month or a month and a half. He says he wasn't allowed to go back to school for almost two months. ██████ offered a witness he believes is vaccinated that was allowed to go to work.

██████ says he typically attends three religious meetings every week; Fresh Lives, Baptist Bible Studies and Bread of Life, but he has not been able to attend for two to three months. Pressed, ████ wasn't sure if anyone was attending religious meetings at this time. ██████ wanted more time to put together more information on his denial of religious services and stated he would send more information in, but the Bureau has not received anything.

██████████ **Administrator** ██████████████████████ ████ is unfamiliar with the complaints under investigation by the Bureau, but she is familiar with the vaccination law. She explained that the industries compound is a different area of the prison and that houses MCE programs (training and educational). It also houses some ████ programs such as maintenance. ██████ says that many of the inmates working in the industries compound around this time were making Personal Protected Equipment (PPE).

It is her best recollection that C-Unit went into quarantine and all movement was restricted for both vaccinated and unvaccinated inmates. After this, ████ and an ████ employee Clinical Services when to C-Unit on August 17, 2021. ████ explained that the C-Unit houses inmates that worked over in the industries compound. ████ explained to the inmates that they could sign a waiver that would allow an inmate's ████ supervisor to know the inmate's vaccination status. If an inmate was vaccinated, he could continue working pursuant to CDC guidelines. She does not recall any inmate asking her what would happen if he was not vaccinated. She believes Clinical Services then took this information back to check against existing records and then a list was created of inmates that were vaccinated. This list was disseminated to the appropriate supervisor (not the entire list of names but the

DEFS 001436

**Exhibit 35 - 66**

## HRB CONFIDENTIAL

names relevant to a particular supervisor). ▮ denies that any sort of list was posted regarding the inmate's vaccination status.

After this, it is ▮ recollection that there were concerns about the discrimination law and that the Warden sent out an email urging compliance with both the state vaccination law and the CDC guidelines. ▮ contends this happened as soon as practicable. She does not recall when everyone went back to work, but it wasn't long after this.

▮ **Medical Bureau Chief.** ▮ has been with ▮ for 20 years. She states that she has previously experienced outbreaks of influenza but nothing like COVID-19. She states that ▮ routinely provides medical services outside of ▮ infirmary. She says medical staff respond to emergencies providing care at the scene. There are different types of medication and medication administration in the various housing units. If there is a "health care request" or kite by an inmate for medical services, that request needs to be assessed within a certain time frame so the inmate may be visited by medical staff in the housing units. Add to this, ▮ has several 'satellite offices' for health care services outside of the infirmary (e.g., locked housing unit, high side, low side, work and re-entry unit.) There's medical staff in the intake unit (the Martz Diagnostic and Intake Unit) every day.

In terms of addressing the spread of COVID-19 in the institution, ▮ says there are unique challenges. For example, social distancing can be hard to achieve. ▮ says there is not an across-the-board-masking requirements at ▮ rather ▮ works to educate staff and inmates on the available infection control protocols. If the compound is on "outbreak status" masks are recommended. ▮ has utilized testing protocols, there are both rapid and PCR (nose swab sent to a lab) types of testing. Rapid testing results will be back in 15 minutes, but PCR can take several days to get results. ▮ says at times ▮ has run low on rapid tests and had to use more PCR tests.

▮ does not have a clear recollection of the quarantine in August 2021 (she stated she did not review her notes for the interview). ▮ says the ▮ has worked DPHHS and relied on CDC guidance for direction. She notes the guidance has changed throughout the pandemic. In C-Unit housing unit, inmates are in cubes and share the same bathroom and have a small common area. A person that tests positive will be removed from the areas. ▮ acknowledges ▮ has had to change its approach depending on the circumstances, ▮ is currently using a "cohorted quarantine" protocol.

### E. Documents

- Emails between ▮ Clinical Services Divisions staff and DPHHS staff on matters relating to masking, testing and vaccination status. (Included are ▮ who is identified as Communicable Disease Nurse Consultant for the Communicable Disease and Prevention Bureau.)

- ▮ 4.5.11 – Infection Control Program. Revised 12/23/16. General Requirements: "Each health care unit will monitor infectious and communicable diseases in an effort to minimize their occurrence in accordance with state and

DEFS 001437

**Exhibit 35 - 67**

## HRB CONFIDENTIAL

federal guidelines." Prevention: "An integral component of the infection control program is the prevention of the occurrence and spread of infectious and communicable diseases."

- Excerpts from CDC Guidance on Management of Coronavirus Disease 2019 (COVID-10) in Correctional and Detention Facilities.

- 'contact' visitation logs for August 2021. Contact visits stop on August 15, 2021 and start again on August 19, 2021.

- C-Unit Hobby Night Call Out sheets for July 13, 2021, July 28, 2021, August 4, 2021, August 11, 2021, (there is no August 18, 2021), August 25, 2021, September 1, 2021, and September 8, 2021. At least one of the inmates that filed is on the call out sheet for September 1, 2021 and two are on September 8, 2021.

- Undated "Sunday" Workers Only C-Unit Haircut list, is marked as a "No Show"

### F. Timeline:

As displayed in the witness interviews **neither** party's witnesses could offer much clarity on dates relevant to the particular quarantine at issue. Albeit based on imperfect evidence, this investigator has put together the following timeline of relevant events:

| August 16, 2021 | Four positive staff at with extensive contacts, starts restricting movement by for inmates. |
|---|---|
| August 17, 2021 | Warden stopped all movement in various units as the day progresses (including C-Unit). No inmates were allowed any function outside of the unit. |
| August 17, 2021 | solicits releases or waivers from inmates to disclose their vaccination status 'for the purpose of returning them to work.' |
| August 18, 2021 | A list of inmates who agreed to have their vaccination status released is circulated to those inmate's supervisors. These inmates 'are available for school, work, and other functions.' |
| August 19, 2021 | Director sends email to leadership team and clinical director stating would 'follow state law' and CDC guidelines "unless they conflict with or violate state law….[h]aving this in mind, we need to allow visitation and programs regardless of vaccination status…" |

DEFS 001438

Exhibit 35 - 68

## HRB CONFIDENTIAL

### III.    ANALYSIS

███ is alleging███ unlawfully discriminated against him in the area of governmental services because of his vaccination status. He has filed a timely complaint and the Montana Human Rights Bureau has jurisdiction.

In███ complaint, he asserts███ quarantined him based on his vaccination status on or about August 17, 2021[4], and that because he was quarantined, he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.  It is███ assertion that these restrictions lasted until he filed his complaint with the Bureau on or around September 1, 2021.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis of these complaints. All we have is the language of the applicable statute:

> **49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:
>
> (a)   a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;
>
> (b)   an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or
>
> (c)   a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.
>
> ...

In its response to these complaints,███ argued the Bureau should dismiss under the authority of another new statute found in Title 2, Chapter 9, "Limitations on Liability Relating to COVID-19." Under this statute, a governmental entity that takes 'reasonable measures' consistent with public health guidance will have an affirmative defense to any civil damages "for injuries or death from or relating to exposure to or potential exposure to COVID-19." *Mont. Code Ann. § 2-9-902.* In § 2-9-905, MCA, it states that if a governmental entity proves an affirmative defense, it operates as a "complete bar" to any action "relating to COVID-19." *Mont. Code Ann. § 2-9-905(4).*[5]  As part of this investigation,███ provided

---

[4] The inmate's complaints all have a paragraph that states "On or about _____, 2021, I was informed that, due to my non-vaccinated status that I would have to quarantine in C-Unit and could no longer enjoy my employment at the industries compound." Inmates███ and███ failed to put a date in the blank, ███ and███ put August 16, 2021, and███ and███ put August 17, 2021.

[5] **2-9-905.** *(Temporary)* **Affirmative defense -- reasonable measures consistent with regulations, orders, and public health guidance.** (1) In addition to all other defenses, a government entity may assert as an affirmative defense that the government entity took reasonable measures consistent with a federal or state statute,

DEFS 001439

**Exhibit 35 - 69**

## HRB CONFIDENTIAL

communication between ▆ Clinical Services and the Department of Public Health and Human Services discussing Centers for Disease Control guidance on how to best handle an outbreak in a correctional setting. ▆ asserts that because it was operating in accordance with this guidance, it has an affirmative defense that stands as an 'absolute bar' to an inmate complaint.

▆ arguments are compelling, but this statute doesn't quite seem to fit. Here, the inmates are not asserting ▆ is liable for their exposure or potential exposure to COVID-19. The inmates are asserting ▆ is liable for violating a provision of the Montana Human Rights Act that protects the inmates based on vaccination status. *Mont. Code Ann.* § *49-2-312.* Ultimately, a fact finder may agree that this statute stands as a bar to inmate complaints under discrimination laws, but for now the Bureau will continue its analysis.

As we begin, it bears noting that putting together a clean timeline was <u>extremely</u> challenging. ▆ counsel was asked and created one, the Bureau then talked to two different ▆ staff as well as six different inmates in C-Unit. Most every witness stated they had some difficulty remembering the details. ▆ argued any restrictions on unvaccinated inmates were short term, lasting for maybe one day. Meanwhile, the inmates put restrictions on unvaccinated inmates anywhere from a week to several months. Given the testimony and documentation, it seems likely that any restrictions lasted a few days.

Everyone involved acknowledged there have been various quarantines throughout the pandemic and these various quarantines have looked different. At the beginning of the pandemic, it sounds like ▆ quarantined every inmate due to the scope of the outbreak, later quarantines were by housing unit, and more recently quarantines are done by "cohort" depending on an inmate's exposure (e.g., direct contact). Inmates that are vaccinated are in the same housing units as inmates that are unvaccinated. The charging parties are housed in C-Unit and according to ▆ C-Unit houses the inmates that work over in the industries compound. An inmate's vaccination status is not necessarily static. An inmate's status may be unvaccinated one day and vaccinated the next. Through interviews, it is apparent that some ▆ inmates choose to discuss their vaccination status freely, while others do not.

---

regulation, order, or public health guidance related to covid-19 that was applicable to the government entity or activity at issue at the time of the alleged injury, death, or property damage.

    (2)   If two or more sources of public health guidance are applicable, a government entity does not breach a duty of care if the person took reasonable measures consistent with one applicable set of public health guidance.

    **(3)   If a government entity proves the affirmative defense contained in this section, the affirmative defense is a complete bar to any action relating to covid-19.**

    (4)   This section may not be construed to impose liability on a government entity for failing to comply with a federal or state statute, regulation, order, or public health guidance related to covid-19. *(Terminates December 31. 2031--sec. 12, Ch. 516, L. 2021.)*

**History:   En. Sec. 5, Ch. 516, L. 2021.**

(emphasis added)

DEFS 001440

**Exhibit 35 - 70**

## HRB CONFIDENTIAL

All of the inmates stated that they were allowed to "comingle" for the purposes of recreation, laundry pass, food services and other non-restrictive social activities but denied other services, such as visitation, hobby services, religious activities.  In interviewing the inmates, clearly this is what created the most confusion. But, as ▮▮▮ has pointed out in this investigation, the pandemic did not relieve▮▮ of its obligation to provide basic services and keep the facility as operational as possible.

Four of the inmates asserted that their visitation was restricted because they were unvaccinated. It is difficult to put your arms around these allegations. ▮▮▮ provided visitation logs for August 2021 and only one of the unvaccinated inmates shows up; ▮▮▮▮ on August 12, 2021.  It also appears visitation was cancelled for everyone between August 15, 2021, and August 18, 2021.  If an inmate's visit was supposed to occur in this timeframe, that would not be an issue. (Visitation was cancelled for all inmates.) But, no one has a clear recollection of what happened when. If several inmates had tested positive inside the C-Unit, ▮▮▮▮▮▮ stated medical services would have recommended limiting exposure. Several inmates confirmed that both vaccinated and unvaccinated inmates were using a form of "tele-visitation."  I find the inmates have not established they were denied visitation based on vaccination status.

Similarly, ▮▮▮ argues that given the short time frame of the quarantine, the inmates cannot show they were denied hobby services. ▮▮▮ says C-Unit is called out for hobby on Wednesday nights. Because of the quarantine, there was no C-Unit hobby on August 18, 2021. ▮▮▮ provided the Inmate Call Out Sheets for hobby from July 13, 2021 through September 8, 2021.  (A listing of the inmates called out to the activity.)  There was no call out sheet for August 18, 2021.  There are inmates that filed vaccination complaints on both the September 1, 2021, and September 8, 2021, call out sheets.

Only one inmate alleged a denial of religious services in his complaint, ▮▮▮  He was unsure of the timeframes or whether the services were being offered to anyone. ▮▮▮ was asked to send in additional information, but nothing was provided (nor did he submit a rebuttal).  As for ▮▮ assertion that he was not allowed to get a haircut, ▮▮ argued ▮▮ did not show up for his haircut and it produced documentation he was a "no show."

In ▮▮ timeline of the restrictions for this particular quarantine, ▮▮ asserted that on August 16, 2021, there were four COVID-19 positives. Initially, ▮▮▮ Warden restricted movement in the A-Unit.  But this changed as the day progressed, and by the end of the day, no movement was allowed in either the A-Unit or the C-Unit.  There is a lot of testing happening. ▮▮▮ says it sent out 225 PCR tests. ▮▮ emails reflect that it is looking to CDC guidance for protocols, including testing strategies. If there is a clear bad act to grab on to, it happens somewhere in here. ▮▮ allows persons that are vaccinated to return to work on August 18, 2021, whereas persons that were unvaccinated were not allowed to return to work. Later, the quarantine was lifted for unvaccinated inmates as well.

If the claim at issue involved only employment, ▮▮ argued the Bureau does not have jurisdiction over inmates' complaints. *See Quigg v. South, 243 Mont. 218 (1990).*  In *Quigg,* the male inmates had filed a discrimination complaint asserting that they were being paid less than female inmates. Our Supreme Court found that there was statutory language, specifically §§ 53-30-151-153, MCA, that precluded this type of discrimination complaint,

DEFS 001441

**Exhibit 35 - 71**

## HRB CONFIDENTIAL

specifically wage based discrimination complaints. Generally speaking, the Bureau disagrees with ███ assertion that *Quigg* is "black letter law." It remains unclear how the ruling in *Quigg* will apply to this new statute.

All this aside, these complaints have raised a whole different question. As noted, the Bureau is working with a new statute and this new statute contains special provisions for health care facilities. *Mont. Code Ann. § 49-2-312(3)(b)*. The new statute treats health care facilities differently from other environments and the language suggests that such a facility may have to take measures to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases.

> (b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:
>
> (i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.
>
> (ii)   implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

The new statute defines health care facility using § 50-5-101, MCA:

> (26)   (a)   "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

Inmates argue that because ███ was not providing "quality" care, it could not be considered a health care facility, but this argument is not compelling. Quality of care may impact licensure but not designation as a health care facility. ███ has been issued a health care facility license by DPPHS and ███ is accredited by the National Commission on Correctional Healthcare.

The inmates also argued the definition of health care facility should be restricted to ███ infirmary. The inmates have a point. It would be reasonable for the Bureau to restrict its interpretation of the term "health care facility" to those portions of ███ that are labeled as providing health care services, specifically the infirmary. But the definition says a health care facility means "all or portion of an institution" *used* or designed to provide health services, medical treatment, or nursing, rehabilitative or preventative care to any individual. Meaning if ███ is providing health services, medical treatment, or nursing, rehabilitative or preventative care outside of the infirmary, then seemingly this expands the scope of that "facility." In interviews, ███ provided a laundry list of examples displaying that medical treatment is provided outside of the infirmary. This included emergency treatment, "sick calls," medication distribution, and mental health services. Add to this there are "satellite

DEFS 001442

**Exhibit 35 - 72**

## HRB CONFIDENTIAL

offices" for medical services throughout the ▮▮ campus. Then if you look at the definition of a "health care facility," it seems very broad. It includes hospitals and infirmaries, but it also picks up residential care facilities, home health agencies, medical assistance facilities. The use of such a broad definition suggests the legislature intended for the term health care facility to be interpreted broadly.

Bottom line, ▮▮ is constitutionally obligated to provide health care services for the inmates while the inmate is in ▮▮ custody and the provision of health care is happening across campus. *See* ▮▮ *4.5.2 Responsible Health Authority.* I find ▮▮ has presented adequate documentation to show that ▮▮ operates as a health care facility. Any argument that only the ▮▮ infirmary should be considered a health care facility doesn't hold up given the unique circumstances of this institutional setting.

The statute then says a health care facility does not discriminate if it (1) asks about vaccination status; and then (2) implements reasonable accommodation measures. Here, testimony establishes that ▮▮ asked inmates working in the industries compounds about vaccination status on August 16, 2021. Next, the Bureau looks at whether ▮▮ implemented reasonable accommodation measures. From information provided by ▮▮ it looks like from August 18, 2021, through August 19, 2021 - or as late as August 23, 2021 - inmates that were not vaccinated were restricted in ways inmates that were vaccinated were not, most likely from going to work in the industries compound. So, the relevant question is: Was this a reasonable accommodation measure?

As a quick aside, the Bureau notes Montana's Human Rights Act has a definition for "reasonable accommodation." *Mont. Code Ann. § 49-2-101(19).* A reasonable accommodation is some form of assistance provided to a person with a disability[6] that allows that person to perform in a position or perhaps enjoy a governmental service. In this new statute, the term "reasonable accommodation measures" appears unrelated to this definition. The term reasonable accommodation measures are not intended to attach to a person with a disability. The "measures" are to be taken to "protect the safety and health of employees, patients, visitors and other persons from communicable diseases."

In this investigation, ▮▮ has argued it is immune from suit under § 2-9-902, MCA, precisely because the steps it took were reasonable measures consistent with public health guidance, specifically that it restricted the movement of inmates based on vaccination status in accordance with DPHHS and CDC guidance for correctional facilities. A restriction that was lifted shortly after it was imposed.

Could ▮▮ have handled this differently? Arguably, it could have required working inmates to wear a full set of personal protective equipment (PPE), or it could have quarantined every inmate regardless of vaccination status similarly. But the law does not ask the Bureau to determine the best way to have handled the situation, it asks the Bureau to determine if the health care facility (1) asked about vaccination status; and (2) then implemented reasonable accommodation measures. Here, I find ▮▮ asked about vaccination status and then followed guidance from the CDC for correctional facilities.

---

[6] A person with a disability has a condition or impairment that substantially limits one or more major life activities.

DEFS 001443

**Exhibit 35 - 73**

## HRB CONFIDENTIAL

If this matter goes forward, ▮▮▮ will ultimately have a variety of defenses available. ▮▮▮ may enjoy the protection of the absolute bar to complaints put forth in § 2-9-902, MCA, and since the inmates have not been able to point to any opportunity that was denied outside of employment *Quigg* may be controlling. Following these investigations, it appears that ▮▮▮ would also be able to show that restrictions on unvaccinated inmates were reasonable accommodation measures.

For these reasons, I find that ▮▮▮ is unable to prove by a preponderance of the evidence that ▮▮▮ discriminated against him on the basis of vaccination status.

### CONCLUSION

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Marieke Beck*                                              *February 25, 2022*

_____          _____
Marieke Beck                                                     Date
Montana Human Rights Bureau

DEFS 001444

**Exhibit 35 - 74**

# HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

| | |
|---|---|
| ▓▓▓▓▓▓ ▓▓▓▓ | |
| Charging Party, | Final Investigative Report |
| vs. | |
| ▓▓▓▓▓▓▓▓▓▓▓▓[1], | HRB Case No. 0210580 |
| Respondent. | |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.    ISSUE PRESENTED

Did the ▓▓▓▓▓▓▓▓ discriminate against Robert Lee ▓▓▓▓ (▓▓▓▓ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) when he was quarantined and denied employment and other opportunities?

## II.    SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.    Charging Party's Position Statement:

▓▓▓▓ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓ He asserts he is employed by Montana ▓▓▓▓▓▓ and that on or about August 17, 2021, he was informed that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnessed vaccinated inmates being permitted to enjoy their employment status. ▓▓▓▓ also asserts he was informed he could not visit due to being vaccinated.

### B.    Respondent's Position Statement:

---

[1] Nine complaints were filed by ▓▓▓▓▓▓ ▓▓▓▓ inmates on a template form containing substantially similar allegations. All these complaints involve a quarantine by ▓▓▓ in August 2021 at ▓▓▓ The template names '▓▓▓▓▓▓▓▓▓▓▓▓

Defendants." The Bureau sent Charging Parties' complaints to ▓▓▓ and ▓▓ responded.

DEFS 001445

**Exhibit 35 - 75**

## HRB CONFIDENTIAL

███ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in MSP's Unit C. In the wake of this potential exposure, inmates were quarantined based on vaccination status.  On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ███ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19.  The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

In its response, ███ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue, ███ argues HRB should dismiss these complaints. HRB is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ███ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ███ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims.

Additionally, ███ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19.  It is ███ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19.  Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period.  Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ███ "absolute immunity" from civil actions

### C.    Additional Information

On October 20, 2021, ███ was asked to address the application of the health care facility provisions of § 49-2-312, MCA. ███ responded and stated that ███████████ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

### D.    Omissions

The Bureau currently has nine substantially similar complaints filed by inmates regarding a quarantine event on or about August 17, 2021. After ███ provided its response, it was sent to the named Charging Parties on October 20, 2021.  The inmates were given until November 9, 2021, to provide a rebuttal. ███ did not submit a rebuttal.

A second letter was sent on November 30, 2021, stating that if ███ did not respond or contact the Bureau on or before December 20, 2021, the Bureau would write the report based on the information contained in the file. A final letter was sent to ███ attention on January 11, 2021.  The Bureau has not heard from ███ The Bureau was able to interview and proceed with five substantially similar complaints.

Page 2 of 4

DEFS 001446

**Exhibit 35 - 76**

# HRB CONFIDENTIAL

████ has not participated.  The Bureau limited its investigation to the information in the file.

## III.   ANALYSIS

████ alleges ████ unlawfully discriminated against him in the area of governmental services because of his vaccination status. ████ establishes he filed a timely complaint. The Montana Human Rights Bureau has jurisdiction over the complaint.

████ asserts ████ quarantined him based on his vaccination status on or about August 17, 2021, and that because he was quarantined he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis. All we have is the language of the applicable statutes:

**49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:

(a)   a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;

(b)   an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or

(c)   a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

(2)   This section does not apply to vaccination requirements set forth for schools pursuant to Title 20, chapter 5, part 4, or day-care facilities pursuant to Title 52, chapter 2, part 7.

(3)   (a)  A person, governmental entity, or an employer does not unlawfully discriminate under this section if they recommend that an employee receive a vaccine.

(b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:

(i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

(ii) implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

DEFS 001447

**Exhibit 35 - 77**

## HRB CONFIDENTIAL

(4)    An individual may not be required to receive any vaccine whose use is allowed under an emergency use authorization or any vaccine undergoing safety trials.

(5)    As used in this section, the following definitions apply:

(a)    "Immunity passport" means a document, digital record, or software application indicating that a person is immune to a disease, either through vaccination or infection and recovery.

(b)    "Vaccination status" means an indication of whether a person has received one or more doses of a vaccine.

**History:    En. Sec. 1, Ch. 418, L. 2021.**

**49-2-313.    Exemption.** A licensed nursing home, long-term care facility, or assisted living facility is exempt from compliance with **49-2-312** during any period of time that compliance with **49-2-312** would result in a violation of regulations or guidance issued by the centers for medicare and medicaid services or the centers for disease control and prevention.

**History:    En. Sec. 2, Ch. 418, L. 2021.**

Here, ▇▇▇ submitted a boilerplate complaint that is substantially similar to complaints filed by other inmates. ▇▇▇ has chosen not to participate in this investigation. The Bureau notes when a party refuses to provide information or evidence reasonably necessary for an investigation, the Bureau can draw an "adverse inference" as to the information sought. *Admin. R. Mont. 24.8.216.*

Without ▇▇▇ participation, the Bureau cannot fully understand the adverse act(s). Further, ▇▇▇ has failed to counter ▇▇▇ various defenses. The Bureau will focus its attention on the remaining Charging Parties with substantially similar allegations.

## CONCLUSION

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Bre Koffman*                                          February 11, 2022

_____          _____
Bre Koffman                                               Date
Montana Human Rights Bureau

DEFS 001448

**Exhibit 35 - 78**

# HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

|  |  |
|---|---|
| Charging Party,<br><br>vs. | Final Investigative Report |
| ▆▆▆▆▆▆▆▆▆▆▆▆▆[1], <br><br>Respondent. | HRB Case No. 0210581 |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.   ISSUE PRESENTED

Did the ▆▆▆▆▆▆▆▆ discriminate against ▆▆▆▆▆▆▆ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) by subjecting him to quarantine and denying him employment and other opportunities?

## II.   SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.   Charging Party's Position Statement:

▆▆▆▆▆▆ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ▆▆▆▆▆▆▆▆▆. He asserts he is employed by ▆ and that he was informed on August 17, 2021, that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnesses vaccinated inmates being permitted to enjoy their employment status.

---

[1] Nine complaints were filed by ▆▆▆▆▆▆▆▆ inmates using a template containing substantially similar language. On the template, inmates checked whether they were felt they were denied visitation or medical care, some inmates wrote in additional information regarding denials including hobby, haircuts and religious services. The complaints all involve a quarantine by ▆ in August 2021 at ▆. The template names "MDOC Clinical Services Division, ▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆▆ Defendants." The Bureau sent Charging Parties' complaints to ▆ which responded on behalf of all named respondents.

DEFS 001449

**Exhibit 35 - 79**

## HRB CONFIDENTIAL

He then states that, "I and all other vaccinated inmates" were allowed to commingle after work for purposes of recreation, laundry pass, food service and other non-restrictive social activities. He asserts that as a result of the quarantine he has been denied services and privileges such as visitation.

**B.    Respondent's Position Statement:**

████ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in MSP's C-Unit. In the wake of this potential exposure, inmates were quarantined based on vaccination status.

On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ████ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19.  The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

████ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue that must be addressed before any further proceeding, ████ argues the Human Rights Bureau (the Bureau) should dismiss these complaints.  The Bureau is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ████ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ████ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims."

Additionally, ████ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19.  It is ████ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19. Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period.  Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ████ "absolute immunity" from civil actions.

In response to the Bureau's requests for information, ████ further argued that COVID-19 presented unique challenges because the prison population was at or near capacity for bed space. ████ needed to provide certain services such as food and laundry while simultaneously managing the health crisis. ████ contends it relied on the "expertise of clinical services division staff which was receiving regular guidance specific to correctional facilities from the U.S. Centers for Disease Control (CDC), the Montana Department of Health and Human Services, county/local health officials, as well as direction from the Department Director in the event of a conflict between Montana law and guidance provided by the aforementioned resources."

DEFS 001450

**Exhibit 35 - 80**

## HRB CONFIDENTIAL

█████ argues the inmates complains amount to a 'brief disruption of non-employment "employment" activity,' temporary disruption of haircut services and hobby, and brief disruptions to in-person visitation.

### C.     Additional Information

The parties were asked to address the application of the health care facility provisions of § 49-2-312, MCA. █████ responded and stated that█████████████ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

Inmates argued █████ is not a health care facility given the quality of care and further, if it were, then only the █████ building containing the infirmary should be considered as a health care facility. The infirmary is a separate building from the housing units.

### D.     Witnesses

**Don █████ Inmate.** █████ asserts that he was denied employment and visitation. He says when the pandemic began, he was housed up in the Shelby facility. As a result of the outbreak up there, █████ says he has natural immunity, and he is not vaccinated. At █████ he works on buildings doing HVAC (heating ventilation and air conditioning). He moves all around the campus.

He recalls that someone tested positive in August 2021 and after that the inmates were confined for a week and then █████ gave you an option of going back to work if you were vaccinated. The vaccination was not mandatory, but it is his opinion that █████ was trying to force inmates to get the vaccine. He believes he recalls the █████ Administrator █████ coming to the unit, but later he says maybe it was that he was given the option of doing a waiver. █████ says he wishes he would have taken better notes. His recollection is that the quarantine was lifted and then put in place and then lifted again. He says █████ asks the inmates to wear masks, he refers to the inmates that wear masks as "sheeple."

█████ asserts he was not even allowed to use a phone during this quarantine. Asked if he could identify anyone that was allowed to go to visitation, he says he's not sure. As for any contention that █████ is a healthcare facility, █████ doesn't believe that █████ should qualify because they 'don't provide healthcare at all.'

**█████ Inmate.** █████ is an inmate at█████ He is not vaccinated, and states vaccination is not mandatory at the prison. He asserted he was denied employment, visitation, and the ability to get a haircut. █████ was employed by █████ as a boilerman in the maintenance department. In this position, he would leave the C-Unit and go to the 'industries compound.' (The industries compound is a separate facility at█████

█████ asserts that on or around August 16, 2021, the Administrator for Montana █████ █████ █████ and another person from the Clinical Services Division announced that inmates needed to sign a "waiver" regarding their medical information to disclose their vaccination status to work in the "industries compound." █████ states he never got to read this waiver. He says if you did not sign the waiver you were assumed to be

Page 3 of 14

**Exhibit 35 - 81**

## HRB CONFIDENTIAL

unvaccinated. It is ███████ recollection that █████ said, "if you're not vaccinated and cannot prove your vaccination status, you will be required to stay in the Unit."

███████ says ███████ posted a notice listing the inmates that could go to work in the "industries compound." ███████ says only persons that were vaccinated were on the list. Since he could not go to the industries compound, ███████ asserts his hours were reduced significantly. It is his recollection that shortly after the complaints were filed, he was allowed to return to work. ███████ states he then lost this position on October 4, 2021.

In August 2021, ███████ locked down the C-Unit. ███████ does not take issue with ███████ quarantining individuals that test positive in accordance with the Centers for Disease Control (CDC). He tested positive in 2020, at that time the whole facility was locked down.

As for ███████ assertion that he was denied visitation, he says it was "common knowledge" that you could not have visitation if you were not vaccinated. Asked how this was known, he asserted there was a memo posted by ███████████ at the Command Post. ███████ has been to the infirmary 12 to 15 times in the past year but disagrees that ███████ as a whole should be a considered a health care facility.

███████████ **Inmate.** ███████ is an inmate at ███████ and he is not vaccinated. He states vaccines are not mandatory at ███████ He asserted he was denied employment, visitation and hobby. ███████ says if there is an outbreak on the unit, the unvaccinated are quarantined, whereas the vaccinated are allowed to go to work. ███████████ states this has occurred "a couple times" with the last occurring in around August 2021.

███████ has been working for Montana ████████████████████ since March 2021. ███████ states inmates work in close proximity to one another and are there from 7 a.m. to around 4:15 p.m. He says he was denied visitation once in September 2021, because he wasn't vaccinated. ███████ says he 'told his family to not bother coming.' ███████ said the only inmates allowed visitation at that time were the ones who were vaccinated. He doesn't know if other unvaccinated inmates are still being denied visitation.

███████ says he was also denied hobby once (and a there was a second time when he wasn't scheduled for hobby). He believes this occurred in around August or September 2021. He said for the past month and a half, they have been on a regular weekly schedule where inmates can go to hobby, regardless of whether they are vaccinated.

███████ indicated that he has been to the infirmary several times. He does not feel that ███████ is a healthcare facility because they do not provide adequate healthcare. ███████ said he does not want to get the vaccine because, as a Native American he does not believe in vaccines. He has not submitted any sort of religious accommodation relative to vaccines.

███████████ **Inmate.** ███████ complaint only asserts he was denied employment based on his vaccination status. In his interview, he said he was not allowed to work to earn money to make earrings or buy commissary items. ███████ says he was prevented from going to work for two weeks and the unvaccinated restrictions lasted about three weeks. After a month and a half, ███████ completely changed policies and the quarantines were

DEFS 001452

**Exhibit 35 - 82**

## HRB CONFIDENTIAL

cube specific. (The entire cube, which is a subsection of the unit, would quarantine regardless of vaccination status.)

███████ wants it noted that he does not go to religious services, but he would not have been able to go if he did. Although it is not in his complaint, he also asserted that once he wanted to get a haircut but was stopped in the hall by a Correctional Officer. ███████ does not recall which officer, but the officer knew ███████ was not vaccinated. When ███████ asked how the officer knew his vaccination status, the officer then asked, "Well, are you?" ███████ said he wouldn't release this information and he was denied his haircut.

███████ says an inmate in a different cube tested positive for COVID-19 and inmates in his cube were allowed to go to work if they were vaccinated. He asserts that it doesn't make sense that vaccinated and unvaccinated inmates were allowed to eat, use telephones, go in the yard and intermingle with each other but they were not allowed to enjoy other opportunities.

███████ **Inmate.** ███████ asserts he was denied employment and visitation based on his vaccination status.[2] ███████ states that all of the housing units have been shut down at various times beginning in 2020, probably for three to four months in the beginning. He believes the C-Unit was shut down for approximately three weeks in July and August 2021. When an inmate tested positive, that inmate was sent to administrative segregation and the rest of his unit was locked down. Now, when an inmate tests positive, he is still sent to administrative segregation, but only the cube is locked down for 14 days.

███████ began taking Motor Vocational Maintenance Classes in October 2020. He graduated in October 2021 and did not miss work during this time but missed classes that slightly prolonged his graduation, maybe a day or a week. He says he missed class time when he was quarantined in July and August 2021. ███████ says it's interesting that inmates that are unvaccinated are not allowed to go to work with vaccinated, but they all eat together. ███████ says he was supposed to have a visit with his wife, but this visit was cancelled. He says he knows of vaccinated inmates that received visits. He was asked to identify these inmates and said he would send in a list. In this later submission, ███████ doesn't identify inmates that were allowed visitation rather he lists six inmates "that had seen or heard" that vaccinated inmates were allowed to continue services. ███████ says Correctional Officers have told him that vaccinated inmates get visits, but ███████ could not recall the names of the ███████ staff that told him this.

███████ believes the infirmary staff doctors/nurses need more training to provide quality care like a healthcare facility should. Since the quality of care is lacking, he does not believe ███ is a healthcare facility.

In written submissions, ███████ relayed that more recent quarantining had been done differently. Both vaccinated and unvaccinated inmates were allowed to go to work "except those that were in direct contact."

---

[2] ███████ submitted additional statements and said that on August 16, 2021, he was told that due to his non-vaccinated status he would have to quarantine and no longer enjoy employment, haircuts, religious activities, library, and visitation. He only asserted employment and visitation in his complaint.

DEFS 001453

**Exhibit 35 - 83**

## HRB CONFIDENTIAL

███████████ **Inmate.** ████████ complaint was substantially similar to the other complaints, but it was handwritten.  He asserted he was denied employment, medical care, and religious services.

**Initially,**███████ was asked to explain the assertion in his complaint that he was denied **medical care,** but he did not remember making this allegation.  Later in the interview, he stated that he believes he should have received treatment for a non-emergency back injury.  He said another inmate was allowed to get medical services during this time and he was not. (███████ believes that inmate had a knee injury, but he is unsure of the inmate's exact medical situation or his vaccination status.)

███████ complaint asserts that he was denied employment but he explained that he was in the MCE "education program" for welding.  It is his recollection that ███ had multiple COVID-19 cases in the facility and initially they tried to do something with testing; if you were negative you could go to work.  He believes C-Unit was locked down for a month or a month and a half.  He says he wasn't allowed to go back to school for almost two months. ███████ offered a witness he believes is vaccinated that was allowed to go to work.

███████ says he typically attends three religious meetings every week; Fresh Lives, Baptist Bible Studies and Bread of Life, but he has not been able to attend for two to three months.  **Pressed,** ██████ **wasn't sure if anyone was attending religious meetings at this time.** ███████ wanted more time to put together more information on his denial of religious services and stated he would send more information in, but the Bureau has not received anything.

███████████ **Administrator for** ███████████████████████ ██████ is unfamiliar with the complaints under investigation by the Bureau, but she is familiar with the vaccination law.  She explained that the industries compound is a different area of the prison and that houses MCE programs (training and educational).  It also houses some ██████ programs such as maintenance. ███████ says that many of the inmates working in the industries compound around this time were making Personal Protected Equipment (PPE).

It is her best recollection that C-Unit went into quarantine and all movement was restricted for both vaccinated and unvaccinated inmates.  After this, ██████ and an ██████ employee Clinical Services when to C-Unit on August 17, 2021. ██████ explained that the C-Unit houses inmates that worked over in the industries compound. ██████ explained to the inmates that they could sign a waiver that would allow an inmate's ██████ supervisor to know the inmate's vaccination status.  If an inmate was vaccinated, he could continue working pursuant to CDC guidelines.  She does not recall any inmate asking her what would happen if he was not vaccinated.  She believes Clinical Services then took this information back to check against existing records and then a list was created of inmates that were vaccinated.  This list was disseminated to the appropriate supervisor (not the entire list of names but the names relevant to a particular supervisor). ██████ denies that any sort of list was posted regarding the inmate's vaccination status.

**After this, it is** ██████ recollection that there were concerns about the discrimination law and that the Warden sent out an email urging compliance with both the state vaccination law

DEFS 001454

**Exhibit 35 - 84**

and the CDC guidelines. ███ contends this happened as soon as practicable. She does not recall when everyone went back to work, but it wasn't long after this.

███ Medical Bureau Chief. ███ has been with ███ for 20 years. She states that she has previously experienced outbreaks of influenza but nothing like COVID-19. She states that ███ routinely provides medical services outside of MSP's infirmary. She says medical staff respond to emergencies providing care at the scene. There are different types of medication and medication administration in the various housing units. If there is a "health care request" or kite by an inmate for medical services, that request needs to be assessed within a certain time frame so the inmate may be visited by medical staff in the housing units. Add to this, ███ has several 'satellite offices' for health care services outside of the infirmary (e.g., locked housing unit, high side, low side, work and re-entry unit.) There's medical staff in the intake unit (the ███ Diagnostic and Intake Unit) every day.

In terms of addressing the spread of COVID-19 in the institution, ███ says there are unique challenges. For example, social distancing can be hard to achieve. ███ says there is not an across-the-board-masking requirements at ███ rather ██ works to educate staff and inmates on the available infection control protocols. If the compound is on "outbreak status" masks are recommended. ███ has utilized testing protocols, there are both rapid and PCR (nose swab sent to a lab) types of testing. Rapid testing results will be back in 15 minutes, but PCR can take several days to get results. ███ says at times ███ has run low on rapid tests and had to use more PCR tests.

███ does not have a clear recollection of the quarantine in August 2021 (she stated she did not review her notes for the interview). ███ says the ███ has worked DPHHS and relied on CDC guidance for direction. She notes the guidance has changed throughout the pandemic. In C-Unit housing unit, inmates are in cubes and share the same bathroom and have a small common area. A person that tests positive will be removed from the areas. ███ acknowledges ███ has had to change its approach depending on the circumstances, ███ is currently using a "cohorted quarantine" protocol.

E.   Documents

- Emails between ███ Clinical Services Divisions staff and DPHHS staff on matters relating to masking, testing and vaccination status. (Included are ███ who is identified as Communicable Disease Nurse Consultant for the Communicable Disease and Prevention Bureau.)

- ███ 4.5.11 – Infection Control Program. Revised 12/23/16. General Requirements: "Each health care unit will monitor infectious and communicable diseases in an effort to minimize their occurrence in accordance with state and federal guidelines." Prevention: "An integral component of the infection control program is the prevention of the occurrence and spread of infectious and communicable diseases."

DEFS 001455

Exhibit 35 - 85

## HRB CONFIDENTIAL

- Excerpts from CDC Guidance on Management of Coronavirus Disease 2019 (COVID-10) in Correctional and Detention Facilities.

- ▬ 'contact' visitation logs for August 2021. Contact visits stop on August 15, 2021 and start again on August 19, 2021.

- C-Unit Hobby Night Call Out sheets for July 13, 2021, July 28, 2021, August 4, 2021, August 11, 2021, (there is no August 18, 2021), August 25, 2021, September 1, 2021, and September 8, 2021. At least one of the inmates that filed is on the call out sheet for September 1, 2021 and two are on September 8, 2021.

- Undated "Sunday" Workers Only C-Unit Haircut list, ▬ is marked as a "No Show"

### F.  Timeline:

As displayed in the witness interviews **neither** party's witnesses could offer much clarity on dates relevant to the particular quarantine at issue. Albeit based on imperfect evidence, this investigator has put together the following timeline of relevant events:

| | |
|---|---|
| August 16, 2021 | Four positive staff at ▬ with extensive contacts, ▬ starts restricting movement by for inmates. |
| August 17, 2021 | Warden ▬ stopped all movement in various units as the day progresses (including C-Unit). No inmates were allowed any function outside of the unit. |
| August 17, 2021 | ▬ solicits releases or waivers from inmates to disclose their vaccination status 'for the purpose of returning them to work.' |
| August 18, 2021 | A list of inmates who agreed to have their vaccination status released is circulated to those inmate's supervisors. These inmates 'are available for school, work, and other functions.' |
| August 19, 2021 | Director ▬ sends email to leadership team and ▬ clinical director stating ▬ would 'follow state law' and CDC guidelines "unless they conflict with or violate state law….[h]aving this in mind, we need to allow visitation and programs regardless of vaccination status…" |

### III.  ANALYSIS

▬ is alleging ▬ unlawfully discriminated against him in the area of governmental services because of his vaccination status. He has filed a timely complaint and the Montana Human Rights Bureau has jurisdiction.

DEFS 001456

**Exhibit 35 - 86**

## HRB CONFIDENTIAL

In ▮▮▮▮ complaint, he asserts ▮▮▮▮ quarantined him based on his vaccination status on or about August 17, 2021[3], and that because he was quarantined, he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.  It is ▮▮▮▮ assertion that these restrictions were off and on.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis of these complaints. All we have is the language of the applicable statute:

**49-2-312.  Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:

(a)  a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;

(b)  an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or

(c)  a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

...

In its response to these complaints, ▮▮▮▮ argued the Bureau should dismiss under the authority of another new statute found in Title 2, Chapter 9, "Limitations on Liability Relating to COVID-19."  Under this statute, a governmental entity that takes 'reasonable measures' consistent with public health guidance will have an affirmative defense to any civil damages "for injuries or death from or relating to exposure to or potential exposure to COVID-19." *Mont. Code Ann. § 2-9-902.*  In § 2-9-905, MCA, it states that if a governmental entity proves an affirmative defense, it operates as a "complete bar" to any action "relating to COVID-19." *Mont. Code Ann. § 2-9-905(4).[4]*  As part of this investigation, ▮▮▮▮ provided

---

[3] The inmate's complaints all have a paragraph that states "On or about _____, 2021, I was informed that, due to my non-vaccinated status that I would have to quarantine in C-Unit and could no longer enjoy my employment at the industries compound." Inmates ▮▮▮▮ and ▮▮▮▮ failed to put a date in the blank, ▮▮▮▮ and ▮▮▮▮ put August 16, 2021, and ▮▮▮▮ and ▮▮▮▮ put August 17, 2021.

[4] **2-9-905.**  *(Temporary)* **Affirmative defense -- reasonable measures consistent with regulations, orders, and public health guidance.** (1) In addition to all other defenses, a government entity may assert as an affirmative defense that the government entity took reasonable measures consistent with a federal or state statute, regulation, order, or public health guidance related to covid-19 that was applicable to the government entity or activity at issue at the time of the alleged injury, death, or property damage.

(2)  If two or more sources of public health guidance are applicable, a government entity does not breach a duty of care if the person took reasonable measures consistent with one applicable set of public health guidance.

**(3)  If a government entity proves the affirmative defense contained in this section, the affirmative defense is a complete bar to any action relating to covid-19.**

DEFS 001457

**Exhibit 35 - 87**

## HRB CONFIDENTIAL

communication between ▮▮▮ Clinical Services and the Department of Public Health and Human Services discussing Centers for Disease Control guidance on how to best handle an outbreak in a correctional setting. ▮▮▮ asserts that because it was operating in accordance with this guidance, it has an affirmative defense that stands as an 'absolute bar' to an inmate complaint.

▮▮▮ arguments are compelling, but this statute doesn't quite seem to fit. Here, the inmates are not asserting ▮▮▮ is liable for their exposure or potential exposure to COVID-19. The inmates are asserting ▮▮▮ is liable for violating a provision of the Montana Human Rights Act that protects the inmates based on vaccination status. *Mont. Code Ann. § 49-2-312.* Ultimately, a fact finder may agree that this statute stands as a bar to inmate complaints under discrimination laws, but for now the Bureau will continue its analysis.

As we begin, it bears noting that putting together a clean timeline was <u>extremely</u> challenging. ▮▮▮ counsel was asked and created one, the Bureau then talked to two different ▮▮▮ staff as well as six different inmates in C-Unit. Most every witness stated they had some difficulty remembering the details. ▮▮▮ argued any restrictions on unvaccinated inmates were short term, lasting for maybe one day. Meanwhile, the inmates put restrictions on unvaccinated inmates anywhere from a week to several months. Given the testimony and documentation, it seems likely that any restrictions lasted a few days.

Everyone involved acknowledged there have been various quarantines throughout the pandemic and these various quarantines have looked different. At the beginning of the pandemic, it sounds like ▮▮▮ quarantined every inmate due to the scope of the outbreak, later quarantines were by housing unit, and more recently quarantines are done by "cohort" depending on an inmate's exposure (e.g., direct contact). Inmates that are vaccinated are in the same housing units as inmates that are unvaccinated. The charging parties are housed in C-Unit and according to ▮▮▮ C-Unit houses the inmates that work over in the industries compound. An inmate's vaccination status is not necessarily static. An inmate's status may be unvaccinated one day and vaccinated the next. Through interviews, it is apparent that some ▮▮▮ inmates choose to discuss their vaccination status freely, while others do not.

All of the inmates stated that they were allowed to "comingle" for the purposes of recreation, laundry pass, food services and other non-restrictive social activities but denied other services, such as visitation, hobby services, religious activities. In interviewing the inmates, clearly this is what created the most confusion. But, as ▮▮▮ has pointed out in this investigation, the pandemic did not relieve ▮▮▮ of its obligation to provide basic services and keep the facility as operational as possible.

---

(4)   This section may not be construed to impose liability on a government entity for failing to comply with a federal or state statute, regulation, order, or public health guidance related to covid-19. *(Terminates December 31, 2031--sec. 12, Ch. 516, L. 2021.)*

**History:   En. Sec. 5, Ch. 516, L. 2021.**

(emphasis added)

DEFS 001458

**Exhibit 35 - 88**

## HRB CONFIDENTIAL

Four of the inmates asserted that their visitation was restricted because they were unvaccinated, including ▇▇▇▇ It is difficult to put your arms around these allegations. ▇▇▇▇ provided visitation logs for August 2021 and only one of the unvaccinated inmates shows up; ▇▇▇▇ on August 12, 2021. It also appears visitation was cancelled for everyone between August 15, 2021, and August 18, 2021. If an inmate's visit was supposed to occur in this timeframe, that would not be an issue. (Visitation was cancelled for all inmates.) But, no one has a clear recollection of what happened when. If several inmates had tested positive inside the C-Unit, ▇▇▇▇▇▇▇▇ stated medical services would have recommended limiting exposure. Several inmates confirmed that both vaccinated and unvaccinated inmates were using a form of "tele-visitation." I find the inmates have not established they were denied visitation based on vaccination status.

Similarly, ▇▇▇▇ argues that given the short time frame of the quarantine, the inmates cannot show they were denied hobby services. ▇▇▇▇ says C-Unit is called out for hobby on Wednesday nights. Because of the quarantine, there was no C-Unit hobby on August 18, 2021. ▇▇▇▇ provided the Inmate Call Out Sheets for hobby from July 13, 2021 through September 8, 2021. (A listing of the inmates called out to the activity.) There was no call out sheet for August 18, 2021. There are inmates that filed vaccination complaints on both the September 1, 2021, and September 8, 2021, call out sheets.

Only one inmate alleged a denial of religious services in his complaint, ▇▇▇▇ He was unsure of the timeframes or whether the services were being offered to anyone. ▇▇▇▇ was asked to send in additional information, but nothing was provided (nor did he submit a rebuttal). As for ▇▇▇▇ assertion that he was not allowed to get a haircut, ▇▇▇▇ argued ▇▇▇▇ did not show up for his haircut and it produced documentation he was a "no show."

In ▇▇▇▇ timeline of the restrictions for this particular quarantine, ▇▇▇▇ asserted that on August 16, 2021, there were four COVID-19 positives. Initially, MSP's Warden restricted movement in the A-Unit. But this changed as the day progressed, and by the end of the day, no movement was allowed in either the A-Unit or the C-Unit. There is a lot of testing happening. ▇▇▇▇ says it sent out 225 PCR tests. ▇▇▇▇ emails reflect that it is looking to CDC guidance for protocols, including testing strategies. If there is a clear bad act to grab on to, it happens somewhere in here. ▇▇▇▇ allows persons that are vaccinated to return to work on August 18, 2021, whereas persons that were unvaccinated were not allowed to return to work. Later, the quarantine was lifted for unvaccinated inmates as well.

If the claim at issue involved only employment, ▇▇▇▇ argued the Bureau does not have jurisdiction over inmates' complaints. *See Quigg v. South, 243 Mont. 218 (1990).* In *Quigg,* the male inmates had filed a discrimination complaint asserting that they were being paid less than female inmates. Our Supreme Court found that there was statutory language, specifically §§ 53-30-151-153, MCA, that precluded this type of discrimination complaint, specifically wage based discrimination complaints. Generally speaking, the Bureau disagrees with ▇▇▇▇ assertion that *Quigg* is "black letter law." It remains unclear how the ruling in *Quigg* will apply to this new statute.

All this aside, these complaints have raised a whole different question. As noted, the Bureau is working with a new statute and this new statute contains special provisions for health care facilities. *Mont. Code Ann. § 49-2-312(3)(b).* The new statute treats health care facilities

Page 11 of 14

DEFS 001459

**Exhibit 35 - 89**

## HRB CONFIDENTIAL

differently from other environments and the language suggests that such a facility may have to take measures to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases.

> (b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:
>
> (i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.
>
> (ii)   implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

The new statute defines health care facility using § 50-5-101, MCA:

> (26)  (a)   "Health care facility" or "facility" means all or a portion of an institution, building, or agency, private or public, excluding federal facilities, whether organized for profit or not, that is used, operated, or designed to provide health services, medical treatment, or nursing, rehabilitative, or preventive care to any individual. The term includes chemical dependency facilities, critical access hospitals, eating disorder centers, end-stage renal dialysis facilities, home health agencies, home infusion therapy agencies, hospices, hospitals, infirmaries, long-term care facilities, intermediate care facilities for the developmentally disabled, medical assistance facilities, mental health centers, outpatient centers for primary care, outpatient centers for surgical services, rehabilitation facilities, residential care facilities, and residential treatment facilities.

Inmates argue that because ▆▆▆ was not providing "quality" care, it could not be considered a health care facility, but this argument is not compelling. Quality of care may impact licensure but not designation as a health care facility. ▆▆▆ has been issued a health care facility license by DPPHS and ▆▆▆ is accredited by the National Commission on Correctional Healthcare.

The inmates also argued the definition of health care facility should be restricted to MSP's infirmary.  The inmates have a point. It would be reasonable for the Bureau to restrict its interpretation of the term "health care facility" to those portions of ▆▆▆ that are labeled as providing health care services, specifically the infirmary.  But the definition says a health care facility means "all or portion of an institution" *used* or designed to provide health services, medical treatment, or nursing, rehabilitative or preventative care to any individual. Meaning if ▆▆▆ is providing health services, medical treatment, or nursing, rehabilitative or preventative care outside of the infirmary, then seemingly this expands the scope of that "facility."  In interviews, ▆▆▆ provided a laundry list of examples displaying that medical treatment is provided outside of the infirmary. This included emergency treatment, "sick calls," medication distribution, and mental health services. Add to this there are "satellite offices" for medical services throughout the ▆▆▆ campus. Then if you look at the definition of a "health care facility," it seems very broad.  It includes hospitals and infirmaries, but it also picks up residential care facilities, home health agencies, medical assistance facilities. The use of such a broad definition suggests the legislature intended for the term health care facility to be interpreted broadly.

Bottom line, ▆▆▆ is constitutionally obligated to provide health care services for the inmates while the inmate is in MSP's custody and the provision of health care is happening

DEFS 001460

**Exhibit 35 - 90**

## HRB CONFIDENTIAL

across campus. *See* ▮ *4.5.2 Responsible Health Authority*. I find ▮ has presented adequate documentation to show that ▮ operates as a health care facility. Any argument that only the ▮ infirmary should be considered a health care facility doesn't hold up given the unique circumstances of this institutional setting.

The statute then says a health care facility does not discriminate if it (1) asks about vaccination status; and then (2) implements reasonable accommodation measures. Here, testimony establishes that ▮ asked inmates working in the industries compounds about vaccination status on August 16, 2021. Next, the Bureau looks at whether ▮ implemented reasonable accommodation measures. From information provided by ▮ it looks like from August 18, 2021, through August 19, 2021 - or as late as August 23, 2021 - inmates that were not vaccinated were restricted in ways inmates that were vaccinated were not, most likely from going to work in the industries compound. So, the relevant question is: Was this a reasonable accommodation measure?

As a quick aside, the Bureau notes Montana's Human Rights Act has a definition for "reasonable accommodation." *Mont. Code Ann. § 49-2-101(19)*. A reasonable accommodation is some form of assistance provided to a person with a disability[5] that allows that person to perform in a position or perhaps enjoy a governmental service. In this new statute, the term "reasonable accommodation measures" appears unrelated to this definition. The term reasonable accommodation measures are not intended to attach to a person with a disability. The "measures" are to be taken to "protect the safety and health of employees, patients, visitors and other persons from communicable diseases."

In this investigation, ▮ has argued it is immune from suit under § 2-9-902, MCA, precisely because the steps it took were reasonable measures consistent with public health guidance, specifically that it restricted the movement of inmates based on vaccination status in accordance with DPHHS and CDC guidance for correctional facilities. A restriction that was lifted shortly after it was imposed.

Could ▮ have handled this differently? Arguably, it could have required working inmates to wear a full set of personal protective equipment (PPE), or it could have quarantined every inmate regardless of vaccination status similarly. But the law does not ask the Bureau to determine the best way to have handled the situation, it asks the Bureau to determine if the health care facility (1) asked about vaccination status; and (2) then implemented reasonable accommodation measures. Here, I find ▮ asked about vaccination status and then followed guidance from the CDC for correctional facilities.

If this matter goes forward, ▮ will ultimately have a variety of defenses available. ▮ may enjoy the protection of the absolute bar to complaints put forth in § 2-9-902, MCA, and since the inmates have not been able to point to any opportunity that was denied outside of employment *Quigg* may be controlling. Following these investigations, it appears that ▮ would also be able to show that restrictions on unvaccinated inmates were reasonable accommodation measures.

---

[5] A person with a disability has a condition or impairment that substantially limits one or more major life activities.

DEFS 001461

**Exhibit 35 - 91**

## HRB CONFIDENTIAL

For these reasons, I find that ▊▊▊▊ is unable to prove by a preponderance of the evidence that ▊▊▊ discriminated against him on the basis of vaccination status.

**CONCLUSION**

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Marieke Beck*                                                          *February 25, 2022*
_____                   _____
Marieke Beck                                                                    Date
Montana Human Rights Bureau

DEFS 001462

**Exhibit 35 - 92**

# HRB CONFIDENTIAL

### *MONTANA DEPARTMENT OF LABOR & INDUSTRY*
### EMPLOYMENT RELATIONS DIVISION
### HUMAN RIGHTS BUREAU

|  |  |
|---|---|
| Charging Party,<br><br>vs. | Final Investigative Report |
| �_____▇[1], <br><br>Respondent. | HRB Case No. 0210582 |

**Recommendation:** Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

## I.   ISSUE PRESENTED

Did the ▇ discriminate against ▇ ▇ based on his vaccination status in violation of the Montana Human Rights Act (Title 49, Chapter 2, MCA) when he was quarantined and denied employment and other opportunities?

## II.   SUMMARY OF THE INVESTIGATION

This report constitutes a summary of the investigation conducted in this case. Content of this report is limited to witnesses, documents and other evidence relevant to the analysis of the issue presented. The case file may contain additional evidence not included in this report.

### A.   Charging Party's Position Statement:

▇ sent in a self-drafted complaint asserting that he is an inmate serving his sentence with the ▇ He asserts he is employed by Montana ▇ and that on or about August 17, 2021, he was informed that due to his non-vaccinated status, he would have to quarantine in C-Unit and could no longer enjoy his employment at the industries compound. He asserts he witnessed vaccinated inmates being permitted to enjoy their employment status. ▇ also asserts he was informed he could not attend "hobby" on his scheduled day.

//

---

[1] Nine complaints were filed by ▇ ▇ inmates on a template form containing substantially similar allegations. All these complaints involve a quarantine by ▇ in August 2021 at ▇ The template names '▇

Defendants." The Bureau sent Charging Parties' complaints to ▇ and ▇ responded.

DEFS 001463

**Exhibit 35 - 93**

## HRB CONFIDENTIAL

**B.      Respondent's Position Statement:**

███ denies that it discriminated. In the week of August 15, 2021, there was a confirmed COVID-19 case in MSP's Unit C. In the wake of this potential exposure, inmates were quarantined based on vaccination status.  On July 30, 2021, Montana's Department of Public Health and Human Services (DPHHS) provided ███ with guidance from the Centers for Disease Control (CDC) stating that vaccinated individuals did not need to be quarantined or restricted from work following a potential exposure to COVID-19.  The CDC had developed specific guidance for correctional facilities permitting fully-vaccinated individuals to participate in facility programs rather than quarantine.

In its response, ███ argues the Bureau does not have jurisdiction. Since jurisdiction is a threshold issue, ███ argues HRB should dismiss these complaints. HRB is an administrative agency and it cannot consider or investigate claims that are not authorized by the Montana legislature. ███ points to § 53-30-152, MCA, this statute states that inmates are not employees and therefore employment rights do not attach. ███ then argues "[f]or over 30 years, it has been black letter law that 'general anti-discrimination statutes' in Title 49 cannot 'override the specific legislative intent' to prohibit inmates from asserting work-related discrimination claims.

Additionally, ███ argues that the newly passed § 2-9-902, MCA, states that a governmental entity is not liable for civil damages for injuries or death from or relating to exposure or potential exposure to COVID-19.  It is ███ position that this statute was drafted to broadly cover "every civil claim for damages 'relating to' a potential exposure" to COVID-19.  Here, these inmates were quarantined based on a potential exposure they are asserting injuries in the form of inability to go to work or engage in other activities during the limited quarantine period.  Since a claim for vaccination discrimination is a civil claim and inmates seek damages, this statute precludes the inmates' ability to recover. This statute affords ███ "absolute immunity" from civil actions

**C.      Additional Information**

On October 20, 2021, ███ was asked to address the application of the health care facility provisions of § 49-2-312, MCA. ███ responded and stated that ████████ is a licensed health care facility/service and provided licensure and accreditation documentation through the National Commission on Correctional Health Care.

**D.      Omissions**

The Bureau currently has nine substantially similar complaints filed by inmates regarding a quarantine event on or about August 17, 2021. After ███ provided its response, it was sent to the named Charging Parties on October 20, 2021.  The inmates were given until November 9, 2021, to provide a rebuttal. ███ did not submit a rebuttal.

A second letter was sent on November 30, 2021, stating that if ███ did not respond or contact the Bureau on or before December 20, 2021, the Bureau would write the report based on the information contained in the file. A final letter was sent to ███ attention on

DEFS 001464

**Exhibit 35 - 94**

## HRB CONFIDENTIAL

January 11, 2021. The Bureau has not heard from ▮▮▮▮ The Bureau was able to interview and proceed with five substantially similar complaints.

▮▮▮▮ has not participated. The Bureau limited its investigation to the information in the file.

### III.   ANALYSIS

▮▮▮▮ alleges ▮▮▮ unlawfully discriminated against him in the area of governmental services because of his vaccination status. ▮▮▮ establishes he filed a timely complaint. The Montana Human Rights Bureau has jurisdiction over the complaint.

▮▮▮▮ asserts ▮▮▮ quarantined him based on his vaccination status on or about August 17, 2021, and that because he was quarantined he could not work or enjoy other opportunities that inmates that were vaccinated were allowed to enjoy.

To start, this is a new statute. There are no interpreting administrative rules, no hearing officer decisions, much less any court cases to assist the Bureau in the analysis. All we have is the language of the applicable statutes:

**49-2-312.   Discrimination based on vaccination status or possession of immunity passport prohibited -- definitions.** (1) Except as provided in subsection (2), it is an unlawful discriminatory practice for:

(a)   a person or a governmental entity to refuse, withhold from, or deny to a person any local or state services, goods, facilities, advantages, privileges, licensing, educational opportunities, health care access, or employment opportunities based on the person's vaccination status or whether the person has an immunity passport;

(b)   an employer to refuse employment to a person, to bar a person from employment, or to discriminate against a person in compensation or in a term, condition, or privilege of employment based on the person's vaccination status or whether the person has an immunity passport; or

(c)   a public accommodation to exclude, limit, segregate, refuse to serve, or otherwise discriminate against a person based on the person's vaccination status or whether the person has an immunity passport.

(2)   This section does not apply to vaccination requirements set forth for schools pursuant to Title 20, chapter 5, part 4, or day-care facilities pursuant to Title 52, chapter 2, part 7.

(3)   (a) A person, governmental entity, or an employer does not unlawfully discriminate under this section if they recommend that an employee receive a vaccine.

(b)   A health care facility, as defined in **50-5-101**, does not unlawfully discriminate under this section if it complies with both of the following:

(i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

DEFS 001465

**Exhibit 35 - 95**

## HRB CONFIDENTIAL

(ii) implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.

(4)   An individual may not be required to receive any vaccine whose use is allowed under an emergency use authorization or any vaccine undergoing safety trials.

(5)   As used in this section, the following definitions apply:

(a)   "Immunity passport" means a document, digital record, or software application indicating that a person is immune to a disease, either through vaccination or infection and recovery.

(b)   "Vaccination status" means an indication of whether a person has received one or more doses of a vaccine.

**History:   En. Sec. 1, Ch. 418, L. 2021.**

**49-2-313.   Exemption.** A licensed nursing home, long-term care facility, or assisted living facility is exempt from compliance with **49-2-312** during any period of time that compliance with **49-2-312** would result in a violation of regulations or guidance issued by the centers for medicare and medicaid services or the centers for disease control and prevention.

**History:   En. Sec. 2, Ch. 418, L. 2021.**

Here, ▨ submitted a boilerplate complaint that is substantially similar to complaints filed by other inmates. ▨ has chosen not to participate in this investigation. The Bureau notes when a party refuses to provide information or evidence reasonably necessary for an investigation, the Bureau can draw an "adverse inference" as to the information sought. *Admin. R. Mont. 24.8.216.*

Without ▨ participation, the Bureau cannot fully understand the adverse act(s). Further, ▨ has failed to counter ▨ various defenses. The Bureau will focus its attention on the remaining Charging Parties with substantially similar allegations.

## CONCLUSION

Based on my investigation, I find **no reasonable cause** to believe unlawful discrimination occurred as alleged in Charging Party's complaint.

*Bre Koffman*                                              February 11, 2022
_____               _____
Bre Koffman                                                  Date
Montana Human Rights Bureau

DEFS 001466

**Exhibit 35 - 96**