AUSTIN KNUDSEN
Montana Attorney General
DAVID M.S. DEWHIRST
  *Solicitor General*
CHRISTIAN B. CORRIGAN
  *Deputy Solicitor General*
BRENT MEAD
  *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
david.dewhirst@mt.gov
christian.corrigan@mt.gov
brent.mead2@mt.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, ET. AL., | No. CV-21-108-M-DWM |
| *Plaintiffs,* | |
| and | **DEFENDANTS' STATEMENT OF UNDISPUTED FACTS** |
| MONTANA NURSES ASSOCIATION, | |
| *Plaintiff-Intervenors,* | |
| v. | |
| AUSTIN KNUDSEN, ET AL., | |
| *Defendants.* | |

Pursuant to Local Rule 56.1, Defendants submit this Statement of Undisputed Facts.  Exhibits refer to the exhibits attached to the accompanying Declaration of Brent A. Mead.

## I.    Facts Related to House Bill 702 (2021).

1.      In 2021, the Montana legislature enacted House Bill 702 ("HB 702") which prohibits discrimination by employers or places of public accommodation based on an individual's vaccination status or possession of an immunity passport.  *See* MCA § 49-2-312(1); Exhibit 1.

2.      HB 702 does not apply to the vaccination requirements for schools set forth in Title 20, Chapter 5, part 4, or day-care facilities pursuant to Title 52, chapter 2, part 7.  *See* MCA § 49-2-312(2).

3.      Montana law requires pupils attending a school, other than postsecondary schools, to be immunized against varicella, diphtheria, pertussis, poliomyelitis, rubella, mumps, and measles.  *See* MCA § 20-5-403(1)(a).  Additionally, pupils under the age of five must be immunized against Haemophilus influenza type "b" before enrolling in a preschool. *See* MCA § 20-5-403(1)(b).

4.      Montana law requires pupils attending a postsecondary school to be immunized against rubella and measles.  *See* MCA § 20-5-

403(2)(a)(i).  Postsecondary schools may, as a condition of attendance, impose more stringent immunization requirements.  *See* MCA § 20-5-403(2)(b).

5.      Montana law allows pupils to enroll in school without receiving the required immunizations if the pupil properly submits a medical or religious exemption from the required immunization.  *See* MCA § 20-5-405.

6.      For the 2020–21 school year, 92.9% of Montana kindergarteners had received two doses of the MMR vaccine, 91.9% had received five doses of the DTaP vaccine, and 91.9% had received two doses of the varicella vaccine.  3.5% of Montana kindergarteners had a medical or religious exemption from required vaccinations.  The percentage of Montana kindergarteners with a medical or religious exemption decreased by 0.8% since the 2019–20 school year.  *See* Exhibit 4.

7.      Montana law requires children attending daycare be immunized against measles, mumps, poliomyelitis, diphtheria, pertussis, tetanus, varicella, hepatitis B, pneumococcal, and Haemophilus influenza type B.  *See* MCA § 52-2-735(1); Mont. Admin. R. 37.95.140.  The specific

doses required of a specific vaccine vary according to the child's age group.  *See* Mont. Admin. R. 37.95.140.

8.    Persons, government entities, and employers may recommend vaccines without violating HB 702.  *See* MCA § 49-2-312(3)(a).

9.    Health care facilities, as defined in MCA § 50-5-101(26), do not violate HB 702 if they both (1) ask an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases; and (2) implement reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases.  A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.  *See* MCA § 49-2-312(3)(b).

10.    A licensed nursing home, long-term care facility, or assisted living facility is exempt from HB 702 during any period of time that compliance with HB 702 would result in a violation of regulations or guidance issued by the Centers for Medicare and Medicaid Services or the Centers for Disease Control.  *See* MCA § 49-2-313.

11.    On April 28, 2021, Montana Governor Greg Gianforte returned HB 702 with a proposed amendment that added the sections codified as MCA § 49-2-312(3)(b) and § 49-2-313.  Exhibit 2.

12.    On April 28, 2021, the Montana House of Representatives adopted the Governor's amendment.  On April 29, 2021, the Montana Senate adopted the Governor's amendment.  On May 7, 2021, Governor Gianforte signed HB 702 as amended.  The provisions at issue in this case went into effect immediately.  Exhibit 3.

13.    On May 13, 2021, the Centers for Medicare and Medicaid Services said: "Individuals residing in congregate settings, regardless of health or medical conditions, are at greater risk of acquiring infections, and many residents and clients of long-term care (LTC) facilities and Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICFs–IID) face higher risk of severe illness due to age, disability, or

underlying health conditions." *See Medicare and Medicaid Programs; COVID–19 Vaccine Requirements for Long-Term Care (LTC) Facilities and Intermediate Care Facilities for Individuals With Intellectual Disabilities (ICFs–IID) Residents, Clients, and Staff*, 86 Fed. Reg. 26306, 26306 (May 13, 2021); Exhibit 5.

14.    The Centers for Medicare and Medicaid Services noted, "[n]ursing home residents are less than 1 percent of the American population, but have historically accounted for over one-third of all COVID–19 deaths." 86 Fed. Reg. 26306, 26306 (May 13, 2021).

15.    The Centers for Medicare and Medicaid Services May Rule required long-term care facilities to "offer residents and staff vaccination against COVID-19," 86 Fed. Reg. 26306, 26312 (May 13, 2021), ensure "facility staff are educated about vaccination against COVID–19," *id.* at 26314, ensure "facility residents or resident representatives are educated about vaccination against COVID–19," *id.* at 26315, and report the aggregate vaccination uptake among residents and staff. *Id.* at 26315–26316. The Rule imposed similar requirements on Intermediate Care Facilities for Individuals with Intellectual Disabilities. *Id.* at 26317–26319.

16.     The Omicron variant now represents substantially all new SARS-COV2 infections in the United States.  Exhibit 6, ¶ 36.  The Omicron variant is more transmissible than prior variants.  Exhibit 37 at 80:14–81:2 (deposition of Dr. David Taylor); Exhibit 38 at 44:5–45:7 (deposition of Dr. David King).  Approved COVID-19 vaccines are ineffective at preventing infection and transmission from the Omicron variant.  Exhibit 6, ¶¶ 48–60; Exhibit 7 at 18.  In other words, individuals vaccinated for COVID-19 may still become infected and transmit the virus.  Exhibit 6, ¶¶ 48–60; Exhibit 8 at 5–6; SUF, ¶¶ 31–33.  The Centers for Disease Control and Prevention changed its guidance to eliminate any difference in isolation or quarantine based on vaccination status.  Exhibit 11.

17.     On July 28, 2021, the Montana Department of Labor and Industry and Montana Department of Public Health and Human Services issued guidance on HB 702 implementation.  Exhibit 12.  That guidance clarified that nothing "in the language of HB 702 prohibits a person, governmental entity, public accommodation, or employer from asking about vaccination status or whether you have an immunity passport."  Exhibit 12 at 3.  Further, the guidance clarified that incentives to persons to voluntarily become vaccinated don't violate HB 702.  Exhibit 12 at 3.

Finally, the guidance clarified that nothing "in HB 702 prohibits a person, governmental entity, public accommodation, or employer from requiring everyone on their premises or during the course of employment to wear masks, regardless of vaccination status, as long as there is a provision for accommodations for persons based on sincerely held religious beliefs or disability."  Exhibit 12 at 4.

## II.   Facts Related to the individual Plaintiffs

18.   None of Plaintiffs Mark Carpenter, Pat Appleby, Wallace Page, Diana Jo Page, or Cheyenne Smith ("individual Plaintiffs") has filed a complaint against any entity under the Montana Human Rights Act since January 1, 2018.  Exhibit 9 at 18 (Response to Request for Production No. 8).

19.   No individual Plaintiff has filed a complaint against any entity under the Americans with Disabilities Act within the last five years. Exhibit 9 at 19 (Response to Request for Production No. 10).

20.   None of the individual Plaintiffs inquired into the vaccination status of employees at commercial or professional establishments prior to COVID-19.  Exhibit 9 at 51–52 (Answer to Interrogatory No. 12).  The individual Plaintiffs instead assumed vaccination status based upon

vaccination requirements at public schools, daycares, and within the military.  Exhibit 9 at 51–52 (Answer to Interrogatory No. 12); Exhibit 8 at 5 (Wallace Page "assumed" healthcare worker vaccinations were required).

21.    Mark Carpenter does not possess any record of any accommodation request made under the Americans with Disability Act due to the vaccination status of an employee at a healthcare provider.  Exhibit 9 at 18–19 (Responses to Requests for Production 8 and 10).

22.    Mark Carpenter does not possess any record of any accommodation request made under the Montana Human Rights Act due to the vaccination status of an employee at a healthcare provider.  Exhibit 9 at 18 (Response to Request for Production No. 8).

23.    The individual Plaintiffs, other than Mark Carpenter, have not made any accommodation request, written or verbal, under the Americans with Disability Act due to the vaccination status of an employee at a healthcare provider within the last five years.  Exhibit 9 at 18–19 (Responses to Requests for Production 8 and 10).

24.    The individual Plaintiffs, other than Mark Carpenter, have not made any accommodation request, written or verbal, under the

Montana Human Rights Act due to the vaccination status of an employee at a healthcare provider.  Exhibit 9 at 18 (Response to Request for Production No. 8).

25.    The individual Plaintiffs all visited healthcare providers since May 7, 2021.  Exhibit 9 at 23 (Response to Request for Admission No. 1); Exhibit 10 at 4.

26.    None of the individual Plaintiffs avoided seeking the services of healthcare providers based on the vaccination status of employees at that healthcare provider.  Exhibit 8 at 2–10.

27.    None of the individual Plaintiffs cited a situation in which they were discouraged from accepting potential employment otherwise available to them at any healthcare provider.  Exhibit 9 at 20 (Response to Request for Production No. 11); Exhibit 10 at 3.

28.    Pat Appleby was fully vaccinated for COVID-19 in the Spring of 2021.  Pat Appleby still contracted COVID-19 in November 2021 and recovered from COVID-19.  Exhibit 8 at 6–7.

29.    Wallace Page contracted COVID-19 after being vaccinated against the disease.  Exhibit 8 at 4–6.

30.    Diana Jo Page contracted COVID-19 after being vaccinated against the disease.  Exhibit 8 at 4–6.

31.    Wallace Page made over 100 trips to a healthcare setting for chemotherapy.  During these visits, he waited in the emergency care waiting room with other individuals who may be among the sickest with COVID-19.  His healthcare providers masked and kept a clean environment.  He never contracted COVID-19 from any of his hundreds of visits to his healthcare providers.  Exhibit 8 at 5.

32.    Cheyenne Smith works as a dental hygienist.  She has not requested any accommodations based on the vaccination status of other healthcare workers.  Exhibit 8 at 8; Exhibit 9 at 18–19 (Responses to Requests for Production No. 8 and 10).

## III.  Facts related to Plaintiff Five Valleys Urology

33.    Five Valleys Urology does not operate and is not regulated as a licensed healthcare facility, as defined in MCA § 50-5-101(26).  Exhibit 13 at 13:11–16 (Deposition of Five Valleys Urology's 30(b)(6) designee John O'Connor).

11

34.   Prior to HB 702, Five Valleys Urology did not require its healthcare providers to disclose their vaccination status for any vaccine preventable disease.  Exhibit 13 at 39:6–40:17; Exhibit 14 at PL1471.

35.   Five Valleys Urology's vaccination policy states, "[a]ll employees are *encouraged* to receive vaccinations as determined by the Missoula County Health Department.  Employees will be notified by administration as to the type of vaccination(s) covered by this policy and the timeframe(s) for having it/them administered, if applicable." Exhibit 14 at PL1471 (emphasis added).  Five Valleys Urology testified, prior to HB 702, they did not require disclosure of vaccination status for any vaccine preventable disease as a condition of employment.  Exhibit 13 at 39:6–11.

36.   Prior to HB 702, Five Valleys Urology did not require any special precautions related to unvaccinated, or non-immune, employees.  Exhibit 13 at 44:13–21.

37.   Prior to HB 702, Five Valleys Urology did not take an employee's vaccination status into account when determining whether that employee could interact with patients.  Exhibit 13 at 58:3–12.

38.     Prior to HB 702, Five Valleys Urology did not inquire into the staff vaccination policies, or infectious disease control polices, at a receiving healthcare provider before Five Valleys Urology referred a patient to that provider.   Five Valleys Urology testified that it never refused to transfer a patient based on the vaccination or infectious control policy at the receiving healthcare provider.  Exhibit 13 at 16:10–17:11.

39.     Prior to HB 702, Five Valleys Urology felt it "did everything in our powers to make the environment safe for employees and patients alike."  Exhibit 13 at 58:13–25.

40.     Prior to the COVID-19 pandemic, Five Valleys Urology did not receive any requests from patients for accommodations regarding preventing the transmission of communicable diseases.  Exhibit 13 at 53:9–55:7.

41.     During the COVID-19 pandemic, Five Valleys Urology accommodated such requests by checking patients in virtually, allowing patients to enter through a private door, and move directly to an examination room.  Exhibit 13 at 53:9–54:3.

42.     Five Valleys Urology handles Americans with Disability Act requests on a case-by-case basis.  Exhibit 13 at 57:2–18.

13

43.     Five Valleys Urology did not receive any Americans with Disability Act accommodation requests since March 1, 2020.  Exhibit 8 at 32–36 (Responses to Requests for Production No. 23, 25, and 26).

44.     In the last five years, Five Valleys Urology has not been the subject of any disciplinary action for alleged violations of a legal or medical obligation because of unvaccinated or non-immune employees.  Exhibit 13 at 59:1–11.

45.     In the last five years, Five Valleys Urology has not been the subject of any medical malpractice or negligence claim based on the vaccination or immunity status of Five Valleys' employees.  Exhibit 13 at 59:19–60:2.

46.     Five Valleys Urology has not been the subject of any complaint or citation related to deficient infectious disease control practices in the last five years.  Exhibit 13 at 60:10–17.

47.     Counsel for Plaintiffs asserted the Fifth Amendment in response to the question, "does FVU [currently] take any special precautions when that new patient first enters into an FVU facility?"  Exhibit 13 at 23:2–22.

48.    Five Valleys Urology's "OSHA Manual" requires the Hepatitis B vaccination be made available at no cost to all employees who have occupational exposure.   Exhibit 15 at PL 1634.   Five Valleys' Occupational Safety and Health Act compliance manual mentions only the Hepatitis B vaccination and says "[a]lthough OSHA does not require it, you may wish to request new employees who have already been vaccinated to provide proof of their vaccination." Exhibit 15 at PL 1634.   The manual further says that "the OSHA Standard requires that an employee who declines to accept hepatitis B vaccination offered by the employer sign the Hepatitis B Vaccine Declination." Exhibit 15 at PL 1639.   That declination doesn't ask the employee to disclose their vaccination status.   Exhibit 15 at PL1641.   It merely requires employees to acknowledge both that they are declining the offered Hepatitis B vaccination and the associated risks from the Hepatitis B.   Exhibit 15 at PL1641.

49.    Prior to HB 702, Five Valleys Urology did not require employee vaccinations or disclosure of vaccination status as part of its "OSHA Manual."   Exhibit 13 at 39:6–11.

50.    Five Valleys Urology has employed individuals known to be unvaccinated against COVID-19 when such vaccines were available.  Exhibit 9 at 23–24 (Response to Request for Admission No. 2).

## IV.  Facts related to Plaintiff Western Montana Clinic

51.    Western Montana Clinic does not operate and is not regulated as a licensed healthcare facility, as defined in MCA § 50-5-101(26).  Exhibit 16 at 15:9–17:16 (Deposition of Western Montana Clinic 30(b)(6) designee Meghan Morris).

52.    Western Montana Clinic does not inquire into the infectious disease control policies, staff vaccination policies, or staff vaccination status at receiving healthcare providers when Western Montana Clinic transfers patients to those providers.  Exhibit 16 at 31:21–32:7, 35:4–37:21.  Western Montana Clinic never refused to transfer a patient based on the receiving healthcare provider's health and safety protocols.  Exhibit 16 at 37:8–37:21.

53.    Prior to the COVID-19 pandemic, Western Montana Clinic's infection control practices included separating the pediatric department into a "sick" and "well" department.  Parents self-directed which side their child waited in, regardless of the child's actual infection status.

16

Exhibit 16 at 48:6–49:9.  Likewise, Western Montana Clinic did not direct any interventions in the patient waiting room based on patients' vaccination or infection status.  Exhibit 16 at 52:10–53:02.

54.    Prior to HB 702, Western Montana Clinic did not require any vaccination or immunization as a condition of employment.  Exhibit 16 at 74:14–25; Exhibit 17 at PL1023.  Western Montana Clinic allowed employees to opt-out of any vaccine through a declination form.  Exhibit 17 at PL1023.  The only vaccine Western Montana Clinic focused on recommending to its healthcare providers was the influenza vaccine.  Exhibit 16 at 68:14–22.  Western Montana Clinic healthcare providers could opt-out of receiving that vaccine through a declination form.  Exhibit 16 at 65:18–68:22; Exhibit 18 at PL1033.

55.    Prior to HB 702, Western Montana Clinic did not actively track employees' vaccination status.  Exhibit 16 at 76:3–19.

56.    Western Montana Clinic repealed its COVID-19 vaccination and testing policy that aligned with the Occupational Safety and Health Act Emergency Temporary Standard.  Exhibit 19; Exhibit 20.  Prior to that Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021), the Occupational Safety and Health Act did not require Western

Montana Clinic to mandate any vaccinations.  Exhibit 9 at 50 (Response to Request for Admission No. 6).

57.    Prior to HB 702, Western Montana Clinic did not require disclosure of vaccination or immunization status as part of its infection control policies.  Exhibit 21 at PL1572–73; Exhibit 22 at PL1595–96.

58.    Prior to HB 702, Western Montana Clinic did not provide any reasonable accommodations under the Montana Human Rights Act based on the vaccination status of other Western Montana Clinic employees.  Exhibit 16 at 81:12–86:2.

59.    Prior to HB 702, Western Montana Clinic did not provide any reasonable accommodations under the Americans with Disabilities Act based on the vaccination status of other Western Montana Clinic employees.  Exhibit 16 at 86:7–90:2; Exhibit 9 at 32–35 (Responses to Requests for Production No. 23 and 25).

60.    Western Montana Clinic addresses accommodation requests under the Americans with Disability Act "on a case-by-case" basis.  Exhibit 16 at 91:11–92:17.

61.   Prior to HB 702, Western Montana Clinic never took an employee's vaccination status into account when determining whether that employee could interact with patients.  Exhibit 16 at 93:11–94:5.

62.   Prior to HB 702, Western Montana Clinic had not been the subject of any disciplinary action by any entity for alleged violations of legal or medical obligations based on the vaccination status of employees. Exhibit 16 at 99:21–100:6.  Western Montana Clinic has not been the subject of any lawsuits because the vaccination status of Western Montana Clinic employees.  Exhibit 16 at 102:13–103:1.  Western Montana Clinic has not been subject to a complaint with a regulatory body based on allegedly deficient infection control policies.  Exhibit 16 at 103:16–24.

63.   Western Montana Clinic has employed individuals known to be unvaccinated against COVID-19 when such vaccines were available. Exhibit 9 at 23–24 (Response to Request for Admission 2).  Western Montana Clinic employed individuals unvaccinated for other vaccine preventable diseases.  Exhibit 18 at PL 1033.

64.   Western Montana Clinic declined to answer when asked whether it sued on behalf of its physician members.  Exhibit 16 at 107:3–13.

65.    Western Montana Clinic invoked the Fifth Amendment, at the behest of counsel, when asked about their current vaccination policies. Exhibit 16 at 68:23–69:21. Western Montana Clinic again invoked the Fifth Amendment at the request of counsel when asked whether Western Montana Clinic provided reasonable accommodations to an employee since January 1, 2021, under the Montana Human Rights Act, due to the vaccination status of other Western Montana Clinic employees. Exhibit 16 at 84:8–85:18.

## V.    Facts related to Plaintiff Providence

66.    Plaintiff Providence Health and Services operates multiple licensed healthcare facilities, as defined by MCA § 50-5-101(26). Exhibit 23 at 13:11–14:13 (Deposition of Providence's 30(b)(6) designee Kirk Bodlovic).

67.    Prior to HB 702, Providence did not check any "other facility's vaccination policy" when referring a patient to that provider. Exhibit 23 at 16:17–25. Providence, likewise, did not check the actual vaccination status of individuals at the receiving facility. Exhibit 23 at 17:2–9. No other healthcare provider refused to transfer patients to Providence

20

based on the vaccination status of Providence employees.  Exhibit 23 at 17:11–17.

68.    Providence initially required certain precautions of all individuals during the COVID-19 pandemic such as universal masking and pre-entry temperature screenings.  Exhibit 23 at 19:12–22:12.  Due to the declining COVID-19 transmission rate in the community and declining hospitalizations, Providence has since dropped the precaution of pre-entry temperature screenings.  Exhibit 23 at 21:24–22:12.

69.    Prior to the COVID-19 pandemic, Providence did not require symptomatic influenza patients to wear masks or require social distancing in common areas, like waiting rooms.  Exhibit 23 at 24:18–25:11.

70.    The assisted living facility operated by Providence in Polson primarily cares for an elderly population.  Exhibit 23 at 26:20–27:2.

71.    Regarding the Centers for Medicare and Medicaid Services COVID-19 vaccine mandate, Providence does not independently verify, or audit, the vaccination status of contractors and vendors that Providence certifies for the purposes of the rule.  Exhibit 23 at 28:22–32:16.

72.    Prior to the Centers for Medicare and Medicaid Services COVID-19 vaccine mandate, Providence was not required to mandate

any employee vaccinations by Centers for Medicare and Medicaid Ser-
vices. Likewise, Providence was not required to mandate any employee
vaccinations by the Montana Department of Public Health and Human
Services. Exhibit 23 at 34:7–35:1; Exhibit 9 at 50–51; Exhibit 24 at
35:18–36:10 (Deposition of Providence 30(b)(6) designee Karyn Trainor).

73.   Prior to HB 702, Providence did not mandate any employee
vaccinations. Exhibit 25 at PL171–174; Exhibit 24 at 28:8–34:24, 36:25–
37:6. Providence asserted the Fifth Amendment when asked if Provi-
dence has "a current policy for immunization requirements," Exhibit 24
at 31:4–9, and whether Exhibit 25 was the current policy. Exhibit 24 at
28:8–31:9. Prior to HB 702, Providence only recommended the influenza
vaccine. Exhibit 24 at 31:24–32:13. Likewise, Providence only recom-
mended the Pertussis vaccine. Exhibit 24 at 34:4–24.

74.   Providence testified "the general public assumes that our peo-
ple are vaccinated and were required to be vaccinated in many cases"
because of the "vaccinations you had to have it in school, you had to have
it for day care, you had it have it to go to university." Exhibit 24 at 40:13–
41:3. Providence further testified that it "kn[e]w that there are exemp-
tions" within HB 702 for those settings. Exhibit 24 at 41:17–42:9.

22

75.   Providence was not aware of any accommodation requests made under the Montana Human Rights Act based on the vaccination status of other Providence employees.  Exhibit 24 at 45:9–46:11, 57:9–20, 65:25–66:17; Exhibit 10 at 6–7; Exhibit 9 at 31–36 (Responses to Requests for Production No. 22–27).

76.   When asked the question: "did Providence ever ask a caregiver to receive a vaccination based on the reasonable accommodation request of a different Providence employee?," Providence testified that they would not be "impinging on somebody else's right" in working through the accommodation request.  Exhibit 24 at 47:16–48:7.

77.   Providence was not aware of any reasonable accommodation request made by a Providence employee under the Americans with Disabilities Act based on the vaccination status of a different Providence employee.  Exhibit 24 at 55:23–57:7, 65:25–66:17; Exhibit 10 at 6–7; Exhibit 9 at 31–36 (Responses to Requests for Production No. 22–27).   During the time period beginning January 1, 2018 to the present, Providence has not been the subject of any Americans with Disabilities Act complaints due to the vaccination status of another Providence employee.  Exhibit

24 at 67:9–22; Exhibit 9 at 37 (Response to Request for Production No. 29).

78.    Providence testified that accommodations under the Americans with Disabilities Act and Montana Human Rights Act require an individualized process specific to the needs of the requesting individual and the circumstances of the case.  Exhibit 24 at 43:23–45:7.

79.    Prior to HB 702, Providence's infection control policies did not mandate any employee vaccinations.  Exhibit 25.  Employee could sign a statement of declination for Hepatitis B.  Exhibit 25 at PL172.  Employees could also decline the MMR (measles, mumps, and rubella) vaccine and varicella vaccine.   Exhibit 25 at PL172–173.   Providence only "strongly recommended" the influenza and Tdap (tetanus, diphtheria, pertussis) vaccines.  Exhibit 25 at PL173–174.  The policy made clear that individuals whose vaccination status is unknown or who do not provide vaccination documentation will be treated as unvaccinated.  Exhibit 25 at PL172.

80.    In the previous three years, Providence has not been subject to any disciplinary action by any government entity for an alleged violation of a legal obligation because of unvaccinated employees, nor has

Providence been subject to a malpractice or negligence complaint based on Providence's employees' vaccination status, nor has Providence received any complaints related to allegedly deficient infectious disease control policies.  Exhibit 24 at 78:19–80:7.

81.    Providence employs individuals unvaccinated for COVID-19 and for other vaccine-preventable diseases.  Ex. 9 at 23–24.  Providence grants medical and religious exemptions to otherwise recommended vaccines.  Exhibit 25; Exhibit 24 at 49:2–51:23.

82.    Providence's infectious disease management policies allow for caregivers to work even if those caregivers are unvaccinated or non-immune.  Exhibit 35.  For example, caregivers can work without receiving the influenza vaccine so long as they comply with masking requirements.  Exhibit 35 at PL177.  Quarantined patients may also receive visitors so long as those visitors comply with health and safety rules.  Exhibit 35 at PL197.

83.    Providence's COVID-19 plan prior to the COVID-19 vaccine mandate does not mention or refer to vaccination.  Exhibit 36.

## VI.  Facts related to Plaintiff-Intervenor Montana Nurses Association

84.    Plaintiff Intervenor Montana Nurses Association does not possess any record of any reasonable accommodation request made under the Americans with Disabilities Act or Montana Human Rights Act related to vaccine-preventable disease.  Exhibit 26 at 8–10.

85.    Montana Nurses Association strongly supports religious and medical exemptions to all vaccinations.  Exhibit 27 at MNA149, 151.

86.    Montana Nurses Association opposes retaliation against employees based on the employee's vaccination status.  Exhibit 27 at MNA 150, 152.

87.    Montana Nurses Association surveyed its members in September 2021 to understand their views on vaccine mandates.  Exhibit 28. Only 34.6% of respondents answered they support mandatory vaccinations without exemptions.  Exhibit 28 at MNA228.  35.67% of respondents do not support mandatory vaccines for healthcare workers.  Exhibit 28 at MNA228.

88.    Montana Nurses Association entered into a collectively bargained contract with the State of Montana at the Montana Mental Health Nursing Care Center.  Exhibit 29.  This agreement states "No employee

will be subject to mandatory vaccines or immunizations by the Employer." Exhibit 29 at MNA406.  This provision is identical to a provision in the preceding collective bargaining agreement between the State of Montana and the Montana Nurses Association at this facility.  Exhibit 30 at 14.  The State of Montana does not require any mandatory vaccinations or immunizations at this facility.  Exhibit 33, ¶ 13.

89.    The Montana Nurses Association acknowledges that the Centers for Medicare and Medicaid Services Covid-19 vaccination mandate "is an unprecedented mandate and as this is NEW to all of you it is also NEW to us."  Exhibit 31 at MNA1308, 1314.

## VII. Facts related to Centers for Medicare and Medicaid Services and the Occupational Safety and Health Act

90.    Prior to its November 5, 2021, *Interim Final Rule, Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61555 (Nov. 5, 2021), the Centers for Medicare and Medicaid Services never required any healthcare staff vaccinations as a condition of participation in Medicare or Medicaid.  Exhibit 9 at 50–51 (Response to Request for Admission No. 7).

91.    Prior to HB 702 and COVID-19, Providence's staff vaccination policies never triggered a complaint, citation, or violation of Centers for

Medicare and Medicaid Services conditions of participation, including those set forth in 42 C.F.R. § 482.41 and 42 C.F.R. § 482.42.  Exhibit 9 at 48–49 (Response to Request for Production No. 49); Exhibit 32 at PL236–282.  Providence's infection control survey deficiencies were unrelated to staff vaccination policies, or knowledge of staff vaccination status.  Exhibit 32 at PL256–257.

92.    Prior to HB 702 and COVID-19, Five Valleys Urology's staff vaccinations policies never triggered a complaint, citation, or violation of Centers for Medicare and Medicaid Services conditions of participation, including those set forth in 42 C.F.R. § 482.41 and 42 C.F.R. § 482.42. Exhibit 9 at 48–49 (Response to Request for Production No. 49).

93.    Prior to HB 702 and COVID-19, Western Montana Clinic's staff vaccinations policies never triggered a complaint, citation, or violation of Centers for Medicare and Medicaid Services conditions of participation, including those set forth in 42 C.F.R. § 482.41 and 42 C.F.R. § 482.42.  Exhibit 9 at 48–49 (Response to Request for Production No. 49).

94.    Prior to the November 5, 2021, *Interim Final Rule, Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination*, 86 Fed. Reg. 61555 (Nov. 5, 2021), state surveyors did not

investigate a facility's staff vaccination policy or status and the federal government did not even have a code or tag to cite for vaccination issues until the Vaccine Mandate and guidance came out. One was specifically created for COVID-19 vaccination issues.  Prior to the Vaccine Mandate, surveyors would focus on universal infection control policies but not vaccines, in any manner.  These universal infection control policies did not require surveyors to investigate a facility's vaccination policy or whether the facility tracked employees' vaccination status.  Exhibit 33, ¶ 12.

## VIII. Facts related to the Montana Human Rights Bureau

95.    To determine whether a condition qualifies as a disability, the Human Rights Bureau must consider what impact the condition has on an individual.  Exhibit 34 at 93:1–12 (Deposition of HRB's 30(b)(6) designee Marieke Beck).

96.    The Human Rights Bureau looks "at every case as it comes" and considers both the "facts being presented by the charging party" and the "defenses being raised by the respondent."  Exhibit 34 at 94:7–11.

97.    To determine whether discrimination occurred, the Human Rights Bureau considers each case based on the specific facts presented. Exhibit 34 at 50:24–51:6, 52:5–8.

Respectfully submitted this 26th day of August 2022.

Austin Knudsen
Montana Attorney General

DAVID M.S. DEWHIRST
  Solicitor General

CHRISTIAN CORRIGAN
  Deputy Solicitor General

*/s/Brent Mead*
BRENT MEAD
  *Assistant Attorney General*
P.O. Box 201401
Helena, MT 59620-1401
david.dewhirst@mt.gov
christian.corrigan@mt.gov.
brent.mead2@mt.gov

*Attorneys for Defendants*

CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: <u>August 26, 2022</u>                     <u>/s/ *Brent Mead*   </u>
                                                                      BRENT MEAD