# Exhibit 8

Justin K. Cole
Kathryn S. Mahe
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT 59807-7909
Phone (406) 523-2500
Fax (406) 523-2595
jkcole@garlington.com
ksmahe@garlington.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, et al., <br><br> Plaintiffs, <br><br> and <br><br> MONTANA NURSES ASSOCIATION, <br><br> Plaintiff-Intervenors, <br><br> v. <br><br> AUSTIN KNUDSEN, et al., <br><br> Defendants. | Case No. CV 21-00108-DWM <br><br><br> PLAINTIFFS' FOURTH SUPPLEMENTAL RESPONSES TO DEFENDANTS' FIRST COMBINED DISCOVERY REQUESTS |

Plaintiffs submit the following supplemental answers/responses to Defendants' First Combined Discovery Requests dated June 29, 2022.

4881-6917-9437                                                                                      1

These answers/responses are prepared and submitted in accordance with Federal Rules of Civil Procedure 26, 33, 34, and 36. Plaintiffs do not recognize or accept any obligation to supplement answers/responses to discovery requests except as required by Federal Rule of Civil Procedure 26(e). The preface included in these discovery requests is not within the express or implied provisions of the Federal Rules of Civil Procedure and, as such, has been disregarded in preparing these answers/responses.

In the event Plaintiffs inadvertently or otherwise produce copies of documents that are subject to protection from discovery under the doctrines of attorney-client privilege, work-product, trade secrets, confidentiality, proprietary or confidential business or commercial information, or are not relevant and not reasonably calculated to lead to the discovery of the admissible evidence, any production herewith shall not be deemed a waiver of such protection or any subsequent obligation to use for admissibility in any proceedings herein.

**INTERROGATORY NO. 5:** In Paragraph 25 of the Second Amended Complaint, Individual Plaintiffs allege that they must "avoid or minimize contact" with "persons who carry or may carry the COVID-19 virus" and must "avoid commercial and professional establishments" that "fail to take steps to minimize the spread of the virus and other common viruses and germs" and must avoid establishments that "employ unvaccinated workers" or are unable to "take

necessary measures to protect against preventable diseases." Please describe in detail how you define these quoted phrases from Paragraph 25 of the Second Amended Complaint.

**ANSWER:** The phrases quoted in the response are defined as to their ordinary meaning. As additional explanation, individuals who are vulnerable due to age, disability, or health condition are more at risk of contracting and being harmed by vaccine-preventable diseases. These individuals are required to take particular precaution to avoid contracting vaccine-preventable diseases. This applies not only to COVID during the current pandemic, but to all infectious diseases.

For Mark Carpenter specifically, as a kidney transplant patient, he was given a significant amount of guidance prior to the transplant and afterwards regarding the risks of infections because of immunosuppressants. This started back in 2016 when he applied for a kidney transplant and the guidance is ongoing. This included his entire transplant team at Virginia Mason Hospital in Seattle, his primary care physician in Missoula, his nephrologist in Missoula, his infectious disease specialist in Missoula, and the Missoula County Health Department where he received a large number of vaccinations strongly recommended by his various medical providers. People on immunosuppressants are given guidance to the extent of avoiding things like salad bars due to the risk of infection for diseases

like Hepatitis B. In order to protect himself during the pandemic, he did extensive research on his own following clinical studies at John Hopkins and elsewhere. This is how he discovered that the vaccines might not produce antibodies for him and what levels of antibodies are expected to provide protection. For these reasons, he has not attended large gatherings (conferences, trade shows, sporting events, festivals, concerts, or weddings) since the pandemic began. Since March 2020, he has lived at his remote cabin on Salmon Lake and kept his interactions to a very small group of friends and family who were fully vaccinated and exercised caution.

For Wally Page, he avoided seeing people and establishments who disregarded masking and vaccination recommended by health care professionals. Jo Page limited places she visited to healthcare establishments, where providers masked and followed distancing protocols.

Cheyenne Smith was pregnant during the pandemic and exercised caution when in public. Pat Appleby also exercised caution when leaving the house or going to the grocery store.

**FIRST SUPPLEMENTAL ANSWER:** Plaintiffs provide the following additional information from each individual Plaintiff.

**Additional information for Wally and Jo Page**

For Wally, frequent trips to health care providers are not optional and he expects that his medical providers do him no harm. They mask and keep a clean work environment and he naturally assumed their vaccinations were a work requirement. With his cancer diagnosis, he has had to be very cautious. He felt some of the times he was at most risk of catching something included going to the emergency care waiting room where very sick patients waited for treatment. He knew that many of the sickest with COVID ended up being treated at emergency care before admission to the hospital. He has had to visit the chemotherapy infusion room over 100 times. Not knowing whether all individuals were vaccinated, he has had to be very cautious and he feels lucky that he did not catch COVID from someone there while he was receiving those treatments (though did contract COVID later).

Jo was diagnosed with breast cancer in 2019. As she met with different doctors, including primary care, oncologist, surgeons, and radiologists, she learned from them how important it was to keep herself safe from crowds, public areas, and exposures to anything that could penetrate her immune compromised system. She has a very active family and once the pandemic surfaced, she and her family became isolationists. They did not attend athletic events, weddings, any organization meetings, concerts, or the like. Her family would come by and talk to Wally and Jo from the yard just so they could see them and vice versa. Then

Wally was diagnosed with Non-Hodgkin's Lymphoma and Multiple Myeloma. At this point, Jo did the shopping which was mostly done via the internet and curb side services at grocery stores. Her contact with friends and family was mostly by phone and social networking. She did get all the immunizations offered for COVID-19.

Jo and Wally were extremely cautious with masking and personal contact. Gradually, their families came to visit, still masking. As of late, they have started seeing friends in small groups and still masked. They finally felt comfortable attending some of their grandchildren's events. And then Jo and Wally both contracted COVID. They are thankful they were immunized and they both recovered from COVID. They did receive the antiviral treatments as part of their treatment for COVID. Then they went back to being more cautious again.

**Additional information for Pat Appleby:**

During 2020, Pat worked in Billings at a plant nursery job where +/- 90% of the work was outdoors and masks and social distancing were nonetheless required. That seasonal employment ended at the end of November, and she thereafter hunkered down at home in the Bitterroot Valley with family going out as little as possible. She has many friends in her age group with health concerns as well and they freely discussed the need for vaccinations and precautions.

During the spring of 2021, vaccinations became available and her and her family were all fully vaccinated. By the time vaccine waiting periods were complete they were continuing to restrict activity but feeling less intimidated about going out and about. They did have out of state friends visit during the summer, but they were vaccinated prior to travel.

Pat and her husband were working a combination of in person and at home throughout 2020 and 2021. Pat's husband's employer required staff to wear masks and reduced customer contact as much as possible. They also encouraged customers to wear masks when interacting with company employees. Many of his customers were unwilling to protect themselves and others. By November 2021, her husband tested positive for COVID, and she tested positive a few days later. Fortunately for her, the illness was not severe and she recovered. But as the months go on, she is feeling many symptoms of what is now being called "Long Covid."

**As for Cheyenne Smith:**

Cheyenne has been immunocompromised since her diagnosis of Juvenile Rheumatoid Arthritis since 1996. She has always been cautious of her surroundings. Relying on immunosuppressants to live day to day, she has always been advised that she was at higher risk for infections and illnesses. Growing up,

she was constantly reminded to wash her hands and avoid any children that might be sick in school.

She loves her work as a dental hygienist. Upon getting accepted into hygiene school she was required to receive many vaccinations in order to attend. She has always assumed that all healthcare workers are required to receive vaccinations to go through school. As a hygienist, she believes becoming vaccinated is a measure to protect herself, her family, as well as her patients.

COVID-19 brought upon a whole new level of terror into Cheyenne's life. COVID-19 was so new, scary and unknown that she was terrified to go back to work. In late fall 2020, she found out she was pregnant. She struggled to get pregnant and once she was able to conceive, she was advised to be extremely cautious by her OBGYN, and was strongly advised to get vaccinated against COVID19 by both her OBGYN and her rheumatologist.

Cheyenne got vaccinated for COVID-19 when cleared for emergency use for healthcare workers, and at 5 weeks pregnant. She got vaccinated to protect herself, her growing baby, her husband and her patients. She believes this is the right thing to do as a healthcare worker, you protect yourself and you protect those you are caring for.

Every rheumatology visit, every ultrasound, and every prenatal visit she masked and followed all the guidelines recommended by her medical professionals to avoid as best she could the possible risk of infection.

Following the birth of her child, she now had a newborn who had no immune system and was unable to get vaccinated against COVID-19. She evermore trusted the healthcare workers were getting vaccinated to protect their patients, even the littlest patients.

**As for Mark Carpenter:**

Mark's primary care doctor and nephrology teams were adamant pre- and post-transplant about being up to date on all vaccinations and other preventative healthcare tasks. Mark received many of his vaccinations at the Missoula County Health Department and they also strongly stressed how important vaccinations were. Other things Mark did to reduce risk:

- Ordered groceries online with a specific pickup time where you park and they bring groceries to your car.
- Order more things online as opposed to going to local stores.
- Ordered food online for pickup/delivery as opposed to dining in.
- Did not visit any family members or friends who were not fully vaccinated and didn't wear masks or take precautions to disinfect surfaces. When socializing most activities were outdoors and tried to implement social distancing whenever possible.
- Canceled pre-planned vacation travel like annual family ski trips.

**INTERROGATORY NO. 12:** Please explain in detail what steps, if any, individual Plaintiffs took prior to May 7, 2021 to assess the vaccination or

4881-6917-9437

9

immunity status of employees or personnel at any commercial or professional establishment before entering it.

**ANSWER:** Plaintiffs object that this request is overly broad, unduly burdensome and not limited to a discreet timeframe. As to the non-objectionable portion of the request, in general, prior to the COVID pandemic, the individual plaintiffs did not believe vaccination was an issue, due to the fact that vaccinations were a common requirement for the military, public schools, and daycares. Individual plaintiffs were unaware of the magnitude of the anti-vaccination movement prior to the pandemic. Mark Carpenter, for example, assumed most individuals were vaccinated, as vaccination status had never previously been a political issue and vaccinations were a common requirement of people proceeding through the public school system. In healthcare settings, Mark Carpenter assumed vaccination was a requirement of employment to protect patients, given that vaccinations were mandated for public schools and daycares.

**FIRST SUPPLEMENTAL ANSWER:** Please see the first supplemental answer to Interrogatory No. 5.

**REQUEST FOR ADMISSION NO. 8:** Please admit that the Montana Department of Health and Human Services has never required staff vaccination as a condition of participation in Medicaid.

**RESPONSE:** Plaintiffs object that this request is overly broad, unduly burdensome, argumentative, assumes inaccurate facts, and seeks information not in the possession of Plaintiffs. Plaintiffs are unable to answer this request as Montana DPHHS is not responsible for establishing the conditions of participation for Medicaid.

**FIRST SUPPLEMENTAL RESPONSE:** Subject to the objections and response set forth in the initial response, Plaintiffs deny this request as written. The conditions for participation in Medicare and Medicaid are set by the Centers for Medicare and Medicaid Services, set forth in Title 42 of the Code of Federal Regulations ("CFR"). DPHHS may not set standards for the quality of care that are inconsistent with the requirements in Title 42 of the CFRs. *See* Mont. Code Ann. § 53-6-106(3). Furthermore, as a condition of participation in the Montana Medicaid program, all providers are required by DPHHS regulations to comply with all applicable state and federal statutes, rules and regulations, including but not limited to the federal regulations and statutes found in Title 42 of the CFR and the USC governing the Medicaid program. Admin. R. Mont. 37.85.401. As such, Montana regulation would, at a minimum, require participating facilities to comply with the CMS Conditions of Participation, and would specifically require hospitals to comply with 42 CFR 482.41 and 482.22.

DATED this 19th day of August, 2022.

        Attorneys for Plaintiffs:

        GARLINGTON, LOHN & ROBINSON, PLLP

        By _____
              Justin K. Cole


## CERTIFICATE OF SERVICE

I hereby certify that on August 19, 2022, a copy of the foregoing document was served on the following persons by the following means:

|   | |
|---|---|
| _____ | Hand Delivery |
| __1-3__ | Mail |
| _____ | Overnight Delivery Service |
| _____ | Fax (include fax number in address) |
| __1-3__ | E-Mail (include email in address) |

1. Austin Knudsen
   David M.S. Dewhirst
   Christian Corrigan
   Brent Mead
   Office of the Attorney General
   P.O. Box 201401
   Helena, MT  59620
   David.dewhirst@mt.gov
   Christian.corrigan@mt.gov
   Brent.mead2@mt.gov
   *Attorneys for Defendants*

2. Emily Jones
   Jones Law Firm, PLLC
   115 N Broadway, Suite 410
   Billings, MT 59101
   emily@joneslawmt.com
   *Attorneys for Defendants*

3. Raph Graybill
   Graybill Law Firm, PC
   300 4th Street North
   Great Falls, MT  59403
   rgraybill@silverstatelaw.net
   *Attorneys for Plaintiff-Intervenor*

_____