Justin K. Cole
Kathryn S. Mahe
GARLINGTON, LOHN & ROBINSON, PLLP
350 Ryman Street • P. O. Box 7909
Missoula, MT  59807-7909
Phone (406) 523-2500
Fax (406) 523-2595
jkcole@garlington.com
ksmahe@garlington.com

Attorneys for Plaintiffs

IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, et al., | CV 21-108-M-DWM |
| Plaintiffs, | |
| and | PLAINTIFFS' AND PLAINTIFF-INTERVENOR'S DISPUTED STATEMENT OF FACTS |
| MONTANA NURSES ASSOCIATION, | |
| Plaintiff-Intervenors, | |
| v. | |
| AUSTIN KNUDSEN, et al., | |
| Defendants. | |

**Verbatim Response to Defendants' Statement of Undisputed Facts:**

I.     Facts Related to House Bill 702 (2021).

1.     In 2021, the Montana legislature enacted House Bill 702 ("HB 702")

which prohibits discrimination by employers or places of public accommodation based on an individual's vaccination status or possession of an immunity passport. *See* MCA § 49-2-312(1); Exhibit 1.

*Undisputed, with the clarification that the codified version of HB 702 also includes Montana Code Annotated § 49-2-313.*

2.      HB 702 does not apply to the vaccination requirements for schools set forth in Title 20, Chapter 5, part 4, or day-care facilities pursuant to Title 52, chapter 2, part 7. *See* MCA § 49-2-312(2).

*This is a statement of law. Undisputed.*

3.      Montana law requires pupils attending a school, other than postsecondary schools, to be immunized against varicella, diphtheria, pertussis, poliomyelitis, rubella, mumps, and measles. *See* MCA § 20-5-403(1)(a). Additionally, pupils under the age of five must be immunized against Haemophilus influenza type "b" before enrolling in a preschool. *See* MCA § 20-5-403(1)(b).

*This is a statement of law.  Undisputed, subject to exceptions and exemptions.  For the purpose of completeness, Montana Code Annotated § 20-5-403(1)(a) also requires immunization for tetanus.*

4.      Montana law requires pupils attending a postsecondary school to be immunized against rubella and measles. *See* MCA § 20-5-403(2)(a)(i). Postsecondary schools may, as a condition of attendance, impose more stringent

2

immunization requirements. See MCA § 20-5- 403(2)(b).

*This is a statement of law.  Undisputed, subject to exceptions and exemptions.*

5.      Montana law allows pupils to enroll in school without receiving the required immunizations if the pupil properly submits a medical or religious exemption from the required immunization. *See* MCA § 20-5-405.

*This is a statement of law.  Undisputed, subject to the requirements of Montana Code Annotated § 20-5-405.*

6.      For the 2020–21 school year, 92.9% of Montana kindergarteners had received two doses of the MMR vaccine, 91.9% had received five doses of the DTaP vaccine, and 91.9% had received two doses of the varicella vaccine. 3.5% of Montana kindergarteners had a medical or religious exemption from required vaccinations. The percentage of Montana kindergarteners with a medical or religious exemption decreased by 0.8% since the 2019–20 school year. *See* Exhibit 4.

*Undisputed, but for clarity, Exhibit 4 portrays "estimates" and the notes specific to Montana indicate that "[t]he proportion surveyed likely was <100% but is reported as 100% based on incomplete information about the actual current enrollment."  (Doc. 94-4 at 5-6).*

7.     Montana law requires children attending daycare be immunized against measles, mumps, poliomyelitis, diphtheria, pertussis, tetanus, varicella, hepatitis B, pneumococcal, and Haemophilus influenza type B. *See* MCA § 52-2-735(1); Mont. Admin. R. 37.95.140. The specific doses required of a specific vaccine vary according to the child's age group. *See* Mont. Admin. R. 37.95.140.

*This is a statement of law.  Undisputed, subject to the language of the regulations.*

8.     Persons, government entities, and employers may recommend vaccines without violating HB 702. *See* MCA § 49-2-312(3)(a).

*This is a statement of law.  Undisputed, subject to the language of Montana Code Annotated § 49-2-312.*

9.     Health care facilities, as defined in MCA § 50-5-101(26), do not violate HB 702 if they both (1) ask an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases; and (2) implement reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may

4

consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented. *See* MCA § 49-2-312(3)(b).

*This is a statement of law.  Undisputed, subject to the language of Montana Code Annotated § 49-2-312.*

10.     A licensed nursing home, long-term care facility, or assisted living facility is exempt from HB 702 during any period of time that compliance with HB 702 would result in a violation of regulations or guidance issued by the Centers for Medicare and Medicaid Services or the Centers for Disease Control. *See* MCA § 49-2-313.

*This is a statement of law.  Undisputed, subject to the language of Montana Code Annotated § 49-2-313.*

11.     On April 28, 2021, Montana Governor Greg Gianforte returned HB 702 with a proposed amendment that added the sections codified as MCA § 49-2-312(3)(b) and § 49-2-313. Exhibit 2.

*Undisputed, subject to the language of the Amendatory Veto.*

12.     On April 28, 2021, the Montana House of Representatives adopted the Governor's amendment. On April 29, 2021, the Montana Senate adopted the Governor's amendment. On May 7, 2021, Governor Gianforte signed HB 702 as

amended. The provisions at issue in this case went into effect immediately. Exhibit 3.

*Undisputed.*

13.     On May 13, 2021, the Centers for Medicare and Medicaid Services said: "Individuals residing in congregate settings, regardless of health or medical conditions, are at greater risk of acquiring infections, and many residents and clients of long-term care (LTC) facilities and Intermediate Care Facilities for Individuals with Intellectual Disabilities (ICFs–IID) face higher risk of severe illness due to age, disability, or underlying health conditions." *See* Medicare and Medicaid Programs; COVID–19 Vaccine Requirements for Long-Term Care (LTC) Facilities and Intermediate Care Facilities for Individuals With Intellectual Disabilities (ICFs–IID) Residents, Clients, and Staff, 86 Fed. Reg. 26306, 26306 (May 13, 2021); Exhibit 5.

*Undisputed.*

14.     The Centers for Medicare and Medicaid Services noted, "[n]ursing home residents are less than 1 percent of the American population, but have historically accounted for over one-third of all COVID– 19 deaths." 86 Fed. Reg. 26306, 26306 (May 13, 2021).

*Undisputed, that statement was made in May of 2021.*

15.     The Centers for Medicare and Medicaid Services May Rule required
long-term care facilities to "offer residents and staff vaccination against COVID–
19," 86 Fed. Reg. 26306, 26312 (May 13, 2021), ensure "facility staff are educated
about vaccination against COVID–19," *id*. at 26314, ensure "facility residents or
resident representatives are educated about vaccination against COVID–19," *id*. at
26315, and report the aggregate vaccination uptake among residents and staff. *Id*.
at 26315– 26316. The Rule imposed similar requirements on Intermediate Care
Facilities for Individuals with Intellectual Disabilities. *Id*. at 26317– 26319.

*This is a statement of law.  Disputed to the extent this was an interim final
rule, with comment period.  Disputed to the extent this fact contains selective
quotes and is inconsistent with the interim final rule.*

16.     The Omicron variant now represents substantially all new SARS-
COV2 infections in the United States. Exhibit 6, ¶ 36. The Omicron variant is more
transmissible than prior variants. Exhibit 37 at 80:14–81:2 (deposition of Dr. David
Taylor); Exhibit 38 at 44:5–45:7 (deposition of Dr. David King). Approved
COVID-19 vaccines are ineffective at preventing infection and transmission from
the Omicron variant. Exhibit 6, ¶¶ 48–60; Exhibit 7 at 18. In other words,
individuals vaccinated for COVID-19 may still become infected and transmit the
virus. Exhibit 6, ¶¶ 48–60; Exhibit 8 at 5–6; SUF, ¶¶ 31–33. The Centers for

Disease Control and Prevention changed its guidance to eliminate any difference in isolation or quarantine based on vaccination status. Exhibit 11.

*Undisputed as to the first and second sentences.*

*As to the third sentence, disputed that COVID-19 vaccines are ineffective at preventing infection and transmission from the Omicron variant. (Taylor Report ¶ 64, Doc. 86-2 at 34-36); (King Report ¶¶ 20-21, Doc. 86-1 at 10-11); 2d Found. Decl. Kathryn Mahe ¶ 7, Sept. 16, 2022, ("2d Decl. Mahe") Ex. 6: Dep. Ram Duriseti 67:18-22; 102:1-10, Aug. 17, 2022, filed herewith.*

*Undisputed that individuals vaccinated with the current COVID-19 vaccines may still become infected and transmit the virus.*

*Undisputed that current CDC guidance regarding isolation and quarantine is not based upon vaccination status.*

17.     On July 28, 2021, the Montana Department of Labor and Industry and Montana Department of Public Health and Human Services issued guidance on HB 702 implementation. Exhibit 12. That guidance clarified that nothing "in the language of HB 702 prohibits a person, governmental entity, public accommodation, or employer from asking about vaccination status or whether you have an immunity passport." Exhibit 12 at 3. Further, the guidance clarified that incentives to persons to voluntarily become vaccinated don't violate HB 702. Exhibit 12 at 3.

Finally, the guidance clarified that nothing "in HB 702 prohibits a person, governmental entity, public accommodation, or employer from requiring everyone on their premises or during the course of employment to wear masks, regardless of vaccination status, as long as there is a provision for accommodations for persons based on sincerely held religious beliefs or disability." Exhibit 12 at 4.

*Undisputed as to the first and second sentences.*

*Disputed as to the third sentence.  The guidance provided only incentives which were "not so substantial as to be coercive" were not discriminatory.  (Doc. 95-1 at 4).*

*Undisputed as to the second paragraph.*

II.    Facts Related to the individual Plaintiffs

18.    None of Plaintiffs Mark Carpenter, Pat Appleby, Wallace Page, Diana Jo Page, or Cheyenne Smith ("individual Plaintiffs") has filed a complaint against any entity under the Montana Human Rights Act since January 1, 2018. Exhibit 9 at 18 (Response to Request for Production No. 8).

*Misstates the discovery response.  (Pls.' Disc. Resp., Doc. 94-9 at 19). Undisputed that the individual Plaintiffs did not possess documentation of filing formal legal complaints during that time period.*

19.    No individual Plaintiff has filed a complaint against any entity under the Americans with Disabilities Act within the last five years. Exhibit 9 at 19

(Response to Request for Production No. 10).

*Misstates the discovery response. (Pls.' Disc. Resp., Doc. 94-9 at 20). Undisputed that the individual Plaintiffs did not possess documentation of any complaints against any entity under the Americans with Disabilities Act ("ADA") within the last five years.*

20.    None of the individual Plaintiffs inquired into the vaccination status of employees at commercial or professional establishments prior to COVID-19. Exhibit 9 at 51–52 (Answer to Interrogatory No. 12). The individual Plaintiffs instead assumed vaccination status based upon vaccination requirements at public schools, daycares, and within the military. Exhibit 9 at 51–52 (Answer to Interrogatory No. 12); Exhibit 8 at 5 (Wallace Page "assumed" healthcare worker vaccinations were required).

*Disputed as to the first sentence, misstates the discovery responses and that was not the question asked in Interrogatory No. 12. (Pls.' Disc. Resp., Doc. 94-9 at 52-53).*

*Disputed as to the use of the word "instead" in the second sentence and to the extent this misstates the responses to the Interrogatory at issue. (Doc. 94-9 at 52-53). Undisputed to the extent Mark Carpenter assumed most individuals were vaccinated. Undisputed that Cheyenne Page assumed healthcare workers were required to be vaccinated. Undisputed that Wallace Page assumed health care*

10

*providers were vaccinated based upon a work requirement.  Disputed that these*

*responses provided information regarding the assumptions of Pat Appleby or*

*Diana Page.*

21.    Mark Carpenter does not possess any record of any accommodation request made under the Americans with Disability Act due to the vaccination status of an employee at a healthcare provider. Exhibit 9 at 18–19 (Responses to Requests for Production 8 and 10).

*Undisputed.*

22.    Mark Carpenter does not possess any record of any accommodation request made under the Montana Human Rights Act due to the vaccination status of an employee at a healthcare provider. Exhibit 9 at 18 (Response to Request for Production No. 8).

*Undisputed.*

23.    The individual Plaintiffs, other than Mark Carpenter, have not made any accommodation request, written or verbal, under the Americans with Disability Act due to the vaccination status of an employee at a healthcare provider within the last five years. Exhibit 9 at 18–19 (Responses to Requests for Production 8 and 10).

*Disputed as this misstates the responses to the Requests for Production.*

*Individual Plaintiffs were not in possession of any documents related to reasonable*

11

*accommodations available under the ADA.  (Doc. 94-9 at 19-20).  Mr. Carpenter*

*and Mrs. Page had discussions with their healthcare providers about their*

*healthcare providers' vaccination status.  2d Decl. Mark Carpenter ¶ 6, Sept. 9,*

*2022 ("2d Decl. Carpenter"); Decl. Diana Jo Page ¶ 8, Sept. 12, 2022 ("Decl. J.*

*Page"), both declarations have been filed herewith.*

24.     The individual Plaintiffs, other than Mark Carpenter, have not made

any accommodation request, written or verbal, under the Montana Human Rights

Act due to the vaccination status of an employee at a healthcare provider. Exhibit 9

at 18 (Response to Request for Production No. 8).

*Disputed as this misstates the responses to the Requests for Production.*

*Individual Plaintiffs were not in possession of any documents related to reasonable*

*accommodations available under the MHRA.  (Pls.' Disc. Resp., Doc. 94-9 at 19-*

*20).  Mrs. Page had discussions with her healthcare providers about her*

*healthcare providers' vaccination status.  Decl. J. Page ¶ 8.*

25.     The individual Plaintiffs all visited healthcare providers since May 7,

2021. Exhibit 9 at 23 (Response to Request for Admission No. 1); Exhibit 10 at 4.

*Undisputed.*

26.     None of the individual Plaintiffs avoided seeking the services of

healthcare providers based on the vaccination status of employees at that

healthcare provider. Exhibit 8 at 2–10.

*Disputed.  This misstates the discovery response.  (Doc. 94-8 at 3-11).*
*Defendants sought the definitions of quoted phrases.  (Doc. 94-8 at 3-4).  Plaintiffs*
*responded that the phrases "'avoid commercial and professional establishments'*
*that 'fail to take steps to minimize the spread of the virus and other common*
*viruses and germs' and must avoid establishments that 'employ unvaccinated*
*workers' or are unable to 'take necessary measures to protect against preventable*
*diseases,'" were "defined as to their ordinary meaning."  (Doc. 94-8 at 3-4).  Mr.*
*Carpenter kept his interactions to small groups who were fully vaccinated and*
*exercised caution.  (Doc. 94-8 at 5).  He also delayed and reduced the number of*
*times he saw his primary care provider.  2d Decl. Carpenter ¶ 4.  Mr. Page*
*avoided establishments that disregarded vaccination.  (Doc. 94-8 at 5).  Mr. Page*
*has been unable to obtain dental treatment and avoided trips to the emergency*
*room and urgent care, including recently for a cut to his finger based upon*
*vaccination status.  Decl. Wallace L. Page ¶¶ 8-9, Sept. 12, 2022 ("Decl. W.*
*Page"), filed herewith.  Mrs. Page has avoided getting her knee replaced, a trip to*
*the emergency room due to an asthma attack, and other trips to urgent or*
*emergency care, due to vaccination status of healthcare workers.  Decl. J. Page ¶¶*
*6-7.  Ms. Smith avoided, as best she could, the possible risk of infection.  (Doc. 94-*
*8 at 10).  Ms. Smith has not had routine physicals, did not see her dermatologist,*

13

*and avoided in-person rheumatoid appointments, to the extent she was able.  Decl.*

*Cheyenne Smith ¶ 5, Sept. 16, 2022 ("Decl. Smith").*

27.    None of the individual Plaintiffs cited a situation in which they were

discouraged from accepting potential employment otherwise available to them at

any healthcare provider. Exhibit 9 at 20 (Response to Request for Production No.

11); Exhibit 10 at 3.

*Disputed to the extent this misstates the responses to discovery.  (Doc. 94-9*

*at 21).  Undisputed that Plaintiffs do not possess documents illustrating they were*

*discouraged from accepting potential employment opportunities at offices of*

*private physicians or hospitals.*

28.    Pat Appleby was fully vaccinated for COVID-19 in the Spring of

2021. Pat Appleby still contracted COVID-19 in November 2021 and recovered

from COVID-19. Exhibit 8 at 6–7.

*Undisputed as to the first sentence.*

*Undisputed Ms. Appleby contracted COVID-19 and recovered.  Disputed as*

*to the implication she has fully recovered.  Ms. Appleby "is feeling many symptoms*

*of what is now being called 'Long Covid.'"  (Doc. 94-8 at 8).*

29.    Wallace Page contracted COVID-19 after being vaccinated against the

disease. Exhibit 8 at 4–6.

*Undisputed.*

30.     Diana Jo Page contracted COVID-19 after being vaccinated against the disease. Exhibit 8 at 4–6.

*Undisputed.*

31.     Wallace Page made over 100 trips to a healthcare setting for chemotherapy. During these visits, he waited in the emergency care waiting room with other individuals who may be among the sickest with COVID-19. His healthcare providers masked and kept a clean environment. He never contracted COVID-19 from any of his hundreds of visits to his healthcare providers. Exhibit 8 at 5.

*Undisputed as to the first sentence.*

*Disputed as to the second sentence, as it misstates the discovery responses. Mr. Page indicated the risk was "going to the emergency care waiting room," not waiting with other individuals. (Doc. 94-8 at 6).*

*Undisputed as to the third sentence.*

*Disputed as to the fourth sentence, as it misstates the discovery responses. Mr. Page indicated he felt lucky he did not catch COVID-19 from someone at the chemotherapy infusion room.  (Doc. 94-8 at 6).*

32.     Cheyenne Smith works as a dental hygienist. She has not requested any accommodations based on the vaccination status of other healthcare workers.

Exhibit 8 at 8; Exhibit 9 at 18–19 (Responses to Requests for Production No. 8 and 10).

*Undisputed as to the first sentence.*

*Disputed as to the second sentence, which misstates discovery responses. (Doc. 94-9 at 19-20).  Undisputed that Ms. Smith does not possess any documents responsive to Requests for Production Nos. 8 or 10.  Ms. Smith is aware that all the individuals she works with are fully vaccinated.  Decl. Smith ¶ 4.*

III.   Facts related to Plaintiff Five Valleys Urology

33.   Five Valleys Urology does not operate and is not regulated as a licensed healthcare facility, as defined in MCA § 50-5-101(26). Exhibit 13 at 13:11–16 (Deposition of Five Valleys Urology's 30(b)(6) designee John O'Connor).

*This contains a statement of law.  Undisputed as to the fact that Five Valleys Urology ("Five Valleys") is not licensed as a healthcare facility under Montana Code Annotated § 50-5-101(26).*

34.   Prior to HB 702, Five Valleys Urology did not require its healthcare providers to disclose their vaccination status for any vaccine preventable disease. Exhibit 13 at 39:6–40:17; Exhibit 14 at PL1471.

*Disputed.  Five Valleys required providers to have privileges at the hospital as a condition of employment and those hospitals required proof of immunizations*

16

*and vaccination disclosures in order to obtain privileges.  (Dep. Five Valleys*

*39:16-40:1, Doc. 95-1 at 48).*

35.    Five Valleys Urology's vaccination policy states, "[a]ll employees are

encouraged to receive vaccinations as determined by the Missoula County Health

Department. Employees will be notified by administration as to the type of

vaccination(s) covered by this policy and the timeframe(s) for having it/them

administered, if applicable." Exhibit 14 at PL1471 (emphasis added). Five Valleys

Urology testified, prior to HB 702, they did not require disclosure of vaccination

status for any vaccine preventable disease as a condition of employment. Exhibit

13 at 39:6– 11.

*Undisputed as to the first and second sentences.*

*Disputed as to the third sentence.  Five Valleys required providers to have*

*privileges at the hospital as a condition of employment and those hospitals*

*required proof of immunizations and vaccination disclosures in order to obtain*

*privileges.  (Dep. Five Valleys 39:16-40:1, Doc. 95-1 at 48).*

36.    Prior to HB 702, Five Valleys Urology did not require any special

precautions related to unvaccinated, or non-immune, employees. Exhibit 13 at

44:13–21.

*Disputed, misstates testimony.  (Dep. Five Valleys 53:17-54:3, Doc. 95-1 at*

*62).*

17

37.     Prior to HB 702, Five Valleys Urology did not take an employee's vaccination status into account when determining whether that employee could interact with patients. Exhibit 13 at 58:3–12.

*Disputed, misstates testimony.  Five Valleys stated it was not aware of any situation where that occurred, but that did not mean that it did not happen "on the fly" at the individual provider level.  (Dep. Five Valleys 58:3-12, Doc. 95-1 at 67).*

38.     Prior to HB 702, Five Valleys Urology did not inquire into the staff vaccination policies, or infectious disease control polices, at a receiving healthcare provider before Five Valleys Urology referred a patient to that provider. Five Valleys Urology testified that it never refused to transfer a patient based on the vaccination or infectious control policy at the receiving healthcare provider. Exhibit 13 at 16:10–17:11.

*Undisputed as to Five Valleys as an organization.  For clarification, Five Valleys did not testify related to its individual providers' actions.  2d Decl. Mahe ¶ 11, Ex. 10: Dep. Ex. 16: Five Valleys Urology's 30(b)(6) Designation.*

39.     Prior to HB 702, Five Valleys Urology felt it "did everything in our powers to make the environment safe for employees and patients alike." Exhibit 13 at 58:13–25.

*Disputed as to "Five Valleys Urology."  Undisputed that John O'Connor "subjectively" felt that way from January 1, 2019 through May 6, 2021.  (Dep.*

18

*Five Valleys 58:13-25, Doc. 95-1 at 67).*

40.     Prior to the COVID-19 pandemic, Five Valleys Urology did not receive any requests from patients for accommodations regarding preventing the transmission of communicable diseases. Exhibit 13 at 53:9– 55:7.

*Disputed.  (Dep. Five Valleys 45:18-23; 53:17-54:3, Doc. 95-1 at 54, 62-63).*

41.     During the COVID-19 pandemic, Five Valleys Urology accommodated such requests by checking patients in virtually, allowing patients to enter through a private door, and move directly to an examination room. Exhibit 13 at 53:9–54:3.

*Disputed, misstates testimony.  Prior to May 6, 2021, Five Valleys utilized masking, distancing, checking symptoms, checking patients in virtually, utilizing different doors, and moving them directly to an examination room.  (Dep. Five Valleys 53:17-54:3, Doc. 95-1 at 62-63).*

42.     Five Valleys Urology handles Americans with Disability Act requests on a case-by-case basis. Exhibit 13 at 57:2–18.

*Undisputed.*

43.     Five Valleys Urology did not receive any Americans with Disability Act accommodation requests since March 1, 2020. Exhibit 8 at 32–36 (Responses to Requests for Production No. 23, 25, and 26).

*Disputed.  Five Valleys testified it was aware that patients had requested to only be treated by vaccinated staff, provided accommodations to employees due to the pandemic, provided accommodations to one employee related to vaccination status of other employees, and had requests from immunocompromised patients for special arrangements.  (Dep. Five Valleys 44:22-45:6; 47:16-50:19; 53:17-54:3, Doc. 95-1 at 56-59, 62-63).*

44.     In the last five years, Five Valleys Urology has not been the subject of any disciplinary action for alleged violations of a legal or medical obligation because of unvaccinated or non-immune employees. Exhibit 13 at 59:1–11.

*Undisputed.*

45.     In the last five years, Five Valleys Urology has not been the subject of any medical malpractice or negligence claim based on the vaccination or immunity status of Five Valleys' employees. Exhibit 13 at 59:19–60:2.

*Undisputed.*

46.     Five Valleys Urology has not been the subject of any complaint or citation related to deficient infectious disease control practices in the last five years. Exhibit 13 at 60:10–17.

*Undisputed.*

47.     Counsel for Plaintiffs asserted the Fifth Amendment in response to the question, "does FVU [currently] take any special precautions when that new

patient first enters into an FVU facility?" Exhibit 13 at 23:2–22.

*Disputed, as it misstates the question and objection.  (Dep. Five Valleys 23:3-7, Doc. 95-1 at 32).*

48.    Five Valleys Urology's "OSHA Manual" requires the Hepatitis B vaccination be made available at no cost to all employees who have occupational exposure. Exhibit 15 at PL 1634. Five Valleys' Occupational Safety and Health Act compliance manual mentions only the Hepatitis B vaccination and says "[a]lthough OSHA does not require it, you may wish to request new employees who have already been vaccinated to provide proof of their vaccination." Exhibit 15 at PL 1634. The manual further says that "the OSHA Standard requires that an employee who declines to accept hepatitis B vaccination offered by the employer sign the Hepatitis B Vaccine Declination." Exhibit 15 at PL 1639. That declination doesn't ask the employee to disclose their vaccination status. Exhibit 15 at PL1641. It merely requires employees to acknowledge both that they are declining the offered Hepatitis B vaccination and the associated risks from the Hepatitis B. Exhibit 15 at PL1641.

*Undisputed as to the first sentence.  As to the second sentence, disputed that Five Valleys OSHA Manual only relates to Hepatitis B and to the extent it does not contain the full sentence.  (See Five Valleys' OSHA Manual, Doc. 95-1 at 107 and generally at 102-116).  Undisputed as to the third and fourth sentences.*

21

49.     Prior to HB 702, Five Valleys Urology did not require employee vaccinations or disclosure of vaccination status as part of its "OSHA Manual." Exhibit 13 at 39:6–11.

*Disputed. Five Valleys OSHA Manual states that the employee medical records "must include the employee's Hepatitis B vaccination status, including dates received, and any medical records relative to the employee's ability to receive the vaccination."  (Five Valleys' OSHA Manual, Doc. 95-1 at 112-113).*

50.     Five Valleys Urology has employed individuals known to be unvaccinated against COVID-19 when such vaccines were available. Exhibit 9 at 23–24 (Response to Request for Admission No. 2).

*Undisputed that occurred at some point in time. (Doc. 94-9 at 24-25).*

IV.     Facts related to Plaintiff Western Montana Clinic

51.     Western Montana Clinic does not operate and is not regulated as a licensed healthcare facility, as defined in MCA § 50-5-101(26). Exhibit 16 at 15:9–17:16 (Deposition of Western Montana Clinic 30(b)(6) designee Meghan Morris).

*This contains a statement of law.  Undisputed as to the fact that Western Montana Clinic ("Clinic") is not licensed as a healthcare facility under Montana Code Annotated § 50-5-101(26).*

52.     Western Montana Clinic does not inquire into the infectious disease control policies, staff vaccination policies, or staff vaccination status at receiving

22

healthcare providers when Western Montana Clinic transfers patients to those

providers. Exhibit 16 at 31:21–32:7, 35:4– 37:21. Western Montana Clinic never

refused to transfer a patient based on the receiving healthcare provider's health and

safety protocols. Exhibit 16 at 37:8–37:21.

*Undisputed as to the Clinic as an organization.  For clarification, the Clinic*

*did not testify related to its individual providers' actions.  2d Decl. Mahe ¶ 12, Ex.*

*11: Dep. Ex. 14: Western Montana Clinic's 30(b)(6) Designation.*

53.     Prior to the COVID-19 pandemic, Western Montana Clinic's infection

control practices included separating the pediatric department into a "sick" and

"well" department. Parents self-directed which side their child waited in,

regardless of the child's actual infection status. Exhibit 16 at 48:6–49:9. Likewise,

Western Montana Clinic did not direct any interventions in the patient waiting

room based on patients' vaccination or infection status. Exhibit 16 at 52:10–53:02.

*Undisputed as to the first and second sentences.*

*Disputed as to the last sentence.  (Dep. Clinic 48:14-49:2, Doc. 95-1 at 130-*

*131).*

54.     Prior to HB 702, Western Montana Clinic did not require any

vaccination or immunization as a condition of employment. Exhibit 16 at 74:14–

25; Exhibit 17 at PL1023. Western Montana Clinic allowed employees to opt-out

of any vaccine through a declination form. Exhibit 17 at PL1023. The only vaccine

23

Western Montana Clinic focused on recommending to its healthcare providers was the influenza vaccine. Exhibit 16 at 68:14–22. Western Montana Clinic healthcare providers could opt-out of receiving that vaccine through a declination form. Exhibit 16 at 65:18–68:22; Exhibit 18 at PL1033.

*Undisputed to the extent it applies to the timeframe prior to HB 702.*

55.     Prior to HB 702, Western Montana Clinic did not actively track employees' vaccination status. Exhibit 16 at 76:3–19.

*Disputed.  (Dep. Clinic 61:11-21, Doc. 95-1 at 134), testifying the Clinic tracked flu vaccination status.*

56.     Western Montana Clinic repealed its COVID-19 vaccination and testing policy that aligned with the Occupational Safety and Health Act Emergency Temporary Standard. Exhibit 19; Exhibit 20. Prior to that Emergency Temporary Standard, 86 Fed. Reg. 61,402 (Nov. 5, 2021), the Occupational Safety and Health Act did not require Western Montana Clinic to mandate any vaccinations. Exhibit 9 at 50 (Response to Request for Admission No. 6).

*Undisputed as to the first sentence.  As to the second sentence, undisputed that OSHA had not issued a regulation, rule or standard mandating vaccination for a disease.*

57.     Prior to HB 702, Western Montana Clinic did not require disclosure of vaccination or immunization status as part of its infection control policies. Exhibit

24

21 at PL1572–73; Exhibit 22 at PL1595–96.

*Disputed.  (Dep. Clinic 61:11-21, Doc. 95-1 at 134), testifying the Clinic required employees to disclose whether they had received the flu vaccination.*

58.    Prior to HB 702, Western Montana Clinic did not provide any reasonable accommodations under the Montana Human Rights Act based on the vaccination status of other Western Montana Clinic employees. Exhibit 16 at 81:12–86:2.

*Disputed.  Misstates the testimony.  The time period was limited from January 1, 2019 through January 1, 2021.  (Dep. Clinic 81:12-13; 89:21-90:2, Doc. 95-1 at 139, 141).  The Clinic testified it could not know whether any one of its thousands of patients made a request in a patient visit.  (Dep. Clinic 77-78:9, Doc 95-1 at 138).  See also Dep. Clinic 61:11-21, Doc. 95-1 at 134 (testifying the Clinic took steps to protect others from staff that was not vaccinated for influenza); Dep. Clinic 89:12-90:2, Doc. 95-1 at 141 (testifying that conversations had occurred between patients and their care team regarding the vaccination status of Clinic employees and accommodating those requests).*

59.    Prior to HB 702, Western Montana Clinic did not provide any reasonable accommodations under the Americans with Disabilities Act based on the vaccination status of other Western Montana Clinic employees. Exhibit 16 at 86:7–90:2; Exhibit 9 at 32–35 (Responses to Requests for Production No. 23 and

25).

*Disputed.  The time period was limited from January 1, 2019 through January 1, 2021.  (Dep. Clinic 86:13, Doc. 95-1 at 140).  See also Dep. Clinic 77-78:9, Doc 95-1 at 138, (testifying that the Clinic could not know whether any one of its thousands of patients made a request in a patient visit); Dep. Clinic 61:11-21, Doc. 95-1 at 134 (testifying the Clinic took steps to protect others from staff that was not vaccinated for influenza); Dep. Clinic 80:14-81:2, Doc. 95-1 at 138-139 (describing patient accommodations); Dep. Clinic, 89:12-90:2, Doc. 95-1 at 141 (testifying that patients did not specifically invoke the ADA, but conversations had occurred between patients and their care team regarding the vaccination status of Clinic employees and accommodating those requests).*

60.    Western Montana Clinic addresses accommodation requests under the Americans with Disability Act "on a case-by-case" basis. Exhibit 16 at 91:11–92:17.

*Undisputed.*

61.    Prior to HB 702, Western Montana Clinic never took an employee's vaccination status into account when determining whether that employee could interact with patients. Exhibit 16 at 93:11–94:5.

*Disputed.  (Dep. Clinic 61:11-21, Doc. 95-1 at 134).  (Dep. Clinic 89:12-90:2, Doc. 95-1 at 141, testifying that patients did not specifically invoke the ADA,*

26

*but conversations had occurred between patients and their care team regarding the vaccination status of Clinic employees and accommodating those requests).*

62.     Prior to HB 702, Western Montana Clinic had not been the subject of any disciplinary action by any entity for alleged violations of legal or medical obligations based on the vaccination status of employees. Exhibit 16 at 99:21–100:6. Western Montana Clinic has not been the subject of any lawsuits because the vaccination status of Western Montana Clinic employees. Exhibit 16 at 102:13–103:1. Western Montana Clinic has not been subject to a complaint with a regulatory body based on allegedly deficient infection control policies. Exhibit 16 at 103:16–24.

*Undisputed as to the first sentence.  As to the second and third sentences, undisputed as to the last five years prior to enactment of HB 702.*

63.     Western Montana Clinic has employed individuals known to be unvaccinated against COVID-19 when such vaccines were available. Exhibit 9 at 23–24 (Response to Request for Admission 2). Western Montana Clinic employed individuals unvaccinated for other vaccine preventable diseases. Exhibit 18 at PL 1033.

*Undisputed that occurred at some point in time.*

64.     Western Montana Clinic declined to answer when asked whether it sued on behalf of its physician members. Exhibit 16 at 107:3– 13.

*Disputed.  Counsel objected to the question as it called for attorney-client and work product information.  (Dep. Clinic 107:4-13, Doc. 95-1 at 145).*

65.     Western Montana Clinic invoked the Fifth Amendment, at the behest of counsel, when asked about their current vaccination policies. Exhibit 16 at 68:23–69:21. Western Montana Clinic again invoked the Fifth Amendment at the request of counsel when asked whether Western Montana Clinic provided reasonable accommodations to an employee since January 1, 2021, under the Montana Human Rights Act, due to the vaccination status of other Western Montana Clinic employees. Exhibit 16 at 84:8–85:18.

*As to the first sentence, disputed.  There was a discussion between counsel related to the Fifth Amendment and it was not invoked at the cited portion.  (Dep. Clinic 69:9-70:4, Doc. 95-1 at 136).*

*As to the second sentence, disputed.  Ms. Morris invoked the Fifth Amendment to the extent it sought information related to discrimination based upon vaccination status after passage of House Bill 702, but answered the question on behalf of the Clinic as to prior to the passage of House Bill 702.  (Dep. Clinic 85:13-86:2, Doc. 95-1 at 140).*

V.     Facts related to Plaintiff Providence

66.     Plaintiff Providence Health and Services operates multiple licensed healthcare facilities, as defined by MCA § 50-5-101(26). Exhibit 23 at 13:11–

14:13 (Deposition of Providence's 30(b)(6) designee Kirk Bodlovic).

*Undisputed.*

67.     Prior to HB 702, Providence did not check any "other facility's vaccination policy" when referring a patient to that provider. Exhibit 23 at 16:17–25. Providence, likewise, did not check the actual vaccination status of individuals at the receiving facility. Exhibit 23 at 17:2–9. No other healthcare provider refused to transfer patients to Providence based on the vaccination status of Providence employees. Exhibit 23 at 17:11–17.

*Undisputed as to St. Patrick's Hospital as whole.  For clarification, the questions were limited to St. Patrick's Hospital.  (Dep. Bodlovic 16:3-6, Doc. 95-1 at 282).  Further, Providence Health and Services Montana ("Providence") did not testify related to its individual providers' actions.  2d Decl. Mahe ¶ 13, Ex. 12: Dep. Ex. 18: Providence's Amended 30(b)(6) Designation.*

68.     Providence initially required certain precautions of all individuals during the COVID-19 pandemic such as universal masking and pre-entry temperature screenings. Exhibit 23 at 19:12–22:12. Due to the declining COVID-19 transmission rate in the community and declining hospitalizations, Providence has since dropped the precaution of pre-entry temperature screenings. Exhibit 23 at 21:24–22:12.

*As to the first sentence, undisputed as to St. Patrick's Hospital.  For*

*clarification, the questions were limited to St. Patrick's Hospital.  (Dep. Bodlovic*

*16:3-6, Doc. 95-1 at 282).*

*As to the second sentence, disputed as to the reasons provided for dropping*

*the pre-entry physical temperature screenings.  2d Decl. Kirk Bodlovic ¶ 11, Sept.*

*16, 2022 ("2d Decl. Bodlovic").*

69.     Prior to the COVID-19 pandemic, Providence did not require

symptomatic influenza patients to wear masks or require social distancing in

common areas, like waiting rooms. Exhibit 23 at 24:18–25:11.

*Undisputed as to St. Patrick's Hospital.  For clarification, the questions*

*were limited to St. Patrick's Hospital.  (Dep. Bodlovic 16:3-6, Doc. 95-1 at 282).*

70.     The assisted living facility operated by Providence in Polson primarily

cares for an elderly population. Exhibit 23 at 26:20–27:2.

*Undisputed.*

71.     Regarding the Centers for Medicare and Medicaid Services COVID-

19 vaccine mandate, Providence does not independently verify, or audit, the

vaccination status of contractors and vendors that Providence certifies for the

purposes of the rule. Exhibit 23 at 28:22–32:16.

*Disputed that Providence certifies vendors and contractors' vaccination*

*status.  See 42 C. F. R. § 482.42(g) (2022); (QSO-22-09-ALL Revised, Doc. 86-*

*17); (CMS Hospital Attachment Revised, Doc. 86-18).  Undisputed that Providence*

*relies upon the documentation provided by vendors and contractors.*

72.     Prior to the Centers for Medicare and Medicaid Services COVID-19

vaccine mandate, Providence was not required to mandate any employee

vaccinations by Centers for Medicare and Medicaid Services. Likewise,

Providence was not required to mandate any employee vaccinations by the

Montana Department of Public Health and Human Services. Exhibit 23 at 34:7–

35:1; Exhibit 9 at 50–51; Exhibit 24 at 35:18–36:10 (Deposition of Providence

30(b)(6) designee Karyn Trainor).

*This is a statement of law.*

73.     Prior to HB 702, Providence did not mandate any employee

vaccinations. Exhibit 25 at PL171–174; Exhibit 24 at 28:8–34:24, 36:25– 37:6.

Providence asserted the Fifth Amendment when asked if Providence has "a current

policy for immunization requirements," Exhibit 24 at 31:4–9, and whether Exhibit

25 was the current policy. Exhibit 24 at 28:8–31:9. Prior to HB 702, Providence

only recommended the influenza vaccine. Exhibit 24 at 31:24–32:13. Likewise,

Providence only recommended the Pertussis vaccine. Exhibit 24 at 34:4–24.

*As to the first sentence, disputed.  (Dep. Trainor 31:11-18, Doc. 95-1 at 360*

*and (Providence Immunization Requirements, Doc 95-1 at 427-431).  Providence*

*required:  proof of the flu vaccine; proof of two MMR vaccines and/or positive*

31

*titers (proof of immunity); proof of two Varicella vaccines and positive titer; proof*

*of Tdap vaccination; proof of Hepatitis B vaccination or immunity; proof of*

*Influenza vaccination.  2d Decl. Mahe ¶¶ 2-4, Ex. 1: St. Patrick Hospital's*

*Influenza Vaccination Policy (PL 176-177), Ex. 2: Providence St. Joseph Health*

*Policy (PL 224-229), Ex. 3: Guideline: Communicable Disease – Guidelines for*

*Exposure (PL 1529-1530); 2d Decl. Bodlovic ¶ 10.*

*Disputed as to the second sentence.  Karyn Trainor asserted her Fifth*

*Amendment Right based upon the criminal penalties in Montana Code Annotated §*

*49-2-601.  (Dep. Trainor 31:7-9, Doc. 95-1 at 360).  Providence provided its*

*current policy, which mandates COVID-19 vaccines, requires proof of*

*documentation of Hepatitis B immunization, requires proof of MMR*

*immunizations, and requires proof of Varicella vaccination.  (Providence*

*Immunization Requirements, Doc. 95-1 at 427-431).*

*Undisputed that Providence recommended the flu vaccine, but required a*

*declination form for those who did not obtain one.  2d Decl. Mahe ¶ 2, Ex. 1: St.*

*Patrick Hospital's Influenza Vaccination Policy (PL 176-177).*

*Undisputed that Providence recommended the pertussis vaccine, but*

*required a declination form for those who did not obtain one.  2d Decl. Mahe ¶¶ 3-*

*4, Ex. 2: Providence St. Joseph Health Policy (PL 224-229), Ex. 3: Guideline:*

*Communicable Disease – Guidelines for Exposure (PL 1529-1530).*

74.     Providence testified "the general public assumes that our people are vaccinated and were required to be vaccinated in many cases" because of the "vaccinations you had to have it in school, you had to have it for day care, you had it have it to go to university."  Exhibit 24 at 40:13– 41:3. Providence further testified that it "kn[e]w that there are exemptions" within HB 702 for those settings. Exhibit 24 at 41:17–42:9.

*Undisputed.*

75.     Providence was not aware of any accommodation requests made under the Montana Human Rights Act based on the vaccination status of other Providence employees. Exhibit 24 at 45:9–46:11, 57:9–20, 65:25–66:17; Exhibit 10 at 6–7; Exhibit 9 at 31–36 (Responses to Requests for Production No. 22–27).

*Disputed.  Providence testified it was most familiar with accommodations related to vaccination status of other employees related to COVID-19.  (Dep. Trainor 45:15-18, Doc. 95-1 at 375).  Providence testified that it had requests come in for a myriad of reasons, including immunocompromised issues that could pertain to vaccination status.  (Dep. Trainor 46:6-11; 51:5-11, Doc. 95-1 at 376, 381-382).  Providence testified there have been a few situations where they accommodated someone based upon vaccination status.  (Dep. Trainor 51:5-11, Doc. 95-1 at 381).  Providence testified they have had immunocompromised patients request only vaccinated caregivers.  (Dep. Trainor 52:24-53:15; 54:12-*

*54:4, Doc. 95-1 at 382-385).  Providence testified there have been requests for*

*accommodations related to vaccinations, which were handled in an interactive*

*verbal process.  (Dep. Trainor 66:10-15, Doc. 95-1 at 396).  (See also Dep.*

*Trainor 43:1-21; 44:5-12, Doc. 95-1 at 373-374); 2d Decl. Mahe ¶¶ 5-6 Ex. 4:*

*Email from S. Dotson to K. Trainor and J. Van Fossen, Nov. 9, 2021 (PL 774-775),*

*Ex. 5: Providence Email Correspondence, May 18, 2022 (PL 795-798).*

76.    When asked the question: "did Providence ever ask a caregiver to

receive a vaccination based on the reasonable accommodation request of a

different Providence employee?," Providence testified that they would not be

"impinging on somebody else's right" in working through the accommodation

request. Exhibit 24 at 47:16–48:7.

*Disputed, as it selectively quotes testimony.  (Dep. Trainor 48:3-7, Doc. 95-*

*1 at 378).  Providence testified, "Well, again, it would go back to depending on*

*what the -- the situation was, we would be working through the accommodation of*

*that person and not necessarily impinging on somebody's right."*

77.    Providence was not aware of any reasonable accommodation request

made by a Providence employee under the Americans with Disabilities Act based

on the vaccination status of a different Providence employee. Exhibit 24 at 55:23–

57:7, 65:25–66:17; Exhibit 10 at 6–7; Exhibit 9 at 31–36 (Responses to Requests

for Production No. 22–27).  During the time period beginning January 1, 2018 to

the present, Providence has not been the subject of any Americans with Disabilities Act complaints due to the vaccination status of another Providence employee. Exhibit 24 at 67:9–22; Exhibit 9 at 37 (Response to Request for Production No. 29).

*As to the first sentence, disputed.  Providence testified there have been requests for accommodations related to vaccinations, which were handled in an interactive verbal process.  (Dep. Trainor 66:10-15, Doc. 95-1 at 396); 2d Decl. Bodlovick ¶ 12.  As to the second sentence, undisputed that Providence has not been subject to any legally filed complaints under the ADA.*

78.    Providence testified that accommodations under the Americans with Disabilities Act and Montana Human Rights Act require an individualized process specific to the needs of the requesting individual and the circumstances of the case. Exhibit 24 at 43:23–45:7.

*This is a legal conclusion, which is inadmissible.  Fed. R. Evid. 602, 701-702.  Undisputed that Providence engaged in an individualized process regarding requests for accommodations.*

79.    Prior to HB 702, Providence's infection control policies did not mandate any employee vaccinations. Exhibit 25. Employee could sign a statement of declination for Hepatitis B. Exhibit 25 at PL172. Employees could also decline the MMR (measles, mumps, and rubella) vaccine and varicella vaccine. Exhibit 25

at PL172–173. Providence only "strongly recommended" the influenza and Tdap (tetanus, diphtheria, pertussis) vaccines. Exhibit 25 at PL173–174. The policy made clear that individuals whose vaccination status is unknown or who do not provide vaccination documentation will be treated as unvaccinated. Exhibit 25 at PL172.

*Disputed that Exhibit 25 depicts Providence's policy prior to House Bill 702. (See Providence Immunization Requirements, Doc. 95-1 at 427), depicting an effective date of May 2022. (Dep. Trainor 31:11-18, Doc. 95-1 at 361); (Providence Immunization Requirements, Doc. 95-1 at 427-431). Providence required: proof of the flu vaccine; proof of two MMR vaccines and/or positive titers (proof of immunity); proof of two Varicella vaccines and positive titer; proof of Tdap vaccination; proof of Hepatitis B vaccination or immunity; proof of Influenza vaccination. 2d Decl. Mahe ¶¶ 2-4, Ex. 1: St. Patrick Hospital's Influenza Vaccination Policy (PL 176-177), Ex. 2: Providence St. Joseph Health Policy (PL 224-229), Ex. 3: Guideline: Communicable Disease – Guidelines for Exposure (PL 1529-1530).; 2d Decl. Bodlovic ¶ 10.*

80.    In the previous three years, Providence has not been subject to any disciplinary action by any government entity for an alleged violation of a legal obligation because of unvaccinated employees, nor has Providence been subject to a malpractice or negligence complaint based on Providence's employees'

vaccination status, nor has Providence received any complaints related to allegedly deficient infectious disease control policies. Exhibit 24 at 78:19–80:7.

*Undisputed as to legal filings.*

81.     Providence employs individuals unvaccinated for COVID-19 and for other vaccine-preventable diseases. Ex. 9 at 23–24. Providence grants medical and religious exemptions to otherwise recommended vaccines. Exhibit 25; Exhibit 24 at 49:2–51:23.

*Undisputed.*

82.     Providence's infectious disease management policies allow for caregivers to work even if those caregivers are unvaccinated or non-immune. Exhibit 35. For example, caregivers can work without receiving the influenza vaccine so long as they comply with masking requirements. Exhibit 35 at PL177. Quarantined patients may also receive visitors so long as those visitors comply with health and safety rules. Exhibit 35 at PL197.

*Disputed to the extent the first sentence includes COVID-19 vaccination and the caregiver does not have a valid exemption.  (Providence Immunization Requirements, Doc. 95-1 at 428).  Undisputed as to other diseases, so long as they do not present a direct threat to the safety of others.  (Dep. Trainor 54:12-55:4, Doc. 95-1 at 384-385); 2d Decl. Bodlovic ¶ 10.*

*Undisputed as to the second sentence.*

*Disputed as to the third sentence.  COVID positive patients in quarantine and those awaiting test results are not permitted to have visitors (with the exception of end of life patients).  (Providence Montana Visitor Policy, Doc. 95-1 at 771).  Further, Providence retains the ability to limit visitation by specific unit, patient population, or individual patients.  (Providence Montana Visitor Policy, Doc. 95-1 at 771).*

83.    Providence's COVID-19 plan prior to the COVID-19 vaccine mandate does not mention or refer to vaccination. Exhibit 36.

*Undisputed, as the plan was developed before COVID-19 vaccines were readily available.  2d Decl. Bodlovic ¶ 9.*

VI.    Facts related to Plaintiff-Intervenor Montana Nurses Association

84.    Plaintiff Intervenor Montana Nurses Association does not possess any record of any reasonable accommodation request made under the Americans with Disabilities Act or Montana Human Rights Act related to vaccine-preventable disease. Exhibit 26 at 8–10.

*Undisputed.*

85.    Montana Nurses Association strongly supports religious and medical exemptions to all vaccinations. Exhibit 27 at MNA149, 151.

*Undisputed.*

86.     Montana Nurses Association opposes retaliation against employees based on the employee's vaccination status. Exhibit 27 at MNA 150, 152.

*Undisputed related to the COVID-19 vaccine.*

87.     Montana Nurses Association surveyed its members in September 2021 to understand their views on vaccine mandates. Exhibit 28. Only 34.6% of respondents answered they support mandatory vaccinations without exemptions. Exhibit 28 at MNA228. 35.67% of respondents do not support mandatory vaccines for healthcare workers. Exhibit 28 at MNA228.

*Disputed that the survey included all of MNA's members.  2d Decl. Mahe ¶ 8, Ex. 7: Dep. Montana Nurses Association 30(b)(6) 44:6-8, 23-24, Aug. 24, 2022 ("Dep. MNA"). Disputed that the survey related to all vaccine mandates.  (MNA Covid Vaccine Survey, Doc. 95-1 at 480-481).  Undisputed as to the 1,029 individuals that responded to that question on the survey.  (MNA Covid Vaccine Survey, Doc. 95-1 at 484).*

88.     Montana Nurses Association entered into a collectively bargained contract with the State of Montana at the Montana Mental Health Nursing Care Center. Exhibit 29. This agreement states "No employee will be subject to mandatory vaccines or immunizations by the Employer." Exhibit 29 at MNA406. This provision is identical to a provision in the preceding collective bargaining agreement between the State of Montana and the Montana Nurses Association at

this facility. Exhibit 30 at 14. The State of Montana does not require any mandatory vaccinations or immunizations at this facility. Exhibit 33, ¶ 13.

*As to the first, second, and third sentences, undisputed.*

*As to the last sentence, disputed. (Decl. Anderson ¶ 13, Doc. 95-11 at 612, indicating that Montana Mental Health Nursing Care Center mandates the COVID-19 vaccine).*

89.    The Montana Nurses Association acknowledges that the Centers for Medicare and Medicaid Services Covid-19 vaccination mandate "is an unprecedented mandate and as this is NEW to all of you it is also NEW to us." Exhibit 31 at MNA1308, 1314.

*Undisputed.*

VII.   Facts related to Centers for Medicare and Medicaid Services and the Occupational Safety and Health Act

90.    Prior to its November 5, 2021, Interim Final Rule, Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555 (Nov. 5, 2021), the Centers for Medicare and Medicaid Services never required any healthcare staff vaccinations as a condition of participation in Medicare or Medicaid. Exhibit 9 at 50–51 (Response to Request for Admission No. 7).

*This is a statement of law, undisputed subject to the context of the statement.*

91.     Prior to HB 702 and COVID-19, Providence's staff vaccination policies never triggered a complaint, citation, or violation of Centers for Medicare and Medicaid Services conditions of participation, including those set forth in 42 C.F.R. § 482.41 and 42 C.F.R. § 482.42. Exhibit 9 at 48–49 (Response to Request for Production No. 49); Exhibit 32 at PL236–282.  Providence's infection control survey deficiencies were unrelated to staff vaccination policies, or knowledge of staff vaccination status. Exhibit 32 at PL256–257.

*Undisputed as to the first sentence that Providence did not have any documentation as to any complaint, citation or violation from CMS triggered by its vaccination policies since January 1, 2018.*

*As to the second sentence, undisputed as to the June 2022 survey.*

92.     Prior to HB 702 and COVID-19, Five Valleys Urology's staff vaccinations policies never triggered a complaint, citation, or violation of Centers for Medicare and Medicaid Services conditions of participation, including those set forth in 42 C.F.R. § 482.41 and 42 C.F.R. § 482.42. Exhibit 9 at 48–49 (Response to Request for Production No. 49).

*Five Valleys Urology is not subject to the CMS conditions of participation. (Pls.' Disc. Resp., Doc. 94-9 at 50).*

93.     Prior to HB 702 and COVID-19, Western Montana Clinic's staff vaccinations policies never triggered a complaint, citation, or violation of Centers

for Medicare and Medicaid Services conditions of participation, including those set forth in 42 C.F.R. § 482.41 and 42 C.F.R. § 482.42. Exhibit 9 at 48–49 (Response to Request for Production No. 49).

*The Clinic is not subject to CMS conditions of participation.  (Pls.' Disc. Resp., Doc. 94-9 at 50).*

94.    Prior to the November 5, 2021, Interim Final Rule, Medicare and Medicaid Programs; Omnibus COVID-19 Health Care Staff Vaccination, 86 Fed. Reg. 61555 (Nov. 5, 2021), state surveyors did not investigate a facility's staff vaccination policy or status and the federal government did not even have a code or tag to cite for vaccination issues until the Vaccine Mandate and guidance came out. One was specifically created for COVID-19 vaccination issues. Prior to the Vaccine Mandate, surveyors would focus on universal infection control policies but not vaccines, in any manner. These universal infection control policies did not require surveyors to investigate a facility's vaccination policy or whether the facility tracked employees' vaccination status. Exhibit 33, ¶ 12.

*Undisputed.*

VIII.  Facts related to the Montana Human Rights Bureau

95.    To determine whether a condition qualifies as a disability, the Human Rights Bureau must consider what impact the condition has on an individual. Exhibit 34 at 93:1–12 (Deposition of HRB's 30(b)(6) designee Marieke Beck).

*Undisputed.*

96.     The Human Rights Bureau looks "at every case as it comes" and considers both the "facts being presented by the charging party" and the "defenses being raised by the respondent." Exhibit 34 at 94:7–11.

*Undisputed.*

97.     To determine whether discrimination occurred, the Human Rights Bureau considers each case based on the specific facts presented. Exhibit 34 at 50:24–51:6, 52:5–8.

*Undisputed.*

## PLAINTIFFS AND PLAINTIFF-INTERVENOR'S ADDITIONAL FACTS IN OPPOSITION TO DEFENDANTS' MOTION

98.     Vaccination and natural/recovered immunity through prior infection reduce the risk of individuals contracting and transmitting vaccine-preventable illnesses and reduce the risk of severe disease.  (Bhattacharya Report ¶¶ 5, 17, 34, Doc. 86-5 at 5, 15, 33-34); (King Report ¶¶ 6-12, 21, 24, Doc. 86-1 at 3-6, 10-13); (Taylor Report ¶¶ 6-11, 56, 62, Doc. 86-2 at 3-5, 29-30, 33); (Holzman Report ¶ 13, Doc. 86-3 at 7-8); (Duriseti Report 19, 24-26, Doc. 86-6 at, 19, 24-26).

99.     Vulnerable and immunocompromised individuals seek healthcare from Montana physicians, hospitals and other healthcare facilities.  (Stephens Report ¶¶ 10-12, Doc. 86-4 at 4-6); (Holzman Report ¶ 9, Doc. 86-3 at 6) (King

Report, ¶¶ 42, 50, Doc. 86-1); (Taylor Report ¶ 55, Doc. 86-2 at 29); (Pls.' Disc. Resp., Doc. 86-36 at 23); (Pls.' 4th Supp. Disc. Resp., Doc. 86-37 at 2-9); 2d Decl. Carpenter ¶¶ 1-3; Decl. W. Page ¶¶ 2-3; Decl. J. Page ¶¶ 2-3; Decl. Smith ¶ 2.

100.   Healthcare settings employ individuals who are particularly vulnerable or at higher risk of harm or death if they acquire an infectious disease, including those with disabilities.  (Holzman Report ¶ 10, Doc. 86-3 at 6); (Dep. Five Valleys 47:6-23, Doc. 95-1 at 56); (Dep. Trainor 18:19-19:6, Doc. 95-1 at 348-349); (Decl. V. Byrd ¶¶ 8-9, Doc. 85-1 at 3).

101.   Healthcare workers are more likely to be exposed to infectious diseases than the general population, and more likely to come into contact with individuals who are vulnerable and at high-risk of contracting and being harmed by infectious diseases.  (Taylor Report ¶ 55, Doc. 86-2 at 29); (Holzman Report ¶¶ 8-9, Doc. 86-3 at 6); (Decl. V. Byrd ¶ 25, Doc. 85-1 at 6).

102.   Vaccine-preventable diseases pose a substantial risk of death and serious illness to immunocompromised individuals and those with severe chronic disease.  (King Report ¶ 5, Doc. 86-1 at 3); (Taylor Report ¶¶ 29, 55, Doc. 86-2 at 14-15, 29); (Bhattacharya Report ¶¶ 13, 15, Doc. 86-5 at 10, 12); (Holzman Report ¶¶ 4, 8, 9, Doc. 86-3 at 3, 6); (Wilson Report ¶¶ 16-17, Doc. 86-7 at 5-7); (Stephens Report ¶¶ 5-11, Doc. 86-4 at 3-5).

103.   Immunocompromised individuals with disabilities are more susceptible to vaccine-preventable illnesses and at increased risk of serious harm or death from such illnesses.  (King Report ¶¶ 39, 42, Doc. 86-1 at 17-19); (Stephens Report ¶ 11, Doc. 86-4 at 5); (Taylor Report ¶ 55, Doc. 86-2 at 29); (Duriseti Report, Doc. 86-6 at 23-24).

104.   Health conditions such as cancer, kidney transplant, diabetes, and other diseases are physical impairments that impact one or more major life activities.  (Stephens Report ¶ 11, Doc. 86-4 at 5); (King Report ¶ 18, Doc. 86-1 at 9); (Wilson Report ¶ 17, Doc. 86-7 at 6-7).

105.   Certain immunocompromised individuals should not be exposed to unvaccinated individuals, including unvaccinated healthcare workers.  (King Report ¶¶ 42, 44, Doc. 86-1 at 18-20); (Taylor Report ¶ 55, Doc. 86-2 at 29); (Holzman Report ¶ 20, Doc. 86-3 at 11); (Stephens Report ¶¶ 5-8, Doc. 86-4 at 3-4); (1st Decl. Carpenter ¶¶ 3-6, Doc. 90 at 2).

106.   Given the benefits of vaccines such as MMR and the Hepatitis B vaccine, "clearly demonstrated reduction in transmission with high community vaccination rates requires more consideration than one's personal autonomy." (Duriseti Report, Doc. 86-6 at 25).

107.   Patients in Montana have requested to be treated by vaccinated staff. (Stephens Report ¶ 14, Doc. 86-4 at 6); (Dep. Trainor 37:23-38:10, 66:10-15, Doc. 95-1 at 367-368, 396); (Dep. Five Valleys 44:22-45:6, Doc. 95-1 at 53-54).

108.   In recent years, the Clinic was aware that conversations had occurred between patients and their care team, asking about accommodations related to vaccination status of Clinic employees, and the Clinic attempted to accommodate those requests.  (Dep. Clinic 58:9-90:2, Doc. 95-1 at 131-141).

109.   Providence has had patients request accommodations based upon vaccination status of its employees.  (Dep. Trainor 43:1-21; 44:5-12; 45:15-18; 46:6-11; 51:5-11; 52:24-53:15; 54:12-55:4, Doc. 95-1 at 373-376, 381-385); 2d Decl. Mahe ¶¶ 5-6, Ex. 4: *Email from S. Dotson to K. Trainor and J. Van Fossen, Nov. 9, 2021 (PL 774-775)*, Ex. 5: *Providence Email Correspondence, May 18, 2022 (PL 795-798).*

110.   Providence had an employee quit because they could not guarantee they would only work with vaccinated staff.  2nd Decl. Bodlovic ¶ 12.

111.   Five Valleys has had patients request the accommodation of being treated by vaccinated staff.  (Dep. Five Valleys 44:22-45:6, Doc. 95-1 at 53-54).

112.   Five Valleys has had employees request accommodations based upon vaccination status.  (Dep Five Valleys 45:18-23; 53:17-54:3, Doc. 95-1 at 54, 62-63).

113.   The Montana Human Rights Bureau recognized that accommodations to disabled individuals can be related to vaccination status.  (Dep. HRB 122:10-13, Doc. 95-1 at 736).

114.   The Equal Employment Opportunity Commission has recognized that, "[t]he proportion of employees in the workplace who already are partially or fully vaccinated against COVID-19 and the extent of employee contact with non-employees, who may be ineligible for a vaccination or whose vaccination status may be unknown, can impact ADA undue hardship consideration."  (EEOC COVID-19 Guidance, Doc. 86-32 at 47).

115.   Plaintiff Mark Carpenter is a kidney transplant patient, which has impacted his major life functions, and, as a result, has a significantly compromised immune system.  (Pls.' Disc. Resp., Doc. 94-9 at 15); 2d Decl. Carpenter ¶ 1-2.

116.   As a result of his transplant, Mr. Carpenter is more susceptible to diseases and at a higher risk of harm from such diseases.  2d Decl. Carpenter ¶ 1-2.

117.   Due to his disability, Mr. Carpenter should avoid contact with unvaccinated individuals.  (1st Decl. Carpenter ¶ 5-6, Doc. 90 at 2).

118.   As a result of his disability, Mr. Carpenter faces the risk of serious illness or death if he does not attend frequent, in-person visits with healthcare providers.  2d Decl. Carpenter ¶¶ 1, 3.

119.   While the majority of his treatments could not be postponed, Mr. Carpenter has delayed and reduced the number of visits to his primary care provider, due to the increased risk during the pandemic.  2d Decl. Carpenter ¶ 4.

120.   Prior to the pandemic, Mr. Carpenter believed that his medical providers were all vaccinated against infectious diseases, but after House Bill 702 was passed and there was more media attention regarding the anti-vaccination movement, he learned that may not be the case in Montana.  2d Decl. Carpenter ¶ 5.

121.   After learning that, Mr. Carpenter had discussions with his primary care physician, nephrologist, and infectious disease physician regarding the fact that they were fully vaccinated.  2d Decl. Carpenter ¶ 6.

122.   Mr. Carpenter was aware that, due to House Bill 702, his providers were unable to tell him whether other staff was vaccinated and were unable to take steps to prevent him from being treated by unvaccinated staff.  2d Decl. Carpenter ¶ 6.

123.   House Bill 702 placed Mr. Carpenter in the untenable position of having to choose between receiving potentially life-saving treatments and risk exposure to vaccine-preventable diseases from non-vaccinated healthcare workers or avoiding non-vaccinated healthcare workers and foregoing potentially life-saving treatments.  2d Decl. Carpenter ¶ 7.

124.   Plaintiff Wallace Page has non-Hodgkins lymphoma and multiple myeloma, which impact his major life activities and, as a result of his treatments, he is immunocompromised.  Decl. W. Page ¶¶ 2-3; (Pls.' Disc. Resp., Doc. 94-9 at 15).

125.   As a result of his health conditions, Mr. Page is more susceptible to diseases and at a higher risk of harm from diseases.  Decl. W. Page ¶ 4.

126.   As a result of his health conditions, Mr. Page faces the risk of serious illness or death if he does not attend frequent, visits with healthcare providers. Decl. W. Page ¶ 6.

127.   While most of his healthcare treatments could not be postponed, Mr. Page has avoided dental treatment due to the added risk of exposure during the pandemic.  Decl. W. Page ¶ 8.

128.   Mr. Page avoided emergency room and urgent care visits, including a visit related to cutting his finger, due to the vaccination status of healthcare workers and others.  Decl. W. Page ¶ 9.

129.   Prior to HB 702 and the media coverage around it, Mr. Page assumed all of his medical providers were vaccinated.  Decl. W. Page ¶ 10.

130.   Plaintiff Diana "Jo" Page is in remission from breast cancer, which impacts her major life activities, and her immune system is compromised due to her cancer treatment.  Decl. J. Page ¶ 2.

131.   Ms. Page was informed by healthcare providers to avoid exposures to anything that could penetrate her compromised immune system.  Decl. J. Page ¶ 3

132.   Ms. Page avoided receiving a knee replacement, emergency room visits (including one for an asthma attack), and urgent care visits because she could not ensure she would only be treated by vaccinated healthcare workers.  Decl. J. Page ¶¶ 6-7.

133.   Ms. Page had conversations with her primary care provider regarding the provider's vaccination status.  Decl. J. Page ¶ 8.

134.   Plaintiff Cheyenne Smith has Juvenile Rheumatoid Arthritis, which impacts her major life activities, and her immune system is compromised due to her treatments.  (Pls.' Disc. Resp., Doc. 94-9 at 15); Decl. Smith ¶ 2.

135.   Ms. Smith continued her work as a dental hygienist because all the individuals that she works with are fully vaccinated.  Decl. Smith ¶ 4.

136.   While some of her healthcare visits are not optional, she has not had her routine physicals, did not see the dermatologist, and avoided in-person rheumatoid appointments, to the extent she was able, due to the risk posed by nonvaccinated healthcare workers and the pandemic.  Decl. Smith ¶ 5.

137.   Ms. Smith's infant son must avoid exposure to unvaccinated persons, because he is too young to be fully vaccinated.  Decl. Smith ¶ 6.

138.   Plaintiff Pat Appleby is in remission from cancer and has type 2 diabetes, which impact her major life activities.  (Pls.' Disc. Resp., Doc. 94-9 at 15).

139.   Five Valleys OSHA Manual requires employees receive a Hepatitis B vaccine, provide proof of complete Hepatitis B vaccination series, provide proof that the employee is immune, or provide documentation indicating the employee has declined to be vaccinated for Hepatitis B.  (Five Valleys OSHA Manual, Doc. 95-1 at 107).

140.   Five Valleys OSHA Manual requires that if Hepatitis B exposure occurs, Five Valleys must assess the employee's immune status for Hepatitis B infection and obtain a history of Hepatitis B vaccination for the employee.  (Five Valleys OSHA Manual, Doc. 95-1 at 107).

141.   Five Valleys Employee Medical Record form in its OSHA Manual requires "History of [Hepatitis B] vaccination (date received, or if not received, a brief explanation of why not).  (Five Valleys OSHA Manual, Doc. 95-1 at 113).

142.   Prior to HB 702, the Clinic would track whether employees received the flu vaccine.  (Dep. Clinic 61:11-21, Doc. 95-1 at 134).

143.   Prior to HB 702, if the flu reached a certain risk of transmissibility in the community, the Clinic would take additional steps to protect individuals from

employees who had not received the flu vaccine.  (Dep. Clinic 61:11-21, Doc. 95-1 at 134).

144.   Prior to HB 702, if flu became highly prevalent in the community, unvaccinated employees "would be asked to wear a mask and potentially be reassigned to nondirect patient care role" to protect patients and other employees. (Dep. Clinic 65:3-10, Doc. 95-1 at 135).

145.   Providence St. Joseph Assisted Living Facility ("St. Joseph Assisted Living Facility") is a department of Providence St. Joseph Medical Center ("St. Joseph Hospital"), a critical access hospital.  (Dep. Bodlovic 14:14-21, Doc. 95-1 at 280).

146.   St. Joseph Assisted Living Facility shares staff with St. Joseph Hospital.  (Dep. Bodlovic 15:15-21, Doc. 95-1 at 281); 2d Decl. Bodlovic ¶¶ 3-5.

147.   St. Joseph Hospital treats St. Joseph Assisted Living Facility patients. 2d Decl. Bodlovic ¶ 6.

148.   St. Joseph Hospital providers do limited rounding at St. Joseph Assisted Living Facility.  2d Decl. Bodlovic ¶ 5.

149.   St. Joseph Hospital has offices of private physicians located within its physical facility.  2d Decl. Bodlovic ¶ 7.

150.   St. Patrick's Hospital has private physician offices that are located in and interspersed throughout the same physical facility as the hospital.  2d Decl. Bodlovic ¶ 8.

151.   Prior to House Bill 702, if there were an influenza outbreak, Providence would have required non-vaccinated individuals to wear additional PPE.  (Dep. Trainor 32:10-13, Doc. 95-1 at 362).

152.   Prior to House Bill 702, Providence has treated non-vaccinated people differently than vaccinated individuals, including removing them from direct patient care.  (Dep. Trainor 54:12-55:4, Doc. 95-1 at 384-385).

153.   Hospitals and physician offices are similarly situated in all meaningful ways when it comes to treating patients.  (King Report ¶¶ 39,48, Doc. 86-1 at 17-18, 21-22); (Holzman Report ¶¶ 11, 21, Doc. 86-3 at 6-7, 11); (Order ¶ 4(k), Doc. 77 at 5); (Decl. V. Byrd ¶ 25, Doc. 85-1 at 6).

154.   Physicians of all types of specialties treat similar types of patients in acute hospital settings as well as outpatient physician clinic or office settings. (King Report ¶ 48, Doc. 86-1 at 21-22).

155.   Physician offices and hospitals are similarly situated to long-term care settings such as assisted living facilities and skilled nursing facilities.  (King Report ¶ 48, Doc. 86-1 at 21-22); (Holzman Report ¶ 21, Doc. 86-3 at 11).

156.   Primary care physicians as well as subspecialists treat elderly and immunocompromised patients in clinic settings, hospital settings, rural swing-bed hospital settings, and nursing homes and long-term care settings.  (King Report ¶ 48, Doc. 86-1 at 21-22).

157.   Hospitals treat the same patients as nursing homes, long-term care facilities and assisted living facilities.  (Dep. King 55:10-56:23; 57:23-3; 59:6-16; 124:24-126:2; 151:1-14, Doc. 86-42 at 4-8); April 28, 2021 House Floor Session Video, 2nd Reading Governor's Proposed Amendments Adopted, timestamp 16:53:20-16:57:52, http://sg001-harmony.sliq. net/00309/Harmony/en/PowerBrowser/PowerBrowserV2/20170221/-1/41104?agendaId=220301.

158.   Critical access hospital and hospital swing beds are often used in the exact same manner as nursing homes and long-term care facilities; these facilities provide the same (or similar) care to similarly situated patients by similarly situated healthcare workers.  (King Report ¶ 48, Doc. 86-1 at 21-22); (Dep. King 52:18-53:19, Doc. 86-42 at 3-4).

159.   The ethical principles of these healthcare providers and duties to their patients and fellow coworkers are unchanged whether the healthcare provider is providing treatment in a hospital, physician office, or long-term care setting.  (King Report ¶ 48, Doc. 86-1 at 21-22); (Holzman Report ¶¶ 20-21, Doc. 86-3 at 11).

160.   Healthcare entities have the same interest in infection prevention and preventing the spread of communicable diseases to their patients and staff.  (Dep. Taylor 35:5-36; 59:5-24; 94:6-95:5, Doc. 86-8 at 4-5, 8); (King Report ¶¶ 47-48, Doc. 86-1 at 21-22).

161.   The Montana Nurses Association is the professional association that speaks on behalf of the approximately 18,000 Registered Nurses and approximately 1,000 Advanced Practice Registered Nurse ("APRN") in Montana. (Decl. V. Byrd ¶ 2, Doc. 85-1 at 2).

162.   Nurses in nursing homes, assisted living facilities, and long term care facilities face the same workplace risks from vaccine-preventable disease as those in other healthcare facilities.  (Decl. V. Byrd ¶¶ 14, 17, Doc. 85-1 at 4-5).

163.   The Montana Nurses Association has approximately 3,000 members. 2d Decl. Mahe ¶ 7, Ex. 7: 30(b)(6) Dep. MNA 44:6-8.

164.   Assisted living facilities are not Medicare or Medicaid certified facility providers, are not subject to the CMS conditions of participation, and do not risk losing funding from CMS based on not complying with the conditions of participation.  (Dep. DPHHS 36:5-17; 83:14-25; 84:1-7, Doc. 86-9 at 8, 13); (DPHHS Provider Q&A, Doc. 86-20).

165.   Providence receives a majority of its reimbursement through CMS. (1st Decl. Bodlovic ¶ 7, Doc. 45 at 3).

166.   Continued participation with CMS is essential to Providence's continued operations and ability to continue to deliver its current level and volume of patient care.  (1st Decl. Bodlovic ¶ 7, Doc. 45 at 3).

167.   Rural hospitals receive 60% or more of their gross billing from CMS, emphasizing that CMS funding is critical to continued operations.  (Decl. Stukaloff, Doc. 51-2 at 5); (Dep. AG 97:15-103:2, Doc. 86-15 at 17-18).  *(See also* Dep. DPHHS 76:22-80:24; 82:22-83:7, Doc. 86-9 at 11-13) (DPHHS testifying the loss of CMS funding will make it difficult to operate the Montana State Hospital).

168.   Failure to comply with the CMS conditions of participation subjects a covered facility to potential termination from the Medicare and Medicaid programs.  (Dep. DPHHS 50:25-51:20, Doc. 86-9 at 9); (CMS Termination Letter, Doc. 86-19); (1st Decl. Bodlovic ¶ 3, Doc. 45 at 2-3).

169.   Healthcare settings in Montana required vaccinations and proof of vaccination prior to the enactment of MCA 49-2-312.  2d Decl. Mahe ¶ 8, Ex. 7: 30(b)(6) Dep. MNA 34:17-35:4; (Wilson Report ¶ 18, Doc. 86-7 at 7).

170.   Members of the Montana Nurses Association in Exempted Facilities (nursing homes, long term care facilities, and assisted living facilities) are similarly situated to members who do not work in Exempted Facilities, in terms of their

workplace risks from vaccine-preventable disease.  (Decl. Byrd, ¶¶ 13-18, Doc. 85-1 at 4-5); 2d Decl. Mahe ¶ 14, Ex. 13:  Dep. Dr. Gregory Holzman 91:22-93:18, Aug. 16, 2022.

DATED this 16th day of September, 2022.


/s/  Kathryn S. Mahe
Attorneys for Plaintiffs


/s/  Raph Graybill
Attorneys for Plaintiff-Intervenors