AUSTIN KNUDSEN
Montana Attorney General
DAVID M.S. DEWHIRST
 *Solicitor General*
CHRISTIAN B. CORRIGAN
 *Deputy Solicitor General*
BRENT MEAD
 *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
david.dewhirst@mt.gov
christian.corrigan@mt.gov
brent.mead2@mt.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, ET. AL.,<br><br>*Plaintiffs,*<br><br>and<br><br>MONTANA NURSES ASSOCIATION,<br><br>*Plaintiff-Intervenors,*<br><br>v.<br><br>AUSTIN KNUDSEN, ET AL.,<br><br>*Defendants.* | No. CV-21-108-M-DWM<br><br><br>**DEFENDANTS' RESPONSE TO PLAINTIFF-INTERVENORS' MOTION FOR SUMMARY JUDGMENT** |

## TABLE OF CONTENTS

Table of Authorities..................................................................... iii

Argument.................................................................................1

I.   HB 702 doesn't violate Equal Protection...................................... ......1

   A. Intervenor lacks standing to sustain its Equal Protection claim.   ...................................................................1

   B. Intervenor isn't similarly situated. ...........................................2

   C. HB 702 is subject to rational basis review.................................6

      1.   Intervenor's Article II, Section 3 claim fails as a matter of law. ..................................................................6

      2.   Intervenor's Article II, Section 3 claim also fails as a factual matter.............................................................10

   D. HB 702 satisfies rational basis review......................................12

   E. HB 702 serves compelling interests. .......................................19

II.  Federal law doesn't preempt HB 702. ..........................................22

   A. Legal Standard ................................................................22

   B. HB 702 doesn't conflict with the Americans with Disabilities Act................................................................23

   C. The Occupational Safety and Health Act doesn't preempt HB 702 ...................................................................25

   D. The Centers for Medicare and Medicaid Services Rule is illegal and invalid ................................................................28

      1.   The Rule violates the major questions and non-delegation doctrines. ....................................................29

2.   The Rule is arbitrary and capricious...........................31

3.   The Rule violates the Tenth Amendment. ..................31

III. The requested injunctive relief is invalid because it's vague
and overbroad............................................................... ....33

Certificate of Compliance.......................................................36

Certificate of Service .............................................................36

## CASES

*Ala. Ass'n of Realtors*,
   141 S. Ct. 2485 (2021) ..................................................................... 33

*Anderson v. Liberty Lobby, Inc.*,
   477 U.S. 242 (1986) ......................................................................... 11

*Ariz. Dream Act Coal. v. Brewer*,
   855 F.3d 957 (9th Cir. 2017) ............................................................. 2

*Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*,
   481 U.S. 537 (1987) ........................................................................... 7

*Biden v. Missouri*,
   142 S. Ct. 647 (2022) ............................................................ 26, 28-29

*Boardman v. Inslee*,
   978 F.3d 1092 (9th Cir. 2020) ............................................ 2, 13, 15-16

*Braunstein v. Ariz. DOT*,
   683 F.3d 1177 (9th Cir. 2012) ........................................................... 1

*Brnovich v. Biden*,
   562 F. Supp. 3d 123 (D. Ariz. 2022) ............................................... 20

*Castro v. Kailin*,
   2012 WL 209187 (C.D. Cal. Jan. 24, 2012) ................................... 33

*Sch. Bd. of Nassau Cty. v. Arline*,
   480 U.S. 273 (1987) ..................................................................... 21-22

*Chicanos Por La Causa, Inc. v. Napolitano*,
   544 F.3d 976 (9th Cir. 2008) ........................................................... 27

*Christian Legal Soc'y v. Eck*,
   625 F. Supp. 2d 1026 (D. Mont. 2008) ....................................... 8, 20

*City Cleburne v. Cleburne Living Ctr.*,
   473 U.S. 432 (1985) ......................................................................... 13

*City of L.A. v. AECOM Servs.*,
   854 F.3d 1149 (9th Cir. 2017) ................................................... 23, 25

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*,
   894 F.3d 1005 (9th Cir. 2018) ............................................................ 1

*Donovan v. Royal Logging Co.*,
   645 F.2d 822 (9th Cir. 1981) ............................................................ 25

*Engquist v. Or. Dep't of Agric.*,
   553 U.S. 591 (2008) ...................................................................... 2-3

*Erickson v. Cty. of Nev.*,
   607 F. App'x 711 (9th Cir. 2015) ....................................................... 3

*FCC v. Beach Commc'ns*,
   508 U.S. 307 (1993) ...................................................................... 15

*Feezor v. Patterson*,
   896 F. Supp. 2d 895 (E.D. Cal. 2012) ................................................. 9

*First Resort, Inc. v. Herrera*,
   860 F.3d 1263 (9th Cir. 2017) ......................................................... 14

*Flower World, Inc. v. Sacks*,
   2022 U.S. App. LEXIS 22254 (9th Cir. Aug. 11, 2022) ..................... 25, 28

*Fortyune v. Am. Multi–Cinema, Inc.*,
   364 F.3d 1075 (9th Cir. 2004) ......................................................... 33

*Gallinger v. Becerra*,
   898 F.3d 1012 (9th Cir. 2018) ......................................................... 13

*Gazelka v. St. Peter's Hosp.*,
   2018 MT 152, 392 Mont. 1, 420 P.3d 528 ........................................... 2

*Gazelka v. St. Peter's Hosp.*,
   420 P.3d 528 (Mont. 2018) ............................................................. 17

*Gundy v. United States*,
   139 S. Ct. 2116 (2019) .................................................................. 30

*Hasan v. E. Wash. State Univ.*,
   485 F. App'x 169 (9th Cir. 2012) ....................................................... 9

*Heller v. Doe*,
   509 U.S. 312 (1993) .................................................................. 13, 15

*Hill St. Health Servs. LLC v. Cty. of L.A.*,
  2016 U.S. Dist. LEXIS 192359 (C.D. Cal. Nov. 16, 2016) ................................ 5

*Hurley v. Irish-Am. Gay*,
  515 U.S. 557 (1995) ........................................................................ 20

*Interpipe Contr., Inc. v. Becerra*,
  898 F.3d 879 (9th Cir. 2018) .......................................................... 1

*Jacobson v. Massachusetts*,
  197 U. S. 11 (1905) ..................................................................... 19, 33

*Jaksha v. Butte-Silver Bow Cty.*,
  2009 MT 263, 352 Mont. 46, 214 P.3d 1248 ............................ 18, 19

*Kafka v. Hagener*,
  176 F. Supp. 2d 1037 (D. Mont. 2001) ........................................ 10

*Kim v. Holder*,
  603 F.3d 1100 (9th Cir. 2010) .................................................... 1-2, 2

*Merrill v. Milligan*,
  142 S. Ct. 879 (2022) (Kavanaugh, J., concurring) ........................ 29

*Mont. Cannabis Indus. Ass'n v. State*,
  286 P.3d 1161 (Mont. 2012) .............................................. 6, 7, 8, 22

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018) ................................................................ 32

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*,
  228 F.3d 1043 (9th Cir. 2000) ...................................................... 17

*NFIB v. DOL*,
  142 S. Ct. 661 (2022) .................................................................. 28

*NFIB v. Sebelius*,
  567 U.S. 519 (2012) .................................................................... 32

*Nken v. Holder*,
  556 U.S. 418 (2009) .................................................................... 29

*Pennhurst State Sch. & Hosp. v. Halderman*,
  451 U.S. 1 (1981) ........................................................................ 32

*Pickern v. Pier 1 Imps. (U.S.), Inc.*,
    457 F.3d 963 (9th Cir. 2006) ............................................................ 9

*Printz v. United States*,
    521 U.S. 898 (1997) ....................................................................... 32

*Roberts v. U.S. Jaycees*,
    468 U.S. 609 (1984) ............................................................... 7, 8, 20

*S. Bay United Pentecostal Church v. Newsom*,
    140 S. Ct. 1613 (2020) .............................................................. 19, 20

*Satterlee v. Lumberman's Mut. Cas. Co.*,
    2009 MT 368, 353 Mont. 265, 222 P.3d 566 ............................. 17-18

*Silveira v. Lockyer*,
    312 F.3d 1052 (9th Cir. 2002) ........................................................ 13

*Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*,
    4 F.4th 747 (9th Cir. 2021) ............................................................ 17

*State v. Nelson*,
    941 P.2d 441 (Mont. 1997) ............................................................ 21

*State v. Safeway Stores*,
    76 P.2d 81 (Mont. 1938) ................................................................. 7

*State v. Skurdal*,
    767 P.2d 304 (Mont. 1988) ............................................................. 6

*Stengel v. Medtronic Inc.*,
    704 F.3d 1224 (9th Cir. 2013) ................................................... 22-23

*Tandon v. Newsom*,
    517 F. Supp. 3d 922 (N.D. Cal. 2021) ....................................... 19-20

*Taylor v. San Diego Cty.*,
    800 F.3d 1164 (9th Cir. 2015) ...................................................... 4-5

*Titanium Metals Corp. v. Usery*,
    579 F.2d 536 (9th Cir. 1978) ......................................................... 25

*Tucson Woman's Clinic v. Eden*,
    379 F.3d 531 (9th Cir. 2004) .................................................... 14, 21

*United Haulers Ass'n v. Oneida Herkimer Solid Waste Mgmt. Auth.*,
   550 U.S. 330, 342–343 (2007) ............................................................. 7

*United States v. Navarro*,
   800 F.3d 1104 (9th Cir. 2015) ........................................................... 17

*Wadsworth v. State*,
   275 Mont. 287, 911 P.2d 1165 (1996) ...................................... 8, 9, 20

*West Virginia v. EPA*,
   142 S. Ct. 2587 (2022) ................................................................ 29, 30

*Whitman v. Am. Trucking Assoc.*,
   531 U.S. 457 (2001) ........................................................................ 30

*Wiser v. State*,
   129 P.3d 133 (Mont. 2006) ...................................................... 6-7, 7, 10

*Wyeth v. Levine*,
   555 U.S. 555 (2009) ........................................................................ 23

*Yates v. Collier*,
   868 F.3d 354 (5th Cir. 2017) ........................................................... 33

## OTHER AUTHORITIES

UNITED STATES CONSTITUTION
   Amend. X ................................................................................. 31, 33

UNITED STATES CODE
   29 U.S.C. § 654(a)(1) ...................................................................... 26

FEDERAL REGISTER
   86 Fed. Reg. 61555 (Nov. 5, 2021) ................................................. 29

FEDERAL RULES OF CIVIL PROCEDURE

Rule 8(a)(2) ................................................................................. 9

Rule 65(d)(1)(B) ....................................................................... 33

MONTANA CONSTITUTION

Art. II, § 3 ..................................................................... *passim*

MONTANA CODE ANNOTATED

§ 49-2-312 ........................................................................ 26, 34

§ 49-2-313 ......................................................................... 3, 17

§ 50-5-101(26)(b) ..................................................................... 3

§ 50-5-101(7), (37), (56) ........................................................... 5

§ 50-5-225 ............................................................................ 16

§ 50-5-226(8)(d) ..................................................................... 5

§ 50-5-227(1)-(3) .................................................................... 5

§ 50-5-301 ............................................................................ 5

§ 50-5-1101 .......................................................................... 5

§ 50-5-1104 .......................................................................... 5

§ 53-6-109(1) ........................................................................ 5

ADMINISTRATIVE RULES OF MONTANA

Rule 37.106.313 ..................................................................... 5

Rule 37.106.2802 .................................................................... 5

Rule 37.106.2809 .................................................................... 5

Rule 37.106.2855 .................................................................... 5

Rule 50.5.1104(3) ................................................................... 5

ARGUMENT

**I.    HB 702 doesn't violate Equal Protection.**

> **A. Intervenor lacks standing to sustain its Equal
>     Protection claim.**

"[A]t the summary judgment stage, a plaintiff must offer evidence

and specific facts demonstrating each element" of standing.  *Ctr. for*

*Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012

(9th Cir. 2018).  Only those "personally denied" equal treatment have a

cognizable injury under Article III.  *Braunstein v. Ariz. DOT*, 683 F.3d

1177, 1185 (9th Cir. 2012).  "To have standing to press its equal

protection claim" a plaintiff must "show that the law deprives it of some

cognizable fundamental right guaranteed to other similarly situated

entities." *See Interpipe Contr., Inc. v. Becerra*, 898 F.3d 879, 904 (9th Cir.

2018).

Intervenor cannot demonstrate an Equal Protection injury because

HB 702 doesn't regulate nurses, it regulates employers and public

accommodations.

As employees and patients, nurses aren't subject to legal penalties

for HB 702 violations. Even if HB 702 were discriminatory, they cannot

show injury because they don't receive the disparate treatment.  *See Kim*

*v. Holder*, 603 F.3d 1100, 1104 (9th Cir. 2010).   In *Interpipe*, a trade association attempted to challenge a statute that treated union and non-union business differently, but Ninth Circuit held that the trade association lacked standing for an equal protection claim because "[t]he law applies to employers, and so [plaintiff] cannot show that SB 954 causes an equal protection injury to *itself*."  898 F.3d at 904 (emphasis in original).  Likewise, the Intervenor cannot show an injury to themselves because HB 702 regulates their employers, not them.

### B. Intervenor isn't similarly situated.

To prevail on an Equal Protection claim, plaintiffs must show that a class that is similarly situated has been treated disparately. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017).  Intervenor must identify "a control group composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy." *Boardman v. Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020) (internal quotations omitted); *accord Gazelka v. St. Peter's Hosp.*, 2018 MT 152, ¶ 16, 392 Mont. 1, 10, 420 P.3d 528, 535.  Parties are similarly situated only when they're "arguably indistinguishable." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (internal

quotations and citations omitted); *accord Erickson v. Cty. of Nev.*, 607 F. App'x 711, 712 (9th Cir. 2015).

Intervenor identifies nurses at the exempted facilities under MCA § 49-2-313 as the classified group and nurses at all non-exempt facilities as the control group. *See* Doc. 85 at 11. The proposed control group, however, includes nurses who work at both hospitals and offices of private physicians. Those nurses aren't even similarly situated to each other. Nurses at hospitals work at licensed "healthcare facilities" under MCA Title 50 (health and safety). By contrast, nurses working at Five Valleys and Western Montana don't work at licensed "healthcare facilities" and are, instead, subject to separate regulations under Title 37 (professions and occupations). *See* MCA § 50-5-101(26)(b); Doc. 93, ¶¶ 33, 51. The reason for this is that the services performed at these facilities—and their communicable disease policies—are different.

The record bears this out. Plaintiffs Providence and Western Montana operate in the same building in Missoula and share common space on Floors 4 and 5. Doc. 129-1 at 3. During the onset of the COVID-19 pandemic, Providence noted on March 13, 2020, that "WMC has a different set of guidelines and Providence has a different set related to

COVID-19 which could put Providence caregivers and patients at risk." *Id.* Providence, as a hospital (and licensed health care facility), operated under different protocols than Western Montana because they are different types of facilities.

Intervenor claims nurses at exempt and non-exempt facilities are similarly situated because "nurses in Exempted Facilities face the same workplace risks from vaccine-preventable disease as those in non-exempt facilities." Doc. 85 at 11 (citing SUF ¶ 50,54). First, Intervenor's characterization of the "workplace risks from vaccine-preventable disease" lacks any specificity. Second, Intervenor relies solely on unfounded factual assertions made by Vicky Byrd to support this claim. Defendants have moved to exclude the testimony of Ms. Byrd related to "work environments," "workplace safety concerns," and the "risk of vaccine-preventable disease." *See* Doc. 110 at 6.

Even if Intervenor is correct about the similarity of risks faced by nurses in exempt and nonexempt facilities, the State still regulates the two types of facilities differently. *See Taylor v. San Diego Cty.*, 800 F.3d 1164, 1169 (9th Cir. 2015) (two groups of civilly committed individuals were not similarly situated because state "ha[d] enacted a detailed

statutory scheme distinguishing the two classifications of mentally ill individuals."); MCA §§ 50-5-101(7), (37), (56) (defining the exempted facilities separately from hospitals or other types of healthcare facilities). Assisted living facilities, for example, follow a separate licensing and regulatory scheme under Title 50, which includes different licenses based on the populations served. *See, e.g.*, MCA §§ 50-5-227(1)-(3), 50-5-226(8)(d) (standards for operating assisted living facilities). Long-term care facilities have their own scheme. *See, e.g.*, MCA §§ 50-5-1101, *et seq.*, 53-6-109(1) (rulemaking consultation); 50-5-1104(3) (rights of residents), 50-5-1205(4) (compliance and enforcement); 50-5-301 (certificate of need); A.R.M. 37.106.2855 (infection control); A.R.M. 37.106.313 (communicable disease control); A.R.M. 37.106.2802, 37.106.2809 (licensing).

At a minimum, Plaintiffs fail to demonstrate specific facts demonstrating that the exempt facilities are "arguably indistinguishable" from the non-exempt facilities. *See Hill St. Health Servs. LLC v. Cty. of L.A.*, 2016 U.S. Dist. LEXIS 192359, at *21 (C.D. Cal. Nov. 16, 2016) (dismissing claim because plaintiff failed to demonstrate sufficient similarities between groups).

## C. HB 702 is subject to rational basis review.

HB 702 is subject to rational basis because no fundamental right is implicated. Plaintiffs' claim concerns only the right to seek health in "all lawful ways." *See* Mont. Const. art. II, § 3; Doc. 35 at 14; Doc. 37, ¶¶ 57–58; Doc. 38, ¶¶ 51–53. The right to seek health isn't implicated because (1) as a matter of law the State may regulate health, welfare, and morals without implicating the right and (2) because Intervenor fails to submit any evidence that HB 702 impairs the right to seek health.

### 1. Intervenor's Article II, Section 3 claim fails as a matter of law.

The police power extends to all "reasonable legislation for the health, safety, welfare or morals of the public." *State v. Skurdal*, 767 P.2d 304, 306 (Mont. 1988). "Montana recognizes that such police power exists even when the regulations are an infringement of individual rights." *Id.* "[T]he Constitution is clear that the right to seek health is circumscribed by the State's police power to protect the public's health and welfare." *Mont. Cannabis Indus. Ass'n v. State*, 286 P.3d 1161, 1166 (Mont. 2012). This is because "[l]iberty is necessarily subordinate to reasonable restraint and regulation by the state in the exercise of its sovereign prerogative-police power." *Wiser v. State*, 129 P.3d 133, 139

6

(Mont. 2006) (quoting *State v. Safeway Stores*, 76 P.2d 81, 86 (Mont. 1938)); *see also United Haulers Ass'n v. Oneida Herkimer Solid Waste Mgmt. Auth.*, 550 U.S. 330, 342–343 (2007) (the police power sets state and local government apart from private enterprise).  Non-discrimination laws like HB 702 advance the public welfare and morals—a well-settled aspect of the police power.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (same for public accommodation laws).

The Montana Supreme Court has rejected that the right to seek health grants an affirmative right to access a particular treatment.  *See Mont. Cannabis*, 286 P.3d at 1166 (the right "to obtain and reject medical treatment … does not extend to give a patient a fundamental right to use any drug ….").  *Wiser* made clear that all healthcare regulations aren't subject to strict scrutiny.  *See Wiser,* 129 P.3d at 137.  It reasoned that requiring the State to demonstrate that "no less restrictive" regulations could still serve the State's interest would make "regulation of health care professions … very difficult, if not impossible." *Id.* at 138.

This case, therefore, presents a straightforward analysis.  Montana enacted HB 702 pursuant to its police power to protect public welfare and

7

morals.  *See Roberts*, 468 U.S. at 624.  Montana's constitutional text delimits the right to seek health to exercises of the State's police power. *See Mont. Cannabis*, 286 P.3d at 1166.  Preventing discrimination unquestionably serves legitimate purposes. *See Roberts*, 468 U.S. at 624 (anti-discrimination laws "plainly serves compelling state interests of the highest order"); *Christian Legal Soc'y v. Eck*, 625 F. Supp. 2d 1026, 1051 (D. Mont. 2008).  The Legislature struck a balance between public health, welfare, and morals.  As such, Intervenor possesses no free-standing right to discriminate based on immunity status in the pursuit of health. Intervenor also attempts to smuggle in a new claim regarding the fundamental right to seek employment under Article II, Section 3 of the Montana Constitution to trigger strict scrutiny.  *See* Doc. 85 at 10.  Intervenor's complaint, however, makes clear that they're asserting a claim under Article II, Section 3's right to seek health—with no mention of the separate right to seek employment. *See* Doc. 38 at ¶¶ 50–54.

In support, Intervenor attempts a sleight of hand, quoting *Wadsworth v. State*, 275 Mont. 287, 299, 911 P.2d 1165, 1172 (1996), for the proposition that the right to seek health in Article II, Section 3 incorporates the unenumerated right to seek employment.  *See* Doc. 85

8

at 16. The provided quote says: "we hold the opportunity to pursue employment … is itself a fundamental right because it is a right without which other constitutionally guaranteed rights would have little meaning." Doc. 85 at 16 (quoting *Wadsworth*, 911 P.2d at 1172). The full language from that paragraph in *Wadsworth*, however, makes clear that the right to seek employment derives not from the right to health in Article II, Section 3, but rather, the separate and distinct fundamental right to pursue life's basic necessities in Article II, Section 3. *See Wadsworth*, 911 P.2d at 1172 ("We conclude that without the right to the opportunity to pursue employment, the right to pursue life's basic necessities would have little meaning, because it is primarily through work and employment that one exercises and enjoys this latter fundamental constitutional right.").

Because Intervenor didn't plead these allegations in its complaint, this Court shouldn't consider them. *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (citing Fed. R. Civ. P. 8(a)(2)); *Hasan v. E. Wash. State Univ.*, 485 F. App'x 169, 171 (9th Cir. 2012); *Feezor v. Patterson*, 896 F. Supp. 2d 895, 903 (E.D. Cal. 2012).

This claim, nevertheless, fails for the same reasons as the right to seek health claim. *See Wiser*, 129 P.3d at 139 ("the idea that the right to pursue employment and life's other 'basic necessities' is limited by the State's police power is imbedded in the plain language of the Constitution."); *see also Kafka v. Hagener*, 176 F. Supp. 2d 1037, 1043 (D. Mont. 2001) (The right to pursue employment doesn't equate to "being able to run a business unfettered by state laws and regulations" as that "would be the equivalent of neutering the regulatory power of state government.").

### 2. Intervenor's Article II, Section 3 claim also fails as a factual matter.

Intervenor provides no evidence supporting its right to seek health claim. It relies solely on this Court's Order on the Motion to Dismiss. *See* Doc. 85 at 19. This Court stated, however, that "the Individual Plaintiffs and the Nurses have sufficiently *alleged* a claim under Article II, § 3 … because they have *alleged* facts that support their claim that unvaccinated workers prevent them from obtaining or providing safe healthcare in a safe workplace." Doc. 35 at 14 (emphasis added). Intervenor cavalierly rests on these allegations. Doc. 85 at 16, 19. But resting on the laurels of sufficiently pleaded *allegations* doesn't cut it at

10

the summary judgment stage. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986).

The record demonstrates—conclusively—that HB 702 has not infringed on nurses' right to seek health or employment. The Institutional Plaintiffs each averred that in the last three years, including post-HB 702, they haven't been subject to any regulatory, disciplinary, or legal action based on the immunity status of their healthcare workers. *See* Doc. 93, ¶¶ 44–46, 62, 80. Prior to HB 702, Five Valleys didn't require any special precautions related to unvaccinated or non-immune employees. *Id.*, ¶ 36. Similarly, Western Montana never took an employee's vaccination status into account when determining whether that employee could interact with patients. *Id.*, ¶ 61. Providence allowed unvaccinated, or non-immune, healthcare workers to care for patients. *Id.*, ¶ 82.

Although Intervenor puts forward no facts regarding the nurses' experience as patients, the Individual Plaintiffs each sought and received healthcare services since HB 702's passage. Doc. 93, ¶¶ 25–26. Wallace Page made over 100 healthcare visits. *Id.*, ¶ 31. He attested that despite being exposed to other patients who likely had COVID-19, his healthcare

providers kept a "clean environment" and he never contracted COVID-19. *Id.*, ¶ 31. Cheyenne Smith works as a dental hygienist and never requested any accommodation based on the vaccination status of her coworkers. *Id.*, ¶ 32.

Intervenor, moreover, collectively bargained *with the State of Montana* for a provision prohibiting all mandatory vaccinations or immunizations at the Montana Mental Health Nursing Care Center. Doc. 93, ¶ 88. It also strongly supports exemptions to all vaccinations. *Id.*, ¶ 85.

Before and after HB 702, healthcare settings have provided care while also meeting all regulatory, ethical, and legal obligations. In other words, assuming *arguendo* that the right to seek health encompasses the right to receive safe medical treatment—or work in a safe medical environment—there's proof HB 702 didn't negatively affect any relevant health or safety conditions.[1]

### D. HB 702 satisfies rational basis review.

---

[1] Intervenor's new "right to seek employment" claim likewise fails as a factual matter. Doc. 85 at 10, 13. Intervenor failed to enter any evidence that HB 702 denies any individual an employment opportunity. (Doc. 93, ¶ 84). Cheyenne Smith's continued employment as a dental hygienist contradicts this claim as well. Doc. 93, ¶ 32.

12

Intervenor must prove that the classification drawn by the statute isn't rationally related to a legitimate state interest. *Gallinger v. Becerra*, 898 F.3d 1012, 1017 (9th Cir. 2018). In the realm of "social or economic legislation," states have "wide latitude." *City Cleburne v. Cleburne Living Ctr.*, 473 U.S. 432, 440 (1985). Plaintiff must show there's no "plausible policy reason for [a] classification" "and the relationship of the classification to its goal is [] so attenuated as to render the distinction arbitrary or irrational." *Boardman*, 978 F.3d at 1118 (internal quotations omitted). Intervenor must negate "'every conceivable basis which might support it, whether or not the basis has a foundation in the record.'" *Id.* (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). The Court "must attempt to identify any hypothetical rational basis for the exception." *Silveira v. Lockyer*, 312 F.3d 1052, 1090 (9th Cir. 2002); *accord Gallinger v. Becerra*, 898 F.3d 1012, 1018 (9th Cir. 2018) (The court is free to consider any legitimate governmental interest the State has).

Intervenor claims nurses "face the same, recognized workplace risk from the spread of vaccine-preventable disease whether they work in Exempted Facilities or somewhere else." Doc. 85 at 15. But the Ninth

13

Circuit has held that a State may hold some types of medical facilities to a more stringent regulatory scheme—even if they perform similar services. *Tucson Woman's Clinic v. Eden*, 379 F.3d 531 (9th Cir. 2004), upheld Arizona's law requiring licensing and regulation of any medical facility in which five or more first trimester abortions in any month or any second or third trimester abortions are performed. *Id.* at 537; *see also First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1279 (9th Cir. 2017).

The plaintiffs alleged the statute violated the "equal protection rights of physicians and their patients by distinguishing between those who provide abortions and those who provide other comparably risky medical services." *Id.* The distinction satisfied rational basis because "the law [was] facially related to health and safety issues, and no evidence [was] presented that is sufficient to create an issue of material fact as to whether there is a stigmatizing or animus based purpose to the law." *Id.* at 546. States, thus, have broad leeway in regulating healthcare providers. The State already regulates these facilities differently. *See* Part(I)(B), *infra*.

The Governor's Amendatory Veto added the exemption to ensure that HB 702 didn't put the exempted facilities in violation of regulations

or guidance issued by the Centers for Medicare and Medicaid Services. Doc. 93, ¶ 11.

As of May 2021, the Centers for Medicare and Medicaid Services had never before required vaccinations as a condition of participation, Doc. 93, ¶ 90, and it didn't until November 5, 2021, *id.*—six months after the Governor's Amendatory Veto. *See Heller*, 509 U.S. at 321. It was entirely plausible—and rational—that it might only require vaccinations as a condition of participation for residential facilities such as licensed nursing homes, long-term care facilities, or assisted living facilities. *See id.* at 320; *FCC v. Beach Commc'ns*, 508 U.S. 307, 320 (1993).

Also, in May 2021, it was well-documented that residents of the exempted facilities were some of the most acute victims of COVID-19.[2] The Centers for Medicare and Medicaid Services endorsed this very rationale just days after HB 702 became law. Doc. 93, ¶¶ 13-14.

The combination of congregate settings and elderly populations in the exempted facilities warrant special protection. *Id.; see also*

---

[2] *See, e.g.*, Shaylee Ragar, *Montana COVID-19 Nursing Home Death Rate Ranks Second In The Nation*, MONTANA PUBLIC RADIO (Dec. 10, 2020), https://www.mtpr.org/montana-news/2020-12-10/montanacovid-19-nursing-home-death-rate-ranks-second-in-the-nation.

*Boardman*, 978 F.3d at 1118 (state had legitimate interest in protecting seniors and other vulnerable individuals from identity theft and financial crimes); MCA § 50-5-225 (assisted living facilities may not hire certain persons, must provide personal services, and assistance with daily living).

The rationale for an exemption to a statute also doesn't have to be related to the statute's purpose. The State may provide an exemption to a regulation to balance competing interests such as non-discrimination and patient safety. In *Tucson Woman's Clinic*, the plaintiffs claimed the State's regulatory scheme discriminated between doctors who provided more abortions and those who provide fewer abortions. *Id.* at 543. The State's asserted interest was an "attempt to balance the additional requirements that licensing would impose upon abortion providers with the desire to protect the health and welfare of women seeking abortions." (internal quotation marks omitted). *Id.* at 547. The panel noted, "[g]enerally, such line drawing survives rational basis review because it account[s] for limitations on the practical ability of the State to remedy every ill." *Id.* at 547 (quotations omitted). It concluded that "[w]hile we might imagine more precise ways to estimate practice size than the raw

number of abortions a doctor provides per month, we cannot say that the classification chosen by the Arizona legislature as a proxy for relative administrative burden is so absurd as to be irrational on its face." *Id.*

Thus, even if Intervenor is correct that nurses face similar risks at exempted and non-exempted facilities, it doesn't matter; the State need not draw a precise line in determining which entities are subject to HB 702. It may imperfectly balance the health and safety of patients at the exempted facilities with the State's interests in enacting HB 702. *See Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747, 759–60 (9th Cir. 2021); *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1052 (9th Cir. 2000); *Gazelka v. St. Peter's Hosp.*, 420 P.3d 528, 535 (Mont. 2018).

Nor can Intervenor defeat § 49-2-313 via Montana's Equal Protection Clause. Intervenor attempts to impose a higher standard for the State to satisfy Montana's rational basis test. Doc. 85 at 24–25. That higher standard exists only in Intervenor's imagination, not the law.

Intervenor's only proof of this allegedly heightened standard is a *dissent* in *Satterlee v. Lumberman's Mut. Cas. Co.*, 2009 MT 368, 353

17

Mont. 265, 222 P.3d 566.  Doc. 85 at 24-25.  But the *Satterlee* dissent, however, merely disparaged the majority for "employ[ing] a toothless [rational basis] analysis."  *Satterlee,* 222 P.3d at 577 (Morris, J., dissenting).  If anything, the *Satterlee* dissent defeats Intervenor's own contention.

Intervenor believes *Jaksha v. Butte-Silver Bow Cty.,* 2009 MT 263, 352 Mont. 46, 214 P.3d 1248, where the court concluded that an age limit of 34 for new firefighters didn't survive rational basis, is "instructive." Doc. 85 at 19.  Intervenor fails to note, however, the key basis for the Court's decision:  the comparator classes.  The court defined the classes as: "(1) individuals under the age of 34 who have taken and passed the [Montana Firefighters' Testing] Consortium's physical and written tests, and are eligible to receive an original appointment as a firefighter; and (2) individuals who have met the Consortium's requirements and are eligible to receive an original appointment as a firefighter, but are over the age of 34 at that time."  *Id.* at 1254.   Thus, the reason the Court required *some* factual basis for distinguishing between the two classes was that the excluded class had been defined to include firefighters over the age of 34 who had already passed the standardized written and

18

physical exams.  *See id.* at 1255.  In other words, the definition of the excluded class presupposed that they met all requirements to be firefighters.  In that specific paradigm, therefore, the age cutoff was arbitrary because the excluded class had already passed the only existing health and safety screening protocols.  Here, the definitions of the proposed classes don't presuppose that they're indistinguishable. Exempt and non-exempt facilities possess key differences.

### E. HB 702 serves compelling interests.

Defendants have explained in detail why none of Intervenor's claims trigger strict scrutiny.  Even if, however, the Court determines that a fundamental right guaranteed under the Montana Constitution is implicated, it doesn't trump the State's interests.

"Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J. concurring in denial of application for injunctive relief) (quoting *Jacobson v. Massachusetts,* 197 U.S. 11, 38 (1905).  "When [public] officials 'undertake to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially

19

broad.'" *Tandon v. Newsom*, 517 F. Supp. 3d 922, 949 (N.D. Cal. 2021) (quoting *South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring)). Although "[t]his traditional 'police power' includes authority over compulsory vaccination…. ***It also includes, as a general matter, power to prohibit vaccination from being compelled.***" *Brnovich v. Biden*, 562 F. Supp. 3d 123, 157 (D. Ariz. 2022) (emphasis added).

First, the State possesses a compelling interest in preventing discrimination. *See Hurley v. Irish-Am. Gay*, 515 U.S. 557, 572 (1995). The State "enjoys broad authority to create rights of public access on behalf of its citizens." *Roberts*, 468 U.S. at 624; *Christian Legal Soc'y v. Eck*, 625 F. Supp. 2d 1026, 1051 (D. Mont. 2008).

Second, and relatedly, HB 702 protects Montanans' fundamental right to pursue employment. *See Wadsworth,* 911 P.2d at 1176 (The right "to pursue employment" is a fundamental right.) (citing MONT. CONST. art II, § 3). During the 2021 Legislative Session, Montanans were

concerned about losing their jobs if they declined the new COVID-19 vaccines.[3]

HB 702 also furthers the compelling interest of protecting individuals' right to privacy. This, of course, includes the privacy involved with medical records. *See State v. Nelson*, 941 P.2d 441, 448 (Mont. 1997) ("Medical records are quintessentially private and deserve the utmost constitutional protection."). This interest also includes protection against public disclosure of vaccination status. *See Tucson Woman's Clinic*, 379 F.3d at 551 ("Individuals have a constitutionally protected interest in avoiding disclosure of personal matters, including medical information.") (internal quotations omitted); *cf Sch. Bd. of Nassau Cty. v. Arline*, 480 U.S. 273, 284 (1987) ("Few aspects of a

---

[3] *See, e.g.*, Associated Press, *Bill in Montana will prohibit work discrimination based on vaccine status*, ABC10.COM (Apr. 27, 2021) ("Republican Sen. Tom McGillvray of Billings said last week in presenting the bill in the Senate. …. 'There are employers … that are requiring and coercing employees to get vaccinations under threat of termination                    and                    intimidation.'"), https://www.abc10.com/article/news/health/coronavirus/vaccine/bill-prohibit-work-discrimination-based-vaccine-passport/507-e3f2bb38-9077-4fd7-9018-c0362be40011; David Sherman, *COVID vaccinations mandatory for employees at Benefis*, KRTV.COM (Apr. 8, 2021), https://www.krtv.com/news/great-falls-news/employee-covid-vaccinations-mandatory-at-benefis-not-at-great-falls-clinic.

handicap give rise to the same level of public fear and misapprehension as contagiousness.").

HB 702 also protects the fundamental right of individuals to reject medical treatment and make their own medical decisions about vaccines. *See Mont. Cannabis,* 286 P.3d at 1166.[4]   The Montana Legislature, relatedly, sought to protect individuals from the growing stigma and draconian measures associated with not receiving the new COVID-19 vaccine.[5]

## II.   Federal law doesn't preempt HB 702.

### A. Legal Standard

"Parties seeking to invalidate a state law based on preemption bear the considerable burden of overcoming the starting presumption that Congress does not intend to supplant state law." *Stengel v. Medtronic*

---

[4] *See, e.g.*, Eileen Sullivan, et al., *States swiftly pause the use of Johnson & Johnson's vaccine after a U.S. advisory*, N.Y. TIMES (Apr. 13, 2021), https://www.nytimes.com/2021/04/13/us/states-johnson-vaccine-pause.html.

[5] *See, e.g.*, Fran Kritz, *The Vaccine Passport Debate Actually Began In 1897 Over A Plague Vaccine*, NPR (Apr. 8, 2021) ("'This train [of vaccine certification] has already left the station because people want to know that the people around them are immunized,' says Dr. Chris Beyrer, the Desmond M. Tutu Professor of Public Health and Human Rights at the Johns Hopkins Bloomberg School of Public Health.").

*Inc.*, 704 F.3d 1224, 1227-28 (9th Cir. 2013) (internal quotations omitted).
This is particularly true when "Congress has legislated …  in a field
which the States have traditionally occupied." *Wyeth v. Levine*, 555 U.S.
555, 565 (2009).  Prohibiting discrimination is within the State's historic
powers. *See City of L.A. v. AECOM Servs.*, 854 F.3d 1149, 1159 (9th Cir.
2017).  In cases such as this, courts "find preemption only if Congress
indicated a clear and manifest purpose to that effect." *Id.* (quotations
omitted).

### B. HB 702 doesn't conflict with the Americans with Disabilities Act.

Defendants incorporate the arguments made in their Brief in
Opposition to Plaintiffs' Motion for Summary Judgment.  *See* Doc. 85 at
28–29 (Intervenor joined and incorporated the arguments made by
Plaintiffs in their Brief in Support of Motion for Summary Judgment).

Intervenor adds insufficient facts to establish the necessary
elements for either a Title I or Title III claim.  Doc. 85 at 29.  Intervenor
asserts, contrary to discovery responses, they have members who qualify
for a disability under the Americans with Disability Act.  Doc. 85 at 29
(citing Doc. 85.1, ¶¶ 8–9); *but see* Doc. 110 at 3–5 (Vicky Byrd's testimony

on this matter should be limited to Intervenor's production, to which there wasn't any).

The record undermines Intervenor's alleged injuries. First, Intervenor strongly supports exemptions to all vaccinations. Doc. 93, ¶ 85. It also opposes retaliation against employees based on the employee's vaccination status. Doc. 93, ¶ 86. In other words, it doesn't support "ordinary workplace vaccinations as a condition of their employment." Doc. 85 at 13. It instead supports and collectively bargains against mandatory workplace vaccinations. *E.g.*, Doc. 93, ¶ 88.

Given Intervenor's opposition to mandatory vaccinations, it comes as little surprise they don't possess any documents related to any reasonable accommodation request made under the Americans with Disabilities Act based on a nurse's vaccination status. Doc. 93, ¶ 84.

As with Plaintiffs, Intervenor fails to demonstrate how HB 702 precludes affording a reasonable accommodation in all circumstances. As with Plaintiffs, Intervenor fails to establish a prima facie case under the Americans with Disabilities Act because they fail to prove any request has been made by Intervenor's members. And as with Plaintiffs, the

Court should deny Intervenor's motion for summary judgment on Claims I and II.

### C. The Occupational Safety and Health Act doesn't preempt HB 702.

Intervenor must demonstrate Congress indicated a clear and manifest purpose for the Occupational Safety and Health Act ("Act") to preempt HB 702.  *City of L.A.*, 854 F.3d at 1159.  The Act "contemplates that the Secretary will promulgate specific safety standards to insure safe and healthful working conditions." *Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981).  "The general duty clause applies when there are no specific standards." *Flower World, Inc. v. Sacks*, 2022 U.S. App. LEXIS 22254, at *4 (9th Cir. Aug. 11, 2022). "[U]nder the [general duty] clause, the Secretary [of  Labor] must prove (1) that the employer failed to render its workplace 'free' of a hazard which was (2) recognized and (3) causing or likely to cause death or serious physical harm[.]" *Titanium Metals Corp. v. Usery*, 579 F.2d 536, 540 (9th Cir. 1978) (internal quotations omitted).

Intervenor must prove "state law[] stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *City of L.A.*, 854 F.3d at 1159.  Intervenor cannot show that

HB 702 prevents employers from complying with the General Duty Clause in 29 U.S.C. § 654(a)(1).

Intervenor relies on the conclusory allegation that HB 702 "prohibits healthcare settings from utilizing the most important tools to render their workplaces free from the recognized hazard of vaccine-preventable disease: common vaccination requirements, and the ability to treat employees according to their (actual, known) immunity status." Doc. 85 at 25.

Intervenor erroneously claims that "[p]rior to § 49-2-312, healthcare settings in Montana addressed the recognized hazard of vaccine-preventable disease in the healthcare workplace like every other state in the country has for decades: through routine vaccinations and the collection of accurate information regarding employees' immunity status." Doc. 85 at 31-32. What does it cite in support of this proposition? Nothing in the record—only dicta from *Biden v. Missouri*, 142 S. Ct. 647, 653 (2022). *See* Doc. 85 at 32.

The record, moreover, belies this blatantly incorrect statement. Intervenor laments that HB 702 prevents them from "utilizing the most important tools to render their workplaces free from the recognized

hazard of vaccine-preventable disease" including "common vaccination requirements." Doc. 85 at 31. This is interesting given that Intervenor has collectively bargained at times to not be subject to mandatory vaccines or immunizations. Doc. 93, ¶ 88. One cannot help but wonder why Intervenor would collectively bargain for a condition that allegedly subjects nurses to recognized workplace hazards. At the very least, this demonstrates that Intervenor's preemption claims depend purely on hypotheticals. *See Chicanos Por La Causa, Inc. v. Napolitano*, 544 F.3d 976, 983 (9th Cir. 2008) (preemption requires actual, not hypothetical conflict).

The Institutional Plaintiffs have never required vaccinations for Hepatitis B, Pertussis, or other communicable diseases; nor have they required disclosure of vaccination status as part of their Occupational Safety and Health Act compliance plan. *See* Doc. 93, ¶¶ 48, 57, 82. Yet despite these facts, the Institutional Plaintiffs admit they have never been cited or faced an enforcement action under the Occupational Safety and Health Act due to the vaccination status of their employees or their vaccination policies. *Id.*, ¶¶ 44, 46, 62, 80.

27

Nor can the General Duty Clause apply to special concerns related to COVID-19.  When the U.S. Supreme Court stayed the Occupational Safety and Health Administration's Emergency Temporary Standard—requiring all employers with at least 100 employees to ensure their workforces are fully vaccinated for COVID-19—it rejected the argument that the generic risk of contracting COVID-19 qualifies as a "work-related danger[]." *NFIB v. DOL*, 142 S. Ct. 661, 665 (2022).

Recently, in a preemption case interpreting the scope of the Act as applied to Washington's COVID-19 public health proclamations, the Ninth Circuit rejected the Agency's "broad interpretation of its existing regulations as applying generally to COVID hazards in the workplace." *Flower World, Inc.,* 2022 U.S. App. LEXIS at *17 (9th Cir. Aug. 11, 2022). Thus, if the Act's specific regulations don't address hazards from COVID-19, then Intervenor cannot rely on its more generic authority to preempt in that same sphere.

### D. The Centers for Medicare and Medicaid Services Rule is illegal and invalid.

The Court should deny Intervenor's Motion as to Claim VII because the Rule is invalid, illegal, and, therefore, unenforceable.  In an emergency posture, the U.S. Supreme Court in *Biden v. Missouri*, 142 S.

Ct. 647, 654-55 (2022), permitted the Centers for Medicare and Medicaid Services Interim Final Rule, 86 Fed. Reg. 61555 (Nov. 5, 2021) ("Rule"), mandating COVID-19 vaccinations as a condition of participation to take effect. That stay, however, did not decide the merits. *See Merrill v. Milligan*, 142 S. Ct. 879, 879 (2022) (Kavanaugh, J., concurring); *Nken v. Holder*, 556 U.S. 418, 432 (2009). The Rule is still being litigated in several venues. The plaintiff States from *Biden v. Missouri* have filed a petition for writ of certiorari with the U.S. Supreme Court challenging other aspects of the Rule.[6]

### 1. *The Rule violates the major questions and non-delegation doctrines.*

The U.S Supreme Court recently decided *West Virginia v. EPA*, 142 S. Ct. 2587 (2022), which added new teeth to the "major questions doctrine." The doctrine applies in "cases in which the history and the breadth of the authority that [the agency] has asserted, and the economic and political significance of that assertion, provide a reason to hesitate

---

[6] *See Biden v. Missouri*, No. 21-3725 (petition filed May 19, 2022), https://www.supremecourt.gov/DocketPDF/21/21-1463/225701/20220518122351130_No.%20___%20PetitionForAWritOfCertiorari.pdf.

before concluding that Congress meant to confer such authority." *Id.* at 2608 (internal quotations omitted)

The Rule constitutes a significant encroachment into the lives—and health—of a vast number of healthcare employees—and profoundly impacts State budgets and the provisions of healthcare in America. The federal government has never before required vaccinations as a condition of participation. Doc. 93, ¶ 90.

Relatedly, "a statutory delegation is constitutional as long as Congress lays down by legislative act an intelligible principle to which the person or body authorized to exercise the delegated authority is directed to conform." *Gundy v. United States*, 139 S. Ct. 2116, 2123 (2019). If the Social Security Act grants the Agency authority to mandate vaccination, both "the degree of agency discretion" and "the scope of the power congressionally conferred" are limitless. *Whitman v. Am. Trucking Assoc.*, 531 U.S. 457, 475 (2001). Accordingly, Congress's "delegation ... of authority to decide major policy questions"—such as whether all healthcare workers must be vaccinated—violates the nondelegation doctrine.

### 2. The Rule is arbitrary and capricious.

The Agency's rationales for both the Rule and the good-cause exception have disappeared—*entirely*. Omicron is now the dominant variant. *See* Doc. 86.5, ¶42 (Expert Report of Dr. Bhattacharya). Omicron no longer presents the same alleged danger as Delta. *Id.*, ¶¶ 39, 40–46. The COVID-19 vaccines are ineffective at preventing omicron infections. *See id.*, ¶¶ 48–60. The Agency's rationale for the vaccine mandate has, therefore, disappeared. *See id.*, ¶ 66.

The Rule is arbitrary and capricious because it imposed a one-size-fits-all solution to a problem that was, and has since, continued to develop rapidly. Imposing the measure of this magnitude without including flexibility to adjust based on updated circumstances and science makes the Rule arbitrary and capricious.

### 3. The Rule violates the Tenth Amendment.

"The powers not delegated by the Constitution to the United States, nor prohibited by it to the States, are reserved to the States respectively, or to the people." U.S. CONST. AMEND. X. The Rule violates the Tenth Amendment for several reasons.

31

First, the Rule is an unconstitutional condition on Montana's receipt of federal funds.  Nothing in federal law gave the State clear notice that a vaccine mandate would be a condition of accepting federal Medicaid and/or Medicare funds.  *See Pennhurst State Sch. & Hosp. v. Halderman, 45*1 U.S. 1, 17 (1981).  By treating Medicaid and Medicare as an "element of a comprehensive national plan" to "pressure[e] the States to accept policy changes" related to COVID-19 vaccination, the Agency attempted to "accomplish[] a shift in kind, not merely degree," in the purpose of those federal programs.  *NFIB v. Sebelius*, 567 U.S. 519, 580, 583 (2012).  Additionally, because noncompliance with the Rule threatens a substantial portion of the State's budget, it violates the Spending Clause by coercing the State into compliance. *See id*. at 581-82.

Second, the Rule violates the anti-commandeering doctrine. Congress lacks the power to issue direct orders to the States, *Murphy v. NCAA*, 138 S. Ct. 1461, 1476 (2018), and may not commandeer State officers "into administering federal law." *Printz v. United States*, 521 U.S. 898, 928 (1997).  The Rule violates this doctrine by requiring Montana's state-run hospitals and other facilities that are covered by the

32

Rule to either fire their unvaccinated employees or forgo all Medicaid and/or Medicare funding.

Finally, the power to impose vaccine mandates is a power reserved to the states.  *See* U.S. Const. amend. X.  Public health—and vaccinations in particular—have long been recognized as an aspect of police power reserved to the States, not the federal government.  *See, e.g.,* J*acobson,* 197 U.S. at 24.  The Rule tramples on the traditional authority of the States to regulate public health within its borders, including the topic of compulsory vaccination.  *Cf. Ala. Ass'n of Realtors*, 141 S. Ct. 2485, 2489 (2021).

## III.  The requested injunctive relief is invalid because it's vague and overbroad.

Federal Rule of Civil Procedure 65(d) requires that "[e]very order granting an injunction … must … state its terms specifically." Fed.R.Civ.P. 65(d)(1)(B);  *see also Fortyune v. Am. Multi–Cinema, Inc.,* 364 F.3d 1075, 1086–87 (9th Cir. 2004); *Yates v. Collier*, 868 F.3d 354, 367 (5th Cir. 2017).  When a plaintiff's request for injunctive relief is too broad or vague, courts will decline to grant relief.  *See Castro v. Kailin*, 2012 WL 209187, at *3 (C.D. Cal. Jan. 24, 2012) (dismissing claim for injunctive relief on vagueness and overbreadth grounds).

Plaintiffs ask this Court to declare § 49-2-312 "invalid and unenforceable" in healthcare settings that "employ[] MNA members" and permanently enjoin enforcement of the law in those same places. Plaintiff-Intervenor's First Amended Complaint at 27. But what are those places? Plaintiffs fail to specify what facilities actually employ MNA members and have declined Defendant's requests to do so. *See* Doc. 129-3 at 31 (declining to identify health care facilities operated by MNA members). Instead, they ask this Court to issue an injunction of indefinite scope and operation. Granting that motion would introduce more confusion, not less, on what hospitals must do to comply with Montana law. The standard for pleading injunctive relief is clear: Plaintiffs' must "specify the particular … sites covered" by the injunctive relief sought, which they have failed to do. The Court should deny injunctive relief.

DATED this 16th day of September, 2022.

Austin Knudsen
Montana Attorney General

David M.S. Dewhirst
 Solicitor General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
  *Deputy Solicitor General*
BRENT MEAD
  *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
christian.corrigan@mt.gov.
brent.mead2@mt.gov

*Attorneys for Defendants*

35

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,491 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/    *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: September 16, 2022          /s/ *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN