AUSTIN KNUDSEN
Montana Attorney General
DAVID M.S. DEWHIRST
  *Solicitor General*
CHRISTIAN B. CORRIGAN
  *Deputy Solicitor General*
BRENT MEAD
  *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
david.dewhirst@mt.gov
christian.corrigan@mt.gov
brent.mead2@mt.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA,
MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, ET. AL., | No. CV-21-108-M-DWM |
| *Plaintiffs,* | |
| and | **DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT** |
| MONTANA NURSES ASSOCIATION, | |
| *Plaintiff-Intervenors,* | |
| v. | |
| AUSTIN KNUDSEN, ET AL., | |
| *Defendants.* | |

## TABLE OF CONTENTS

TABLE OF AUTHORITIES...............................................................................ii

ARGUMENT.................................................................................................1

I.  The Americans with Disabilities Act doesn't preempt HB 702 ........ ..1

II. HB 702 doesn't violate Equal Protection .........................................13

    A. The Individual Plaintiffs lack standing. ...................................13

    B. Institutional Plaintiffs aren't similarly situated. .....................14

    C. HB 702 Satisfies Rational Basis ..............................................18

        1.    Legal Standard.............................................................18

        2.    HB 702 furthers compelling and legitimate interests.18

        3.    MCA § 49-2-313 satisfies rational basis. ....................23

        4.    Physician offices have no Equal Protection Claim......30

CONCLUSION ............................................................................................34

CERTIFICATE OF COMPLIANCE .................................................................35

CERTIFICATE OF SERVICE ........................................................................35

i

# TABLE OF AUTHORITIES

## CASES

*Allied Concrete & Supply Co. v. Baker*,
  904 F.3d 1053 (9th Cir. 2018) ........................................................... 29

*Ariz. Dream Act Coal. v. Brewer*,
  855 F.3d 957 (9th Cir. 2017) ............................................................. 14

*Atay v. Cnty. of Maui*,
  842 F.3d 688 (9th Cir. 2016) .............................................................. 2

*Bd. of Trs. v. Garrett*,
  531 U.S. 356 (2001) ........................................................................... 26

*Boardman v. Inslee*,
  978 F.3d 1092 (9th Cir. 2020) ..................................................... 14, 18

*Boy Scouts of Am. v. Dale*,
  530 U.S. 640, (2000) .......................................................................... 20

*Braunstein v. Ariz. DOT*,
  683 F.3d 1177 (9th Cir. 2012) ........................................................... 13

*Brnovich v. Biden*,
  562 F. Supp. 3d 123 (D. Ariz. 2022) ................................................. 20

*Carroll v. Nakatani*,
  342 F.3d 934 (9th Cir. 2003) ............................................................. 13

*Christian Legal Soc'y v. Eck*,
  625 F. Supp. 2d 1026 (D. Mont. 2008) .............................................. 20

*City of L.A. v. AECOM Servs.*,
  854 F.3d 1149 (9th Cir. 2017) ............................................................. 2

*Crowder v. Kitagawa*,
  842 F. Supp. 1257 (D. Haw. 1994) ...................................................... 7

*Crowder v. Kitagawa,*
   81 F.3d 1840 (9th Cir. 1996) ................................................. 2, 7, 11

*Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.,*
   894 F.3d 1005 (9th Cir. 2018) ........................................................ 13

*Culinary Studios, Inc. v. Newsom,*
   517 F. Supp. 3d 1042 (E.D. Cal. 2021) ........................................... 28

*E.T. v. Paxton,*
   41 F.4th 709 (5th Cir. 2022) .................................................. *passim*

*Engquist v. Or. Dep't of Agric.,*
   553 U.S. 591 (2008) ...................................................................... 15

*Erickson v. Cty. of Nev.,*
   607 F. App'x 711 (9th Cir. 2015) .................................................. 15

*FCC v. Beach Commc'ns,*
   508 U.S. 307 (1993) ...................................................................... 25

*Feezor v. Patterson,*
   896 F. Supp. 2d 895 (E.D. Cal. 2012) ........................................... 17

*First Resort, Inc. v. Herrera,*
   860 F.3d 1263 (9th Cir. 2017) .............................................. 22-23, 30

*Fortyune v. Am. Multi-Cinema, Inc.,*
   364 F.3d 1075 (9th Cir. 2004) ................................................ 1, 3, 4

*Gazelka v. St. Peter's Hosp.,*
   420 P.3d 528 (Mont. 2018) ............................................................ 28

*Hasan v. E. Wash. State Univ.,*
   485 F. App'x 169 (9th Cir. 2012) .................................................. 17

*Heller v. Doe,*
   509 U.S. 312 (1993) ................................................................ 18, 25

*Hill St. Health Servs. LLC v. Cty. of L.A.,*
   2016 U.S. Dist. LEXIS 192359 (C.D. Cal. Nov. 16, 2016) ............... 16

*Hurley v. Irish-Am. Gay,*
   515 U.S. 557 (1995) ...................................................................... 20

*Interpipe Contr., Inc. v. Becerra,*
    898 F.3d 879 (9th Cir. 2018) ........................................................ 13-14

*Jacobsen v. Massachusetts*
    197 U.S. 11 (1905) ...................................................................... 19

*Kim v. Holder,*
    603 F.3d 1100 (9th Cir. 2010) ........................................................ 13

*Mannick v. Kaiser Found. Health Plan, Inc.,*
    2006 U.S. Dist. LEXIS 57173 (N.D. Cal. 2006) .................................. 1

*Mary Jo C. v. N.Y. State & Local Ret. Sys.,*
    707 F.3d 144 (2d Cir. 2013) ......................................................... 2, 7

*Merrifield v. Lockyer,*
    547 F.3d 978 (9th Cir. 2008) ..................................................... 28, 29

*Mont. Cannabis Indus. Ass'n v. State,*
    286 P.3d 1161 (Mont. 2012) .......................................................... 22

*Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.,*
    228 F.3d 1043 (9th Cir. 2000) ........................................................ 28

*Pickern v. Pier 1 Imps. (U.S.), Inc.,*
    457 F.3d 963 (9th Cir. 2006) ......................................................... 17

*Plyler v. Doe,*
    457 U.S. 202 (1982) ..................................................................... 27

*R.K. v. Lee,*
    575 F. Supp. 3d 957 (M.D. Tenn. 2021) ......................................... 2, 8

*Roberts v. U.S. Jaycees,*
    468 U.S. 609 (1984) ..................................................................... 20

*S. Bay United Pentecostal Church v. Newsom,*
    140 S. Ct. 1613 (2020) ............................................................. 19, 20

*Safeway Inc. v. City & Cnty. of S.F.,*
    797 F. Supp. 2d 964 (N.D. Cal. 2011) ............................................. 28

*Salinas v. Edwards Theatres,*
    2016 U.S. Dist. LEXIS 204627 (C.D. Cal. 2016) ........................... 1-2, 4

*Samper v. Providence St. Vincent Med. Ctr.*,
    675 F.3d 1233 (9th Cir. 2012) ....................................................... 6, 7

*Sch. Bd. of Nassau Cnty. v. Arline*,
    480 U.S. 273 (1987) ................................................................. 9-10, 22

*Silveira v. Lockyer*,
    312 F.3d 1052 (9th Cir. 2002) ............................................... 18, 29, 30

*Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*,
    4 F.4th 747 (9th Cir. 2021) ................................................................. 28

*State v. Nelson*,
    941 P.2d 441 (Mont. 1997) ................................................................ 21

*Sylvia Landfield Tr. v. City of L.A.*,
    729 F.3d 1189 (9th Cir. 2013) .......................................................... 18

*Tandon v. Newsom*,
    517 F. Supp. 3d 922 (N.D. Cal. 2021) ............................................... 20

*Taylor v. San Diego Cty.*,
    800 F.3d 1164 (9th Cir. 2015) .................................................... 15, 18

*Tucson Woman's Clinic v. Eden*,
    379 F.3d 531 (9th Cir. 2004) .................................................... *passim*

*United States v. Navarro*,
    800 F.3d 1104 (9th Cir. 2015) .......................................................... 28

*Wadsworth v. State*,
    911 P.2d 1165 (Mont. 1996) ............................................................. 21

*Whole Woman's Health v. Jackson*,
    142 S. Ct. 522 (2021) ....................................................................... 12

*Wong v. Regents of the Univ. of Cal.*,
    192 F.3d 807 (9th Cir. 1999) .............................................................. 5

## OTHER AUTHORITIES

FEDERAL RULES OF CIVIL PROCEDURE

Rule 8(a)(2) ........................................................................ 17

MONTANA CODE ANNOTATED

§ 49-2-312 ................................................................. 10, 18
§ 49-2-312(1)(b) ............................................................ 11
§ 49-2-312(3)(b) ......................................................... 8, 17
§ 49-2-312(3)(b)(ii) ........................................................ 11
§ 49-2-313 ................................................................. 18, 23
§ 50-5-101(26)(a) ...................................................... 30, 31
§ 50-5-103 ...................................................................... 31
§ 50-5-105(2)(a) ............................................................. 31
§ 50-5-112 ...................................................................... 31
§ 50-5-113(1) ................................................................. 31
§ 50-5-204(6) ................................................................. 31
§ 50-5-225 ...................................................................... 27
§ 50-5-226(8)(d) ............................................................ 15
§ 50-5-227(1)-(3) ........................................................... 15
§ 50-5-1101 .................................................................... 16
§ 53-6-109(1)          ..................................................... 16

ADMINISTRATIVE RULES OF MONTANA

Rule 37.106.313 ............................................................. 16
Rule 37.106.2802 .......................................................... 16
Rule 37.106.2809 .......................................................... 16
Rule 37.106.2816 .......................................................... 16
Rule 37.106.2855 .......................................................... 16

## ARGUMENT

## I. The Americans with Disabilities Act doesn't preempt HB 702.

This Court should deny Plaintiffs motion for summary judgment because they have failed to establish a prima facie case for an Americans with Disabilities Act claim.  Title I and Title III of the Americans with Disabilities Act require the Plaintiffs to show HB 702 prevents them from granting a reasonable accommodation to a request for accommodation. *Fortyune v. Am. Multi-Cinema, Inc.*, 364 F.3d 1075, 1082 (9th Cir. 2004)

After voluminous and probing discovery, Plaintiffs can't point to a single request for a reasonable accommodation that all staff get vaccinated.  S*ee Mannick v. Kaiser Found. Health Plan, Inc.,* 2006 U.S. Dist. LEXIS 57173, at *12 (N.D. Cal. 2006) (plaintiff bears the burden of proving that a modification was requested, and that the requested modification was reasonable); *see also Salinas v. Edwards Theatres,* 2016 U.S. Dist. LEXIS 204627, at *24–26 (C.D. Cal. 2016) (granting Defendant's

motion for summary judgment based on Plaintiff's failure to prove request was made).[1]

Plaintiffs say much but collectively fail to concretely demonstrate that HB 702 prevents them from providing all reasonable accommodations requested by disabled employees or patients. Doc. 82 at 20; *see E.T. v. Paxton*, 41 F.4th 709, 718 (5th Cir. 2022) ("It is plainly within the State's power to remove one possible accommodation from consideration, so long as other reasonable options remain.").

Plaintiffs primarily rely upon three cases to support their claims. Doc. 82 at 19, 23, 25. But each of those cases concerns *Title II* challenges—denials of government services or benefits. *See Crowder v. Kitagawa*, 81 F.3d 1840, 1843 (9th Cir. 1996); *R.K. v. Lee*, 575 F. Supp. 3d 957, 985 (M.D. Tenn. 2021); *Mary Jo C. v. N.Y. State & Local Ret. Sys.*, 707 F.3d 144, 155 (2d Cir. 2013). Plaintiffs challenge HB 702 under *Titles I and III* of the Americans with Disabilities Act. *See* Doc. 37, ¶¶ 30–44.

---

[1] Defendants incorporate prior arguments made at the summary judgment stage. Doc. 92 at 11–23. Federal courts strongly disfavor preemption in areas of historic state regulations such as nondiscrimination. *City of L.A. v. AECOM Servs.*, 854 F.3d 1149, 1159 (9th Cir. 2017); *Atay v. Cnty. of Maui*, 842 F.3d 688, 699 (9th Cir. 2016).

But Title I and Title III target different actors and Plaintiffs fail to aver necessary facts to establish the relevant claims.

A Title III claim requires, at a minimum, that a public accommodation "employed a discriminatory policy or practice" and "discriminated against the plaintiff based upon the plaintiff's disability by (a) failing to make a requested reasonable modification that was (b) necessary to accommodate the plaintiff's disability." *Fortyune*, 364 F.3d at 1082.  Plaintiffs fail to isolate any discriminatory policy or practice employed by the Institutional Plaintiffs.  Doc. 82 at 9–10.  They also fail to isolate any example where the Institutional Plaintiffs denied, even allegedly, a patient's request in a discriminatory fashion.  Doc. 93, ¶¶ 40–46, 59, 61–62, 77; *see also* Doc. 94.9 at 34–35 (Providence failed to produce any patient

accommodation requests under the Americans with Disabilities Act);
Doc. 94.10 at 6–7 (same).[2]

Plaintiffs' proffered generalities further highlight the want of spec-
ificity. *See E.T.*, 41 F.4th at 718 (state laws don't "prevent case-by-case
decisionmaking" if they retain reasonable options). Plaintiffs state that
"providers must individually assess a patient care encounter and deter-
mine whether the patient should only be treated by vaccinated staff."
Doc. 82 at 10. This misstates the legal framework. *See Fortyune*, 364
F.3d at 1082. It also presumes—without substantiation—that the only

---

[2] Doc. 83, ¶ 36 fails to substantiate this element. First, Dr. Stephens fails
to offer any documentary proof of this claim and during testimony admit-
ted that she doesn't "know for sure who makes" patient accommodation
decisions, but it isn't her. Doc. 129-2 at 10–11; *see also* Doc. 102 (motion
to exclude Dr. Stephens). Next, Providence failed to produce any docu-
ments substantiating the claim that Plaintiffs requested such accommo-
dations. Doc. 94.9 at 34–35; Doc. 94.10 at 6–7. Karyn Trainor testified
that of the 193 accommodation requests identified—but not produced—
by Providence it's "highly likely" that none of the requests involve accom-
modation requests based on the vaccination status of a Providence em-
ployee. Trainor Dep. at 66:3–17; *see also* Trainor Dep. at 67:9–22 (Prov-
idence hasn't been subject to any Americans with Disabilities Act com-
plaints since 2020). Finally, John O'Connor likewise couldn't recall "a
specific example" and Five Valleys asserted it possesses no documents
related to requests under the Americans with Disabilities Act. O'Connor
Dep. at 44:22–45:5; Doc. 93, ¶ 43. It is undisputed that Plaintiffs failed
to provide documentary evidence necessary to engage in the required
fact-specific analysis. *See Salinas*, 2016 U.S. Dist. LEXIS 204627, at
*24–26.

reasonable accommodation in such circumstances is mandatory staff-wide vaccination.  *See E.T.*, 41 F.4th at 718.

Plaintiffs, for example, proffer that "additional personal protective equipment" may be required in some circumstances.  Doc. 82 at 21.  Montana issued guidance clarifying that requiring all persons to use additional personal protective equipment would not run afoul of HB 702.  Doc. 93, ¶ 17.  This illustrates how Plaintiffs fail to satisfy the required analysis regarding the degree of risk involved, accommodations available, and whether in specific circumstances HB 702 prevents all reasonable accommodations required by the Americans with Disability Act in those specific circumstances.  *Cf. Wong v. Regents of the Univ. of Cal.*, 192 F.3d 807, 818 (9th Cir. 1999).

The record exposes the hollowness of Plaintiffs' Title III claim.  *See* Doc. 92 at 21–22.  The Individual Plaintiffs all received care at healthcare settings since HB 702.  Doc. 93, ¶¶ 18–19, 21–24.  Wallace Page received chemotherapy treatments more than 100 times all while being in a waiting room with "many of the sickest with COVID."  Doc. 93, ¶ 31.  Nevertheless, he acknowledges his healthcare providers maintained clean environments.  *Id.*  The Individual Plaintiffs—those allegedly at risk of

being deprived of their Title III rights—never documented a reasonable accommodation, never inquired into healthcare workers' vaccination status, and don't point to any instance when the vaccination status of a healthcare worker denied them access to healthcare services. Doc. 93, ¶¶ 18–24.

Plaintiffs' Title I claim somehow has even less evidentiary support. *See* Doc. 93, ¶¶ 18–19, 21–24, 40, 34, 58–59, 75–77 (Plaintiffs are unaware of any request made under Title I based on the vaccination status of healthcare workers in the past three years). The sole factual basis for Plaintiffs' Title I claim is that they "employ immunocompromised individuals." Doc. 82 at 22 (citing Doc. 83, ¶ 6). That falls far short of establishing the necessary elements of a Title I claim. *See Samper v. Providence St. Vincent Med. Ctr.*, 675 F.3d 1233, 1237 (9th Cir. 2012) (a Title I claim requires: "a qualified individual … able to perform the essential functions of the job with reasonable accommodation" who "suffered an adverse employment action because of her disability").

The record instead shows that Institutional Plaintiffs employ unvaccinated individuals but have no record of other employees submitting accommodation requests on that basis. Doc. 92 at 19–20. Prior to HB

702, Institutional Plaintiffs allowed unvaccinated workers to interact with patients, visitors, and other employees. *Id.* And Plaintiff Cheyenne Smith continued working in healthcare without seeking any reasonable accommodation from her employer. Doc. 93, ¶ 32. The factual deficiencies defeat the blanket preemption request. *See E.T.*, 41 F.4th at 718.

Plaintiffs' cited cases don't help them.[3] For example, in *Crowder*, visually impaired guide dog users proposed four alternatives to Hawai'i's 120-day quarantine for all dogs coming to the islands. 81 F.3d at 1482; *Crowder v. Kitagawa*, 842 F. Supp. 1257, 1266 (D. Haw. 1994). The Ninth Circuit remanded because, contrary to the district court, antidiscrimination laws could trump public health concerns. *Crowder*, 81 F.3d at 1485. But the Ninth Circuit declined to rule on if the proposed alternatives were reasonable because that is a fact-specific inquiry. *Id.* at 1485–86. Unlike here, the *Crowder* plaintiffs made a specific request that the courts could then analyze under the specific facts of that case for reasonableness.

---

[3] To the extent Plaintiffs rely on *Mary Jo C.*, that case again highlights the need for a "highly fact-specific" inquiry and not a blanket preemption request. 707 F.3d at 165.

Plaintiffs misuse and misunderstand *R.K.* and ignore what the district court decided in that case. *See R.K.*, 575 F. Supp. 3d. at 957 (Plaintiffs requested a modification to a statewide school mask mandate prohibition under Title II). The court enjoined the Tennessee law because the law "dictates exactly what is reasonable" under the Americans with Disabilities Act. *Id.* at 986 (the law established the reasonable accommodations available as maintaining six-feet distancing, limiting unmasked exposure to fifteen minutes, and dictating specific types of personal protective equipment). In short, the law impermissibly required a uniform outcome regardless of the case-specific facts. *Id.* Contrary to Plaintiffs' arguments, Doc. 82 at 23, HB 702 doesn't dictate any outcome from the interactive process. *See* MCA § 49-2-312(3)(b). It properly allows the reasonableness determination to occur on a case-by-case basis. Doc. 93, ¶¶ 96–97; *see also* Doc. 94-9 at 32–33 (objecting to discovery request on the basis that the phrase "reasonable accommodations" available under HB 702 is vague and undefined).

*E.T.* provides a closer parallel. 41 F.4th at 718. *E.T.* involved school masks and COVID-19. *Id.* at 713–14. Texas eliminated one possible accommodation, a mask mandate, while leaving open other

8

accommodations. *Id.* at 718. As the Fifth Circuit said, removing one accommodation while retaining others doesn't equate to "denying the children individualized assessment of their needs." *Id.*[4] HB 702—like the Texas order—leaves open an individualized assessment process.

The record demonstrates that other accommodation options exist because all Institutional Plaintiffs employed unvaccinated individuals pre- and post- HB 702 without triggering an Americans with Disabilities Act complaint. Doc. 93, ¶¶ 34, 37, 40–43, 58–63, 65, 73, 76–78, 81.

Accommodations can be provided to contagious individuals. *Cf. Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 284 (1987) ("Allowing discrimination based on the contagious effects of a physical impairment would be inconsistent with … ensur[ing] that handicapped individuals

---

[4] *E.T.* also parallels redressability issues in this case where the Plaintiffs' requested relief seeks to grant unfettered choice to entities who could instead continue policies that fail to alleviate the alleged injury. *Id.* at 721–22. The pertinent record demonstrates, prior to HB 702 Plaintiffs often didn't mandate vaccination, Doc. 93, ¶ 77, take any special precautions related to unvaccinated employees, Doc. 93, ¶¶ 36–37, or track staff vaccination status Doc. 93, ¶ 55. Intervenor entered into a collective bargaining agreement specifically prohibiting mandated vaccinations. Doc. 93, ¶ 88. Any plausible injuries from unvaccinated healthcare workers, therefore, predate HB 702 and won't be cured by this case. *See also* Doc. 104 at 7–8 (Plaintiffs' expert pontificated that anti-vaccine attitudes among healthcare workers pre-existed COVID-19 and HB 702).

are not denied jobs or other benefits because of the prejudiced attitudes or the ignorance of others."); *but see* Doc. 82 at 24 (alleging that MCA § 49-2-312 impermissibly "requires the accommodation measures be provided to the unvaccinated/nonimmune employee posing the infection risk."). "Few aspects of a handicap give rise to the same level of public fear and misapprehension as contagiousness." *Arline*, 480 U.S. at 284. Perceived contagiousness doesn't obviate the case-specific inquiries required to determine what reasonable accommodations should be provided to individuals. *See id.* at 287.

Plaintiffs understand this. After all, the Institutional Plaintiffs either didn't require vaccination or allowed for simple declinations for all vaccines. *See* Doc. 93, ¶¶ 34–37, 54–55, 61, 76, 79. Providence testified that "[Centers for Medicaid and Medicare Services] does not require the vaccination, knowing that there are exemptions that must be honored through, you know, civil rights, [Equal Employment Opportunity Commission], [Americans with Disabilities Act], and Montana human rights…." Doc. 95-1 at 336 (Karyn Trainor Deposition). Existing law has long prevented mandatory vaccination policies that preclude various exemptions.

That said, HB 702 allows health care facilities to implement reasonable accommodations "to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases." MCA § 49-2-312(3)(b)(ii). That process, if invoked, necessitates case-by-case determinations. Doc. 93, ¶¶ 96–97.

Plaintiffs' argument relies on conclusory hypotheticals. Doc. 82 at 21–22. These hypotheticals don't survive even casual scrutiny. For example, if a patient requests the accommodation of only being treated by vaccinated staff at a physician's office, the provider can grant or deny the request or propose alternatives. *See Crowder*, 81 F.3d at 1485. If denied, or if the patient refuses proposed alternatives, the "determination of what constitutes a reasonable modification is highly fact-specific, requiring case-by-case inquiry." *Id.* at 1486. If granted, HB 702 applies only if the provider discriminates based on an employee's vaccination status. *See* MCA § 49-2-312(1)(b). That would require the patient's accommodation request to constitute discrimination against an employee *who then* actually alleges discrimination. If the employee files a complaint, the Montana Human Rights Bureau must investigate. Doc. 93, ¶¶ 96–97. The responding party may raise affirmative defenses, including that the

11

Americans with Disabilities Act required the patient's accommodation request, prior to the State imposing liability. *Cf. Whole Woman's Health v. Jackson*, 142 S. Ct. 522, 530 n.1 (2021) (constitutional defenses can serve as an affirmative defense to administrative enforcement actions). The entire inquiry—and each successive step—requires evaluation of case-specific facts.

Plaintiffs cannot shortcut the accommodation process. *See E.T.*, 41 F.4th at 718. They, moreover, cannot shortcut a process that hasn't even started. Doc. 93, ¶¶ 21, 23, 40, 43, 59, 75–77; *see also* Doc. 94.9 at 34–35 (Providence failed to produce any patient accommodation requests under the Americans with Disabilities Act); Doc. 94.10 at 6–7 (same). Plaintiffs cannot shirk their evidentiary burden under the guise of a preemption challenge. *See E.T.*, 41 F.4th at 718 ("Because the [Americans with Disabilities Act] does not require clairvoyance, the burden falls on the plaintiff … to request an accommodation in direct and specific terms.").

This Court should deny Plaintiffs motion for summary judgment on Claims I & II and grant Defendants' motion.

## II. HB 702 doesn't violate Equal Protection.

### A. The Individual Plaintiffs lack standing.

"[A]t the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element" of standing. *Ctr. for Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 (9th Cir. 2018). Only those "personally denied" equal treatment have a cognizable injury under Article III. *Braunstein v. Ariz. DOT*, 683 F.3d 1177, 1185 (9th Cir. 2012) (quoting *Allen v. Wright*, 468 U.S. 737, 755 (1984)); *accord Carroll v. Nakatani*, 342 F.3d 934, 940 (9th Cir. 2003).

Individual Plaintiffs cannot demonstrate injury because HB 702 doesn't regulate them. HB 702 regulates employers and public accommodations. As patients, Individual Plaintiffs are not subject to legal penalties for violations. Because they don't belong to the class of persons that HB 702 purportedly discriminates against, they cannot show injury. *See Kim v. Holder*, 603 F.3d 1100, 1104 (9th Cir. 2010).

The patients suggest HB 702 precludes them from benefitting from environments that mandate universal vaccinations. There's no possible injury, however, because plaintiffs lack a protected interest. *See Interpipe Contr., Inc. v. Becerra*, 898 F.3d 879, 904 (9th Cir. 2018) ("To have

standing to press its equal protection claim, ABC-CCC must instead show that the law deprives it of some cognizable fundamental right guaranteed to other similarly situated entities."). In *Interpipe*, a trade association challenged disparate treatment between union and non-union business, but the Ninth Circuit held that the association lacked standing for an equal protection claim because "[t]he law applies to employers, and so [plaintiff] cannot show that SB 954 causes an equal protection injury to *itself*." *Id.* at 904 (emphasis in original). Likewise, the Individual Plaintiffs cannot show an injury because HB 702 doesn't regulate them.[5]

## B. Institutional Plaintiffs aren't similarly situated.

To prevail on an Equal Protection claim, plaintiffs must show that a class that is similarly situated has been treated disparately. *Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017). Plaintiffs must identify "a control group composed of individuals who are similarly situated to those in the classified group in respects that are relevant to the state's challenged policy." *Boardman v. Inslee*, 978 F.3d 1092, 1117 (9th Cir. 2020) (internal quotations omitted). Parties are similarly

---

[5] As discussed in Defendants' Brief in Support of Summary Judgment, the Individual Plaintiffs don't qualify for third-party standing. *See* Doc. 92 at 37. Defendants hereby incorporate that argument by reference.

situated only when they are "arguably indistinguishable." *Engquist v. Or. Dep't of Agric.*, 553 U.S. 591, 601 (2008) (quotation marks and citation omitted); *accord Erickson v. Cty. of Nev.*, 607 F. App'x 711, 712 (9th Cir. 2015).

Plaintiffs appear to identify "healthcare providers" generally as the necessary control group for institutional Plaintiffs.  Doc. 82 at 26.  First, Montana law already regulates different healthcare providers differently.  Hospitals such as Providence are regulated under Title 50 while offices of private physicians such as Five Valleys and Western Montana are regulated under Title 37.  *See* Doc. 92 at 31.

The State regulates the facilities HB 702 exempts differently than Plaintiffs.  *See Taylor v. San Diego Cty.*, 800 F.3d 1164, 1169 (9th Cir. 2015) (two groups of civilly committed individuals were not similarly situated because state "ha[d] enacted a detailed statutory scheme distinguishing the two classifications of mentally ill individuals.").  Assisted living facilities, for example, follow a separate licensing and regulatory scheme under Title 50, which includes different licenses based on the populations served.  *See, e.g.*, MCA §§ 50-5-227(1)-(3), 50-5-226(8)(d) (standards for operating assisted living facilities).  Long-term care

15

facilities have their own regulatory scheme.  *See, e.g.*, MCA §§ 50-5-1101, *et seq.*, 53-6-109(1) (rulemaking consultation); 50-5-1104(3) (rights of residents), 50-5-1205(4) (compliance and enforcement); 50-5-301 (certificate of need); Mont. Admin. R. 37.106.2855 (infection control); Mont. Admin R. 37.106.313 (communicable disease control); Mont. Admin. R. 37.106.2802, 37.106.2809 (licensing); Mont. Admin. R. 37.106.2816 (staffing).

Plaintiffs have proffered no specific facts demonstrating that the exempted facilities are "arguably indistinguishable" from the non-exempt facilities.  *See Hill St. Health Servs. LLC v. Cty. of L.A.*, 2016 U.S. Dist. LEXIS 192359, at *21 (C.D. Cal. Nov. 16, 2016) (dismissing claim because plaintiff failed to demonstrate sufficient similarities).

Plaintiffs also claim that HB 702 allows patients in exempted facilities to receive care differently than patients in hospitals or physician offices.  But even if this were true—and Plaintiffs adduce no facts to establish it—any differences in care would be justified by the inherent differences among various providers, borne out by the State's differentiated regulatory scheme.

16

Finally, Plaintiffs add a new claim that wasn't asserted in their complaint. They now challenge that physician offices such as Western Montana and Five Valleys are treated differently than "healthcare facilities" (such as Providence) because MCA § 49-2-312(3)(b) permits licensed healthcare facilities to ask employees about vaccination status and take certain actions depending on the response. *See* Doc. 82 at 17. But their complaint doesn't allege that or distinguish between Institutional Plaintiffs. At all points, physician offices are lumped together with hospitals for purposes of the Equal Protection analysis. *See* Doc 37 at ¶ 73 ("There is no state interest or rational basis for treating OPPs or Hospitals, such as FVU, WMC, and PH&S, differently than other types of Montana health care facilities."); *accord id.*, ¶ 71.

The Court shouldn't consider this new Equal Protection claim. *See Pickern v. Pier 1 Imps. (U.S.), Inc.*, 457 F.3d 963, 968 (9th Cir. 2006) (citing Fed.R.Civ.P. 8(a)(2)); *Hasan v. E. Wash. State Univ.*, 485 F. App'x 169, 171 (9th Cir. 2012); *accord Feezor v. Patterson*, 896 F. Supp. 2d 895, 903 (E.D. Cal. 2012). But even if it does, as discussed in Part II(C)(3), *infra*, the two groups aren't similarly situated because they're regulated

by the State under entirely different licensing schemes. *Taylor*, 800 F.3d at 1169.

### C. HB 702 satisfies Rational Basis.

#### 1. Legal Standard

"Governmental action is rationally related to a legitimate goal unless the action is clearly arbitrary and unreasonable, having no substantial relation to public health, safety, morals, or general welfare." *Sylvia Landfield Tr. v. City of L.A.*, 729 F.3d 1189, 1193 (9th Cir. 2013). Plaintiffs must negate "every conceivable basis which might support it, whether or not the basis has a foundation in the record." *Boardman*, 978 F.3d at 1118 (quoting *Heller v. Doe*, 509 U.S. 312, 320 (1993)). The Court "must attempt to identify any hypothetical rational basis for the exception." *Silveira v. Lockyer*, 312 F.3d 1052, 1090 (9th Cir. 2002).

#### 2. HB 702 furthers compelling and legitimate interests.

Plaintiffs expend considerable effort positing that the entirety of HB 702—not just the exemption in § 49-2-313—is arbitrary and irrational. *See* Doc. 82 at 31 ("MCA 49-2-312 … is antithetical to the proper exercise of a state's police power—elevating individual rights over the

public good.").[6]  Plaintiffs fundamentally misunderstand the State's police power—and for that matter, how democratic self-government works.

Plaintiffs promote a tortured understanding of *Jacobsen v. Massachusetts* 197 U.S. 11 (1905)—a case involving the State's power to infringe on individual autonomy to *require* vaccinations—in arriving at the conclusion that it's somehow beyond the power of the Legislature to prohibit employment discrimination based on vaccination status.  *See* Doc. 82 at 20.  According to Plaintiffs, it's not the Legislature that sets the proper balance between non-discrimination and public health, but the Plaintiffs and their cherry-picked group of "experts."  The People of Montana didn't elect Plaintiffs or their experts, and the police power isn't a one-way ratchet.

"Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J., concurring in denial of application for injunctive relief) (quoting *Jacobson*, 197 U. S. at 38).  "When [public] officials 'undertake to act in areas fraught with medical and scientific

_____

[6] Plaintiffs don't raise a Substantive Due Process challenge to HB 702.

uncertainties,' their latitude 'must be especially broad.'" *Tandon v. Newsom*, 517 F. Supp. 3d 922, 949 (N.D. Cal. 2021) (quoting *South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring).  Although "[t]his traditional 'police power' includes authority over compulsory vaccination …. ***It also includes, as a general matter, power to prohibit vaccination from being compelled***." *Brnovich v. Biden*, 562 F. Supp. 3d 123, 157 (D. Ariz. 2022) (emphasis added).

With that in mind, HB 702 safeguards several important interests.

First, the State possesses a compelling interest in preventing discrimination.  *See Hurley v. Irish-Am. Gay*, 515 U.S. 557, 572 (1995) ("[Anti-discrimination provisions] are well within the State's usual power to enact when a legislature has reason to believe that a given group is the target of discrimination, and they do not, as a general matter, violate the First or Fourteenth Amendments.").  The State "enjoys broad authority to create rights of public access on behalf of its citizens." *Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *Boy Scouts of Am. v. Dale*, 530 U.S. 640, 657 (2000) (compelling interest in eliminating discrimination in public accommodations); *Christian Legal Soc'y v. Eck*, 625 F. Supp. 2d 1026, 1051 (D. Mont. 2008) ("[T]he state has a compelling interest in

eliminating discrimination.").  Plaintiffs never contest the State's compelling interest in preventing discrimination.

Second, HB 702 protects Montanans' fundamental right to pursue employment.  *See Wadsworth v. State*, 911 P.2d 1165, 1176 (Mont. 1996). During the 2021 Legislative Session, Montanans were concerned about losing their jobs if they declined the new COVID-19 vaccines.[7]

HB 702 also protects individuals' right to privacy.  This includes the privacy associated with traditional medical records.  *See State v. Nelson*, 941 P.2d 441, 448 (Mont. 1997) ("Medical records are quintessentially private and deserve the utmost constitutional protection.").  It also includes public disclosure of vaccination status.  *Tucson Woman's Clinic v. Eden*, 379 F.3d 531, 551 (9th Cir. 2004) ("Individuals have a constitutionally protected interest in avoiding disclosure of personal matters,

---

[7] *See, e.g.*, Associated Press, *Bill in Montana will prohibit work discrimination based on vaccine status*, ABC10.COM (Apr. 27, 2021) ("Republican Sen. Tom McGillvray of Billings said last week in presenting the bill in the Senate …. 'There are employers ... that are requiring and coercing employees to get vaccinations under threat of termination and intimidation.'"), https://www.abc10.com/article/news/health/coronavirus/vaccine/bill-prohibit-work-discrimination-based-vaccine-passport/507-e3f2bb38-9077-4fd7-9018-c0362be40011; David Sherman, *COVID vaccinations mandatory for employees at Benefis*, KRTV.COM (Apr. 8, 2021), https://www.krtv.com/news/great-falls-news/employee-covid-vaccinations-mandatory-at-benefis-not-at-great-falls-clinic.

including medical information.") (internal quotations omitted); *cf Arline*, 480 U.S. at 284.

HB 702 also protects the fundamental right of individuals to reject medical treatment and make their own medical decisions about vaccines. *See Mont. Cannabis*, 286 P.3d at 1166.[8]  The Montana Legislature, relatedly, sought to protect individuals from the growing stigma and draconian measures associated with not receiving the new COVID-19 vaccine.[9]

Finally, Plaintiffs miss the plot entirely when claiming that "[t]here is no supportable rational basis for prohibiting certain healthcare providers from requiring vaccination, when other Montana statutes specifically require vaccination in schools and daycares."  Doc. 82 at 21. First, rational basis allows the State to regulate different types of entities differently.  *See First Resort, Inc. v. Herrera*, 860 F.3d 1263, 1279 (9th Cir.

---

[8] *See, e.g.*, Eileen Sullivan, et al., *States swiftly pause the use of Johnson & Johnson's vaccine after a U.S. advisory*, N.Y. TIMES (Apr. 13, 2021), https://www.nytimes.com/2021/04/13/us/states-johnson-vaccine-pause.html.

[9] *See, e.g.*, Fran Kritz, *The Vaccine Passport Debate Actually Began In 1897 Over A Plague Vaccine*, NPR (Apr. 8, 2021) ("'This train [of vaccine certification] has already left the station because people want to know that the people around them are immunized,' says Dr. Chris Beyrer … at the Johns Hopkins Bloomberg School of Public Health.").

2017) ("[A] legislative body may choose to implement different regulatory schemes for different entities without offending the Equal Protection Clause."). Second, if anything, that's part of HB 702's basis. Most individuals will still receive the required vaccinations. The more important the vaccine, the more likely members of the public are to receive it. And vice versa. HB 702 just ensures individuals aren't targeted for discrimination if they choose to decline vaccinations outside of the school and daycare setting.

### 3. *MCA § 49-2-313 satisfies rational basis.*[10]

As a threshold matter, a state may not only implement different regulatory schemes for different entities, *Herrera*, 860 F.3d at 1279, but also hold some types of medical facilities to a more stringent regulatory scheme than others—even if they perform similar services. In *Tucson Woman's Clinic*, 379 F.3d 531 (per Thomas, J.), the Ninth Circuit upheld a statutory and regulatory scheme that required licensing and regulation of any medical facility in which five or more first trimester abortions in

---

[10] Individual Plaintiffs' claims are subject to rational basis because the right to seek health is not implicated. Defendants hereby incorporate their arguments in Doc. 92 at 32–36.

any month or any second or third trimester abortions were performed. *Id.* at 537.

The plaintiffs alleged that violated the "equal protection rights of physicians and their patients by distinguishing between those who provide abortions and those who provide other comparably risky medical services." *Id.* The distinction satisfied rational basis because "the law [was] facially related to health and safety issues, and no evidence [was] presented that [was] sufficient to create an issue of material fact as to whether there is a stigmatizing or animus based purpose to the law." *Id.* at 546. States, thus, have broad leeway when regulating healthcare providers. The State already regulates different healthcare facilities differently. *See* Part (II)(B), *infra*.

The Governor's Amendatory Veto added the exemption to "ensure that provisions of HB702 do not put licensed nursing homes, long-term care facilities, or assisted living facilities, in violation of regulations or guidance issued by the U.S. Centers for Medicare and Medicaid Services." Doc. 93, ¶ 11. Plaintiffs claim that's irrational because "[h]ospitals crucially rely on CMS conditions of participation, but they are not included

as Exempted Facilities." Doc. 85 at 14. That's improper second-guessing of the Legislature.

As of May 2021, the Centers for Medicare and Medicaid Services had never before required any vaccinations as a condition of participation, Doc. 93, ¶ 90, and it didn't until November 5, 2021—six months after HB 702 became law. *See Heller v. Doe*, 509 U.S. 312, 321 (1993) (The classification need only "find some footing in the realities of the subject addressed by the legislation"). It was entirely plausible—and rational— that it would only require vaccinations as a condition of participation for residential facilities such as licensed nursing homes, long-term care facilities, or assisted living facilities. *See FCC v. Beach Commc'ns*, 508 U.S. 307, 320 (1993) ("The assumptions underlying these rationales may be erroneous, but the very fact that they are arguable is sufficient.") (internal quotation marks omitted); *Heller*, 509 U.S. at 320 ("[A] legislative choice is not subject to courtroom factfinding and may be based on rational speculation unsupported by evidence or empirical data.").

Plaintiffs also claim the statute is irrational because assisted living facilities don't have to follow Centers for Medicare and Medicaid Services conditions of participation. Doc. 82 at 34. The Legislature rationally

concluded that the unique circumstances at the exempted facilities warranted the exemption. *See Bd. of Trs. v. Garrett*, 531 U.S. 356, 366-67 (2001) ("[W]here a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation.") (cleaned up); *cf. Tucson Woman's Clinic*, 379 F.3d at 545 ("There is clear room for disagreement about the effects of treating abortion differently than other services … However, legislatures are more properly suited than courts to predicting these effects….").

It was well-documented in May 2021 that residents of the exempted facilities were some of the most acute victims of COVID-19.[11]  The Centers for Medicare and Medicaid Services endorsed this very rationale just days after HB 702 became law.   Doc. 93, ¶¶ 13–14.

The combination of congregate settings and elderly populations in the exempted facilities warranted special protection. *Id.; see also, e.g.,*

---

[11] *See, e.g.*, Shaylee Ragar, *Montana COVID-19 Nursing Home Death Rate Ranks Second In The Nation*, MONTANA PUBLIC RADIO (Dec. 10, 2020), https://www.mtpr.org/montana-news/2020-12-10/montanacovid-19-nursing-home-death-rate-ranks-second-in-the-nation.

MCA § 50-5-225 (assisted living facilities may not hire certain persons, must provide personal services, and assistance with daily living).

To balance competing interests, the State may delineate exemptions in a statute. As a prime example, in *Tucson Woman's Clinic* the plaintiffs also claimed the State's regulatory scheme discriminated between doctors who provided more abortions and those who provided fewer abortions. 379 F.3d at 543. The State's asserted interest was an "attempt to balance the additional requirements that licensing would impose upon abortion providers with the desire to protect the health and welfare of women seeking abortions." *Id.* at 547 (internal quotation marks omitted). The court noted, "[g]enerally, such line drawing survives rational basis review because it 'account[s] for limitations on the practical ability of the State to remedy every ill.'" *Id.* at 547 (quoting *Plyler v. Doe*, 457 U.S. 202, 216 (1982)). It concluded that "[w]hile we might imagine more precise ways to estimate practice size … we cannot say that the classification chosen by the Arizona legislature as a proxy for relative administrative burden is so absurd as to be irrational on its face." *Id.*

So even if Plaintiffs were correct that the types of patients and services offered at exempted and non-exempted facilities overlap to varying

extents, the State needn't draw a precise line when determining which entities are subject to HB 702. It may balance the health and safety of patients with the State's antidiscrimination interests. *See Slidewaters LLC v. Wash. State Dep't of Labor & Indus.*, 4 F.4th 747, 759–60 (9th Cir. 2021) (classifications that are under- or over-inclusive do not create constitutional violations); *United States v. Navarro*, 800 F.3d 1104, 1114 (9th Cir. 2015) ("A classification does not fail rational-basis review because it is not made with mathematical nicety or because in practice it results in some inequality.") (quotations omitted); *Nat'l Ass'n for the Advancement of Psychoanalysis v. Cal. Bd. of Psych.*, 228 F.3d 1043, 1052 (9th Cir. 2000); *Gazelka v. St. Peter's Hosp.*, 420 P.3d 528, 535 (Mont. 2018); *Culinary Studios, Inc. v. Newsom*, 517 F. Supp. 3d 1042, 1073–74 (E.D. Cal. 2021); *Safeway Inc. v. City & Cnty. of S.F.*, 797 F. Supp. 2d 964, 971–73 (N.D. Cal. 2011).

Plaintiffs cite *Merrifield v. Lockyer*, 547 F.3d 978 (9th Cir. 2008), which held there was no rational basis for a licensing scheme that specifically exempted some pest controllers based on the type of pest controlled. *Id.* at 992. But this holding was based on two critical factors that aren't present here. First, "the record highlight[ed] that the irrational singling

out of three types of vertebrate pests from all other vertebrate animals was designed to favor economically certain constituents at the expense of others similarly situated." *Id.* at 991. Second, there was also a Due Process challenge to the licensing scheme and the only rationale supporting the exemption directly contradicted the rationale used by the court to survive the Due Process challenge. *See id.* at 991 ("We cannot simultaneously uphold the licensing requirement under due process based on one rationale and then uphold Merrifield's exclusion from the exemption based on a completely contradictory rationale."); *see also Allied Concrete & Supply Co. v. Baker*, 904 F.3d 1053, 1065 (9th Cir. 2018) (noting that Merrifield "presented a unique set of facts" and that "the classification in the licensing scheme did not survive constitutional muster because it contradicted the very interest the State proffered to defeat the due process claim"). Those factors aren't present here.

In *Silveira*, 312 F.3d 1052, exemptions in the State's ban on so-called "assault weapons" for retired police offers didn't survive rational basis because the exemption was not for law enforcement purposes and "any exception … unrelated to effective law enforcement is directly contrary to the act's basic purpose of eliminating the availability of high-

29

powered, military-style weapons and thereby protecting the people of California from the scourge of gun violence." *Id.* at 1090. The Court could "discern no legitimate state interest in permitting retired peace officers to possess and use for their personal pleasure military-style weapons." *Id.* at 1091. It, therefore, "arbitrarily and unreasonably afford[ed] a privilege to one group of individuals that is denied to others[.]" *Id.* In contrast, the Legislature had ample reason to exempt nursing homes, assisted living facilities, and long-term care facilities due to the residential aspect and the high-volume of vulnerable patients served. *See, e.g.*, Doc. 93, ¶¶ 13–15.

### 4. Physician offices have no Equal Protection Claim.

In their new Equal Protection claim, the physician providers claim there's no rational basis for HB 702 permitting "[h]ealth care facilities," as defined in MCA § 50-5-101(26)(a), to treat employees differently based upon vaccination status if they implement "reasonable accommodation measures," but not physician offices. Doc. 82 at 17. The State's regulatory scheme, however, already treats them differently. *See Herrera*, 860 F.3d at 1279; *Tucson Woman's Clinic*, 379 F.3d at 546.

Hospitals like Providence are licensed "healthcare facilities" and regulated under Title 50.  MCA § 50-5-101(26)(a). Five Valleys and Western Montana are regulated separately under Title 37 (professions and occupations).  *See* MCA § 50-5-101(26)(b); *see also* Doc. 93, ¶¶ 33, 51. Physician providers aren't required to become licensed health care facilities and may operate with simply a business license.  *Id.*

There are burdens and benefits within any regulatory scheme.  The physician providers chose the less-burdensome licensing scheme.  Doc. 93, ¶¶ 33, 51. Licensed healthcare facilities are subject to the rules and minimum standards adopted under MCA § 50-5-103.  Those facilities must open their entire premises and records to inspection at all reasonable times.  MCA § 50-5-204(6).  They're subject to civil and criminal penalties.  *See* MCA § 50-5-112; MCA § 50-5-113(1).  They "may not refuse to admit a person to the facility solely because the person has an HIV-related condition."  MCA § 50-5-105(2)(a).  None of that applies to Five Valleys and Western Montana.

HB 702 permits licensed healthcare providers subject to Title 50's regulatory scheme to implement reasonable accommodation measures for employees, patients, visitors, and other unvaccinated or nonimmune

persons.  Western Montana and Five Valleys have declined to become Title 50 facilities but now want the (purported) benefits HB 702 provides to those facilities.  They may accept that tradeoff by becoming licensed health care facilities.

Second, despite Plaintiffs' claim that "[p]hysician offices provide a wide array of crucial primary and specialty care to high-risk individuals," there's ample reason to treat Title 50 facilities differently.  First, Plaintiffs put forth no evidence on the relative number of high-risk patients treated by Western Montana and Five Valleys.  Defendants requested that information in discovery but plaintiffs objected.  Doc. 94-9 at 30–32.  There's therefore no evidence that they serve a similar percentage of vulnerable patients.

Finally, the record belies the physician offices' asserted need to be treated like a Title 50 facility due to the provision of care to high-risk individuals.  Prior to HB 702, Five Valleys and Western Montana didn't require their employees to disclose their vaccination status for any vaccine.  Doc. 93, ¶ 34; Doc. 93, ¶¶ 54, 55.  Nor did they require any special precautions related to unvaccinated or non-immune employees.  Doc. 93, ¶36; *id.*, ¶ 60.  They also didn't take those employees' vaccination status

into account when determining whether employees could interact with patients.  Doc. 93, ¶ 37; *id.*, ¶ 61

Nevertheless, prior to HB 702, Five Valleys felt it "did everything in [its] power[] to make the environment safe for employees and patients alike." Doc. 93, ¶ 39; *see also id.*, ¶¶ 40–46 (lack of accommodation requests or complaints/violations due to employees' vaccination status). And prior to HB 702, Western Montana never provided any reasonable accommodations based on the vaccination status of other employees. *Id.*, ¶¶ 57–59.  The State takes the physicians' offices at their word.

Plaintiffs essentially argue that the State must force all health care providers to follow identical protocols for preventing the spread of communicable diseases.  Yet, one piece of evidence is instructive.  Providence and Western Montana operate in the same building in Missoula and share common space on Floors 4 and 5. Doc. 129-1 at 3.  During the onset of the COVID-19 pandemic, Providence noted on March 13, 2020, that "WMC has a different set of guidelines" related to COVID-19 which "could put Providence caregivers and patients at risk."  *Id.*  Providence operated under a different set of guidelines than Western Montana because they're different types of facilities.

CONCLUSION

After extensive discovery, Plaintiffs have failed to carry their burden to demonstrate that HB 702 conflicts with the Americans with Disabilities Act or violates the guarantee of Equal Protection. The Court should deny Plaintiffs' motion and grant Defendants' motion.

DATED this 16th day of September, 2022.

Austin Knudsen
Montana Attorney General

DAVID M.S. DEWHIRST
  Solicitor General

*/s/ Christian B. Corrigan*
CHRISTIAN B. CORRIGAN
  *Deputy Solicitor General*
BRENT MEAD
  *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
christian.corrigan@mt.gov.
brent.mead2@mt.gov

*Attorneys for Defendants*

34

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 6,498 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/   *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: September 16, 2022          /s/ *Christian B. Corrigan*
CHRISTIAN B. CORRIGAN

35