AUSTIN KNUDSEN
Montana Attorney General
DAVID M.S. DEWHIRST
 *Solicitor General*
CHRISTIAN B. CORRIGAN
 *Deputy Solicitor General*
BRENT MEAD
 *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
david.dewhirst@mt.gov
christian.corrigan@mt.gov
brent.mead2@mt.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MONTANA,
MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, ET. AL., | No. CV-21-108-M-DWM |
| *Plaintiffs,* | |
| and | **DEFENDANTS' DISPUTED STATEMENT OF FACTS** |
| MONTANA NURSES ASSOCIATION, | |
| *Plaintiff-Intervenors,* | |
| v. | |
| AUSTIN KNUDSEN, ET AL., | |
| *Defendants.* | |

Pursuant to Local Rule 56.1(b), Defendants respectfully file Statement of Disputed Facts in opposition of Plaintiffs' Motion for Summary Judgment and Plaintiff-Intervenor's Motion for Summary Judgment.

As a preliminary matter, many of these facts are in the nature of "legislative facts" as opposed to "adjudicative facts." Legislative facts "are those which have relevance to legal reasoning and the lawmaking process." Fed. R. Evid. 201, Advisory Committee Note. They do not usually concern the immediate parties but are general facts which help the tribunal decide questions of law, policy, and discretion. *Marshall v. Sawyer*, 365 F.2d 105, 111 (9th Cir. 1966) (quotation marks omitted). They are in other words "facts relevant to shaping a general rule," *Indiana H. B. R.R. Co. v. American Cyanamid Co.*, 916 F.2d 1174, 1182 (7th Cir. 1990) (Posner, J.), that "have salience beyond the specific parties to [a] suit," *Carhart v. Gonzales*, 413 F.3d 791, 799 (8th Cir. 2005), *rev'd*, 550 U.S. 124 (2007). Legislative facts therefor provide the Court with considerable flexibility.

Adjudicative facts, on the other hand, are "about the parties and their activities, businesses, and properties, as distinguished from general facts which help the tribunal decide questions of law and policy and

discretion." *Langevin v. Chenango Court, Inc.*, 447 F.2d 296, 300 (2d Cir. 1971) (Friendly, C.J.) (quotation marks and citation omitted).  They "are simply the facts of the particular case."  Fed. R. Evid. 201, Advisory Committee Note.

With these principles in mind, it is not difficult to separate the legislative facts from the adjudicative facts in this case.  Examples of adjudicative facts include the Plaintiffs' assertions regarding their business operations and the facts of specific reasonable accommodation requests.  By contrast, facts involving the efficacy of vaccines and the State's interest in regulating the health and welfare of its citizens "hinge on social, political, economic, or scientific facts," and thus fall into the category of "legislative facts."  *State v. Erickson*, 574 P.2d 1, 5-6 (Alaska 1978).

In assessing legislative facts, "the judge is unrestricted in his investigation and conclusion.  He may reject the propositions of either party or of both parties.  He may consult the sources of pertinent data to which they refer, or he may refuse to do so.  He may make an independent search for persuasive data or rest content with what he has or what the parties present."  Fed. R. Evid. 201, Advisory Committee Note (quotation marks omitted); *see also Daggett v. Commission on Governmental Ethics*

*& Election Practices,* 172 F.3d 104, 112 (1st Cir. 1999) (Boudin, J.) ("[S]o-called 'legislative facts' . . . usually are not proved through trial evidence but rather by material set forth in the briefs."). Because of this, appellate courts review legislative fact findings *de novo. See United States v. Singleterry*, 29 F.3d 733, 740 (1st Cir. 1994).

1. *Vaccines are safe and effective at preventing disease. Decl. Justin K. Cole, ¶ 2, Aug. 26, 2022 ("Decl. Counsel") Ex. 1: Decl. David King , ¶¶ 6, 24, 25, July 15, 2022 ("King Report"); Decl. Counsel ¶ 3, Ex. 2: Decl. David Taylor , ¶¶ 5, 15-20; 26-28, 65, July 15, 2022 ("Taylor Report"); Decl. Counsel ¶ 8, Ex. 7: Expert Report of Lauren Wilson, ¶ 10-11, July 15, 2022 ("Wilson Report"); Decl. Counsel ¶ 4, Ex. 3: Expert Report of Holzman, ¶ 6, July 15, 2022 ("Holzman Report"); Decl. Counsel ¶ 5, Ex 4: Decl. Bonnie Stephens, ¶ 15, July 15, 2022 ("Stephens Report"); Decl. Counsel ¶ 9, Ex. 8: Dep. David Taylor, 35:16-20; 68:23-70:12; 93:17-95:17, Aug. 4, 2022 ("Dep. Taylor").*

Disputed. Plaintiffs speak to *all* vaccines for *all* diseases, but repeated testimony demonstrates that specific vaccines vary in efficacy and safety. Plaintiffs' experts, when they support their opinions, speak only to COVID-19—not to all other vaccines. Doc. 100 at 11 (noting Dr.

Wilson's admission that she is "not a virologist"); Doc. 102 at 9–10 (describing deficiencies in Dr. Stephens' statements on infection diseases); Doc. 104 at 6–10 (explaining the unsupported and unreliable nature of Dr. King's testimony on non-COVID-19 diseases); Doc. 106 at 8 (noting that Dr. Taylor only cites COVID-19 studies to support his opinion on all vaccine preventable diseases); Doc. 108 (identifying Holzman's expert report as failing to cite any meaningful or relevant data on infectious diseases.  This bears particular importance for vaccines such as Pertussis, which indisputably affords only waning protection, but Plaintiffs failed to establish its efficacy or for how long the vaccine is efficacious.  Doc. 115-2 at 41:14–42:21 (Stephens Dep.).

Moreover, the safety of a given vaccine varies.  The Food and Drug Administration recently restricted the Johnson and Johnson COVID-19 vaccine based on safety concerns for certain population groups.  U.S. FOOD & DRUG ADMINISTRATION, CORONAVIRUS UPDATE: FDA LIMITS USE OF JANSSEN COVID-19 VACCINE TO CERTAIN INDIVIDUALS (May 5, 2022) (attached as Exhibit 1 to Mead Decl.).

Defendants dispute the efficacy of the COVID-19 vaccine at reducing transmission.  Doc. 86-5, ¶¶ 46–60 (Dr. Bhattacharya testified

COVID-19 vaccines are ineffective at preventing Omicron infections); Doc. 86-6 at 5–20 (Dr. Duriseti testifying that COVID-19 vaccines are ineffective at reducing COVID transmission both pre- and post-Omicron).

*2.     Vaccines reduce the risk of individuals contracting and transmitting vaccine-preventable illnesses. Decl. Counsel ¶ 6, Ex. 5: Expert Report of Jayanta Bhattacharya, ¶¶ 5; 17; 34, July 15, 2022 ("Bhattacharya Report"); King Report, ¶¶ 8-11, 21, 24; Taylor Report, ¶ 6-11, 62; Holzman Report, ¶ 13.*

Disputed.  Plaintiffs speak to *all* vaccines for *all* diseases, but repeated testimony demonstrates that specific vaccines vary in efficacy. *See supra* at ¶ 1.

Dr. Bhattacharya speaks only to COVID-19 and severity of illness; Doc. 86-5, ¶ 17, and his later testimony expressly refutes that COVID-19 vaccines "reduce the risk of individuals contracting and transmitting" COVID-19.  Doc. 86-5, ¶¶ 46–60.

King's Report at ¶ 8 is irrelevant for reasons previously stated.  Doc. 104 at 9 n.4.  King's Report at ¶¶ 9–11, 21, 24 concerns only COVID-19 and those facts are in dispute.  Doc. 86-5, ¶¶ 46–60.

Taylor's Report at ¶¶ 6–11 simply doesn't state any facts related to the efficacy of the vaccines mentioned related to contraction or transmission of disease.  These opinions also fail to quantify any change in risk or substantiate any such opinion with relevant studies, research, and methodologies.  Taylor's Report at ¶ 62 concerns only COVID-19.  His opinion is in dispute and subject to a motion in limine.  Doc. 86-5, ¶¶ 46–60; Doc. 106 at 10.

Holzman's Report at ¶ 13 fails to substantiate the opinion with any specific facts as to the reduction in risk to contraction and transmission of a specific disease related to a specific vaccine.  As previously stated, the Pertussis vaccine wanes in efficacy.  Doc. 115-2 at 41:14–42:21.  And COVID-19 vaccines are ineffective at reducing transmission and infection.  Doc. 86-5, ¶¶ 46–60.

3.    *Both vaccination and natural/recovered immunity through prior infection protects an individual from severe disease and disease spread.  Decl. Counsel ¶ 7, Ex. 6: Expert Report of Ram Duriseti, at 19, 24, July 15, 2022 ("Duriseti Report"); Bhattacharya Report, ¶¶ 5, 17, 34; King Report, ¶ 6, 12; Taylor Report, ¶¶ 7, 56.*

Disputed.  Plaintiffs speak to *all* vaccines for *all* diseases, but repeated testimony demonstrates that specific vaccines vary in efficacy.  As previously stated, it is highly disputed that COVID-19 vaccination reduces disease spread, or that all vaccines reduce disease spread similarly. *See supra* ¶¶ 1–2.

Defendants don't dispute that natural immunity provides at least as robust and durable protection against COVID-19 reinfection as vaccinations.  Doc. 86-5, ¶¶ 17–23.  Nor do Defendants' dispute that sterilizing vaccines for diseases like Measles reduce disease severity.  Doc. 86-6, ¶ 23.  Defendants note, however that even with sterilizing vaccines, there remains a risk of disease transmission from vaccinated individuals.  Doc. 86-6, ¶¶ 23–24.

Taylor's Report at ¶ 56 relates only to COVID-19.  Doc. 106 at 10. Taylor also testified that the Omicron strain evades *both* vaccination and natural immunity.  *Id.*; *see also* Doc. 117-4 at 14 (Taylor Rebuttal Report) ("Natural infection will not stop this (COVID-19) outbreak").

King's Report at ¶ 12 states, "The publicized and incorrect contention that immunity derived from natural infection is both highly effective and highly durable has contributed to vaccine avoidance and abetted the

destructiveness of the current pandemic."  While Defendants agree that, specific to COVID-19, natural immunity provides at least as durable protection as vaccination from severe disease and reinfection, Doc. 86-5, ¶¶ 17–23, Plaintiffs grossly misstate the opinions of their own experts.

4.     *An individual's immunity to disease, through vaccination or otherwise, reduces the likelihood that the individual will spread disease to another.  Bhattacharya Report, ¶¶ 26, 34; King Report, ¶¶ 21, 32-33.*

Disputed.  Defendants dispute this statement applies to all diseases.  *See supra*, ¶¶1–3.  The parties specifically disagree on the efficacy of COVID-19 vaccines at reducing disease transmission.  *See supra*, ¶¶ 1–3.

Dr. Bhattacharya's Report shows the COVID-19 vaccines rapidly wane in efficacy at reducing rates of infection.  Doc. 86-5, ¶ 26.  At ¶ 34, he states regarding COVID-19, "there is no medical or scientific reason to believe that vaccine immunity will prove longer-lasting immunity than recovered immunity, much less more durable immunity."  He also clarified that natural immunity also wanes, if less so than vaccine immunity. Doc. 86-5, ¶ 32.  Plaintiffs' overbroad 'fact' misses the scientific nuance at issue.

King's Report at ¶ 21 relates only to COVID-19 and the efficacy of such vaccines at reducing disease severity.  Doc. 86-1, ¶ 21 ("mRNA vaccines, while not as effective at preventing infection with Omicron, remain very effective in preventing severe disease.").  King only refers to COVID-19 in ¶¶ 32–33.  Doc. 104 at 6–7.  He also fails to buttress his opinions there with any supporting studies, research, or methodologies.  *Id.*

   5.   *Vulnerable and immunocompromised individuals seek healthcare from Montana physicians, hospitals and other healthcare facilities.  Stephens Report, ¶ 10-12; Holzman Report, ¶ 9; King Report, ¶¶ 42, 50; Taylor Report, ¶ 55; Decl. Counsel ¶ 38, Ex. 37: Excerpts of Pls.' Resp. Defs.' First Combined Disc. Req. at 23, July 29, 2022 ("Ex. 37"); Decl. Counsel ¶ 39, Ex. 38: Pls.'4th Supp. Resp. Defs.' 1st Combined Disc. Resp. at 2-9, Aug. 19, 2022.*

Defendants acknowledge that immunocompromised individuals have successfully sought care, without adverse incident, at physician offices and hospitals since the passage of HB 702.  Doc. 93, ¶¶ 25–26, 31, 44–46, 62, 80.

Disputed in so far as "seek healthcare" means that all healthcare settings provide similar services, under similar regulations, or even serve

similar populations.  Doc. 92 at 36–43; Doc. 130 at 10–31; Doc. 131 at 20–40.

6.      *Healthcare settings employ individuals who are particularly vulnerable or at higher risk of harm or death if they acquire an infectious disease, including those with disabilities.  Holzman Report, ¶ 10; Decl. Counsel ¶ 17, Ex. 16: 30(b)(6) Dep. Five Valleys Urology, 47:6-23, Aug. 9, 2022 ("Dep. Five Valleys"); Decl. Counsel ¶ 12, Ex. 11: 30(b)(6) Dep. Providence Health and Services, Montana – K. Trainor, 18:19-19:6, Aug. 10, 2022 ("Dep. Providence – Trainor"); Decl. V. Byrd, ¶¶ 8-9, 15 August 26, 2022 ("Decl. Byrd"), filed contemporaneously herewith.*

Disputed.  Holzman's report states that healthcare settings employ people, which is undisputed.  Doc. 86-3, ¶ 10.  He says these individuals "could be" at a higher risk.  *Id.*  Could indicates possibility, not actuality.  Holzman does not substantiate this possibility in any meaningful way, either through documentation, or categorizing the risk based on any specific variables.

Five Valleys Urology testified it provided an accommodation to one employee concerned about the vaccination status of others, not that that

individual was at "a higher risk of harm or death."  Doc. 86-15 at 47:6–23.

Providence testified that it encouraged staff to receive vaccinations but did not testify they employed individuals at "a higher risk of harm or death."  Doc. 86-11 at 18:19–19:6.

Intervenor represented "[n]o documents are known to be in its possession" regarding the claim that Montana Nurses Association has members that have a compromised immune system that qualify as disabilities under the Americans with Disabilities Act.  Doc. 110 at 3–5.  As Defendants assert elsewhere, Vicky Byrd's assertions lack foundation and contradict representations made during discovery.  *Id.*

7.  *Healthcare workers are more likely to be exposed to infectious diseases than the general population, and more likely to come into contact with individuals who are vulnerable and at high-risk of contracting and being harmed by infectious diseases.  Taylor Report, ¶ 55; Holzman Report, ¶¶ 8-9; Decl. Byrd, Ex. B:  OSHA "Healthcare/Infectious Diseases."*

Defendants do not dispute that healthcare workers face occupational exposure to infectious diseases.  Defendants dispute that Plaintiffs' generalized statement that healthcare workers "are more likely" to be

exposed and "more likely to come into contact" is supported. As Doc. 85-3 at 2 says, "not all workers in the same healthcare facility, not all individuals with the same job title, and not all healthcare facilities will be at equal risk of occupational exposure to infectious agents."

8.    *Vaccine-preventable diseases pose a risk of death and serious illness to individuals, particularly to vulnerable or immunocompromised individuals. King Report, ¶ 5; Taylor Report, ¶ 29; Bhattacharya Report, ¶ 15; Holzman Report, ¶¶ 4, 8; Wilson Report, ¶ 16; Stephens Report, ¶¶ 5, 8, 10-11.*

Disputed.  The specific risks for a specific disease depends on numerous factors, including age.  *See* Doc. 86-5 at ¶¶ 13–14 (COVID-19 poses a vanishingly small risk to the young).  Plaintiffs' experts fail to detail the varying risks in a meaningful way. *See* Doc. 100; Doc. 102; Doc. 104; Doc. 106; Doc. 108 (Defendants' motions in limine to exclude or limit Plaintiffs' experts' testimony).

9.    *Health conditions such as cancer, kidney transplant, diabetes, and other diseases are physical impairments that impact one or more major life activities. Stephens Report, ¶ 11; King Report, ¶ 18; Wilson Report,*

*¶ 17; Decl. Counsel ¶ 15, Ex. 14: 30(b)(6) Dep. Montana Human Rights Bureau, 92:17-93:21 Aug. 22, 2022. ("Dep. HRB").*

Disputed.  Plaintiffs' experts aren't experts in compliance with the Americans with Disabilities Act, and "physical impairment" is a term of art within that statutory framework.  Doc. 112 at 6 (motion to exclude Plaintiffs' improper attempt at eliciting a legal conclusion from a 30(b)(6) witness); *see also* Doc. 100 (motion to exclude Wilson's opinions); Doc. 102 (motion to exclude Stephens' opinions); Doc. 104 (motion to exclude King's opinion).

*10.   Infants in the neonatal intensive care unit (NICU) and patients in cancer care settings most often have physical impairments that impact major life activities because of their underlying disease processes and disabilities.  Stephens Report, ¶ 11.*

Disputed.  *See* Doc. 102 (motion to exclude Stephens' opinions).

*11.   The young, the elderly and others with severe chronic disease face a higher mortality risk if infected with disease.  Bhattacharya Report, ¶ 13; King Report, ¶ 19; Holzman Report, ¶ 9; Wilson Report, ¶ 17; Stephens Report, ¶ 5-11; Taylor Report, ¶ 55.*

Disputed.  Risks based on age depend upon the specific disease in question.  For example, COVID-19 poses a vanishingly small risk to the young.  Doc. 86-5 at ¶¶ 13–14.  Plaintiffs' experts fail to detail specific risks to specific groups associated with specific diseases.  *See* Doc. 100 (motion to exclude Wilson's opinions); Doc. 102 (motion to exclude Stephens' opinions); Doc. 104 (motion to exclude King's opinions, or limit to COVID-19); Doc. 106 (motion to limit Taylor's opinions to COVID-19); Doc. 108 (motion to limit Holzman's opinions).

*12.    Immunocompromised individuals with disabilities are more susceptible to vaccine-preventable illnesses and at increased risk of serious harm or death from such illnesses.  King Report, ¶¶ 39, 42; Stephens Report, ¶ 11; Taylor Report, ¶ 55.*

Disputed.  Specific risks depend on multiple factors.  Doc. 86-6 at 24 (a 90% vaccination coverage rate prevents certain disease outbreaks); *see also* Doc. 93 at ¶ 6 (Montana exceeds a 90% vaccination coverage rate for measles); Doc. 86-2 at ¶ 7 (Plaintiffs' expert acknowledges the theory of herd immunity).  King's Report applies only to COVID-19 in this respect.  Doc. 104 at 6; *see also* Doc. 106 at 11 (same for Taylor).  Plaintiffs' experts also fail to provide a reliable methodology to quantify this risk.

Doc. 102 (motion to exclude Wilson's opinions); Doc. 104 at 7; Doc. 106 at 11.

13.   *Certain immunocompromised individuals should not be exposed to unvaccinated individuals, including unvaccinated healthcare workers. King Report, ¶¶ 42, 44; Taylor Report, ¶ 55, Holzman Report, ¶ 20; Stephens Report, ¶¶ 5-8; Decl. Mark Carpenter, ¶¶ 3-6, Aug. 25, 2022, filed contemporaneously herewith.*

Disputed.  Prior to HB 702, Five Valleys Urology cared for immunocompromised patients without taking any special precautions related to unvaccinated or nonimmune staff.  Five Valleys Urology was not subject to any complaints based on these policies.  Doc. 93 at ¶¶ 34–37, 39, 44–46.  Prior to HB 702, Western Montana Clinic did not require any staff vaccinations and did not actively track employees' vaccination status.  Doc. 93 at ¶¶ 54–55, 57.  During this time Western Montana Clinic allowed employees to care for patients regardless of vaccination status.  Doc. 93 at ¶ 61.  Western Montana Clinic was not subject to any adverse actions for violations of legal or ethical obligations because of these policies.  Doc. 93 at ¶ 62.  Prior to HB 702, Providence didn't mandate any vaccinations.  Doc. 93 at ¶¶ 79, 81–82.  Providence allowed unvaccinated

and nonimmune caregivers to treat patients. Doc. 93 at ¶ 82. Providence was not subject to any adverse actions for violations of a legal or ethical obligation based on these policies. Doc. 93 at ¶ 80. The Individual Patients also all received care without requesting a reasonable accommodation such as being treated by only vaccinated healthcare workers. Doc. 93, ¶¶ 18–24, 31. In fact, the Individual Plaintiffs never inquired into their caregiver's vaccination status. Doc. 92 at ¶ 20.

14. *Infants in the NICU setting have compromised immune systems and are particularly vulnerable to infectious disease. Stephens Report, ¶ 5; Wilson Report, ¶ 17.*

Disputed subject to Defendants' motions to exclude the testimony of Wilson and Stephens. *See* Doc. 100; Doc. 102.

15. *Infants in the NICU are too young to receive vaccinations to protect them from vaccine preventable illness. Stephens Report, ¶¶ 5, 9; Wilson Report, ¶ 17.*

Disputed. Childhood vaccination schedules vary by vaccine. For example, the Centers for Disease Control recommends the first Hepatitis B dose at birth. *Child and Adolescent Immunization Schedule*, Centers for Disease Control and Prevention, (last updated Feb. 17, 2022).

17

Whether a specific individual can receive a specific vaccine at a specific time depends on individualized judgments.  *See also* Doc. 100 (motion to exclude Wilson's opinions); Doc. 102 (motion to exclude Stephens' opinions).

*16.    It is standard of care in a NICU setting to confirm the vaccination and/or immunity status of all individuals working in, and providing care to, patients in the NICU.  Wilson Report, ¶ 23; Stephens Report, ¶¶ 5, 6-8.*

Disputed.  This 'fact' states a legal conclusion as to the relevant standard of care.  *See infra* ¶¶ 33–34; *see also* Doc. 100 (motion to exclude Wilson's opinions); Doc. 102 (motion to exclude Stephens' opinions).

*17.    Pertussis is a highly contagious disease that is fatal in young infants.  Wilson Report, ¶ 16; Stephens Report, ¶ 8; Taylor Report, ¶ 29.*

Disputed that pertussis infection is necessarily fatal.  Also disputed that Montana experiences a high number of cases of pertussis.  National Center for Immunization and Respiratory Diseases, 2021 Provisional Pertussis Surveillance Report (2022), available online at https://www.cdc.gov/pertussis/downloads/pertuss-surv-report-

2021_PROVISIONAL.pdf (last accessed on September 16, 2022) (Montana had one reported case of pertussis in 2021).[1]

18.   *Infectious disease prevention is critical in healthcare settings. Stephens Report, ¶ 5; Wilson Report, ¶ 17; King Report, ¶ 23.*

Disputed.  Infectious disease prevention balances risks against factors like costs, burdens and individual autonomy.  Doc. 93 at ¶¶ 76, 79; *see also* Doc. 115-3 at 65:8–12 (Dr. King doesn't "assault … children with a needle" if parents refuse to authorize a vaccination).

19.   *Infection prevention protocols promote public health.  Decl. Counsel ¶ 10, Ex. 9: 30(b)(6) Dep. Montana Department of Public Health and Human Services, 76:11-13 Aug. 18, 2022 ("Dep. DPHHS"); Ex. 8: Dep. Taylor 35:16-36:12.*

Disputed.  While public health certainly informs these protocols, they also take into account factors other than public health such as individual autonomy.  *E.g.*, Doc. 93 at ¶¶ 76, 79.

20.   *The health and safety of healthcare workers is in the interest of the Department of Labor and Industry.  Decl. Counsel ¶ 11, Ex. 10:*

---

[1] Attached as Ex. 2 to Mead Decl.

*30(b)(6) Dep. Montana Department of Labor and Industry, 50:15-51:7 Aug. 18, 2022 ("Dep. DLI").*

Disputed, because this 'fact' calls for a legal conclusion. Doc. 112 at 6.

*21.   Vaccine-preventable diseases have not gone away; the viruses and bacteria that cause illness and death still exist and can be passed on to those who are not protected by vaccines or otherwise immune.  Taylor Report, ¶ 29; Wilson Report, ¶ 12; King Report, ¶¶ 46, 49.*

Disputed.  Disputed that vaccines prevent transmission or infection of all diseases.  Doc. 86-5 at ¶¶48–60; Doc. 86-6 at 23 (even those vaccinated with a sterilizing vaccine can become infected and transmit a disease).  Undisputed that COVID-19 vaccines have not eliminated COVID-19.  Doc. 86-5 at ¶¶ 48–60.

*22.   There have been both measles outbreaks and pertussis outbreaks in Montana.  Wilson Report, ¶¶ 14-15.*

Disputed that the last measles outbreak in Montana, in 1989–90, is relevant to this case.  Undisputed that a measles outbreak occurred in 1989–90.  Disputed that Montana has had a pertussis outbreak since

passage of HB 702. *See* Mead Decl., Ex. 2 (Montana had one case of pertussis in 2021).

> 23. *Available vaccines for Measles, Mumps and Rubella (MMR), Tetanus, Diptheria and Pertussis (TDaP), Polio, Varicella (chickenpox), and Hepatitis B are effective at reducing the risk of disease and should be required in the healthcare setting. Duriseti Report, at 20-21; King Report, ¶ 23; Taylor Report, ¶¶ 7-24; Stephens Report, ¶¶ 6-8.*

Disputed. Dr. Duriseti's report at 20–21 refers to influenza and that studies don't support mandatory influenza vaccinations in health care settings. Doc. 86-6 at 20–21. King's Report merely offers an unsupported declaration. Doc. 86-1, ¶ 23; Doc. 104 at 6. Taylor's Report at ¶¶ 15–24 concerns school-based vaccination programs, not health care settings. Doc. 86-2, ¶¶ 15–23. His report at ¶¶ 7–14 likewise detail what vaccines exist, not their efficacy at reducing risk generally or in health care settings specifically. Stephens' Report too offers conclusions without support. Doc. 86-4, ¶¶ 6–8; Doc. 102 at 7–9.

The idea that these vaccines should be *required* is belied by Plaintiffs' pre-HB 702 policies that did not require any of these vaccines. Doc. 93, ¶¶ 34, 54, 57, 79, 88.

24.    *MMR, TDaP, Polio, Varicella, and Hepatitis B vaccines are all approved by the FDA.  Taylor Report, ¶ 26.*

Undisputed.

25.    *The MMR vaccine for Measles and the Hepatitis B vaccine effectively eliminate infection risk and provide protection from severe illness.  Duriseti Report, at 22, 24-25; King Report, ¶ 23; Taylor Report, ¶¶ 7-24; Stephens Report, ¶¶ 6-8; Wilson Report, ¶ 10; Holzman Report, ¶ 6.*

Disputed.  Dr. Duriseti made clear that "even in the context of Measles and Hepatitis B vaccines, 'sterilizing' is a relative term."  Doc. 86-6 at 23.  Vaccinated individuals for both Measles and Hepatitis B can still become infected and transmit the disease to others.  Doc. 86-6 at 23–25.  In other words, the risk of infection and severe disease, while reduced, isn't eliminated.

As previously stated, Plaintiffs' experts (King, Taylor, Stephens, Wilson, and Holzman) fail to substantiate this claim.  *See supra* at ¶¶ 1–2 (Plaintiffs' experts generally fail to support any opinions on vaccine efficacy, but when they do, such opinions are limited to COVID-19).

26.     *Measles is a respiratory virus that transmits through either aerosol, droplets or surface contact, and is highly contagious.  Duriseti Report, at 22; Wilson Report, ¶ 13.*

Undisputed.

27.     *In the case of Measles and Hepatitis B, there is a major component of the infection that is bloodborne, "such that blood-borne vaccine or infection induced antibodies can perform a pivotal role in preventing infection."  Duriseti Report, at 22-23.*

Disputed.  Dr. Duriseti made clear that "even in the context of Measles and Hepatitis B vaccines, 'sterilizing' is a relative term."  Doc. 86-6 at 23.  Vaccinated individuals for both Measles and Hepatitis B can still become infected and transmit the disease to others.  Doc. 86-6 at 23–25.

28.     *Vulnerable, non-vaccine eligible populations are more susceptible to infection during an outbreak of a disease.  Duriseti Report, at 23-24.*

Disputed.  Plaintiffs' statement is overbroad.  The part of the Report cited deals with a study of a Measles outbreak and the fact that 41% of the cases occurred in previously vaccinated individuals.  Doc. 86-6 at 23.  Dr. Duriseti gave an opinion that 90% vaccination coverage prevents

such outbreaks.  Doc. 86-6 at 24.  Montana exceeds that level of vaccination coverage.  Doc. 93, ¶ 6.  Further, Defendants dispute that COVID-19 vaccines are effective at reducing COVID-19 transmission and infection. Doc. 86-5, ¶¶ 46–60; Doc. 86-6 at 5–20.

29.    *"Hepatitis B is transmitted through body fluid contact. Duriseti Report, at 24.*

Undisputed.

30.    *Given the benefits of vaccines such as MMR and the Hepatitis B vaccine, "clearly demonstrated reduction in transmission with high community vaccination rates requires more consideration than one's personal autonomy." Duriseti Report, at 25.*

Disputed in so far Plaintiffs infer this means health care workers should be required to receive any vaccine.  *See supra*, ¶23; *infra*, ¶ 32; *see also* Doc. 93, ¶ 76; Doc. 95-1 at 336 (Providence testified that "[Centers for Medicaid and Medicare Services] does not require the vaccination, knowing that there are exemptions that must be honored through, you know, civil rights, [Equal Employment Opportunity Commission], [Americans with Disabilities Act], and Montana human rights…."

31.   *"[C]aregivers who do not accept such "sterilizing vaccines" where said vaccination can markedly attenuate transmission when community vaccine coverage is more than 90%, may need to accept special precautions when caring for vulnerable populations." Duriseti Report, at 25–26.*

Disputed in so far as the quote only speaks to the Measles, Mumps, Rubella and Hepatitis B vaccines and that the quote doesn't call for mandatory vaccinations.  *See supra*, ¶ 30; *infra*, ¶ 32.  The quote is also limited to a contingency that doesn't presently exist in Montana.  *See* Doc. 93, ¶ 6 (Montana's vaccination coverage for Measles, Mumps, and Rubella exceeds 90%).

32.   *Special precautions that should be required of unvaccinated workers "may include, but are not limited to, use of fit-tested N95 masking, enhanced barrier precautions, and even surveillance testing." Duriseti Report, at 26.*

Disputed.  First, the quote only speaks to the Measles, Mumps, Rubella and Hepatitis B vaccines.  *See supra*, ¶¶ 31–32.  Second, Dr. Duriseti doesn't say these precautions "should be required."  Doc. 86-6 at 26.  He says they "should be entertained."  *Id.* ("Entertain" means "to

consider; contemplate." *The American Heritage Dictionary*, Second College Edition 456 (1985)).  Further, specifically to Hepatitis B, Plaintiffs—in conformance with the Occupational Safety and Health Act—offered the vaccine to exposed workers, regardless of vaccination status, but did not require the vaccine.  Doc. 93, ¶¶ 48, 79.  Finally, Five Valleys Urology did not require any special precautions related to unvaccinated or nonimmune employees.  Doc. 93, ¶ 36.

33.    *Standard of care and medical ethical principles require healthcare providers to treat individuals in an individualized manner. King Report, ¶¶ 34, 38; Stephens Report, ¶ 12.*

Disputed.  Plaintiffs assert a legal conclusion, not a fact.  Doc. 102 at 10 (Stephens' Report proffers an unsupported legal conclusion masquerading as a factual opinion).  King's Report at ¶ 34 merely recites Hippocrates as a binding obligation.  And at ¶ 38, he offers a generalized opinion on health care providers' obligations.  Doc. 86-1, ¶¶ 34, 38; Doc. 104 at 6.  Even if Plaintiffs assertions are 'facts' they are so general as to carry no meaning.

34.    *Standard of care and medical ethical principles call for healthcare providers to require vaccination and/or confirmed immunity*

*status when treating patients, particularly immunocompromised patients. King Report, ¶¶ 35; 45; Wilson Report, ¶¶ 22-23; Stephens Report, ¶¶ 5-8, 12, 14; Holzman Report, ¶ 12.*

Disputed.  Plaintiffs assert a legal conclusion not a fact.  Doc. 100 at 9; Doc. 102 at 10–11; Doc. 104 at 6–7.  Prior to HB 702, Five Valleys Urology cared for immunocompromised patients without taking any special precautions related to unvaccinated or nonimmune staff.  Five Valleys Urology was not subject to any complaints based on these policies. Doc. 93 at ¶¶ 34–37, 39, 44–46.  Prior to HB 702, Western Montana Clinic did not require any staff vaccinations and did not actively track employees' vaccination status.  Doc. 93 at ¶¶ 54–55, 57.  During this time Western Montana Clinic allowed employees to care for patients regardless of vaccination status.  Doc. 93 at ¶ 61.  Western Montana Clinic was not subject to any adverse actions for violations of legal or ethical obligations because of these policies.  Doc. 93 at ¶ 62.  Prior to HB 702, Providence didn't mandate any vaccinations.  Doc. 93 at ¶¶ 79, 81–82.  Providence allowed unvaccinated and nonimmune caregivers to treat patients.  Doc. 93 at ¶ 82.  Providence was not subject to any adverse actions for

violations of a legal or ethical obligation based on these policies.  Doc. 93 at ¶ 80.

35.     *The Clinic, Five Valleys, and Providence all employ more than fifteen employees.  Decl. Counsel ¶ 14, Ex. 13: 30(b)(6) Dep. Western Montana Clinic 13:9-13 Aug. 8, 2022. ("Dep. Clinic"); Ex. 16: Dep. Five Valleys 12:12-15; Ex. 37 at 41.*

Undisputed.

36.     *Patients in Montana have requested to be treated by vaccinated staff. Stephens Report, ¶ 14; Ex. 11: Dep. Providence – Trainor 37:23-38:10; Ex. 16: Dep. Five Valleys 44:22-45:6.*

Disputed.  Dr. Stephens fails to offer any documentary proof of this claim and during testimony admitted that she doesn't "know for sure who makes" patient accommodation decisions.  Doc. 129-2 at 48:17–49:2.  She also admitted she is not "the one" who assesses reasonable accommodations under the Americans with Disabilities Act.  Stephens Dep. at 49:3–14.  In short, that portion of her report lacks foundation.  *See* Doc. 102.  Next, Providence failed to produce any documents substantiating the claim that plaintiffs requested such accommodations.  Doc. 94-9 at 34–35; Doc. 94-10 at 6–7.  Karyn Trainor also testified that of the 193

accommodation requests identified, but not produced, by Providence it is "highly likely" that none of the requests involve accommodation requests based on the vaccination status of a Providence employee. Doc. 95-1 at 396 lines 66:3–17; *see also* Doc. 95-1 at 397 lines 67:9–22 (Providence hasn't been subject to any Americans with Disabilities Act complaints since 2020). Finally, John O'Connor likewise fails to establish this element because he could not recall "a specific example" and Five Valleys Urology asserted it possesses no documents related to requests under the Americans with Disabilities Act. Doc. 86-15 at 44:22–45:5; Doc. 93, ¶ 43. The record shows the Institutional Plaintiffs treated immunocompromised patients without receiving any such documented requests. Doc. 93, ¶¶ 40–46, 59, 61–62, 77; *see also* Doc. 94-9 at 34–35 (Providence failed to produce any patient accommodation requests under the Americans with Disabilities Act); Doc. 94.10 at 6–7 (same). The Individual Patients also all received care without requesting a reasonable accommodation. Doc. 93, ¶¶ 18–24, 31.

37. *Patient requests to be treated by vaccinated staff should be honored. Stephens Report, ¶ 14; Ex. 11: Dep. Providence – Trainor 39:1-5; Ex. 13: Dep. Clinic 80:16-81:2.*

Disputed.  *See supra* ¶ 36.  Stephens' opinion lacks a credible foundation.  *Id.*  Providence also failed to produce any documents that any such requests were made, much less honored.  *Id.*  Instead, the record shows Providence allowed its unvaccinated caregivers to treat patients. Doc. 93 at ¶ 82.  Prior to HB 702, Western Montana Clinic never took an employee's vaccination status into account when determining whether that employee could interact with patients.  Doc. 93 at ¶ 61.

38.    *Vaccination requirements have been a common staple of healthcare in America.  King Report, ¶ 35; Wilson Report, ¶ 18; Stephens Report, ¶ 13; Decl. Byrd, ¶¶ 19-20.*

Disputed.  Government vaccine mandates are an extraordinary exercise of a state's police power and prior to the COVID-19 vaccination requirement for healthcare workers the federal government had *never* required vaccinations.  Doc. 93 at ¶¶ 89–90; Doc. 94-9 at 51 (Response to Request for Admission No. 6).  As to health care facilities, the Plaintiffs in this case show that none of them required vaccinations prior to HB 702.  Doc. 93 at ¶¶ 34–35, 54, 73, 88.  The Montana Nurses Association strongly opposes vaccination requirements that don't allow exemptions.

Doc. 93 at ¶ 85.  Montana Nurses Association members similarly oppose mandatory vaccinations without exemptions.  Doc. 93 at ¶ 87.

39.   *A healthcare provider or healthcare facility needs to know a caregiver's actual (not presumed) vaccination status, and take meaningful steps to address situations where unvaccinated workers seek to treat patients.  King Report, ¶ 35; Wilson Report, ¶¶ 18, 22-23; Stephens Report, ¶ 12; Holzman Report, ¶¶ 12, 16; Duriseti Report, p. 25-26.*

Disputed.  *See supra* ¶¶ 33–34; *infra* ¶ 46.  The record also demonstrates that Five Valleys Urology and Western Montana Clinic did not actively track or take staff vaccination into account when providers treated patients.  *See supra* ¶ 34.  Providence allowed unvaccinated, or nonimmune, caregivers to treat patients.  *See supra* ¶ 34.  Prior to the COVID-19 vaccination rule, Medicaid and Medicare surveyors did not investigate a facility's vaccination policy, including whether the facility tracked staff vaccinations.  Doc. 93 at ¶ 94.  Plaintiffs also mischaracterize Dr. Duriseti's report.  *See supra* ¶¶ 30–32.  Finally, Plaintiffs' experts offer unsupported opinions.  *See* Doc. 100 at 8–9 (motion to exclude Wilson's opinions); Doc. 102 at 10 (motion to exclude Stephens' opinion); Doc. 104 at 9–10 (motion to exclude King's opinion); Doc. 108 at 7 (motion to

exclude Holzman's opinion).  Ultimately, this "fact" speaks to a legal conclusion.

40.    *Medical standard of care principles require knowing and addressing the immunization status of healthcare workers in healthcare settings, particularly settings where physicians and other providers provide treatment to vulnerable patient populations, such as intensive care settings, neonatal or pediatric intensive care settings, and cancer care settings, among others.  King Report, ¶ 35; Wilson Report, ¶ 23; Holzman Report, ¶ 12; Stephens Report, ¶ 5-8.*

Disputed.  *See supra* at ¶¶ 33–34, 39; *infra* ¶ 46.  As with the previously referred paragraphs, this fact involves a legal conclusion as to Plaintiffs' legal obligations.  Plaintiffs' experts offer unsupported legal conclusions to this effect.  *See* Doc. 100 at 8–9 (motion to exclude Wilson's opinions); Doc. 102 at 10 (motion to exclude Stephens' opinion); Doc. 104 at 9–10 (motion to exclude King's opinion); Doc. 108 at 7 (motion to exclude Holzman's opinion).

41.    *Healthcare facilities and workers have an obligation to comply with national standards of care in the care and treatment of patients. King Report, ¶ 36; Stephens Report, ¶ 12.*

Disputed for reasons previously stated.  *See supra* ¶¶ 33–34.

42.    *A health care provider needs to be able to treat unvaccinated staff members differently from vaccinated staff members when patient care circumstances require it.  King Report, ¶ 40; Wilson Report, ¶¶ 22-23; Holzman Report, ¶¶ 12, 17-19; Stephens Report, ¶ 14; Ex. 11: Dep. Providence – Trainor 39:1-5; Ex. 13: Dep. Clinic 80:16-81:2; Ex. 16: Dep. Five Valleys 39:16-40:1, 43:25-44:5.*

Disputed.    *See supra* ¶¶ 33–34, 39–40; *infra* ¶¶44–46.    Dr. Bhattacharya's report disputes the necessity of COVID-19 vaccination mandates.  Doc. 86-5 at ¶¶ 61–67.

43.    *Exposing patients to non-vaccinated healthcare workers exposes patients to higher risk of injury or death.  King Report, ¶ 50; Wilson Report, ¶ 19; Taylor Report, ¶ 49; Holzman Report, ¶ 8; Stephens Report, ¶ 11.*

Disputed.  All of the Institutional Plaintiffs employ unvaccinated workers.  Doc. 93, ¶¶ 50, 63, 81.  All of the Institutional Plaintiffs allowed unvaccinated workers to interact with patients.  Doc. 93, ¶¶ 36, 63, 82. None of the Institutional Plaintiffs faced any adverse action based on

legal or ethical obligations, or under relevant conditions of participation in Medicare and Medicaid.  Doc. 93, ¶¶ 44, 62, 80.

Plaintiffs' experts offer unsupported opinions.  *See* Doc. 100 at 8–9 (motion to exclude Wilson's opinion); Doc. 102 at 9 (motion to exclude Stephens' opinion); Doc. 104 at 6 (motion to exclude King's opinion); Doc. 106 at 10 (motion to exclude Taylor's opinion).  Holzman's testimony concerns occupational exposure risk.  Doc. 86-3 at ¶ 8; *see also* Doc. 85-3 at 2 ("not all workers in the same healthcare facility, not all individuals with the same job title, and not all healthcare facilities will be at equal risk of occupational exposure to infectious agents.").  Each of these opinions fails to quantify the heightened risk generally, much less specifically by disease, patient condition, or variables like ventilation and personal protective equipment.

*44.    When treating a vulnerable, immunocompromised patient, a facility needs to perform an individualized assessment of whether a reasonable accommodation is available to the patient absent an undue hardship or direct threat to the hospital's operations, including the safety of its patients.  King Report, ¶ 39; Stephens Report, ¶ 11; Ex. 11: Dep. Providence – Trainor 44:5-12; 44:21-45:4.*

Disputed.  This 'fact' seemingly conflates mere treatment of an immunocompromised patient with an automatic request for a reasonable accommodation.  But the record shows the Institutional Plaintiffs treated immunocompromised patients without receiving any such documented requests.  Doc. 93, ¶¶ 40–46, 59, 61–62, 77; *see also* Doc. 94-9 at 34–35 (Providence failed to produce any patient accommodation requests under the Americans with Disabilities Act); Doc. 94-10 at 6–7 (same).  The Individual Patients also all received care without requesting a reasonable accommodation.  Doc. 93, ¶¶ 18–24, 31.

Moreover, this 'fact' also seemingly states that a hospital could refuse to treat a patient if that patient poses a direct threat the safety of other patients.  But other laws require treatment of such patients in certain circumstances.  *E.g.* 42 U.S.C. § 1395dd (Emergency Medical Treatment and Labor Act).

Finally, Plaintiffs' experts offer unsupported legal opinions.  Doc. 102 at 10; Doc. 104 at 9.

45.    *A failure to engage in the interactive process with an individual with a disability constitutes discrimination under the ADA.  Ex. 14: Dep. HRB 90:12-91:10; 94:13-17.*

35

Disputed.  This 'fact' states a legal conclusion.  Doc. 112 at 6–7. Even if the Human Rights Bureau could testify to this legal conclusion, the witness did not testify that failure to engage in the interactive process necessarily constitutes discrimination.  Doc. 86-14 at 94:17.  The witness repeatedly testified that the entire process involves a case-by-case analysis.  Doc. 93 at ¶¶ 96–97.

*46.   In order to provide an individualized assessment of treating a vulnerable patient, health care providers need to know the vaccination status of the healthcare workers, so they can provide appropriate care to vulnerable patients.  King Report, ¶ 39; Stephens Report, ¶ 11.*

Disputed.  This 'fact' attempts to establish a legal conclusion regarding the appropriate standard of care.  *See supra* ¶ 34.  Plaintiffs' experts offer legal conclusions, not facts.  Doc. 102 at 10; Doc. 104 at 9–10. The record also demonstrates that Five Valleys Urology and Western Montana Clinic did not actively track or take staff vaccination into account when providers treated patients.  *See supra* ¶ 34.  Providence allowed unvaccinated, or nonimmune, caregivers to treat patients.  *See supra* ¶ 34.  Prior to the COVID-19 vaccination rule, Medicaid and Medicare

surveyors did not investigate a facility's vaccination policy, including whether the facility tracked staff vaccinations.  Doc. 93 at ¶ 94.

*47.    Other forms of disease prevention, such as masking, while helpful, cannot serve as a substitute for vaccination.  King Report, ¶ 47; Wilson Report, ¶ 20; Holzman Report, ¶ 15.*

Disputed.  *See infra* ¶ 48; *see* also Doc. 100 at 9 (motion to exclude Wilson's opinion at ¶ 20); Doc. 104 at 6, 8 (motion to exclude King's opinion at ¶ 47); Doc. 108 at 7 (motion to exclude Holzman's opinion at ¶ 15).

*48.    Simple masking is not equally as effective as vaccination in preventing the spread and severity of disease.  King Report, ¶ 47; Wilson Report, ¶ 20; Holzman Report, ¶ 15; Taylor Report, ¶ 62; Decl. Counsel ¶ 16, Ex. 15: 30(b)(6) Dep. Attorney General's Office 49:4-53:5 Aug. 19, 2022 ("Dep. AG"); Decl. Counsel, ¶ 41, Ex. 40: One American News Network Dan Ball Radio Interview of Austin Knudsen, Time Stamp 13:00-13:10, Feb. 7, 2022[2] (public radio statement by the AG indicating that masks do not work to prevent the spread of disease); Decl. Counsel, ¶ 45, Ex. 44:*

---

[2] Conventionally filed, also available at: https://www.spreaker.com/user/ oneamericanewsnetwork/2-7-oanra366e-audio (last accessed Aug. 26, 2022)

*Decl. Bhattacharya in Support of Gov. Lee's Opp. To Pls.' Mot. For Prelim. Injunction ("In other words, according to a comprehensive evidence summary of masks effectiveness in the context of the flu – a virus that shares many physical properties with the SARS-CoV-2 virus and is transmitted similarly to SARS-CoV-2 – high-quality evidence finds no effect of masks on the spread of disease, even when the masks are employed by health care workers who are trained to use them properly").*

Disputed.  As previously stated, vaccine efficacy varies by disease. *See supra* ¶¶ 1–3.

Defendants' experts dispute the efficacy of the COVID-19 vaccines at preventing disease transmission.  *See supra* ¶¶ 1–3.  Dr. Bhattacharya's opinion is that COVID-19 vaccines are ineffective at preventing transmission of the Omicron variant.  Doc. 86-5 at ¶¶ 48–60. This statement on vaccine inefficacy doesn't equate to vaccines being more effective than similarly ineffective masks.  Doc. 86-44.

As for masks, Taylor expresses no opinion on the relative efficacy of masking.  Doc. 86-2 at ¶ 62 ("masking and ventilation are still important ways to also continue to reduce the transmission risk of airborne pathogens").  His opinion also only concerns COVID-19.  Doc. 106 at 10.  Dr.

Holzman also expresses his opinion that immunization and masking must be used together, not that masks are ineffective.  Doc. 86-3 at ¶ 15; *see also* Doc. 108 at 7 (Dr. Holzman's opinion should nevertheless be excluded because it lacks any methodology on disease prevention).  King offers an unsupported opinion on disease prevention.  Doc. 104 at 6, 8.

In sum, this fact purports to establish comparative effectiveness of masks and vaccines for all diseases, but the record doesn't support that. Instead, as stated, the opinions generally apply only to COVID-19 and none of Plaintiffs experts use any methodology to establish the effectiveness of masks for any disease, much less the comparative effectiveness of masks to vaccines for a specific disease.

*49.    Masking does not protect against bloodborne pathogens, or the spread of pathogens through surface contact. King Report, ¶ 47; Wilson Report, ¶ 20; Holzman Report, ¶ 15; Taylor Report, ¶ 62.*

Undisputed.

*50.    Hospitals and physician offices are similarly situated in all meaningful ways when it comes to treating patients.  King Report, ¶¶ 39, 48; Holzman Report, ¶ 11, 21; (Doc. 77 at ¶ 4(k)); Decl. Byrd.*

Disputed.  This calls for a legal conclusion central to this dispute. Doc. 92 at 36–44; Doc. 130 at 10–31; Doc. 131 at 20–40; Doc. 104 at 9–10; Doc. 108 at 9.  That Defendants stipulated that the exempt facilities treat immunocompromised patients doesn't reach the legal conclusion Plaintiffs' state here.

51.   *Physicians of all types of specialties treat similar types of patients in acute hospital settings as well as outpatient physician clinic or office settings.  King Report, ¶ 48.*

Disputed.  This calls for a legal conclusion central to this dispute. Doc. 92 at 36–44; Doc. 130 at 10–31; Doc. 131 at 20–40; Doc. 104 at 9–10.

52.   *Physician offices and hospitals are similarly situated to longterm care settings such as assisted living facilities and skilled nursing facilities.  King Report, ¶ 48; Holzman Report, ¶ 21.*

Disputed.  This calls for a legal conclusion central to this dispute. Doc. 92 at 36–44; Doc. 130 at 10–31; Doc. 131 at 20–40; Doc. 104 at 9–10; Doc. 108 at 9.

53.   *Primary care physicians as well as subspecialists treat elderly and immunocompromised patients in clinic settings, hospital settings,*

*rural swing-bed hospital settings, and nursing homes and long-term care settings.  King Report, ¶ 48.*

Disputed to the extent this calls for a legal conclusion.  Doc. 104 at 9–10.  Also disputed in that this over-generalizes differences in care at different settings.  Doc. 93 at ¶¶ 13–15; *see also* Doc. 92 at 36–44; Doc. 130 at 10–31; Doc. 131 at 20–40.

*54.    Hospitals treat the same patients as nursing homes, long-term care facilities and assisted living facilities.  Decl. Counsel, ¶ 46, Ex. 45: Dep. David King 55:10-56:23; 57:23-3; 59:6-16; 124:24-126:2; 151:1-14, Aug. 2, 2022; April 28, 2021 House Floor Session Video, 2nd Reading Governor's Proposed Amendments Adopted, timestamp 16:53:20-16:57:52, http://sg001-harmony.sliq.        net/00309/Harmony/en/Power-Browser/PowerBrowserV2/20170221/-1/41104?agendaId=220301.*

Disputed.  Whether hospitals are similarly situated to nursing homes, long-term care facilities, and assisted living facilities calls for a legal conclusion. Doc. 92 at 36–44; Doc. 130 at 10–31; Doc. 131 at 20–40.  Patients at nursing homes, long-term care facilities, and assisted living facilities constitute a distinct group of patients.  Doc. 93 at ¶¶ 13–15.

55.    *Critical access hospital and hospital swing beds are often used in the exact same manner as nursing homes and long-term care facilities; these facilities provide the same (or similar) care to similarly situated patients by similarly situated healthcare workers.  King Report, ¶ 48; Ex. 45: Dep. King 52:18-53:53:19.*

Disputed.  Whether critical access hospitals are similarly situated to nursing homes, long-term care facilities, and assisted living facilities calls for a legal conclusion. Doc. 92 at 36–44; Doc. 130 at 10–31; Doc. 131 at 20–40; Doc. 104 at 9–10.  Patients at nursing homes, long-term care facilities, and assisted living facilities constitute a distinct group of patients.  Doc. 93 at ¶¶ 13–15.

56.    *The ethical principles of these healthcare providers and duties to their patients and fellow coworkers are unchanged whether the healthcare provider is providing treatment in a hospital, physician office, or long-term care setting.  King Report, ¶ 48; Holzman Report, ¶¶ 20-21.*

Disputed for reasons previously stated.  *See supra*, ¶¶33–34, 50–55.

57.    *Healthcare entities have the same interest in infection prevention and preventing the spread of communicable diseases to their patients*

*and staff. Ex. 8: Dep. Taylor 35:5-36; 59:5-24; 94:6-95:5; Decl. King ¶¶ 47-48.*

Disputed for reasons previously stated. *See supra*, ¶¶ 33–34, 50–55; *see also* Doc. 85-3 at 2 ("not all workers in the same healthcare facility, not all individuals with the same job title, and not all healthcare facilities will be at equal risk of occupational exposure to infectious agents."). Further, Plaintiffs acknowledge that Providence and Western Montana Clinic have divergent interests. Doc. 129-1.

*58.    Providence participates in the federal Medicare and Medicaid programs and cares for patients covered by Medicare and Medicaid. (Doc. 77 at ¶ 4(i)).*

Undisputed.

*59.    When claims of discrimination are filed under MCA 49-2-312, the Montana Human Rights Bureau is mandated to conduct informal investigations of alleged violations of MCA 49-2-312, and to promptly and impartially determine whether there is reasonable cause to believe that there has been a violation. Ex. 14: Dep. HRB 28:1-29:3.*

Undisputed.

60.    *If the HRB makes a for-cause finding of discrimination under the MCA 49-2-312, the case then proceeds to conciliation, and then to a contested case hearing.  Ex. 14: Dep. HRB 32:7-21.*

Undisputed.

61.    *After the HRB makes a for-cause finding, the parties cannot resolve the matter without involving the HRB.  Ex. 14: Dep. HRB 32:22-25.*

Disputed only to the extent that the Human Rights Bureau fulsomely explained what its involvement entails after a for-cause finding. Doc. 86-14 at 32:22–34:20.  Undisputed otherwise.

62.    *The HRB requires targeted equitable relief to resolve a matter after there has been a for-cause finding of discrimination, in a manner that eliminates the discriminatory practice.  Ex. 14: Dep. HRB 33:14-34:7.*

Undisputed.

63.    *"After there is a cause finding, the [HRB] has an obligation to seek redress for any discrimination." Ex. 14: Dep. HRB 33:4-6.*

Disputed only to the extent that the Human Rights Bureau explained what targeted equitable relief entails.  Doc. 86-14 at 32:22–34:20;

39:10–12 (the targeted equitable relief for HB 702 violations has been limited to training and policy changes).  Undisputed otherwise.

64.     *If a hearing officer finds that an entity engaged in a discriminatory practice, the Department of Labor must order that the party refrain from engaging in discriminatory conduct.  Ex. 14: Dep. HRB 37:8-38:3.*

Undisputed.

65.     *The Department of Labor can petition the district court to enforce its orders and sue a party in district court for breach of a conciliation agreement.  Ex. 14: Dep. HRB 38:4-11.*

Undisputed.

66.     *Since its enactment, the Montana Human Rights Bureau has investigated complaints alleging discrimination in violation of MCA 49-2-312. (Doc. 77 at ¶ 4(h)); Ex. 14: Dep. HRB 61:1-3, 11-16.*

Undisputed.

67.     *The DLI defers all enforcement and interpretation of MCA 49-2-312 to the HRB, and DLI testified it has no independent knowledge of such enforcement or interpretation.  Ex. 10: Dep. DLI 16:14-17:10; 31:7-32:21;  34:20-36:5;  37:4-42:11;  45:7-13;  47:8-18;  49:10-50:10;  53:11-23; 90:22-92:12; 99:3-100:2; 102:7-103:21.*

Undisputed.

68.     *The HRB has made 25 for-cause findings related to MCA 49-2-312, some of which are against hospitals.  Ex. 14: Dep. HRB 41:21-42:3.*

Undisputed.

69.     *The HRB testified that it could be unlawful discrimination if a physician office removed an unvaccinated individual from having direct patient care, based on the individual's vaccination status.  Ex. 14: Dep. HRB 50:21-52:17.*

Disputed.  Plaintiffs unquestionably used a 30(b)(6) deposition to pose imperfect hypotheticals to elicit an improper legal conclusion.  Doc. 112 at 7.  Such testimony should be excluded and cannot be used to bind the parties.  Doc. 112 at 3–5, 10.  The Human Rights Bureau testified that it reviews each complaint on a case-by-case basis.  Doc. 93 at ¶¶ 96–97.  Further, the Human Rights Bureau specifically declined to offer a definitive answer without specific facts.  Doc. 86-14 at 51:5–6.

70.     *The HRB testified that it could be unlawful discrimination if a physician office required only unvaccinated employees to wear masks.  Ex. 14: Dep. HRB 52:22-53:16; see also Ex. 15: Dep. AG 52:3-22.*

Disputed.  As previously stated, *see supra* ¶ 69, Plaintiffs improperly sought to elicit a legal conclusion from 30(b)(6) witnesses.  Doc. 112 at 7.  As to the Department of Justice, the Department testified that like all Title 49 complaints, *see* Doc. 86-15 at 37:14–22, individuals who feel they are being discriminated against should seek legal advice from a private attorney and contact the Montana Human Rights Bureau.  Doc. 86-15 at 52:23–53:5.

71.  *For a "health care facility," as defined by MCA 49-2-312, if there are no "reasonable accommodation measures" that can be put in place to protect the health and safety of employees, patients, visitors, and other persons from communicable diseases, terminating an unvaccinated individual could be a violation of the law.  Ex. 14: Dep. HRB 58:12-59:9.*

Disputed.  *See supra* ¶ 69; Doc. 112 at 7–8; Doc. 86-14 at 58:23–59:1 ("We run an analysis from the perspective of whomever filed the complaint, and so we would analyze the person who filed, and of course, the defense proffered by the respondent to answer that.").

72.  *In a claim filed before the HRB, the HRB found that the requirement to obtain a flu vaccine constituted reasonable cause to believe discrimination under MCA 49-2-312 had occurred, even though there had*

*been no other adverse employment action. Ex. 14: Dep. HRB 96:18-98:10, Decl. Counsel ¶ 34, Ex. 33: HRB Final Investigative Report, May 20, 2022.*

Disputed.  The individual filing the complaint faced termination unless he provided proof of vaccination by the end of the business day. Doc. 86-33 at 1.  The adverse act was the threat of termination according to the investigator.  Doc. 86-33 at 2.  Whether this, in fact, constitutes discrimination is a legal conclusion that has not been adjudicated through administrative or judicial proceedings.

73.  *In another claim filed before the HRB, the HRB reasonable cause to believe discrimination under MCA 49-2-312 had occurred where an event scheduled for cancer survivors prohibited unvaccinated individuals to attend in person, even though it allowed them to attend the conference remotely.  Ex. 14: Dep. HRB 99:16-102:1; Decl. Counsel ¶ 35, Ex. 34: HRB Final Investigative Report, May 10, 2022.*

Disputed.  Whether this constitutes discrimination is a legal conclusion that has not been adjudicated through contested proceedings. Further, the for-cause finding made clear that an all-virtual conference would not have resulted in the fining.  Doc. 86-34 at 3.

74.    *In a claim filed against a prison, the HRB found the prison constituted a health care facility and thereby applied the exception in MCA 49-2-312(3)(b). Ex. 14: HRB Dep. 102:5-108:14; Decl. Counsel ¶ 36, Ex. 35: HRB Final Investigative Reports, Feb. 25, 2022 (filed under seal pending leave of Court).*

Disputed and argumentative.  Plaintiffs' counsel acknowledged this "goes directly to the equal protection arguments" and therefore calls for a legal conclusion.  Doc. 86-14 at 103:9–13.[3]  The investigator acknowledges that this complaint involved numerous unanswered *legal* questions.  Doc. 89 at 9, 11–13 (filed under seal).  The scope of MCA § 49-2-312(3)(b) on these facts has not been adjudicated and the findings at issue constitute a legal conclusion, not a 'fact.'  Doc. 89 at 13 (filed under seal).

75.    *In the claim against the prison, the HRB found that the designation of health care facility applied not just to the prison infirmary, but to the entire institution.  Ex. 14: Dep. HRB 107:14-17; Ex. 35.*

Disputed for reasons previously stated.  *See supra* ¶ 74.

---

[3] Plaintiffs also inexcusably failed to redact the transcript in violation of the confidentiality agreement between the parties.  Doc. 88 at 2.  Defendants believe Plaintiffs flagrantly violated the agreement they proposed and to which they entered voluntarily.

76.   The HRB has indicated that the term "reasonable accommodation measures" in MCA 49-2-312 "appears unrelated" to the definition of "reasonable accommodation" under other portions of the Montana Human Rights Act applying to a person with a disability.  Ex. 14: Dep. HRB 109:13-110:3; Ex. 35.

Disputed.  In addition to the reasons previously stated, *see supra* ¶ 74, this 'fact' purports to establish the legal meaning of "reasonable accommodation" under MCA § 49-2-312, which is of course a legal conclusion.

77.   The HRB found no reasonable cause in a claim against a facility exempted from MCA 49-2-312 by virtue of MCA 49-2-313, noting that CDC guidance recommended vaccination for all healthcare personnel.  Ex. 14: Dep. HRB 126:23-128:23; Decl. Counsel ¶ 37, Ex. 36: HRB Final Investigative Report, Nov. 22, 2021.

Disputed.  Calls for a legal conclusion.  Doc. 86-14 at 127:15–128:7 ("We still do not have a court ruling on what is and what is not guidance."); *see also supra* ¶ 72.

78.   The HRB applies to EEOC guidance when such guidance does not conflict with state law.  Ex. 14: Dep. HRB 19:19-21:15; 87:9-24.

Disputed.  Calls for a legal conclusion as to when or if a conflict with state law exists.  Doc. 112 at 8.

79.   *The EEOC has issued guidance indicating that when an immunocompromised employee requests a reasonable accommodation based on a concern of heightened risk of severe illness from a COVID-19 infection, the employer must explore potential reasonable accommodations that may be provided absent undue hardship.  Decl. Counsel ¶ 33, Ex. 32: EEOC Guidance at 49-50, July 12, 2022 ("Ex. 32").*

Undisputed in that the document speaks for itself.  Disputed as to any legal conclusions drawn.

80.   *This obligation applies even if the employee is vaccinated, as "some individuals who are immunocompromised might still need reasonable accommodations because their conditions may mean that the vaccines may not offer them the same measure of protection as other vaccinated individuals." Ex. 32 at 50.*

*See supra* at ¶ 79.

81.   *Montana AG and DLI intend to, and are actively, enforcing MCA § 49-2-312.   Ex. 10: Dep. DLI 75:2-21;  76:18-77:5;  77:14-79:18; 79:23-85:13; 85:18-86:14; 86:22-87:3; 87:20-24; 88:5-9; 88:17-92:12; Decl.*

*Counsel ¶ 25, Ex. 24: Letter from L. Esau to Mountain Pacific Quality Health, Nov. 12, 2021; Decl. Counsel ¶ 26, Ex. 25: Letter from L. Esau to Big Sky Resort, Dec. 17, 2021; Decl. Counsel ¶ 27, Ex. 26: Letter from L. Esau to Ninth Circuit Judicial Conference, June 20, 2022; Ex. 14: Dep. HRB 41:21-42:3; 62:2-67:3; 89:6-90:11; Ex. 15: Dep. AG 27:2-35:15; 37:8-39:18; 43:13-44:13; 44:19-45:18; 49:4-53:5; 74:1-5; Decl. Counsel ¶ 28, Ex. 27: Email Corr. D. Oestreicher to S. Logan, Oct. 13, 2021; Decl. Counsel ¶ 29, Ex. 28: Letter from D. Oestreicher, Jan. 14, 2021; Decl. Counsel ¶ 40, Ex. 39: Excerpts of Defs.' Resp. Pls.' Disc. Reqs., at 3-5, May 11, 2022.*

Disputed.  This 'fact' calls for a legal conclusion that Defendants' denied in discovery.  Doc. 112 at 8.  Further, deposition testimony made clear that the Department of Labor engaged in educational, not enforcement, efforts.  *E.g.* Doc. 86-10 at 89:1–7.  Finally, as noted at *infra*, ¶ 82, the Department of Justice historically deferred to the Human Rights Bureau and the civil private right of action within Title 49.

82.   *Employers face potential criminal penalties for violation of MCA 49-2-312.  Ex. 10: Dep. DLI 75:2-21; 77:14-79:18; 79:23-85:13; 85:18-86:14; 88:17-92:12; Ex. 24; Ex. 25; Ex. 26; Ex. 27; Ex. 15: Dep. AG 37:8-39:18; 43:13-44:13; 74:1-5.*

Disputed.  The statute requires an that entity "willfully engages in an unlawful discriminatory practice … or willfully resists, prevents, impedes, or interferes with the commission …."  MCA § 49-2-601.  The Department of Justice testified that the provision of Title 49 authorizing misdemeanor penalties has never been used by the Department of Justice.  The Department of Justice stated "[o]ur position has been that those discrimination claims are private rights of action handled by the Human Rights Bureau."  Doc. 86-15 at 37:12–22; *see also* Doc. 112 at 8 (Defendants' motion in limine to exclude).

83.     *The exclusion contained in MCA 49-2-313 for licensed nursing homes, long-term care facilities, and assisted living facilities was drafted by the Governor in an amendatory veto dated April 28, 2021, which was later adopted by the legislature.  Decl. Counsel ¶ 42, Ex. 41: Letter from G. Gianforte to Speaker Galt & President Blasdel, April 28, 2021; Mont. Code Ann. § 49-2-312 through 313.*

Disputed.  The "exclusion" doesn't exclude the covered facilities it exempts them only for so long as they face conflicting guidance or regulations from the named federal agencies.  Doc. 93 at ¶¶ 10–12.

*84.    The text of HB 702 identifies the bases of the bill are for pro-*
*tecting patient privacy (citing Montana Code Annotated § 50-16-502,*
*which does not apply to most Montana health care providers) and the con-*
*stitutional right of privacy in medical records, in the context of search and*
*seizure law.  Decl. Counsel ¶ 43, Ex. 42: Montana 67th Legislature, House*
*Bill 702.*

Disputed.  This 'fact' calls for a legal conclusion and seeks to im-
properly establish a legislative fact.  Doc. 112 at 3–5.  Further, the stat-
utory text plainly establishes an interest in preventing discrimination,
among other interests.  Doc. 93 at ¶ 1.

*85.    The AG Office does not know the basis for the disparate treat-*
*ment of different health care entities under MCA 49-2-312 and 313, testi-*
*fying instead that the basis for disparate treatment is contained "within*
*the four corners of the statute itself."  Ex. 15: Dep. AG 92:2-93:21; 93:23-*
*95:7; but see Ex. 39: Defs.' Resp. Pls.' Disc. Reqs., at 24-28.*

Disputed.   This 'fact' improperly seeks legislative facts from a
30(b)(6) deponent and improperly seeks a legal conclusion.  Doc. 112 at
3–5, 8; *see also* Doc. 86-15 at 92:2–95:7 (Defendants' counsel objected to
the questioning as calling for a legal conclusion).

86.     Both the DLI and the AG have recognized the conflict between
federal vaccination mandates and the penalties imposed on employers by
MCA 49-2-312. Ex. 15: Dep. AG 76:2-24; Decl. Counsel ¶ 30, Ex. 29: Letter
Gianforte, Oct. 27, 2021 (Indicating that a federal COVID-19 vaccine
mandate "violates Montana law."); Decl. Counsel, ¶ 44, Ex. 43: Sirius XM
David Webb Radio Interview of Austin Knudsen, Time Stamp 5:28-6:25,
Nov. 11, 2021[4]; Ex. 10: Dep. DLI 61:11-62:15; 64:16-66:6; 74:11-20; 75:2-
21; 76:2-24; 77:14-79:18; 79:23-85:13; 85:18-86:14; 88:17-92:12; Decl.
Counsel ¶ 24, Ex. 23: Excerpt from DLI's House Bill 702 FAQ; Ex. 24; Ex.
25; Ex. 26.

Disputed.  Whether a supremacy clause issue exists forms the basis
of this act.  Therefore, this 'fact' unambiguously states a legal conclusion.
Doc. 112 at 9.  Defendants' previously filed motion to exclude all deposi-
tion testimony related to calls for legal conclusions applies in full force.
Doc. 112 at 3–5, 9.  Further, a radio interview does not bind a party's
legal positions.  Cf. (Mead Decl., Ex. 3 at 86:12–86:16 (Deposition of Vicky
Byrd) ("(By Mr. Graybill) If someone wanted to know MNA's position

_____

[4] Conventionally filed, also available at: https://www.podcastaddict.com/
episode/133340150 (last accessed Aug. 26, 2022).

about the interaction of state and federal law and the United States Constitution's supremacy clause, you'd refer them to MNA's legal pleadings, wouldn't you?").

87. *DPHHS testified that hospitals, when faced with the question of how to comply with MCA 49-2-312 and the CMS COVID-19 vaccine mandate, should follow the CMS COVID-19 mandate. Ex. 9: Dep. DPHHS 88:19-89:12.*

Disputed.  Department of Public Health and Human Services did not put out written guidance related to any perceived conflict between MCA § 49-2-312 and the COVID-19 vaccine mandate.  Doc. 86-9 at 87:1–7.  The Department of Public Health and Human Services also testified that it does not determine compliance with HB 702.  Doc. 86-9 at 86:23–25.  This 'fact' also calls for a legal conclusion as to the preemptive effect of the COVID-19 vaccination rule vis-à-vis HB 702.

88. *Assisted living facilities are not Medicare or Medicaid certified facility providers, are not subject to the CMS conditions of participation, and do not risk losing funding from CMS based on not complying with the conditions of participation. Ex. 9: Dep. DPHHS 36:5-17; 83:14-22;*

*83:23-25; 84:1-3; 84:4-7; Decl. Counsel ¶ 21, Ex. 20: DPHHS Provider Q&A.*

Undisputed.

*89.    Providence receives a majority of its reimbursement through CMS. Decl. Bodlovic. (Doc. 45 at ¶ 7).*

Disputed as noted at *supra* ¶ 90.  Also disputed that in Providence apparently claims total revenue of $433,436,551 in 2020.  Mead Decl., Ex. 4 at PL338.  Providence claims $50,339,493 in revenue for Medicaid (not considering expenses) and $161,994,854 in Medicare revenue.  Mead Decl., Ex. 4 at PL 370–71.  $212,334,347 in combined Medicare and Medicaid revenue comprises 48.9% of total revenue, or less than "a majority."

*90.    Continued participation with CMS is essential to Providence's continued operations and ability to continue to deliver its current level and volume of patient care. (Doc. 45 at ¶ 7).*

Disputed to the extent Providence claims a shortfall of $31,006,319 related to Medicare reimbursements in 2020.  Mead Decl., Ex. 4 at PL371.  Defendants lack sufficient information to assess whether operating at a $31,006,319 per year loss from Medicare is essential to Providence's services.

*91.     Rural hospitals receive 60% or more of their gross billing from CMS, emphasizing that CMS funding is critical to continued operations. Decl. Counsel ¶ 31, Ex. 30: Decl. Stukaloff with attachments (also at Doc. 51-2 at 5); Ex. 15: Dep. AG 97:15-103:2; see also Ex. 9: Dep. DPHHS 76:22-80:24; 82:22-83:7 (DPHHS testifying the loss of CMS funding will make it difficult to operate the Montana State Hospital).*

Disputed as to the Montana State Hospital.  Doc. 86-9 at 81:2–83:7 (projections of funding loss call for speculation on hypothetical impacts to operations).  Disputed as to Doc. 51-2 at 5; *see* Ex. 7 to Mead Decl. (Defendants' First Supplemental Responses to Plaintiffs' First Combined Discovery Requests).

*92.     Failure to comply with the CMS conditions of participation subjects a covered facility to termination from the Medicare and Medicaid programs.  Ex. 9: Dep. DPHHS 50:25-51:20; Decl. Counsel ¶ 20, Ex 19: Letter from CMS to Montana State Hospital Re: Involuntary Termination, Apr. 8, 2022; (Doc. 45 at ¶ 3).*

Disputed.  "Non-compliance does not necessarily lead to termination, and facilities will generally be given opportunities to return to compliance."  Doc. 86-18 at 5.  The Department of Public Health and Human

Services testified that in every case, facilities are given opportunity to return to compliance.  Doc. 86-9 at 111:3–22.  Finally, this 'fact' incorrectly states a legal conclusion.  Doc. 112 at 9.

93.  *Failure to comply with the CMS COVID-19 vaccination mandate subjects a covered facility to termination from the Medicare and Medicaid programs.  Ex. 9: Dep. DPHHS 50:25-52:11; Decl. Counsel ¶ 18, Ex. 17: CMS Revised Guidance for Interim Final Rule, QSO-22-09-ALL.*

Disputed.  "Non-compliance does not necessarily lead to termination, and facilities will generally be given opportunities to return to compliance."  Doc. 86-18 at 5.  The Department of Public Health and Human Services testified that in every case, facilities are given an opportunity to return to compliance.  Doc. 86-9 at 111:3–22.  Finally, this 'fact' incorrectly states a legal conclusion.  Doc. 112 at 9.

94.  *The CMS COVID-19 vaccination mandate requires covered facilities to ensure unvaccinated staff adhere to additional precautions above and beyond those implemented for vaccinated staff.  Ex. 9: Dep. DPHHS 53:23-54:24; Decl. Counsel ¶ 19, Ex. 18: Hospital Attachment Revised to QSO-22-09-ALL.*

Disputed.  Hospitals can comply with the guidance found in QSO-22-09-ALL by requiring the same level of precautions of all staff, so long as unvaccinated workers take sufficient precautions.  Doc. 86-18 at 6–7.

*95.   There have been two hospitals in Montana who have received deficiencies under a complaint survey specifically for deficiencies under the COVID-19 vaccination requirement.   Ex. 9: Dep. DPHHS 107:23-109:16; 113:3-14; Decl. Counsel ¶ 22, Ex. 21: QCOR report; Decl. Counsel ¶ 23, Ex. 22: QCOR report.*

Disputed.  One of the facilities in question disputed their policies violated the COVID-19 vaccination requirement.  Mead Decl., Ex. 5.  The other facility was faulted for allowing unvaccinated staff to only wear surgical, as opposed to N95, masks.  Mead Decl., Ex. 6.  Neither facility is in immediate jeopardy of losing Medicare or Medicaid funding.  *See supra*, ¶ 93.

*96.   MCA 49-2-312 applies to all vaccines, not just the COVID-19 vaccine.  Ex. 15: Dep. AG 35:12-15; Ex. 14: Dep. HRB 26:25-27:25; Decl. Counsel ¶ 32, Ex. 31: Excerpt from DLI's House Bill 702: FAQ, July 26, 2021.*

Undisputed.

97.   *CDC recommends the following vaccines for healthcare work-ers: Hepatitis B, influenza, MMR, Varicella, Tdap, and Meningococcal. See https://www.cdc.gov/vaccines/adults/rec-vac/hcw.html.   See also Decl. Byrd, ¶ 18.*

Disputed to the extent these recommendations translate to require-ments.  Doc. 93, ¶¶ 34, 54–55, 57, 72, 79, 88–90, 94.

98.   *Physician offices provide a wide-array of primary and spe-cialty care to high risk individuals.  Ex. 12: Dep. Clinic 28:25-29:5; 39:9-13; 47:6-12; 48:14-49:2.*

Disputed.  The testimony in question doesn't establish care to high-risk individuals.  At 28:25–29:5, Western Montana Clinic avers some de-partments receive Medicaid or Medicare reimbursement, that varies sig-nificantly by department, not that they care for high-risk individuals.  At 39:9–13, Western Montana Clinic simply states that they require differ-ent intake paperwork by department.  At 47:6–12, Western Montana Clinic testified each department has different patient intake questions.  And at 48:14–49:2, Western Montana Clinic testified that sometimes they allowed patients to self-segregate from one another into "sick" and "well" rooms at the pediatric department.

99.    *Providence operates St. Patrick Hospital in Missoula, Montana, St. Joseph Medical Center, a critical access hospital, in Polson, Montana, 30-40 clinics, as well as an assisted living facility in Polson, Montana. Decl. Counsel ¶ 13, Ex. 12: 30(b)(6) Dep. Providence – K. Bodlovic 13:15-25, Aug. 10, 2022 ("Dep. Providence – Bodlovic"). The critical access hospital and assisted living facility in Polson share staff. Ex. 12: Dep. Providence – Bodlovic 15:15-21.*

Disputed only as to the fact that St. Joseph Medical Center and St. Joseph Assisted Living Center operate under separate licenses and separate licensing requirements. Doc. 86-12 at 14:14–15:3; *see also* Doc. 130 at 14 (citing Montana's regulatory licensing scheme).

100. *St. Patrick Hospital has a specialized critical care unit for Rocky Mountain Laboratory. Ex. 12: Dep. Providence – Bodlovic 20:12-20.*

Undisputed that Rocky Mountain Laboratory exists. Disputed that Rocky Mountain Laboratory provides clinical care. "[Rocky Mountain Laboratories] is not a clinical facility in which researchers study the effects of experimental drugs, vaccines, and diagnostics on patients and healthy volunteers. Rather, you could say that the basic research conducted at

[Rocky Mountain Laboratories] makes clinical research possible." *National Institute of Allergy and Infectious Diseases*, Rocky Mountain Laboratories "Overview," online at https://www.niaid.nih.gov/about/rocky-mountain-overview (accessed September 15, 2022).  Mead Decl. Ex. 8.

*101.  The Montana Nurses Association is the professional association that speaks on behalf of the approximately 18,000 Registered Nurses and approximately 1,000 Advanced Practice Registered Nurse ("APRN") in Montana.  Decl. Byrd, ¶ 2.*

Disputed.  Montana Nurses Association represents 2,700 dues paying members and 600 nurses in non-agency fee shops that have elected not to pay dues.  Doc. 129-3 at 17–18.  Moreover, it is unclear what is meant by "speaks on behalf of" given that significant portions of Montana Nurses Association membership oppose their position on mandatory vaccinations.  Doc. 93 at ¶ 87.

*102.  Nurses in nursing homes, assisted living facilities, and long term care facilities face the same workplace risks from vaccine-preventable disease as those in other healthcare facilities.  Decl. Byrd, ¶¶ 14, 17.*

Disputed.  "[N]ot all workers in the same healthcare facility, not all individuals with the same job title, and not all healthcare facilities will

be at equal risk of occupational exposure to infectious agents." Doc. 85-3 at 2.  The Centers for Medicare and Medicaid Services noted the differing COVID-19 risks at nursing homes, assisted living facilities, and long-term care facilities that existed at the time HB 702 passed.  Doc. 93,, ¶¶13–15.  The risk any individual nurse faces varies based on factors specific to that individual.  Doc. 86-5, ¶¶ 7–16.

*103.  Nurses in hospitals, the offices of private physicians, APRN clinics, nursing homes, long-term care facilities, assisted living facilities, and other healthcare settings treat patients in varying degrees of health. Decl. Byrd, ¶ 13.*

Disputed in the sense that this 'fact' is vague.  Plaintiffs fail to support the assertions at issue with any specific facts as to what "other healthcare settings" are referred to, or what is meant by "varying degrees of health."  Doc. 85-1 at ¶ 13.  It is undisputed that Centers for Medicare and Medicaid Services issued specific rules regarding nursing homes, long-term care facilities, and assisted living facilities based on the characteristics of the population of patients in those specific settings, not shared by other settings, at the time HB 702 passed.  Doc. 93 at ¶¶ 13–15.

DATED this 16th day of September, 2022.

Austin Knudsen
Montana Attorney General

DAVID M.S. DEWHIRST
 Solicitor General

*/s/Brent Mead*
BRENT MEAD
 *Assistant Solicitor General*
CHRISTIAN B. CORRIGAN
 *Deputy Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
christian.corrigan@mt.gov.
brent.mead2@mt.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: <u>September 16, 2022</u>                 <u>/s/ *Christian B. Corrigan*   </u>
                                                CHRISTIAN B. CORRIGAN