AUSTIN KNUDSEN
Montana Attorney General
DAVID M.S. DEWHIRST
 *Solicitor General*
CHRISTIAN B. CORRIGAN
 *Deputy Solicitor General*
BRENT MEAD
 *Assistant Solicitor General*
P.O. Box 201401
Helena, MT 59620-1401
Phone: (406) 444-2026
Fax: (406) 444-3549
david.dewhirst@mt.gov
christian.corrigan@mt.gov
brent.mead2@mt.gov

*Attorneys for Defendants*

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA, MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, ET. AL.,<br><br>*Plaintiffs*,<br><br>and<br><br>MONTANA NURSES ASSOCIATION,<br><br>*Plaintiff-Intervenors*,<br><br>v.<br><br>AUSTIN KNUDSEN, ET AL.,<br><br>*Defendants*. | No. CV-21-108-M-DWM<br><br>**DEFENDANTS' REPLY TO INTERVENOR'S RESPONSE TO DEFENDANTS' MOTION FOR PARTIAL SUMMARY JUDGMENT** |

## INTRODUCTION

At the heart of this dispute is a disagreement over the public's interest in ensuring Montanans don't face discrimination over their private medical choices. Plaintiffs and Intervenor claim the State can "never" act against their view of public health. Doc. 119 at 25. But our society exists in a representative government. The elected and accountable branches of government protected Montanans from a growing wave of discrimination. Doc. 92 at 9. That decision rests solely with elected representatives.

After copious discovery and briefing, nothing changes that basic fact. The peoples' representatives protected Montanans from discrimination. That choice remains valid and constitutional.

### I. Applicable Standards

Plaintiffs and Intervenor lack sufficient evidence to carry their ultimate burden at trial on multiple legal claims. *E.g.*, Doc. 92 at 18–19. The Court should grant summary judgment to the Defendants based on that deficiency. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986); *Nissan Fire & Marine Ins. Co. v. Fritz Cos.*, 210 F.3d 1099, 1106 (9th Cir. 2000) ("The Supreme Court has clearly indicated that … a moving party

may carry its initial burden of production by showing that the nonmoving party does not have enough evidence to carry its ultimate burden of persuasion at trial."). Intervenor's contrary argument, Doc. 118 at 5–7, ignores its inability to produce substantiating evidence in discovery. Doc. 93, ¶ 8. Facts are facts. They exist or they don't. Things Intervenor wishes to be true aren't facts. Defendants are entitled to summary judgment. *Nissan Fire & Marine Ins. Co.*, 210 F.3d at 1106.

## II. Argument

### A. Federal law doesn't preempt HB 702

Intervenor fails, entirely, to confront the anti-preemption presumptions this Court must apply. *Compare* Doc. 118 at 3–5 (Intervenor conflating standing and preemption frameworks) *with* Doc. 92 at 11–12 (Collecting cases regarding the presumptions the Court must apply related to the State's police power).

#### *1. Americans with Disabilities Act*

Defendants incorporate by reference arguments made in reply to Plaintiffs' Response filed contemporaneously.

Intervenor absolves itself of the necessity of formulating a prima facie Americans with Disabilities Act claim under Title I or Title III. Doc.

118 at 7; *but see E.T. v. Paxton*, 41 F.4th 709, 718 (5th Cir. 2022) (plaintiffs must request an accommodation to trigger the Act's individualized assessment guarantee); *Crowder v. Kitagawa*, 81 F.3d 1480, 1486 (9th Cir. 1996) (remanding to district court to determine whether plaintiffs' proposed modifications to Hawaii's public health law were reasonable). Both the Americans with Disabilities Act and MCA § 49-2-312 require case specific facts, rendering a facial preemption challenge wholly inappropriate. Doc. 131 at 19–20.

### 2. Occupational Safety and Health Act

Intervenor merely speculates that MCA § 49-2-312 conflicts with the General Duty Clause. Because, Intervenor muses, bloodborne pathogens such as Hepatitis B are considered workplace hazards, healthcare facilities must be permitted to require vaccinations. Intervenor must prove MCA § 49-2-312 prevents employers from ridding the workplace of a recognized hazard that's likely to cause death or serious physical harm. *Titanium Metals Corp. v. Usery*, 579 F.2d 536, 540 (9th Cir. 1978). Intervenor offers nothing but unfounded speculation.

The Occupational Safety and Health Administration ("Agency") has never before mandated workplace vaccinations. *NFIB v. DOL, OSHA*,

142 S. Ct. 661, 662 (2022). Intervenor hypothesizes that the Agency has not issued specific rules on vaccinations because vaccination requirements are a common feature of healthcare in America. Doc. 118 (citing *Biden v. Missouri*, 142 S. Ct. at 653). That reasoning collapses under the faintest scrutiny.

First, if the ability to mandate vaccinations is integral to compliance with the General Duty Clause, Intervenor would not have collectively bargained with the State of Montana for a provision prohibiting all mandatory vaccinations or immunizations at the Montana Mental Health Nursing Care Center. *See* Doc. 93, ¶ 88; *see also* Doc. 130 at 35–36. This, alone, exposes Intervenor's claim and ends the inquiry.

Second, the Agency actually does have regulations concerning the vaccine for a bloodborne pathogen. *See* 29 C.F.R. § 1910.1030(f). The Agency's standard requires employers to *offer* the Hepatitis B vaccination free of charge to all workers who have occupational exposure. *See id.*

§§ 1910.1030(f)(1)(i), 1910.1030(f)(1)(ii)(A).[1] Workers may decline the vaccination by signing a declination form. *See* 29 C.F.R. §§ 1910.1030(f)(2)(iv); 1910.1030 App.A. It strains credulity to believe the General Duty Clause imposes a more stringent vaccination regime on employers than these specific regulations.

This is, of course, why Defendants highlighted that the Institutional Plaintiffs have never required vaccinations in their Occupational Safety and Health Act compliance plans. *See* Doc. 92 at 24–27. Nor have they been cited or faced an enforcement action under the Occupational Safety and Health Act due to the vaccination status of their employees or their vaccination policies. *Id.* at 26 (citing Doc. 93 at ¶¶ 44, 46, 62, 80).

Second, according to Intervenor's logic, there's no need for specific Occupational Safety and Health Administration regulations or mandates on basic, common-sense measures in healthcare facilities such as hand washing. But they nevertheless exist. The bloodborne pathogen

---

[1] *Available at* https://www.osha.gov/laws-regs/regulations/standard-number/1910/1910.1030AppA; *see also* Occupational Safety and Health Administration, Fact Sheet: Hepatitis B Vaccination Protection, January 2011 https://www.osha.gov/sites/default/files/publications/bbfact05.pdf (last visited Sept. 25, 2022).

DEFENDANTS' REPLY TO INTERVENOR'S RESPONSE TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT | 6

regulations, cited by Intervenor, heavily regulate hand washing. *See* 29 C.F.R. § 1910.1030(d)(2)(iii) ("Employers shall provide handwashing facilities which are readily accessible to employees"); 1910.1030(d)(2)(iv) ("When provision of handwashing facilities is not feasible, the employer shall provide either an appropriate antiseptic hand cleanser in conjunction with clean cloth/paper towels or antiseptic towelettes."); *id.* § 1910.1030(d)(2)(vi) ("Employers shall ensure that employees wash hands and any other skin with soap and water, or flush mucous membranes with water immediately or as soon as feasible following contact of such body areas with blood or other potentially infectious materials."). And these basic sanitary regulations aren't limited to hand washing. *See id.* § 1910.1030(d)(2)(viii) ("[R]eusable sharps shall be placed in appropriate containers until properly reprocessed."); *id.* § 1910.1030(d)(4)(ii) ("All equipment and environmental and working surfaces shall be cleaned and decontaminated after contact with blood or other potentially infectious materials."); *accord id.* §§ 1910.1030(d)(3)(x) (Masks, Eye Protection, and Face Shields); 1910.1030(d)(3)(xi) (Gowns, Aprons, and Other Protective Body Clothing).

Finally, Intervenor grasps at *dicta* from *Biden v. Missouri*, but overlooks that the Supreme Court characterized the Occupational Safety and Health Administration's Emergency Temporary Standard as "a significant encroachment into the lives—and health—of a vast number of employees." *NFIB*, 142 S. Ct. at 665. Vaccine mandates are, after all, extraordinary exercises in government power. The Court noted that the Agency could regulate "occupation-specific risks related to COVID-19" and "targeted regulations are plainly permissible." *Id.* at 665–66. This cuts sharply against Intervenor's speculation that the General Duty Clause applies.

### 3. Center for Medicare and Medicaid Services Regulations

Intervenor's Response rested on Plaintiffs' arguments on Claims VIII(a) and VIII(b). *See* Doc. 118 at 16. Defendants, therefore, incorporate Defendants' briefing on Claims VIII(a) and VIII(b) into this Reply.

### B. HB 702 doesn't implicate the Right to Seek Health

Plaintiffs and Intervenor continue to mischaracterize the nature of the State's police power. Doc. 118 at 16–17; Doc. 119 at 23–25. The police power is necessarily broad and flexible to afford States the ability to

confront emerging societal issues. *See Billings Properties v. Yellowstone Cnty.*, 394 P.2d 182 (Mont. 1964). The Legislature, not the courts, and not these litigants, balances the competing interests to determine how best to serve the public interest. *See Berman v. Parker*, 348 U.S. 26, 32–33 (1954).

"Public safety, public health, morality, peace and quiet, law and order – these are some of the more conspicuous examples of the traditional application of the police power …. Yet they merely illustrate the scope of the power and do not delimit it." *Billings Properties*, 394 P.2d at 182 (quoting *Berman*, 348 U.S. at 32). Antidiscrimination statutes are "grounded on the state's police power." *Mountain State Tel. & Tel. Co. v. Commissioner of Labor & Indus.*, 608 P.2d 1047, 1051–52 (Mont. 1979) (quoting *Bucyrus-Erie Co. v. Department of Industry, Labor, and Human Relations*, 453 F.Supp. 75, 78 (E.D. Wis. 1978)) (the federal Employee Retirement Income Security Act of 1974 didn't preempt Montana's Maternity Leave Act); *see also Roberts v. U.S. Jaycees*, 468 U.S. 609, 624 (1984); *Bd. of Dirs. of Rotary Int'l v. Rotary Club of Duarte*, 481 U.S. 537, 549 (1987) (antidiscrimination laws lie within the States' historic police powers). "[W]hen the legislature has spoken, the public interest has been

declared in terms well-nigh conclusive. In such cases the legislature, not the judiciary, is the main guardian of the public needs to be served by social legislation ...." *Billings Properties*, 394 P.2d at 31 (quoting *Berman*, 348 U.S. at 32).

Specific to this case, Montana's constitutional text circumscribes the right to seek health by the State's police power. *See* Mont. Const. art. II, § 3 (Montanans have a right to "seek[] their safety, health and happiness in all lawful ways."); *Mont. Cannabis Indus. Ass'n v. State*, 286 P.3d 1161, 1166 ("the Constitution is clear that the right to seek health is circumscribed by the State's police power to protect the public's health and welfare.").

"The exercise of the police power is gauged by a standard of reasonableness." *Billings Properties*, 394 P.2d at 31; *see also State v. Skurdal*, 767 P.2d 304, 306 (Mont. 1988) (The police power extends to all "reasonable legislation for the health, safety, welfare or morals of the public."). Contrary to Intervenor's argument, Doc. 118 at 17, the constitutional text itself limits the right subject to reasonable exercises of Montana's police power. In addition to being a reasonable interpretation of Montana's Constitution, it is the express language of multiple Montana Supreme

Court opinions. *See Mont. Cannabis Indus. Ass'n*, 286 P.3d at 1166; *Wiser v. State*, 129 P.3d 133, 139 (Mont. 2006).

In the two cases addressing this issue, the Montana Supreme Court effectively applied a two-step process. First, the Court looked to whether the regulation at issue involved a reasonable exercise of the State's police power. *See Mont. Cannabis Indus. Ass'n*, 286 P.3d at 1166; *Wiser*, 129 P.3d at 139; *cf. State v. Turk*, 643 P.2d 224, 226 (Mont. 1982) ("A statute enacted under a state's police power must be reasonably related to a permissible legislative objective to satisfy substantive due process guarantees."). Next, the Court held that the right doesn't apply in the face of such reasonable regulations because of the Montana Constitution's text. *See Mont. Cannabis Indus. Ass'n*, 286 P.3d at 1166; *Wiser*, 129 P.3d at 139. Rational basis, therefore, applies. *Id.*

HB 702 unquestionably functions as an antidiscrimination statute. MCA § 49-2-312; *see also* Doc. 119 at 24 (Plaintiffs acknowledge HB 702 is a nondiscrimination law). Combatting discrimination is also unquestionably a legitimate and permissible legislative objective. *See Roberts*, 469 U.S. at 624. HB 702 furthers this legitimate objective by actually prohibiting discrimination based on vaccination or immunity status. *See*

MCA § 49-2-312(1); *see also cf. Sch. Bd. of Nassau Cnty. v. Arline*, 480 U.S. 273, 285 (1987) (Congress had a legitimate purpose in prohibiting discrimination based on the perceived contagiousness of individuals). Montana constitutionally used its police powers to fend off growing calls to discriminate based on vaccination status. Doc. 21, 8–10.[2]

Here, Plaintiffs and Intervenor fail to demonstrate any facts amounting to a proscription of the right to seek health. Instead, as previously stated, the Individual Plaintiffs all admit they sought and received health care treatment after HB 702's enactment. Doc. 92 at 34; Doc. 130 at 20–21. Intervenor still fails to muster any facts that HB 702 prohibited any nurse from seeking health care. Doc. 118 at 18. Instead, Intervenor avers that HB 702 "impacts" their right to seek health because "vaccine-preventable disease is a recognized health hazard specific to health care settings." Doc. 118 at 18. But that pre-existed HB 702. Intervenor collectively bargained for workplaces free from any mandatory vaccinations, for example. Doc. 93, ¶ 88. It also omits that sick patients

---

[2] The relevant inquiry into reasonableness focuses on the relationship between the law and the legislative object. Because the legislature enacted a non-discrimination statute, the inquiry focuses on whether HB 702 meets that goal, not some other public health purpose.

DEFENDANTS' REPLY TO INTERVENOR'S RESPONSE TO DEFENDANTS'
MOTION FOR PARTIAL SUMMARY JUDGMENT | 12

themselves pose a possible vector of disease transmission. Doc. 85-3. In sum, the record clearly establishes that patients and caretakers in healthcare settings seek and provide care in a safe manner post HB 702. Doc. 92 at 34–36.

Finally, Plaintiffs and Intervenor incorrectly substitute their view of the public interest for that of the State. Doc. 118 at 17; Doc. 119 at 23–23; *but see Berman*, 348 U.S. at 32 ("[W]hen the legislature has spoken, the public interest has been declared in terms well-nigh conclusive."). "Our Constitution principally entrusts '[t]he safety and the health of the people' to the politically accountable officials of the States 'to guard and protect.'" *S. Bay United Pentecostal Church v. Newsom*, 140 S. Ct. 1613, 1613 (2020) (Roberts, C.J. concurring in denial of application for injunctive relief) (quoting *Jacobson v. Massachusetts*, 197 U.S. 11, 38 (1905)). "When [public] officials 'undertake to act in areas fraught with medical and scientific uncertainties,' their latitude 'must be especially broad.'" *Tandon v. Newsom*, 517 F. Supp. 3d 922, 949 (N.D. Cal. 2021) (quoting *South Bay*, 140 S. Ct. at 1613 (Roberts, C.J., concurring)). Although "[t]his traditional 'police power' includes authority over compulsory vaccination …. ***It also includes, as a general matter, power to prohibit***

***vaccination from being compelled***." *Brnovich v. Biden*, 562 F. Supp. 3d 123, 157 (D. Ariz. 2022) (emphasis added).

The State, of course, can enact reasonable regulations without infringing on fundamental rights. *See Wiser*, 129 P.3d at 139; Doc. 119 at 24 (citing *Jacobson*, 197 U.S. at 22). Plaintiffs and Intervenor fail to distinguish why individual rights to privacy, free exercise, and bodily autonomy can all give way to the State's police power, but the right to seek health cannot. Doc. 118 at 17; Doc. 119 at 23–24.

It's the "sovereign's prerogative" to determine the public interest through reasonable exercises of the police power. *Wiser*, 129 P.3d at 139 (quoting *State v. Safeway Stores*, 76 P.2d 81, 86 (Mont. 1938)). While the State may require vaccinations, *see Jacobson*, 197 U.S. at 22, enforce child labor laws, *see Prince v. Massachusetts*, 321 U.S. 158, 170–71 (1944), and regulate the medical profession, *see Wiser*, 129 P.3d at 139, that doesn't foreclose the State from exercising its police power to further interests beyond public health and safety—such as nondiscrimination. And contrary to Plaintiffs' arguments, Doc. 119 at 25, the State may advance interests under one aspect of its police power over other aspects. Plaintiffs' own cases demonstrate this basic proposition. *See Crowder*, 81

F.3d at 1485 (antidiscrimination laws can trump public health laws). At bottom, the State—not Plaintiffs or Intervenor—determines the public interest at issue. *See Berman*, 348 U.S. at 32.

The State's police power encompasses reasonable nondiscrimination statutes like MCA § 49-2-312 to -313. As such, under controlling precedent, the right to seek health isn't implicated. *See Wiser*, 129 P.3d at 139.

Even if the Court subjects the law to more exacting scrutiny, the facts belie Plaintiffs' and Intervenor's case. *See* Doc. 92 at 34; Doc. 130 at 20–21. The facts show Montanans, including the Individual Plaintiffs, received healthcare services post-HB 702 without incident. Doc. 92 at 34. The right's guarantee is plainly met on these facts.[3]

Defendants are entitled to summary judgment on this claim.

**C. Equal Protection**

### *1. Intervenor and its members lack standing*

"[A]t the summary judgment stage, a plaintiff must offer evidence and specific facts demonstrating each element" of standing. *Ctr. for*

---

[3] As Defendants previously argued, Article II, § 3 doesn't confer an affirmative right to a specific course of treatment free of regulation. Doc. 130 at 16.

*Biological Diversity v. Exp.-Imp. Bank of the U.S.*, 894 F.3d 1005, 1012 (9th Cir. 2018). Intervenor cannot demonstrate an injury-in-fact because HB 702 doesn't regulate nurses, it regulates employers and public accommodations. Only those "personally denied" equal treatment have a cognizable injury under Article III. *Braunstein v. Ariz. DOT*, 683 F.3d 1177, 1185 (9th Cir. 2012); *see also Interpipe Contr., Inc. v. Becerra*, 898 F.3d 879, 904 (9th Cir. 2018); *Kim v. Holder*, 603 F.3d 1100, 1104 (9th Cir. 2010).

Intervenor relies on one case to support its standing, *Summers v. Earth Island Inst.*, 555 U.S. 488, 494 (2009). But *Summers* is an *environmental* case involving a *procedural* injury. *See Citizens for Better Forestry v. United States Dep't of Agric.*, 341 F.3d 961, 971 (9th Cir. 2003) ("In NEPA cases, we have described [the] concrete interest test as requiring a geographic nexus between the individual asserting the claim and the location suffering an environmental impact. That is, environmental plaintiffs must allege that they will suffer harm by virtue of their geographic proximity to and use of areas that will be affected ….") (internal quotations and citations omitted); *accord Earth Island Inst. v. Pengilly*, 376 F. Supp. 2d 994, 1000 (E.D. Cal. 2005). The *Summers* plaintiffs

challenged Forrest Service regulations under the Administrative Procedure Act because the regulations exempted certain projects from notice and comment requirements. *Summers*, 555 U.S. at 490–91. In the environmental context a plaintiff can establish injury by simply alleging reduced recreational and aesthetic enjoyment. *See WildEarth Guardians v. United States Dep't of Agric.*, 795 F.3d 1148, 1155 (9th Cir. 2015); *cf. Nuclear Info. & Res. Serv. v. Nuclear Regul. Comm'n*, 457 F.3d 941, 950 (9th Cir. 2006) (relaxed causation and redressability for National Environmental Policy Act cases).[4]

That unique standard doesn't apply to constitutional challenges. Neither Intervenor nor its members have standing.

### 2. Intervenor isn't similarly situated.

Intervenor cites no caselaw supporting its "similarly situated" status. It must show nurses at the exempted facilities are "arguably indistinguishable" from those at non-exempted facilities. *Engquist v. Or. Dep't*

---

[4] Intervenor's selective quoting of *Summers* neglects the Court's restatement of a key standing principle: "[W]hen the plaintiff is not himself the object of the government action or inaction he challenges, standing is not precluded, but it is ordinarily 'substantially more difficult' to establish." *Summers*, 555 U.S. at 493 (quoting *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 562 (1992)).

*of Agric.*, 553 U.S. 591, 601 (2008) (internal quotations and citations omitted); *accord Erickson v. Cnty. of Nev.*, 607 F. App'x 711, 712 (9th Cir. 2015). As discussed in Defendants' Response, Intervenor cannot show that the nurses—or the facilities at which they work—are similarly situated. *See* Doc. 130 at 11–14.

Even if Vicky Byrd's vague generalizations are taken as true, the nurses aren't similarly situated because the facilities they work at aren't similarly situated. *But see* Doc. 110 (Motion in limine to exclude Vicky Byrd testimony). The facilities aren't similarly situated because the State's statutory scheme regulates different types of facilities differently. *See Taylor v. San Diego Cnty.*, 800 F.3d 1164, 1169 (9th Cir. 2015); MCA §§ 50-5-101(7), (37), (56). Assisted living facilities, for example, follow a separate licensing and regulatory scheme under Title 50, which includes different licenses based on the populations served. *See* Doc. 130 at 4–5; Doc. 131 at 15–16. Finally, as discussed extensively by Defendants, nurses at the non-exempted facilities aren't even similarly situated amongst themselves. *See* Doc. 130 at 12–13.

## III. Conclusion

The Court should grant Defendants' Motion for Summary Judgment.

DATED this 30th day of September, 2022.

>Austin Knudsen
>Montana Attorney General
>
>DAVID M.S. DEWHIRST
>  Solicitor General
>
>CHRISTIAN CORRIGAN
>  Deputy Solicitor General
>
>*/s/Brent Mead*
>BRENT MEAD
>  *Assistant Attorney General*
>P.O. Box 201401
>Helena, MT 59620-1401
>david.dewhirst@mt.gov
>christian.corrigan@mt.gov.
>brent.mead2@mt.gov
>
>*Attorneys for Defendants*

## CERTIFICATE OF COMPLIANCE

Pursuant to Rule Local Rule 7.1(d)(2), I certify that this brief is printed with a proportionately spaced Century Schoolbook text typeface of 14 points; is double-spaced except for footnotes and for quoted and indented material; and the word count calculated by Microsoft Word for Windows is 3,220 words, excluding tables of content and authority, certificate of service, certificate of compliance, and exhibit index.

/s/ *Brent Mead*
BRENT MEAD

## CERTIFICATE OF SERVICE

I certify that on this date, an accurate copy of the foregoing document was served electronically through the Court's CM/ECF system on registered counsel.

Dated: September 30, 2022         /s/ *Brent Mead*
BRENT MEAD