IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MONTANA
MISSOULA DIVISION

| | |
|---|---|
| MONTANA MEDICAL ASSOCIATION, et al., | CV 21–108–M–DWM |
| Plaintiffs, | |
| and | FINDINGS OF FACT and CONCLUSIONS OF LAW |
| MONTANA NURSES ASSOCIATION, | |
| Plaintiff-Intervenor, | |
| vs. | |
| AUSTIN KNUDSEN, Montana Attorney General, and LAURIE ESAU, Montana Commissioner of Labor and Industry, | |
| Defendants. | |

Neither legislation nor litigation arise in a vacuum.  No party questions the authority of the Montana Legislature and Governor to exercise their respective legislative or executive authority to enact or modify public health and anti-discrimination laws.  Rather, the challenge in this case stems from an ostensibly purposed anti-discrimination statute and its incongruent impact on healthcare providers and patients, hospitals, nursing homes, doctors' offices, immunocompromised individuals, and health care workers. The legislation was

1

enacted when varied political and individual concerns came to light around December of 2020 during a worldwide health crisis that caused millions of deaths, inundation of available hospital beds, exhausted and depleted equipment, and the need to deal with a remarkably lethal pathogen identified as COVID-19.  Federal, state, and local governments took various steps to try to minimize and thwart the consequences of the pandemic.  Simultaneously, individuals of different persuasions or views objected to COVID-19 vaccinations because the vaccines had been developed on seemingly short timelines or for religious or other reasons, including being against any vaccination.  For whatever reasons some objected to COVID-19 vaccination mandates and other recommended steps to minimize the terror of the pandemic, including business restrictions and imposed precautions affecting individual citizens.

It was in this social environment that the challenged statute was enacted. Whether by intent or by oversight the statute did not deal specifically with COVID-19 but instead encompassed all vaccines whether for measles, mumps, rubella, tetanus, diphtheria, pertussis, hepatitis, or flu.  The scope and breadth of the statute's application caused critical concerns for health care providers whether hospitals, doctors' offices or other medical facilities by limiting the ability of such providers to know the vaccination status of patients and employees.  The law preemptively precludes health care providers and other employers from knowing

the vaccination status of employees or patients if the employee or patient refuses to answer any inquiry about vaccination status or immunity passports. The statutes allow a question, but no one must answer. That situation, for any number of reasons, creates untoward problems for healthcare providers of any description in trying to protect the environment where services to patients are rendered and to prevent the spread of diseases.

In this case, as with many cases in litigation, there are ironies. The striking irony for the Court here stems from an acknowledgment of the role of Dr. Maurice Hilleman in the history of the development as well as the efficacy of vaccines. Dr. Hilleman is known as the "Father of Modern Vaccines." The irony is that Dr. Hilleman was born in Miles City, Montana, graduated from Montana State College in 1957 and was the most prolific vaccine scientist of the 20th Century. He is estimated to have saved more lives through vaccines he invented than any other medical scientist. Among the many vaccines he developed are hepatitis A and B, Haemophilus influenzae type B (Hib) pneumococcus, meningococcus, and varicella (chicken pox) and he was the first person to combine viral vaccines when he created the MMR vaccine for measles, mumps, and rubella. The importance and efficacy of vaccines is clear if only from the accomplishments of Dr. Hilleman,

3

and to put it in perspective, Dr. Hilleman's measles vaccines alone is credited with preventing almost a million deaths.[1]

It is in this context the present lawsuit arose. For the reasons set forth below, Plaintiffs are entitled to the limited relief requested.

A bench trial was held in this case to determine whether Montana's vaccination and immunity antidiscrimination statutes, Montana Code Annotated §§ 49–2–312 and –313,[2] offend the Supremacy Clause of the United States Constitution or the federal and state constitutional principles of equal protection or the protection of inalienable rights. Based on the evidence and testimony presented at trial and considering the applicable law and the parties' written submissions, the following findings of fact and conclusions of law are made pursuant to Federal Rule of Civil Procedure 52.[3] Having heard or read all of the evidence presented, I find that § 49–2–312 is unconstitutional and it is preempted by federal law. The defendants are permanently enjoined from enforcing § 49–2–312 in health care settings as more particularly stated in the conclusion of this Order and Opinion.

_____

[1] National Inventors Hall of Fame (2022).
[2] Because § 49–2–313's sole purpose is to except certain health care settings from the protections in § 49–2–312, unless otherwise noted, a reference to § 49–2–312 assumes discussion of both sections.
[3] The Joint Proposed Findings of Fact and Conclusions of Law, (Doc. 147), as well as the Agreed Facts included within the Final Pretrial Order, (Doc. 153), are incorporated herewith.

## JURISDICTION AND PROCEDURAL HISTORY

Jurisdiction is proper in this matter under 28 U.S.C. § 1331, providing federal-question jurisdiction, and 28 U.S.C. § 1367, providing supplemental jurisdiction. As previous orders in this case have held, Plaintiffs have standing to challenge the statute at issue.

Plaintiffs are health care professionals, health care facilities, and immunocompromised patients.  They include: (1) Institutional Plaintiffs—Providence Health & Services – MT ("Providence"), Western Montana Clinic, and Five Valleys Urology; (2) Provider Plaintiff—the Montana Medical Association; (3) immunocompromised Individual Plaintiffs—Pat Appleby, Mark Carpenter, Diana Jo Page, Wallace L. Page, and Cheyenne Smith; and (4) the Montana Nurses Association (the "Nurses") as Plaintiff-Intervenor (collectively "Plaintiffs"). Defendants are Austin Knudsen, in his official capacity as the Montana Attorney General, and Laurie Esau, in her official capacity as the Montana Commissioner of Labor and Industry (collectively "Defendants").

The lawsuit was filed on September 22, 2021.  The Nurses intervened as a matter of right under Federal Rule of Civil Procedure 24(a) on November 30, 2021. (Doc. 26.)  Plaintiffs claim that § 49–2–312 is preempted by federal law and is furthermore unconstitutional under both the Montana and United States Constitutions.  Following a hearing on March 18, 2022, a preliminary injunction

was granted against enforcement of § 49–2–312. (Doc. 53.)  Later separate

motions for summary judgment, (Docs. 81, 84, 91), were filed by all parties and

taken under advisement in anticipation of the bench trial, (*see* Doc. 152).

A three-day bench trial took place from October 24 to October 26, 2022.

The parties jointly agreed to treat each expert's Rule 26(a)(2) disclosure as the

witnesses' direct testimony subject to in court cross-examination.  Plaintiffs called

five expert witnesses—Dr. David King, Dr. David Taylor, Dr. Lauren Wilson, Dr.

Gregory Holzman, and Dr. Bonnie Stephens—and eight non-expert witnesses—

Mark Carpenter, Wallace Page (via Zoom), Diana Jo Page (via Zoom) (Individual

Plaintiffs), Megan Morris (on behalf of Plaintiff Western Montana Clinic), Vicky

Byrd (on behalf of Plaintiff-Intervenor), Kirk Bodlovic (on behalf of Plaintiff

Providence), Marieke Beck (on behalf of the Human Rights Bureau), and John

O'Connor (on behalf of Plaintiff Five Valleys Urology).  (*See* Doc. 158.)

Defendants called two expert witnesses, Dr. Jayanta Bhattacharya and Dr. Ram

Duriseti.  The parties also stipulated to submission of the declaration of Carter

Anderson (on behalf of the Montana Department of Health and Human Services)

as trial testimony and the deposition designations of Carter Anderson (on behalf of

the Montana Department of Health and Human Services), John Elizandro (on

behalf of the Montana Department of Labor and Industry), and Derek Oestreicher

6

(on behalf of the Montana Department of Justice).  *See* Fed. R. Civ. P. 32.  The

admitted trial exhibits are found in Doc. 159.

**BACKGROUND**

Defendants' primary contention is that in exercising the state's police

powers, § 49–2–312 protects Montanans from discrimination based on

inappropriate inquiry about vaccination status and protects individuals from the

involuntary disclosure of their private health care information.  Section 49–2–

312(1) prohibits persons and entities—with limited exceptions—from withholding

goods, services, or employment "based on the person's vaccination status or

whether the person has an immunity passport."  "Vaccination status" refers to "an

indication of whether a person has received one or more doses of a vaccine," while

"immunity passport" refers to a form or record "indicating that a person is immune

to a disease, either through vaccination or infection and recovery."  § 49–2–312(5).

School vaccination requirements remain, § 49–2–312(2), and "health care

facilities," as defined under § 50–5–101, are permitted to "ask [] an employee to

volunteer the employee's vaccination or immunization status" and may

"implement [] reasonable accommodation measures for employees, patients,

visitors, and other persons who are not vaccinated or not immune," § 49–2–312(3).

The term "health care facilities" as used in § 49–2–312(3) "does not include offices

of private physicians, dentists, or other physical or mental health care workers

7

regulated under [the Professions and Occupations Title], including licensed addiction counselors." § 50–5–101(26)(b).  Based on the trial evidence, that is where the rub lies: health care settings excluded from the exceptions in § 49–2–312(2) who are at risk if typical safety precautions are not implemented.

The statutes themselves neither prohibit nor mandate any specific vaccination, with the exception of school children who may still be required to get vaccinated.  § 49–3–312.  Section 49–2–313 then exempts licensed nursing homes, long-term care facilities, and assisted living facilities[4] (collectively "Exempted Facilities") from the requirements of § 49–2–312.  The Exempted Facilities exemption applies "during any period of time that compliance with § 49–2–312 would result in a violation of regulations or guidance issued by the centers for medicare and medicaid services or the centers for disease control and prevention [sic]."  § 49–2–313.  Violations of § 49–2–312 may result in criminal penalties. § 49–2–601.  A person or institution "who or which willfully engages in an unlawful discriminatory practice prohibited by this chapter . . . is guilty of a misdemeanor and is punishable by a fine of not more than $500 or by imprisonment for not more than 6 months, or both."  *Id.*

---

[4] "'Assisted living facility' means a congregate residential setting that provides or coordinates personal care, 24-hour supervision and assistance, both scheduled and unscheduled, and activities and health-related services."  § 50–5–101(7).

Notably, § 49–2–312 was not enacted exactly as drafted.  The Governor's lawfully exercised amendatory veto creates the constitutional problem.  The Montana Legislature passed House Bill 702 ("HB 702") and transmitted it to Governor Greg Gianforte on April 28, 2021, for his signature.  Governor Gianforte returned an amendatory veto of the bill to the Legislature on the same day with a letter communicating his appreciation for the Legislature's work along with a list of amendments.  (Ex. 100.)  He wrote, in part, that "[n]o person should be compelled to involuntarily divulge their personal health information as a condition of participating in everyday life."  (*Id.*)  He further declared that his amendments would ensure that the bill would "not put licensed nursing homes, long-term care facilities, or assisted living facilities" in violation of Centers for Medicare and Medicaid Services regulations,[5] and that health care facilities would not violate the bill by asking employees about their vaccination status for the purpose of providing an accommodation to protect the safety of unvaccinated or nonimmune individuals.  (*Id.*)  The Legislature incorporated Governor Gianforte's amendments

---

[5] Montana licensed nursing homes, long-term care facilities, and assisted living facilities are overwhelming funded by federal funding from the Centers for Medicare and Medicaid Services.

as suggested, they were codified as § 49–2–312(3)(b)[6] and § 49–2–313,[7] and

returned to Governor Gianforte for his signature.  *See* §§ 49–2–312, 313.

## SUMMARY CONCLUSION

Defendants argue that the Legislature, exercising its "police power," can

authoritatively classify § 49–2–312 as an anti-discrimination law.  The statute is

codified within the "Prohibited Discriminatory Practices" provisions of the Human

Rights Title, Title 49.  Despite this stated purpose, § 49–2–312 restricts

management in health care settings[8] from establishing vaccination status to assist

---

[6] "(b) A health care facility, as defined in 50-5-101, does not unlawfully discriminate under this section if it complies with both of the following:

   (i)   asks an employee to volunteer the employee's vaccination or immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases. A health care facility may consider an employee to be nonvaccinated or nonimmune if the employee declines to provide the employee's vaccination or immunization status to the health care facility for purposes of determining whether reasonable accommodation measures should be implemented.

   (ii)  implements reasonable accommodation measures for employees, patients, visitors, and other persons who are not vaccinated or not immune to protect the safety and health of employees, patients, visitors, and other persons from communicable diseases."

[7] "Exemption. A licensed nursing home, long-term care facility, or assisted living facility is exempt from compliance with 49-2-312 during any period of time that compliance with 49-2-312 would result in a violation of regulations or guidance issued by the centers for Medicare and Medicaid services or the centers for disease control and prevention [sic]."

[8] In this opinion, "health care settings" refers to all health care providers including Exempted Facilities, hospitals, health care facilities, and offices of private physicians.

with setting workplace policies or vaccination requirements regarding any vaccine-preventable disease.[9]   Section 49–2–312 also severely limits health care settings' ability to prevent or minimize the risk of spreading preventable infection during current or a future mass-infection or pandemic health crisis.

Plaintiffs proved at trial that vaccinations have been, and continue to be, a critical tool in the public health "toolbox" when creating a safe and effective health care environment.  (*See* Ex. 23 (Dr. Holzman and Dr. Wilson expert reports), Ex. 22 (Dr. Stephens expert report), Ex. 8 (Dr. Taylor expert report), Ex. 3 (Dr. Duriseti expert report).)  Vaccines approved by the Food and Drug Administration under either emergency use authorization or traditional approval processes are deemed to be scientifically safe and effective.  (Ex. 8 at ¶ 5.)  Even so, the resolution of this case does not turn on whether vaccines are safe and effective, but rather whether § 49–2–312 is preempted by federal law or is unconstitutional.  It is in both instances.

Plaintiffs seek a permanent injunction against Defendants from enforcing § 49–2–312 in health care settings on the grounds that it is:  (1) preempted by the Americans with Disabilities Act, the Occupational Safety and Health Act, and

---

[9] Vaccine-preventable diseases include measles, mumps, poliomyelitis, diphtheria, pertussis, tetanus, varicella, hepatitis B, pneumococcal, and Haemophilus influenzae type B and others.  When vaccine-preventable diseases are referenced, it is referring to these diseases, unless specifically noted otherwise.

Centers for Medicare and Medicaid Services regulations; (2) unconstitutional under the equal protection clauses of the Montana and United States Constitutions; and (3) unconstitutional under the inalienable rights section of the Montana Constitution.[10]

Defendants argued one specific issue or defense at trial—that Plaintiffs lack standing to bring these claims. Because Plaintiffs have standing, and § 49–2–312 is both preempted by federal law and violates the Montana and United States Constitutions, they are entitled to permanent injunctive relief against the enforcement of § 49–2–312 in health care settings.

## ANALYSIS

### I.     Standing

Defendants have repeatedly argued Plaintiffs lack standing to bring these claims. In the Court's January 25, 2022 Order, Plaintiffs were all determined to have standing based on the legal proposition that "the standing of one plaintiff was sufficient to encompass all plaintiffs." (Doc. 35 at 9–10 (citing *Carey v. Population Servs., Int'l*, 431 U.S. 678 (1977)); *see also Leonard v. Clark*, 12 F.3d 885, 888 (9th Cir. 1993) ("The general rule applicable to federal court suits with multiple plaintiffs is that once the court determines that one of the plaintiffs has standing, it

---

[10] Although presented as eight distinct claims, Plaintiffs' theories are treated in three analytical categories.

need not decide the standing of the others.").  Under this same analysis, nothing

persuades the Court that Plaintiffs no longer have standing.

## II.    Preemption

To begin, Plaintiffs argue that the Americans with Disabilities Act, the

Occupational Safety and Health Act, and the Centers for Medicare and Medicaid

Services regulations each conflict with, and therefore preempt, § 49–2–312.  The

Supremacy Clause of the United States Constitution instructs that a state statute is

preempted insofar as it conflicts with federal law.  *Crosby v. Nat'l Foreign Trade

Council*, 530 U.S. 363, 372 (2000) (analyzing U.S. Const. art. VI, cl. 2).  A conflict

occurs either "when it is impossible for a private party to comply with both state

and federal law" or where "under the circumstances of a particular case, the

challenged state law stands as an obstacle to the accomplishment and execution of

the full purposes and objectives of Congress."  *Id.* at 372–73 (alterations omitted).

The "ultimate task in any pre-emption case is to determine whether state regulation

is consistent with the structure and purpose of the statute as a whole."  *Gade v.

Nat'l Solid Waste Mgmt. Ass'n*, 505 U.S. 88, 98 (1992).

### A.    Americans with Disabilities Act

Here, Plaintiffs argue that the Americans with Disabilities Act preempts

§ 49–2–312 (Claims I and II).  To the extent that § 49–2–312 interferes with their

13

ability to follow employer and public accommodation requirements of the
Americans with Disabilities Act their position is compelling and correct.

The Americans with Disabilities Act states generally that "[n]o covered
entity shall discriminate against a qualified individual on the basis of disability."
42 U.S.C. § 12112(a). Discrimination can occur when an employer fails to make
"reasonable accommodations to the known physical or mental limitations of an
otherwise qualified individual with a disability who is an applicant or employee,
unless such covered entity can demonstrate that the accommodation would impose
an undue hardship on the operation of the business of such covered entity." *Id.*
§ 12112(b)(5)(A). "[N]otifying an employer of a need for an accommodation
triggers a duty to engage in an 'interactive process' through which the employer
and employee can" discuss possible reasonable accommodations. *Snapp v. United
Transp. Union*, 889 F.3d 1088, 1095 (9th Cir. 2018).

The Americans with Disabilities Act similarly prohibits public
accommodations from discriminating on the basis of disability: "No individual
shall be discriminated against on the basis of disability in the full and equal
enjoyment of the goods, services, facilities, privileges, advantages, or
accommodations of any place of public accommodation . . . ." 42 U.S.C.
§ 12182(a). A place of public accommodation includes a "health care provider," a
"hospital," or any "other service establishment." *Id.* § 12181(7)(F).

14

Plaintiffs proved that hospitals and offices of private physicians in some instances employ workers who are disabled as a result of being immunocompromised and that disabled, immunocompromised patients seek health care at these settings. Terry O'Connor, on behalf of Five Valleys Urology, testified that they have employed vulnerable staff who suffer disabilities related to an increased risk of harm from contracting a vaccine-preventable disease. Marieke Beck, on behalf of the Montana Human Rights Bureau, testified that cancer, as a disease that has an impact on an individual's major life activities, is considered a disability for the purposes of an Americans with Disabilities Act accommodation process. These factual findings trigger both the employer and public accommodations protections of the Americans with Disabilities Act.

As noted above, employers are required to engage in the interactive process and must consider an employee's request for accommodation, including immunocompromised or unvaccinated employees. *See Snapp*, 889 F.3d at 1095. Deprived by law of the ability to require vaccination or immunity status of an employee, a health care employer is not able to properly consider possible reasonable accommodations if an employee asks to limit his or her exposure to unvaccinated individuals. (*See* Beck Testimony.) It also creates an obstacle in fluid infection occurrences where unvaccinated employees or patients need to be isolated. While Defendants showed that neither vaccination nor immunity means

15

that an individual is incapable of spreading illness, they were unable to meaningfully demonstrate how employers can accommodate a disabled person or employee and still comply with § 49–2–312.

Similarly, public accommodations need to know this pertinent health information to ensure they are not discriminating against patients. Dr. Bonnie Stephens, the Chief Medical Officer for Community Medical Center in Missoula, Montana, testified that unvaccinated care providers should not treat vulnerable and immunocompromised patients in places such as the cancer care center setting because of the high risk of serious injury due to infection. (*See* Ex. 21 at 5.) Disabled immunocompromised patients are denied the "full and equal enjoyment of . . . services" if a health care provider is unable to accommodate a disabled patient's need to limit exposure to vaccine-preventable diseases in health care settings, a risk that stems from unvaccinated or immunocompromised employees. Therefore, to accommodate disabled immunocompromised patients' safety and health needs, a health care setting must be able to know the vaccination status of employees. Even if a health care setting is unable to limit a patient's exposure to non-immune staff, the setting still needs to know immunity or vaccination status of employees to offer protection and reduce the risk of exposure through other possible methods such as using specialized personal protective equipment or requiring physical distancing.

16

Defendants argue that because Plaintiffs did not prove they had documented, written accommodation requests, § 49–2–312 cannot be preempted. This contention misses the point. Plaintiffs do not need a written prima facie example of Americans with Disabilities Act discrimination to succeed in their preemption claim. The law has long held that if a state law conflicts with a constitutional federal law, the state law is "unconstitutional and void." *McCulloch v. Maryland*, 17 U.S. 316, 326 (1819); *see also Armstrong v. Exceptional Child Care Ctr., Inc.*, 575 U.S. 320, 338 (2015) (Sotomayor, J., dissenting) (noting "that States have no power to enact laws interfering with the operations of the constitutional laws enacted by Congress") (internal quotation marks omitted)). Despite this defense contention, Plaintiffs proved at trial that Institutional Plaintiffs, including Western Montana Clinic, received accommodation requests and Individual Plaintiffs, including Mary Jo Page, asked to be accommodated by being treated by vaccinated staff. While these requests were not written, they do not need to be. A verbal request still triggers the obligation of a health care facility to comply with the Americans with Disabilities Act. (*See* O'Connor Testimony.)

The exception for health care facilities outlined in § 49–2–312(3)(b) does not insulate the statute from being preempted by the Americans with Disabilities Act. Section 49–2–312(3)(b) excepts health care facilities from violation of the statute if it both asks an employee to "to volunteer the employee's vaccination or

17

immunization status for the purpose of determining whether the health care facility should implement reasonable accommodation measures to protect the safety and health of [persons] . . . from communicable diseases," § 49–2–312(3)(b)(i), and "implements reasonable accommodation measures for [persons] who are not vaccinated or not immune to protect the safety and health of [persons] from communicable diseases," § 49–2–312(3)(b)(ii).  This exception, which was added by Governor Gianforte in his amendatory veto of the original version of the bill, allows "health care facilities" to make accommodations for certain employees or patients.  But, the exception only protects those who are not vaccinated or immune. It does not allow for accommodations to be made for persons who have a disability, as is required under the Americans with Disabilities Act.  In this case, § 49–2–312(3)(b) does not save the entire statute from being preempted by federal law.

Courts generally do not "second-guess the public health and safety decisions of state legislatures acting within their traditional police powers." *Crowder v. Kitagawa*, 81 F.3d 1480, 1485 (9th Cir. 1996).  "However, when Congress has passed antidiscrimination laws such as the [Americans with Disabilities Act] which require reasonable modifications to public health and safety policies, it is incumbent upon the courts to [e]nsure that the mandate of federal law is achieved." *Id.*  Here, it is necessary for healthcare providers to comply with the congressional

mandate, and § 49–2–312 conflicts, and prevents those concerned from complying with the Americans with Disabilities Act.  Because of that conflict the Montana statute is preempted.  U.S. Const. art. VI, cl. 2.

**B.     Occupational Safety and Health Administration**

Plaintiffs next argue that the Occupational Safety and Health Act's general duty clause and implementing regulations also preempt § 49–2–312 (Claims III and IV).  *See* 29 U.S.C. § 654(a).  Defendants counter (focusing their argument on how § 49–2–312 relates to COVID-19) that because Plaintiffs cannot point to any specific instance where they have been cited for conflicting with Occupational Safety and Health Administration regulations, there is no conflict.  Plaintiffs are correct as to the statutory general duty clause but not as to the Occupational Safety and Health Act's implementing regulations.

The Occupational Safety and Health Act "requires that every employer provide a workplace that is 'free from recognized hazards that are causing or are likely to cause death or serious physical harm to his employees' . . . and 'comply with occupational safety and health standards promulgated' by the Occupational Safety and Health Administration.'"  *Flower World, Inc. v. Sacks*, 43 F.4th 1224, 1226–27 (9th Cir. 2022) (citing 29 U.S.C. § 654(a) ("general duty clause")).  "An 'occupational safety and health standard' is defined as 'a standard which requires conditions, or the adoption or use of one or more practices, means, methods,

19

operations, or processes, reasonably necessary or appropriate to provide safe or healthful employment and places of employment.'" *Id.* at 1227 (citing 29 U.S.C. § 652(8)). "The general duty clause applies when there are no specific standards." *Donovan v. Royal Logging Co.*, 645 F.2d 822, 829 (9th Cir. 1981). A workplace condition violates the general duty clause when three conditions are met: "(1) the employer failed to render its workplace free of a hazard which was (2) recognized and (3) causing or likely to cause death or serious injury." *Id.* at 829 (internal quotation marks omitted).

The Occupational Safety and Health Act only regulates workplace conduct. To be preempted by this Act, a state statute must regulate occupation-specific activity, not regular public health risks encountered by the general public and in workplaces. *See Nat'l Fed'n of Indep. Bus. v. Occupational Safety & Health Admin.*, 142 S. Ct. 661, 665 (2022). In *National Federation of Independent Business*, the Supreme Court held that an Occupational Safety and Health Administration rule requiring all employers with over 100 employees to mandate COVID-19 vaccination was outside the scope of the Administration's authority, reasoning that the generalized risk of contracting COVID-19 is not an occupation-specific risk when applied to all workplaces. *Id.* The Supreme Court did, however, recognize that COVID-19 regulation is permissible when "the virus

poses a special danger because of the particular features of an employee's job or workplace." *Id.*

Section 49–2–312 does not only regulate vaccination and immunity status related to COVID-19 but by its scope and breadth it also regulates any employer covered conduct regarding *all* vaccine-preventable diseases. Dr. Gregory Holzman, a former Montana State Medical Officer, testified that vaccines are necessary and important, and have historically been used in health care settings to limit or prevent the spread of disease. He testified this is not only a good public health practice that has been implemented consistently in Montana, but it is also nationally recognized by the Advisory Committee on Immunization Practices, which helps health care settings to guide policy regarding immunization and immunity for vaccine-preventable diseases.

Plaintiffs proved that vaccine-preventable diseases constitute recognized hazards in the workplace. (*See* Ex. 23 at 33–35; Dr. Holzman Testimony.) Dr. Holzman testified that health care settings must know the vaccination or immunity status of employees "to secure a safe workplace and protect patients." (Ex. 23 at 34.) Health care settings use vaccinations, along with other measures to protect against the spread of vaccine-preventable diseases and to reduce the risk of this recognized hazard in the workplace. (*Id.*) However, while there are other ways to slow the spread of vaccine-preventable diseases and protect workers, the

21

cumulative evidence Plaintiffs presented at trial demonstrates that vaccines are the single best way to do so. (*See* Exs. 23 (Dr. Holzman Report), 8 (Dr. Taylor Report).) Consequently, health care settings cannot comply with both the federal general duty clause to keep the workplace "free from recognized hazards" and § 49–2–312, because the Montana statute removes an essential tool from the health care provider's toolbox to stop or minimize the risk of spreading vaccine-preventable disease.

As proved at trial, before § 49–2–312, health care settings use vaccines in the workplace as a precaution to keep workers and patients safe from the risk of death or serious bodily injury because of vaccine-preventable disease exposure. *See also Biden v. Missouri*, 142 S. Ct. 647, 653 (2022) ("Vaccination requirements are a common feature of the provision of health care in America: Health care workers around the country are ordinarily required to be vaccinated for diseases such as hepatitis B, influenza, and measles, mumps, and rubella."); (Dr. Taylor Testimony).

Contrary to what Defendants argue, *National Federation of Independent Business* does not preclude the Occupational Safety and Health Act from preempting § 49–2–312 because the risk of vaccine-preventable disease is one that *is* specific to health care settings. In *Flower World* for example, the Ninth Circuit held that state mandates aimed at preventing the spread of COVID-19 in the

workplace were not preempted by the Occupational Safety and Health Act as applied to agricultural workers because the state mandates were construed as public health measures, not workplace-specific measures.  43 F.4th at 1232–33. Section 49–2–312 as applied to health care settings is different from the concerned places in *Flower World* because the workplace risks of exposure to vaccine preventable diseases experienced by employees in health care settings are distinct from those experienced by agricultural workers, or the public.  While the risk of exposure is not necessarily unique to health care settings, it is different from the public exposure because the risk is an inherent and immutable aspect of a health care worker's job.  Because vaccine-preventable diseases are recognized hazards and because § 49–2–312 significantly impacts the requisition of critical knowledge concerning risk assessment in those health care settings from protecting the workplace against such a hazard, the general duty clause of the Occupational Safety and Health Act preempts § 49–2–312.

Plaintiffs also contend that certain Occupational Safety and Health Administration regulations, specifically those relating to Hepatitis B, preempt § 49–2–312.  The Occupational Safety and Health Administration bloodborne pathogen rule requires employers protect workers against exposure to bloodborne pathogens, including Hepatitis B.  29 C.F.R. § 1910.1030.  This rule requires employers to make Hepatitis B vaccines available to workers who may be exposed

to blood, or other potentially infectious materials. That requirement necessitates employers knowing an employee's vaccination or immunity status. When an employee does not want to immunize themselves against Hepatitis B they are not required to do so, and the rule does not require the employer to require immunization, only to provide the option. In this circumstance, the Occupation Safety and Health Administration regulation does not conflict with nor preempt § 49–2–312. Defendants' argument is correct on this issue.

### C. Centers for Medicare and Medicaid Services

On March 18, 2022, a preliminary injunction was granted against enforcement of § 49–2–312 "as it relates to the COVID-19 vaccine . . . against all Montana health care facilities and individual practitioners and clinics subject to the [Centers for Medicare and Medicaid Services] Interim Final Rule for so long as the Interim Final Rule remains in effect." (Doc. 53 at 25.) Because the Interim Final Rule, and its guidance, is still in effect, § 49–2–312 remains preempted, as explained in that Opinion and Order. (*Id.*) Accordingly, that injunction is made permanent so long as the Interim Final Rule remains in effect (Claim VIII).

## III. Equal Protection

Plaintiffs next argue that § 49–2–312 violates the equal protection safeguards in both Article II, Section 4 of the Montana Constitution, and the

Fourteenth Amendment to the United States Constitution (Claims VI and VII).

Regarding the application of § 49–2–312 in health care settings, they are correct.

State and federal equal protection claims are evaluated in three steps:
(1) identification of classes involved and determination of whether they are
similarly situated; (2) determination of the appropriate level of scrutiny; and
(3) application of the appropriate level of scrutiny. *Gallinger v. Becerra*, 898 F.3d
1012, 1016 (9th Cir. 2018); *see also Hensley v. Mont. State Fund*, 477 P.3d 1065,
1073 (Mont. 2020). Because the Montana and United States Constitutions provide
similar protections, it is only necessary to consider one analytical framework for
both state and federal constitutional claims. *See Arneson v. Montana*, 864 P.2d
1245, 1250 (Mont. 1993) (explaining that both constitutions provide substantially
similar protections).

A.     **Similarly Situated**

At the first step, "[t]he groups must be comprised of similarly situated
persons so that the factor motivating the alleged discrimination can be identified."
*Ariz. Dream Act Coal. v. Brewer*, 855 F.3d 957, 966 (9th Cir. 2017) (internal
quotation marks omitted); *see also Hensley*, 477 P.3d at 1074 (explaining the
"similarly situated" analysis under the Montana Constitutional). The groups do not
need to be similarly situated in all respects, merely in "those respects that are
relevant to [the state's] own interests and its policy." *Ariz. Dream Act Coal.*, 855

F.3d at 966; *see also Nordlinger v. Hahn*, 505 U.S. 1, 10 (1992) ("The Equal

Protection Clause does not forbid classifications. It simply keeps governmental

decisionmakers from treating differently persons who are in all relevant respects

alike."). Plaintiffs identify three classifications that they claim are treated

differently in health care settings under §§ 49–2–312 and –313: (1) Exempted

Facilities; (2) hospitals[11] and (3) offices of private physicians. They argue that

these three classes are similarly situated in all relevant respects. They also argue

that by treating the classes differently, § 49–2–312 treats similarly situated patients

who access care, and similarly situated nurses who provide care at these settings

differently. Plaintiffs are right.

Each identified class, though not identically situated, is similarly situated in

all respects relevant to § 49–2–312. All these classes provide health care, in some

cases the same type of care, and in some cases in the same buildings. In the most

telling example, Institutional Plaintiff Providence's St. Joseph Medical Center in

Polson, Montana operates all three classes: a hospital, an Exempted Facility, and

---

[11] "'Hospital' means a facility providing, by or under the supervision of licensed physicians, services for medical diagnosis, treatment, rehabilitation, and care of injured, disabled, or sick individuals. Except as otherwise provided by law, services provided must include medical personnel available to provide emergency care onsite 24 hours a day and may include any other service allowed by state licensing authority. A hospital has an organized medical staff that is on call and available within 20 minutes, 24 hours a day, 7 days a week, and provides 24-hour nursing care by licensed registered nurses." § 50–5–101(31)(a).

an out-patient clinic.  Professional and other staff move in and about all three areas or classes of the facility freely.

These health care settings may be staffed by the same workers, even though the physical settings are treated differently under § 49–2–312.  For example, at St. Joseph's Medical Center, the same providers, nurses, doctors, even janitorial staff, may work in the hospital setting, the Exempted Facility setting, and the clinical setting.  (Bodlovic Testimony.)  In another example, physicians at Western Montana Clinic and Five Valleys Urology treat patients at the local hospitals, Providence St. Patrick Hospital in Missoula, Montana as well as in their private offices.  (Morris Testimony; O'Connor Testimony.)  The Nurses class represent members who work at each type of health care setting, their work at each setting is similar, if not identical, and not necessarily contingent on the care rendered.  (Byrd Testimony.)  The settings also all treat immunocompromised and elderly patients—in some cases the same patient may be treated in all three classes of health care settings.

What this shows is that Exempted Facilities, hospitals, and offices of private physicians are similarly situated health care settings.  Because Exempted Facilities

are not required to follow § 49–2–312 and the other two classes are, the similarly situated classes are treated differently under the statute.

## B.    Rational Basis Scrutiny

Having defined the relevant classes and determined that they are similarly situated, it is necessary to identify and then apply the appropriate level of scrutiny. The Equal Protection Clause of the Fourteenth Amendment states that no State shall "deny any person within its jurisdiction the equal protection of the laws." U.S. Const. amend. XIV, § 1; Mont. Const. art II, § 4 ("No person shall be denied the equal protection of the laws. Neither the state nor any person, firm, corporation, or institution shall discriminate against any person in the exercise of his civil or political rights on account of race, color, sex, culture, social origin or condition, or political or religious ideas."). This "is essentially a direction that all persons similarly situated should be treated alike." *City of Cleburne v. Cleburne Living Ctr., Inc.*, 473 U.S. 432, 439 (1985). To pass constitutional muster, a law must be, at the very least, "rationally related to a legitimate state interest." *New Orleans v. Duke*, 427 U.S. 297, 303 (1976). "The constitutional safeguard is offended only if the classification rests on grounds wholly irrelevant to the achievement of the State's objective." *McGowan v. Maryland*, 366 U.S. 420, 425 (1961). The party challenging the law has the burden to overcome the "strong presumption in favor of laws that are challenged under the rational basis test." *Id.* at 425–26; *see also*

*City of Cleburne*, 473 U.S. at 440 ("[T]he Constitution presumes that even improvident decisions will eventually be rectified by the democratic processes."). Strict scrutiny is applied when a statute classifies by race, alienage, or other suspect classes. *See Wygant v. Jackson Bd. of Educ.*, 476 U.S. 267, 279–80 (1986). "Under strict scrutiny the means chosen to accomplish the State's asserted purpose must be specifically and narrowly framed to accomplish that purpose." *Id.* at 280.

The government's police power is broad and provides almost unlimited authority to address "legitimate" interests over which to legislate. *See Berman v. Parker*, 348 U.S. 26, 32 (1954) ("Public safety, public health, morality, peace and quiet, law and order—these are some of the more conspicuous examples of the traditional application of the police power to municipal affairs. Yet they merely illustrate the scope of the power and do not delimit it."); *see Williamson v. Lee Optical of Okla., Inc.*, 348 U.S. 483, 489–90 (1955) (noting the government has a legitimate purpose when the purported purpose is to promote public health). A law fails to pass rational basis review when it serves no legitimate purpose or is patently irrational, that is when there is no logical connection between the laws' purpose and classification and its regulatory impact. For example, in *Romer v. Evans*, the Supreme Court held that a Colorado constitutional amendment prohibiting all state measures aimed at preventing discrimination based on sexual

orientation failed rational basis review.  517 U.S. 620, 632–35 (1996).  In that case

the Supreme Court found that the rationales for the amendment were "so far

removed from these particular justifications that we find it impossible to credit

them." *Id.* at 635.

A state law generally has a reasonable relationship to its stated purpose

unless the connection is deemed arbitrary or unreasonable.  In *City of Cleburne*, the

Supreme Court struck down a city ordinance that required group homes for

mentally disabled residents to get a special permit while other similarly situated

group homes did not.  473 U.S. at 435–50.  There, the Supreme Court found that

the stated interests of the ordinance, protecting the residents from harassing high

schoolers and protecting the structure against the potential of a "five hundred year

flood," did not "explain why apartment houses, fraternity and sorority houses,

hospitals and the like may freely locate in the area without a permit," *id.* at 450,

and that the government treated group homes differently from other buildings

based on an "irrational prejudice," and the rationale for the differential treatment

was "not at all apparent," *id.* at 446 (reasoning that "[t]he State may not rely on a

classification whose relationship to an asserted goal is so attenuated as to render

the distinction arbitrary or irrational").

Here, the parties agree that in measuring the constitutionality of § 49-2-312,

the rational basis test is the proper measure of review that applies to the hospitals

and office of private physicians' claims. (*See* Doc. 153 at 15.) The parties disagree as to whether a higher level of scrutiny must be applied to the Nurses' and the Individual Plaintiffs' claims. Ultimately, no decision is needed regarding the application of strict scrutiny, because § 49–2–312 is unconstitutional under rational basis review.

Montana's treatment of Exempted Facilities differently from similarly situated classes of other health care settings is irrational when the ostensible purpose of the law is to prevent discrimination. There are obvious differences. If § 49–2–312's purpose was to promote public health, not to prevent discrimination, this law may well pass rational basis review assuming a logical connection between purpose and impact. However, the purpose of this statutory scheme, as often repeated by Defendants, is to prevent discrimination based on actual or perceived vaccination and immunity status. Essentially the statute places an individual's vaccination choice on an elevated dais of importance compared to the public health and safety concerns normally linked to the exercise of the state's police power. The purpose here is not to protect the public health. This distinction is paramount. While there may be unidentified public health reasons to treat Exempted Facilities differently than other health care settings, there is no privacy reason to do so. Employees at Exempted Facilities have the same privacy rights as other health care employees. In fact, at times as discussed above, some of these

31

employees are the very same individuals working in all three types of health care

settings.  Defendants present no rational basis for "protecting" privacy rights in one

setting but not the other.  Just like in the *City of Cleburne*, it is "difficult to

believe" here that Exempted Facilities "would present any different or special

hazard" from Plaintiffs' health care settings.  Based on the evidence produced at

trial, there is no rational relationship between the statute's stated purpose and its

impact on different health care settings.

 Defendants argue that the Legislature has a rational basis to treat the three

classes of health care settings differently because the health care settings are

different and provide different types of care.  The argument is irrelevant to this

particular analysis.  Defendants rely on *Tucson Woman's Clinic v. Eden*, 379 F.3d

531 (9th Cir. 2004), *abrogated on other grounds by Dobbs v. Jackson Women's

Health Org.,* 142 S. Ct. 2228 (2022), to demonstrate why they think the Legislature

had a rational basis for treating similarly situated medical provider classes

differently.  In *Tucson Woman's Clinic*, physicians challenged an Arizona law,

enforced by the Arizona Department of Health Services, which treated abortion

providers differently based on the number of abortions they provided in a month.

*Id.* at 536–37.  The Ninth Circuit, applying rational basis review, held that the

Arizona law did not violate the physicians equal protection rights because although

"the scheme [was] unnecessary and stigmatize[d] abortion providers," it was

32

"facially related to health and safety issues," the purported legislative purpose of the statutory scheme. *Id.* at 546. This case is different from *Tucson Woman's Clinic* because although both laws may be "unnecessary," the Arizona law was facially and practically a public health law.

Here, Defendants did not prove or even convincingly argue that § 49–2–312 is "facially related to health and safety issues" thus providing a reasoned ground to find a rational basis for the law. Rather, at every turn throughout these proceedings, Defendants made clear that § 49–2–312's purpose is the protection of individual Montanans' privacy. Because there is no rational relationship between the stated privacy objective and the disparate treatment of the providers governed by §§ 49–2–312 and –313, this statutory scheme is unconstitutional. *See McGowan*, 366 U.S. at 425.

## IV.   Montana Constitution

Plaintiffs' final claim is that § 49–2–312 violates the Nurses' right to seek employment and Individual Plaintiffs' rights to seek health under the Montana Constitution (Claim V). Defendants counter that these rights are not implicated by § 49–2–312, and in the alternative if they are implicated, Montana may limit them. Defendants are correct to the extent any determination of the question is necessary for a decision in this matter.

Article II, Section 3 of the Montana Constitution provides that, "[a]ll persons are born free and have certain inalienable rights." These fundamental rights include "the right to . . . seek[] . . . safety, health and happiness in all lawful ways," as well as the right to pursue employment. Mont. Const. art. II, § 3; *Wadsworth v. Montana*, 911 P.2d 1165, 1172 (Mont. 1996) ("[W]e hold that the opportunity to pursue employment . . . is itself a fundamental right because it is a right without which other constitutionally guaranteed rights would have little meaning[.]" (cleaned up)), but they are limited by "the state's police power to protect the public health and welfare." *Wiser v. Montana*, 129 P.3d 133, 139 (Mont. 2006). As fundamental rights, when they are implicated, to regulate them the state must have a compelling interest to do so that is "closely tailored to effectuate only that compelling state interest." *Wadsworth*, 911 P.2d at 1174. However, "[t]he government need not demonstrate that a law survives strict scrutiny or any level of scrutiny where the movant fails to make out a prima facie case of a violation of its constitutional rights." *Netzer Law Office, P.C. v. Montana*, ___ P.3d ___, 2022 WL 16954817, at *6 (Mont. Nov. 16, 2022).

Here, the fundamental right to seek employment is not implicated because § 49–2–312 does not forbid people from pursuing a particular type of employment. *Wadsworth* and *Wiser* make clear that the state can exercise its police power to regulate employment. In *Wadsworth*, the Montana Supreme Court found that a

34

fundamental right to seek employment was implicated when a state law completely forbade a certain type of employment to a certain group of people. 911 P.2d at 1174. In *Wiser*, the same Court determined that the Montana Constitution protects a fundamental right to "pursue" a profession, not a fundamental right to do so "free of all regulation." 129 P.3d at 138. Here, as in *Wiser*, the statute is not forbidding a certain type of employment but rather making it difficult, and potentially dangerous, for immunocompromised workers to seek a certain type of employment. *See id.* at 139. Because Plaintiffs have not demonstrated the constitutional right to pursue employment is implicated sufficiently to make out a prima facie case, it is unnecessary to decide if strict scrutiny applies. *See Netzer Law Office, P.C.*, 2022 WL 16954817, at *6.

The right to seek health may also be implicated because § 49–2–312 makes it potentially dangerous for immunocompromised patients to seek health care where unvaccinated persons work, or where employees or professionals refuse to reveal their vaccination status for *any vaccination* involving a vaccine-preventable disease. Like the right to seek employment, "the right to seek health is circumscribed by the State's police power to protect the public's health and welfare." *Mont. Cannabis Industry Ass'n v. Montana*, 286 P.3d 1161, 1166 (Mont. 2012). Consistently, the Montana Supreme Court found that the right to health does not include "the fundamental right to use any drug, regardless of its legality,"

35

but it does include the "fundamental right to obtain and reject medical treatment." *Id.* In this case, the individual patients are not attempting to pursue a certain drug or type of treatment, but rather to pursue treatment at all. When getting treatment is risky or unsafe for a patient, the patient's right to obtain that treatment is implicated.

However, because Montana courts are currently considering similar issues, and because comity is implicated the Court will abstain. On November 14, 2022, in *Netzer Law Office, P.C. v. Montana*, the Montana Supreme Court affirmed the district court for the Seventh Judicial District of Montana finding that the right to seek health was not burdened by § 49–2–312. *See Netzer Law Office, P.C. v. Montana*, 2022 WL 412477 (Mont. Dist. Feb. 1, 2022). This determination was made at the preliminary injunction stage and plaintiff was a law firm, not health care providers and workers. Even so, the case raised important questions properly considered first by Montana courts. Additionally, it is not necessary to reach a resolution on this issue as the case can be decided on preemption and equal protection grounds.

## V.    Permanent Injunction

Plaintiffs seek permanent injunctive relief enjoining Defendants from enforcing § 49–2–312 in health care settings. To be entitled to a permanent injunction, Plaintiffs must demonstrate: (1) actual success on the merits;

36

(2) irreparable injury; (3) remedies available at law are inadequate; (4) the balance of hardships justify a remedy in equity and the public interest would not be disserved by a permanent injunction. *Edmo v. Corizon, Inc.*, 935 F.3d 757, 784 (9th Cir. 2019); *Nken v. Holder*, 556 U.S. 418, 435 (2009) ("[T]he traditional stay inquiry calls for assessing the harm to the opposing party and weighing the public interest. These factors merge when the Government is the opposing party."). They have done so.

First, as explained above, § 49–2–312 is preempted by federal law and unconstitutional as applied to health care settings. Thus, Plaintiffs have demonstrated actual success on the merits.

Second, by demonstrating that § 49–2–312 is unconstitutional, Plaintiffs have established an irreparable injury. *Monterey Mech. Co. v. Wilson*, 125 F.3d 702, 715 (9th Cir. 1997) (finding that constitutional violations constitute irreparable harm, especially when they cannot be remedied by awarding damages). Plaintiffs have also shown that the Nurses have experienced a hazardous work environment resulting from a heightened risk of serious injury and death due to snags cause by § 49–2–312. Individual Plaintiffs Mary Jo Page and Mark Carpenter also proved irreparable harm by showing that as immunocompromised patients, they had no choice but to go to their required health care appointments but

were exposed to unnecessary risk due to § 49–2–312's prohibition precluding institutional knowledge about vaccination or immunity passport status.

Third, Plaintiffs proved that the remedies at law are inadequate. "When enforcement actions are imminent—and at least when repetitive penalties attach to continuing or repeated violations and the moving party lacks the realistic option of violating the law once and raising its federal defenses—there is no adequate remedy at law." *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). Accordingly, because Plaintiffs would need to either violate § 49–2–312 or be harmed by it before attempting to recover some remedy at law, there is no viable remedy available.

Fourth, the balance of equities and the public interest weigh in favor of permanently enjoining enforcement of § 49–2–312 in health care settings. In balancing the equities, considerations include whether "the impact of an injunction reaches beyond the parties, carrying with it a potential for public consequences." *Boardman v. Pac. Seafood Grp.*, 822 F.3d 1011, 1023–24 (9th Cir. 2016) (internal quotation marks omitted). While "[t]he public interest may be declared in the form of a statute," *Golden Gate Rest. Ass'n v. City & Cnty. of S.F.*, 512 F.3d 1112, 1126 (9th Cir. 2008) (internal quotations marks omitted), "it would not be equitable or in the public's interest to allow the state to violate the requirements of federal law, especially when there are no adequate remedies available," *Ariz. Dream Act Coal.*,

757 F.3d at 1069 (internal quotation marks and alteration omitted).  Further, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Melendres v. Arpaio*, 695 F.3d 990, 1002 (9th Cir. 2012) (internal quotation marks omitted).

The public has a serious interest in a permanent injunction prohibiting enforcement of § 49–2–312 in health care settings.  To protect and support public health, individual rights "are subject to such reasonable conditions as may be deemed by the governing authority of the country essential to the safety, health, peace, good order, and morals of the community." *Jacobson v. Massachusetts*, 197 U.S. 11, 26 (1905).  The Supreme Court continues that "[e]ven liberty itself, the greatest of all rights, is not unrestricted license to act according to one's own will." *Id.* at 26–27.  The state has the right and authority to protect individual liberty, as it purports to here, but in cases like this where doing so infringes on other Constitutional rights, such liberty is not unrestricted.  *See id.*  The public interest in protecting the general populace against vaccine-preventable diseases in health care settings using safe, effective vaccines is not outweighed by the hardships experienced to accomplish that interest.  Plaintiffs' constitutional injuries also tip the balance of equities and the public interest in favor of granting a permanent injunction.  *See Melendres*, 695 F.3d at 1002.

Accordingly, § 49–2–312 is permanently enjoined against enforcement in health care settings.  Section 49–2–312 is also permanently enjoined against all settings subject to Centers for Medicare and Medicaid Services' Interim Final Rule.  Because § 49–2–312 is enjoined, an injunction against § 49–2–313, the exemption statute, is unnecessary.

## CONCLUSION

For the reasons stated above, § 49–2–312 as applied is unconstitutional and preempted by federal law as applied in health care settings.  Accordingly,

IT IS ORDERED that the preliminary injunction (Doc. 53) is made permanent as to Claim VIII.  The Court finds by a preponderance of evidence in favor of Plaintiffs on Claims I, II, III, VI, and VII.  The Court finds for Defendants as to Claims IV and V.

IT IS FURTHER ORDERED that Defendants are permanently enjoined from enforcing Montana Code Annotated § 49–2–312 in health care settings.  Defendants are further enjoined from enforcing the law as it relates to the COVID-19 vaccine against all health care facilities and individual practitioners and clinics subject to the Center for Medicare and Medicaid Services Interim Final Rule so long as that Rule remains in effect.

IT IS FURTHER ORDERED that the parties' motions for summary judgment (Docs. 81, 84, 91) are terminated as moot.

40

IT IS FURTHER ORDERED that the Clerk is DIRECTED TO ENTER

JUDGMENT in accordance with these findings of fact and conclusions of law.

DATED this 9th day of December, 2022.

Donald W. Molloy, District Judge
United States District Court

41